**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------- x

UNITED STATES OF AMERICA             :

                                           :

    -v-                                   :        Hon. Sterling Johnson, Jr.

                                           :        11-cr-134-SJ-SG

CHAIM LEBOVITS, ET AL.,              :

                      Defendants.     :

                                           :

----------------------------------------------------------------------------x

### DEFENDANT MOSES NEUMAN'S MEMORANDUM OF LAW
### IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE
### <u>DERIVED FROM WIRETAP INTERCEPTIONS OF HIS CELLULAR TELEPHONE</u>

**HAFETZ NECHLES & ROCCO**
Susan R. Necheles
Joshua R. Geller
500 Fifth Avenue, Floor 29
New York, New York  10110
(212) 997-7595
snecheles@hnrlawoffices.com
jgeller@hnrlawoffices.com


*Attorneys for Defendant Moses Neuman*

October 14, 2011
New York, NY

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ....................................................................................................... 3

    A.  The Market for Life Settlements and STOLI Policies .................................................... 3

    B.  The Initial Wiretap Application ...................................................................................... 5

    C.  Subsequent Applications for Wiretaps and Search Warrants for Electronic Mail ........................ 16

ARGUMENT ............................................................................................................................ 18

    A.  Neuman's Intercepted Conversations Must Be Suppressed........................................... 19

    B.  Evidence From Wiretap Extensions And The Search Warrant for Moses Neuman's Text Messages And Emails Must Be Suppressed Because It Is Derived From The Initial Unlawful Wiretap Interception ....................................................................................................... 24

    C.  The Wiretapped Conversations Must Be Suppressed Because the Government Failed To Comply With The Minimization Requirement of Title III ......................................................... 26

    D.  Moses Neuman Joins In The Motions Of Co-Defendants To The Extent That Those Motions Are Applicable To Him .......................................................................................................... 30

    E.  CONCLUSION.............................................................................................................. 30

"CORRECTED" ALBRIGHT AFFIDAVIT……………………………………………………….Rider

## CASES

*Franks v. Delaware,* 438 U.S. 154 (1978) ............................................................................ 1,19, 21

*Gelbard v. United States,* 408 U.S. 41 (1972) ............................................................................ 18

*United States v. Giordano,* 416 U.S. 505 (1974) ................................................................... 24,25

*United States v. United States District Court,* 407 U.S. 297 (1972) ........................................ 18

*United States v. Bianco*, 998 F.2d 1112 (2d Cir. 1993) ...................................................... 19, 21

*United States v. Cox,* 462 F.2d 1293 (8th Cir. 1972) ................................................................ 28

*United States v. David,* 940 F.2d 722 (1st Cir. 1991) ......................................................... 25, 27

*United States v. Guadagna,* 183 F.3d 122 (2d Cir.1999) .......................................................... 22

*United States v. Lopez,* No. 99-79-P-C, 2000 WL 761977 (D. Me. Apr. 28, 2000), *aff'd,* 300 F.3d 46 (1st Cir. 2002) ................................................................................................................ 28, 30

*United States v. Padilla-Pena,* 129 F.3d 457 (8th Cir. 1997) ................................................... 28

*United States v. Rizzo,* 491 F.2d 215 (2d Cir. 1974) ................................................................ 27

*United States v. Wagner,* 989 F.2d 69 (2d Cir. 1993) ............................................................... 23

*United States v. Cale,* 508 F. Supp. 1038 (S.D.N.Y. 1981) ...................................................... 28

*United States v. Dupre*, 339 F.Supp.2d 534 (S.D.N.Y. 2004) .................................................. 22

*United States v. Goffer,* 756 F. Supp. 2d 588 (S.D.N.Y. 2011) ........................................ 27, 28

*United States v. Prada,* No. 90 Cr. 306–S–1 (KMW), 1991 WL 161323 (S.D.N.Y. Aug. 13, 1991) ........................................................................................................................................ 28

*United States v. Renzi,* 722 F. Supp. 2d 1100 (D. Ariz. 2010) ................................................ 28

*United States v. Salas,* No. 07 Cr. 557(JGK), 2008 WL 4840872 (S.D.N.Y. Nov. 5, 2008) .................... 27

*United States v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009)  18, 25,26,28,29

*Kramer v. Phoenix Life Ins. Co.,* 15 N.Y.3d 539 (N.Y. 2010) .................................................. 5

*Phoenix Life Ins. Co. v. Irwin Levinson Ins. Trust II,* No. 600985/08  (Supreme Court, New York County, Feb. 26, 2009) ......................................................................................................... 3

## STATUTES & RULES

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2522 ..............................................................................................................................*passim*

N.Y. Ins. Law. § 7518(a) ...................................................................................................................... 5

## ARTICLES

American Community Survey Reports, *Language Use in the United States: 2007*, http://www.census.gov/prod/2010pubs/acs-12.pdf .............................................................................. 27

Neil A. Doherty and Hal J. Singer, *The Benefits of a Secondary Market For Life Insurance Policies*, 2002 Wharton Financial Institutions Center, 4, http://knowledge.wharton.upenn.edu/papers/1125.pdf .......................................................................... 3

Charles Duhigg, *Late in Life, Finding a Bonanza in Life Insurance*, N.Y. Times, Dec. 17, 2006, http://www.nytimes.com/2006/12/17/business/17life.html.................................................................. 3,4

Matthew Goldstein, *Profiting From Mortality*, Businessweek, July 30, 2007, http://www.businessweek.com/magazine/content/07_31/b4044001.htm ........................................... 3,4

John Hoogesteger, *Berkshire Unit Lends $400M to Startup; Firm Buys Out Life Policies*, Minneapolis / St. Paul Business Journal, Feb. 1, 2002, http://twincities.bizjournals.com/twincities/stories/2002/02/04/story1.html......................................... 3

N.Y. Times, *How Spin-Life Works*, Dec. 16, 2006, http://www.nytimes.com/imagepages/2006/12/16/business/20061217_LIFE_GRAPHIC.html ........... 4

Leslie Scism, *Insurers Sued Over Death Bets*, Wall St. J., Jan. 2, 2011, http://online.wsj.com/article/SB10001424052748704543004576052190231428096.html .................. 5

Leslie Scism, *Regulators Rein In Murky Life Policies*, Wall St. J., June 21, 2010.................................... 4,5

Wall St. J., *Insurance Pipeline: From Senior Citizens to Hedge Funds*, June 21, 2010, http://online.wsj.com/public/resources/documents/info-enlargePic07.html?project=imageShell07&bigImage=P1-AV868_AGENT.gif&w=778&h=288&title=WSJ.COM&thePubDate=20100524................................ 4

In violation of the Constitution and the federal statutes governing wiretaps, the government wrongfully intercepted more than 7000 of Moses Neuman's private telephone conversations over the course of three months in 2010. The affidavits in support of the wiretap applications contained material misrepresentations and omissions of facts critical to the determination of probable cause, thereby misleading the issuing judge into issuing the authorizing orders.

Moreover, the government flagrantly failed to comply with the minimization requirements for wiretaps, failing to use interpreters contemporaneously and therefore taping and then distributing many of Mr. Neuman's calls which the government had no right to tape.

Due to the government's wrongdoing, Mr. Neuman respectfully moves, pursuant to 18 U.S.C. § 2518(10) and *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress the intercepted calls, and any evidence derived therefrom, including text messages and email messages obtained pursuant to search warrants, on the grounds that the evidence was obtained in violation of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2522.[1]

## I.    INTRODUCTION

Moses Neuman's intercepted calls and the evidence derived therefrom must be suppressed because the government's application for the wiretap order was supported by the affidavit of a law enforcement officer containing "deliberately or recklessly false statement[s]" and material omissions. *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  Because the government failed in its obligation of truthfulness to the court, its interception of Mr. Neuman's calls violated the Constitution and Title III.

The government submitted the initial wiretap application to District Judge Sandra L. Townes on January 11, 2010.  The support for this wire tap was the sworn affidavit of Postal Inspector Maria Albright (the "Albright Affidavit").[2]  The Albright Affidavit purported to fulfill Title III's requirement

---

[1] In addition to the calls intercepted over Mr. Neuman's cellular telephone, the government intercepted several calls over Avigdor Gutwein's telephone to which Mr. Neuman was a party.  With respect to these calls, Mr. Neuman is an "aggrieved person" under Title III, 18 U.S.C. § 2510(11), and joins Mr. Gutwein's motion to suppress these calls.
[2] The Albright Affidavit is attached as Exhibit A to the Declaration of Susan Necheles (the "Necheles Declaration").

that the government's application for a wiretap to provide a "full and complete" statement of fact establishing probable cause to believe that Mr. Neuman was using his cell phone in furtherance of one or more predicate offenses enumerated in 18 U.S.C. § 2516.[3]

We explain in section III(A) below that the government failed to comply with the requirements of the Fourth Amendment and Title III but instead presented the court with false statements and withheld material facts that were essential to the court's probable cause determination. Meaningful judicial review of wiretap applications is impossible when the government so flagrantly disregards its duty of full disclosure to the court. Thus, Mr. Neuman's intercepted calls and all evidence derived therefrom should be suppressed.

In section III(B) we explain that after obtaining the initial wiretap order and intercepting Mr. Neuman's telephone conversations for one month, the government used the same information provided in the original application, together with information obtained from the newly intercepted calls, to apply for and obtain two extensions of the wiretap order, as well as a wiretap on Avigdor Gutwein's phone, a search warrant for Moses Neuman's text messages, and a search warrant for the email accounts of Moses Neuman and Yudah Neuman. This evidence must be suppressed because it was derived from the initial unlawful interception.

In section III(C) we explain that in further violation of the requirements of Title III, the government abjectly failed to comply with statute's minimization requirements in executing the wiretap. For this reason, as well, this Court should suppress the intercepted calls.

Finally, in section III(D) we join in the motions of our co-defendants insofar as they are applicable to Moses Neuman.

---

[3] The government was also required to truthfully establish probable the necessity of resorting to a wiretap because less intrusive investigative techniques had failed or would be futile if tried. Mr. Neuman joins and incorporates by reference herein the necessity arguments advanced in Mr. Gutwein's motion to suppress.

## II.     STATEMENT OF FACTS

### A.  The Market for Life Settlements and STOLI Policies

Moses Neuman and his co-defendants are accused of participating in a fraudulent scheme related to the life settlement insurance business.  To understand Mr. Neuman's actions it is critical to have a general understanding of the life settlement industry and stranger-originated life insurance ("STOLI") policies, which are one facet of the life settlement business.

In a life insurance settlement transaction, an owner of a life insurance policy transfers his ownership of the policy to a purchaser in return for a payment.  The life settlement industry took off around the year 2000, when firms sprang up to purchase policies from insureds.[4]  These life settlement firms raised and invested significant capital to purchase and pay the premiums on third party  life insurance policies.  By 2006 the life settlement market was worth approximately $15 billion.[5]  In 2006, the New York Times reported that "[t]rading in life insurance policies held by wealthy seniors has quietly become a big business. Hedge funds, financial institutions like Credit Suisse and Deutsche Bank, and investors like Warren E. Buffett are spending billions to buy life insurance policies from the elderly."[6]

Even the life insurance companies, the same entities that created policies and sold them on the primary life insurance market, became involved in the life settlement business and were active in purchasing policies.[7]

---

[4] *See* Neil A. Doherty and Hal J. Singer, *The Benefits of a Secondary Market For Life Insurance Policies*, 2002 WHARTON FINANCIAL INSTITUTIONS CENTER, 4, http://knowledge.wharton.upenn.edu/papers/1125.pdf.. *See* John Hoogesteger, *Berkshire Unit Lends $400M to Startup; Firm Buys Out Life Policies*, MINNEAPOLIS / ST. PAUL BUSINESS JOURNAL, Feb.  1, 2002, http://twincities.bizjournals.com/twincities/stories/2002/02/04/story1.html.
[5] Matthew Goldstein, *Profiting From Mortality*, BUSINESSWEEK, July 30, 2007, http://www.businessweek.com/magazine/content/07_31/b4044001.htm.
[6] *See* Charles Duhigg, *Late in Life, Finding a Bonanza in Life Insurance*, N.Y. TIMES, Dec. 17, 2006, http://www.nytimes.com/2006/12/17/business/17life.html.  *See also Phoenix Life Ins. Co. v. Irwin Levinson Ins. Trust II*, No. 600985/08  (Supreme Court, New York County, Feb. 26, 2009) ("In 2006 alone, more than $12 billion in life insurance policies (measured by face value) were sold to purchasers in the secondary market such as Goldman Sachs & Co., Credit Suisse, and UBS AG.").
[7] *See Phoenix Life Ins. Co. v. Irwin Levinson Ins. Trust II*, No. 600985/08  (Supreme Court, New York County, Feb. 26, 2009) ("Phoenix itself created its own separate division, Phoenix Life Solutions, to participate in the life settlement market.").

As the life settlements market developed, a related market emerged for stranger-originated life insurance ("STOLI") policies.[8]  In a STOLI policy, the insured purchases life insurance using money loaned by an outside investor.  Typically, ownership of the policy is assigned to a trust, with a relative of the insured as the beneficiary.  The investor in the STOLI policy pays the premiums on the policy, which are typically large.  The outside investor is repaid when the policy is sold on the life settlement market, or – if the insured has died before the policy is sold – the beneficiary repays the investor.[9]

The market for STOLI policies developed in parallel with the life settlement market, and STOLI became big business by the mid-2000s.  In 2006, the New York Times reported that "Investors estimate that spin-life policies worth as much as $13 billion will change hands next year." [10]  A 2007 Businessweek article reported similarly large estimates of the STOLI market:  "[i]ndustry sources estimate that $10 billion to $20 billion in such policies have been created since 2004."[11]  The investors who purchased STOLI policies were the same institutional players that participated in the general life settlement market, such as hedge funds.[12]

Under New York state law, both STOLI policies and life settlements were perfectly legal.  In *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539 (N.Y. 2010), the New York Court of Appeals held that New York insurance law permitted a person to procure an insurance policy on his or her own life and immediately transfer it to someone without an insurable interest in that life, even where the policy was

---

[8] These policies are also known as investor-originated life insurance ("IOLI") and speculator-initiated life insurance ("SPIN-life").

[9] *See* N.Y. TIMES, *How Spin-Life Works*, Dec. 16, 2006, http://www.nytimes.com/imagepages/2006/12/16/business/20061217_LIFE_GRAPHIC.html.

[10] Duhigg, *Late in Life, Finding a Bonanza in Life Insurance*, N.Y. TIMES, Dec. 17, 2006, http://www.nytimes.com/2006/12/17/business/17life.html.

[11] Matthew Goldstein, *Profiting From Mortality*, BUSINESSWEEK, July 30, 2007, http://www.businessweek.com/magazine/content/07_31/b4044001.htm; *see also* Leslie Scism, *Regulators Rein In Murky Life Policies*, WALL ST. J., June 21, 2010,[11] ("billions of dollars of stranger-originated life insurance was sold to senior citizens between 2004 and 2008 with the intention of selling the policies to investors").

[12] WALL ST. J., *Insurance Pipeline: From Senior Citizens to Hedge Funds*, June 21, 2010, http://online.wsj.com/public/resources/documents/info-enlargePic07.html?project=imageShell07&bigImage=P1-AV868_AGENT.gif&w=778&h=288&title=WSJ.COM&thePubDate=20100524.

obtained for just such a purpose.[13]  *Kramer* also affirmed that an insured could purchase a policy on his own life with an intention to sell that policy on the life settlement market.

The reaction of the insurance companies to the life settlements and STOLI industries evolved.  At first, at least some insurance companies embraced the life settlement and STOLI businesses.  The Wall Street Journal reported that: "[w]hen hedge funds moved into [the STOLI business] around 2004 . . . many insurers did little double-checking of the financial information provided on applications and didn't drill down deeply about buyer's intentions in taking out the policies; they focused on medical underwriting, and some initially welcomed the influx in business, according to insurance-industry executives."[14]  Indeed, as discussed above, insurance companies themselves set up investment funds which purchased policies in the life settlements market, including STOLI policies.

However, when it came time for them to pay out policies, insurance companies began to challenge their validity.[15]  As insurance companies became opposed to life settlements and STOLI business, they began to revise their applications to pose specific questions regarding whether the purchasers of insurance policies intended to re-sell their policies on the life settlements market, or if a third-party investor, as opposed to the insured, was the actual purchaser of the policy.

### B.  The Initial Wiretap Application

The Albright Affidavit submitted in support of the application for authorization to intercept conversations on Moses Neuman's telephone (1) was based on stale information, all of which was at least six months old, and (2) did not contain facts that provided probable cause to believe that Neuman was involved in criminal activity.  To the contrary, the evidence about *Neuman,* as opposed to the evidence about *other people*, merely established that he was investing in STOLI policies.  However, the Albright

---

[13] 2010 amendments to the New York insurance law prohibited STOLI arrangements for policies entered into after May 18, 2010.  *See* N.Y. Ins. Law. § 7518(a).

[14] Leslie Scism, *Regulators Rein In Murky Life Policies*, WALL ST. J., June 21, 2010 (emphasis added), http://online.wsj.com/article/SB10001424052748704324304575306440620747882.html.  *See also* Scism, *Insurers Sued Over Death Bets*, WALL ST. J., Jan. 2, 2011 (discussing claims by investors in STOLI policies that insurers encouraged STOLI business to boost profits), http://online.wsj.com/article/SB10001424052748704543004576052190231428096.html.

[15] Scism, *Insurers Sued Over Death Bets*, WALL ST. J., Jan. 2, 2011,

Affidavit disguised its lack of probable cause to believe that *Neuman* was involved in criminal activity or would be discussing criminal activity over his phone by failing to tell the Judge critical information and instead making misleading and false statements. We describe below the statements contained in the section of the Affidavit entitled "Sources of Probable Cause" and explain the false or misleading nature of critical statements.

- *Allegations Concerning Wrongdoing By Liberty Planning*: Overall, the Affidavit told a story of a group of allegedly corrupt insurance agents associated with a company called Liberty Planning, Inc. ("Liberty Planning"). The first thing discussed in the "Sources of Probable Cause" section of the Albright Affidavit, which began in paragraph 11, was wrongdoing by Liberty Planning and its insurance agents. This discussion was lengthy - consuming four pages.

Thus, paragraph 11 of the Albright Affidavit began with a statement that for approximately six months (since the summer of 2009) the United States Postal Inspection Service had been investigating Liberty Planning, a general insurance agency located in Monsey, New York, for submitting fraudulent life insurance policies. This investigation began after the Postal Inspectors received a report of an internal fraud investigation conducted by ING Group, N.V. ("ING"), a life insurance company, which concluded that Liberty Planning had fraudulently induced ING to issue "a large number of multi-million dollar life insurance policies." The Affidavit continued, stating the following about Liberty Planning:

- ING entered into agreements with a number of licensed insurance agents, including agents affiliated with Liberty Planning, whom ING has approved to act as insurance agents on ING life insurance policies. The agents were supposed to find potential insureds and if ING approved an insurance application, the agent received a commission out of the premiums that the insured paid to ING. Affidavit ¶ 12.
- An investigation conducted by ING "uncovered facts indicating that Chaim Lebovits, Moses Schlesinger, a number of agents associated with Liberty Planning and others have been defrauding ING and other insurance companies by submitting applications containing false statements to induce the insurance companies to enter into life insurance contracts." Affidavit ¶ 12.
- ING's internal investigation revealed that Liberty Planning submitted insurance applications for at least fifteen people that involved Stranger Owned Life Insurance ("STOLI") and the applications contained "significant incorrect and/or misleading information." Affidavit ¶ 14.

- The Fifteen Insureds sought and obtained ING life insurance policies that totaled over $135,000,000.  Affidavit ¶ 14.
- ING investigated these applications and as a result of this investigation it terminated its relationship with five Liberty Planning agents due to their misconduct in submitting applications for STOLI policies that contained incorrect information.  None of these five agents cooperated with ING's investigation.  Affidavit ¶ 14.

This emphasis—in an Affidavit submitted in support of a wiretap of Moses Neuman's phone—on a company called Liberty Planning and the false applications submitted to ING by insurance agents associated with Liberty Planning created the impression that Agent Albright had evidence that Moses Neuman was a principal of Liberty Planning or an insurance agent associated with Liberty Planning and was involved in submitting the false life insurance applications.

This was utterly false.  Moses Neuman was *not* an insurance agent and did *not* work for or own Liberty Planning.  By failing to disclose these facts, the Albright Affidavit instead presented the false impression that Neuman was involved with the fifteen fraudulent insurance policies submitted by Liberty Planning.

- *Allegations Concerning Continuing Criminal Activity*:  The Affidavit also falsely created the impression that Neuman was involved in a *continuing* fraud that involved submitting false insurance applications and a continuing pattern of money laundering.  The Albright Affidavit repeated in two separate paragraphs that Albright had probable cause to believe that the mail fraud, wire fraud, and money laundering described in the Affidavit was not only committed in the past, but was being committed at the time that the Affidavit was submitted to the Court, and would continue to be committed in the future.  Affidavit ¶¶ 7, 4.  These statements had no factual basis.

The criminal activity referred to in the Affidavit was (1) filing false applications with insurance companies, and (2) money laundering.

With respect to the insurance applications, the Albright Affidavit failed to disclose that the ING applications that are discussed at length in the Affidavit were all filed eighteen months or more before the date of the Affidavit.  The Albright Affidavit contained generalized allegations about there being "other"

insurance applications filed with "other" insurance companies, but did not provide any specifics about any other fraudulent insurance applications, or allege any actual facts to establish that those applications were submitted more recently than the ING applications. Thus, Albright's claim that there was a continuing mail fraud scheme involving submitting false applications to insurance companies was contradicted by the facts that she knew - that the last insurance application occurred approximately 18 months prior to her submission of the Affidavit.

With respect to the money laundering, the Albright Affidavit alleged that the subjects and others had transferred money between themselves to "funnel the premiums paid and the profits earned from the scheme."[16] Affidavit ¶ 13. The Affidavit failed to disclose that the most recent of the transfers that Agent Albright identified in her Affidavit occurred six months prior to the date of the Albright Affidavit. Indeed, many of the transactions occurred in 2007 or 2008.

The failure to tell the Court that the allegedly false insurance applications were all submitted years earlier, and the transfers of money between the parties also ceased months before, appears to have been a deliberate omission, designed to hide from the reviewing Judge the staleness of the allegations concerning criminal conduct.

- *Allegation That All Insurance Companies Prohibited STOLI Policies:* The Affidavit additionally told the Court that stranger owned life insurance was prohibited by insurance companies, and by implication that STOLI policies could be obtained only by fraud. Thus, footnote three of the Affidavit stated, "Insurance companies in general, and ING in particular, will not knowingly issue life insurance policies to persons who are 'strangers' to the insured, that is, persons who have no interest in the continued health of the insured and to whom the insured is worth more dead than alive."

---

[16] The specific transactions identified were (1) Rocklyn Group, a company owned by Chaim Lebovits, paid $370,000 to Bold Associates, a company owned by Neuman, (2) Lebovits wire transferred $240,000 from his personal account to Bold Associates, (3) Bold Associates issued a check for $370,000 to Lebovits, (4) Liberty Planning transferred approximately $500,000 to Bold Associates, and (5) Avigdor Gutwein transferred $4,500,000 into Bold Associates. Affidavit ¶¶ 13, 27.

This statement falsely conveyed the impression that there was no legitimate way to invest in a STOLI policy because every life insurance company banned these policies. Therefore, if Neuman was investing in such a policy, or paying the premiums on such a policy, he was involved in criminal activity. As we explained above in the statement of facts, this was entirely untrue. In fact, there was a thriving and completely legal market in STOLI policies and publically available documents including newspaper articles and web reports were reporting on how profitable this investment could be. The Affidavit, however, did not inform the Court about any of this.

- *Allegations Concerning CI-1 and CI-2:* Finally, the Affidavit stated that the insureds for two of the fifteen applications mentioned in the ING report were now cooperating with the government. Affidavit ¶ 14. As to CI-1, the Affidavit did not allege *any* facts connecting Neuman to the allegedly false application submitted by him. As to CI-2, Morton Siegel, the Albright Affidavit stated the following:

1. *Siegel's Credibility*: First, Albright was aware that Morton Siegel and his accountant – CI-3, or Dan Halpern – historically were not truthful people. They apparently conspired together and lied to the government to hide their own misconduct, Siegel lied under oath in insurance applications, Halpern recruited Siegel for this scheme and assisted him, and Siegel lied to at least one doctor about his health. However, footnote five of the Albright Affidavit attempted to obscure these two individuals' lack of candor and to portray them as truth-tellers.[17]

Footnote 5 is 26 lines long. It vouches for the credibility of Siegel and Halpern, beginning by telling the Court that that neither of these individuals had criminal records, and both were expected to enter into agreements with the government to testify. It then conveys the false impression that these two told the government agents the truth from the very first time they were interviewed, stated that "CI-2

---

[17] The manner in which the Albright Affidavit disguised CI-2 and CI-3's prior lack of reliability illustrates the general manner in which the Affidavit attempted to create false impressions and bury the truth, while attempting to maintain the illusion of having disclosed everything to the Court.

agreed to cooperate when he was first interviewed by the United States Attorney's Office," that "both CI-2 and CI-3, when they were first interviewed by the government, provided evidence of Liberty Planning's fraud against ING with respect to the CI-2 life insurance policies," and that their statements about the fraudulent application were corroborated by documents.[18] After vouching for the credibility of these witnesses, finally on line 21 of footnote 5 the government admitted in passing that "each made false statements about their own involvement in the fraud in their initial interviews with the government...."

Thus, the willingness of these witnesses to lie for their own benefit was buried in line 21 of a 26-line footnote, and even then was brushed over, with no details about the false statements made by the witnesses, whether they conspired with each other to lie, how long those false statements continued, or whether the witnesses were threatened with prosecution before agreeing to cooperate with the government. The Albright Affidavit had to brush over problems with Siegel's credibility because, as explained further below, it relied so heavily on Siegel's uncorroborated, and sometimes disputed, statements.

2. *Siegel Was Approached By Grodsky To Submit An Insurance Application:* The Albright Affidavit stated that according to Siegel, in 2007 Siegel's accountant Halpern told Siegel that an accountant named Edward Grodsky "was looking for healthy elderly persons who were willing to purchase life insurance." Grodsky then spoke with Siegel and told Siegel that "(1) CI-2 could obtain life insurance since he was healthy and between the ages of 81 and 84; (2) 'investors,' whom Grodsky did not otherwise identify, rather than CI-2 himself, would be paying the premiums on this policy; (3) the policy would be resold after two years at which time CI-2 would be paid $2 million; and (4) CI-2 would be paid $500 per month until the policy was resold." Affidavit ¶ 15.

3. *Siegel Lied On His Insurance Application*: The Affidavit further stated that according to Siegel, Grodsky later told Siegel that his net worth would be inflated in the insurance application. Siegel's completed application was submitted by Liberty Planning and falsely stated that Siegel had not

---

[18] It is our belief that the documents do not provide any corroboration as to anything that Siegel said about Neuman, but instead merely corroborate that the confidential informants made false statements to the insurance companies.

had any discussions about reselling the policy and that the premiums were going to be paid from income and savings.  Affidavit ¶ 15.

The Affidavit does not mention, and appears to have deliberately omitted, the highly relevant fact that Agent Albright was not aware of any evidence that Neuman had any involvement whatsoever in *preparing* or *reviewing* the Siegel life insurance application that was submitted in 2008.[19]  The Affidavit also failed to inform the Judge that Siegel never even met or spoke to Neuman until *well after* Siegel submitted the false insurance application to the insurance company, and that Siegel never even intimated to Neuman that Siegel had included false information in his life insurance application until after Siegel began cooperating with the government.

*4. Companies Controlled By Neuman Paid The Premiums On Siegel's Policy*:  At Grodsky's direction, Halpern was made the trustee of Siegel's life insurance trust and the trust bank account issued checks for the premiums.  The trust's bank account was funded by companies that the Affidavit previously alleged were owned by Moses Neuman, or his brother Yudah Neuman - Blue Rock Group and Bold Associates.  Affidavit ¶ 13.  These companies had also, at unspecified times, received large sums of money from Chaim Lebovits, the General Agent at Liberty Planning, and Avigdor Gutwein, also a Liberty Planning agent.  Affidavit ¶ 13.

The Albright Affidavit failed to disclose that investing in STOLI policies was not illegal and therefore created the false impression that the fact that Neuman's company was paying these premiums was *per se* evidence that Neuman was involved in criminality.

*5. Scheme To Obtain False Doctor's Report*:  The Albright Affidavit further states that Siegel told Albright that in the summer of 2009, Moses Neuman and his associate Lenny suggested to Siegel that he go to the doctor and falsely say that he was suffering from vertigo and transient ischemic attacks ("TIA"), an illness.  When Siegel began cooperating he initiated thirteen consensual conversations with Neuman.  During some of these conversations, Siegel discussed this alleged scheme to create false

---

[19] We believe that Siegel conveyed this information to the government but that the Agent deliberately failed to include this fact in the Albright Affidavit.

doctor's reports.  The Albright Affidavit discusses these conversations about the scheme to create false doctor's reports at length.  Affidavit ¶¶ 19, 20.

The Albright Affidavit, however, fails to disclose two significant facts about this allegedly fraudulent doctor's report scheme: (a) even if this fraudulent scheme existed, it was not a fraud on the insurance companies, and (b) Siegel admitted in a taped conversation that he had told Neuman that he really did suffer from vertigo and TIA– an admission completely at odds with his claims that Moses Neuman and Neuman's associate, Lenny, dreamed up this illness and attempted to create phony symptoms:

a.  <u>Not A Fraud On The Insurance Companies:</u>  First, the Albright Affidavit created the false impression that the fraudulent doctor's reports that Siegel was attempting to create were intended to go to insurance companies, and therefore were part of the fraud on insurance companies. Footnote 11 stated that "the insurance agency receives a release from the insured to allow the agency to obtain and provide to the insurance company the insured's medical records."  Thus, the Albright Affidavit told the Court that the false doctor's records would be sent to the insurance company.

This was false.  The purpose of obtaining the medical report on Siegel was to determine how the value of Siegel's life insurance to prospective third party investors.  The doctor's reports were sought long after the insurance policy was obtained and therefore were not part of an application for such a policy, and were not supposed to go to ING or any other insurance company.

b.  <u>Siegel's Admission On A Tape Recorded Conversation</u>: Second, the Affidavit repeated Siegel's numerous uncorroborated statements that Neuman and Lenny instructed Siegel to lie to the doctor but failed to inform the Court that Siegel's statements were contradicted by statements made by both Neuman and Siegel during consensually recorded telephone calls.

Thus, the Affidavit repeated Siegel's claim that Neuman told Siegel that they wanted to resell the Siegel life insurance policy and that in order to get more money for the policy when it was resold, Siegel would have to appear to be unhealthy. Siegel therefore asserted that Neuman and Lenny told Siegel to go to the doctor and complain of a list of symptoms they provided to him which were supposedly symptoms of a serious illness called "TIA". Siegel further asserted that Neuman and Lenny told Siegel that before the doctor's visit Lenny would prepare "strong cups of coffee" for Siegel to drink in order to raise his blood pressure but that Siegel "became concerned that Lenny and Moses Neuman were trying to kill him to collect the full amount of the life policy on him." Affidavit ¶ 17.

The Albright Affidavit, however, failed to reveal that not only was there no corroboration for this fanciful story, but in fact a consensually taped conversation between Siegel and Neuman established that this story was a complete fabrication by Siegel. On November 3, 2009, Neuman told Siegel that (i) Neuman believed that Siegel *did* in fact have vertigo and TIA, and that (ii) Neuman's belief was based on Siegel having told this to Neuman. Siegel confirmed that this in fact was what occurred:

> Siegel: OK I just want to tell you, you know that - you're asking me as though you think the TIA was real. They were all made up. I had nothing to do with the TIA. You know that, that's - I was wondering why you asked me the question. Remember, Lenny came up with the TIA, he brought that into me. Hello?
> Neuman: Yeah, hello? I can't hear you. I'm in the basement over here.
> Siegel: Oh I'm sorry. No, I'm just saying that all the TI symptoms were made up. I, I didn't have that.
> Neuman: Oh, you don't have vertigo and TIA?
> Siegel: None of that. Well, I had a little vertigo about 2 years ago but I, we can't live with that because I don't have it anymore.
> Neuman: But I thought you told me you had it.
> Siegel: Well I did but I don't get up every day with vertigo.
> Neuman: No, not everybody with TIA and vertigo don't get up every day, whenever they get up.
> Siegel: Oh, well the last vertigo I had was about 2 years ago so -
> Neuman: Oh, I thought you just had it, I didn't realize ....

*See* transcript attached as Exhibit B to Necheles Declaration.

13

Clearly this was a significant admission by Siegel which directly contradicted the claim that Neuman was aware that Siegel was lying to the doctor about vertigo and TIA.  However, Albright chose to leave Siegel's admission out of her Affidavit, instead telling the Court the following about this conversation:

> When CI-2 stated that the TIA symptoms that Moses Neuman and Lenny told him to complain to the doctor about 'were all made up' and not 'real,' Moses Neuman stated that he (Moses Neuman) thought that CI-2 really suffered from those symptoms.  CI-2 reaffirmed to me after the phone call, that Moses Neuman was well aware that CI-2 did not have the symptoms about which Moses Neuman and Lenny told him to complain to his doctor

> Albright Affidavit ¶ 20.

The Albright Affidavit's failure to disclose Siegel's admission was materially misleading.

Making matters worse, the Albright Affidavit attempted to bolster Siegel's false story by misquoting a different consensually recorded conversation.  The Affidavit asserted that on October 29 in a consensually recorded conversation in which only Siegel's voice was recorded, Siegel called Moses and spoke with Moses about the time Siegel had gone to the doctor and "pretended to have the symptoms of TIA."   Affidavit ¶ 19.

The Affidavit's characterization of Siegel's statement inaccurately suggests that Siegel conveyed to Neuman that Siegel was lying or "pretending" when he discussed these symptoms with the doctor.  But Siegel did not tell Neuman anything about lying to the doctor or "pretending."  Instead, a transcript of the October 29 conversation establishes that Siegel said, "you know you told me that when I went to the doctor for the TIA and I had to pay personally, ...."  *See* transcript attached as Exhibit C to Necheles Declaration.  Thus, the Agent's allegation that on October 29 Siegel discussed with Moses Neuman "pretending" to have symptoms of TIA was untruthful.

Additionally, in this same October 29 conversation, the Affidavit claims that Siegel asked how the doctor's report turned out and "Moses Neuman responded in a disappointed tone that when he had ordered the records of CI-2's doctor visit, the records did not indicate that CI-2

suffered from TIAs but only that CI-2 reported to the doctor that he had suffered from TIA. Moses Neuman then stated that this result was not good enough and therefore nothing had changed. CI-2 replied that this was the best he could do." Affidavit ¶ 19.

This is the same tape on which Neuman's voice was not recorded, only Siegel's voice can be heard. The Affidavit is therefore entirely based on Agent Albright's recollection. However, this recollection is sharply contradicted by a tape recorded conversation that occurred between Neuman and Siegel on November 3.

On November 3 Siegel specifically asked Neuman what Siegel's doctor wrote in his report. The Albright Affidavit claimed that Neuman had said on October 29 that Neuman knew what the doctor's report said, and that it was disappointing in that it did not say that Siegel had TIA. However, on November 3, Neuman when asked by Siegel about the doctor's report, Neuman responded, "Well uh, to be honest I don't know how to read this doc - we ordered the records from the doctor and we sent them to an underwriter to read it because I don't know how to read it." Thus, Neuman told Siegel *he did not know what the doctor's records said about TIA* – exactly the opposite of what the Affidavit claims that Neuman said five days earlier, in a conversation that did not record Neuman's words. Again, the Albright Affidavit appears to contain a false statement about what Neuman said in an unrecorded conversation.

The Albright Affidavit then again attempted to link Neuman to Liberty Planning by stating that "the fact that Moses Neuman had access to CI-2's medical records shows that he either had some affiliation with Liberty Planning or obtained the records from some person who was affiliated with Liberty Planning." Affidavit ¶ 19 n. 11.

This too was a false statement. The medical exam that Siegel and Neuman were discussing had nothing to do with an application for an insurance policy. It occurred almost two years *after* Siegel obtained his insurance policy. Results of this medical exam would not have been given to the insurance company. Instead, the report would have been given to the Life

Settlement broker who was attempting to sell Siegel's policy. Therefore, contrary to the assertion in the Affidavit, the fact that Neuman obtained a copy of the exam did not show his connection to Liberty Planning. It merely showed that Neuman was an investor, attempting to sell Siegel's STOLI policy.

*6. Payments to Siegel:* Finally, the Affidavit quotes sections of the consensual recordings where Siegel repeatedly asked about the $500 per month that he was supposed to be paid and also asked about when his insurance policy would be sold and how much money he would receive. Affidavit ¶¶ 19, 20. Again, the Affidavit failed to disclose to the Court that there was an entire market in STOLI policies that was not illegal, and that Neuman's paying the premiums on Siegel's policy, agreeing with Siegel to share profits from the sale of his insurance policy, and providing Siegel with an advance on the expected profits, was completely consistent with the behavior of an investor in STOLI policies and was not, in and of itself, criminal.

- *Other Allegations In The Albright Affidavit:* The only other allegations in the Albright Affidavit concerning Moses Neuman are that pen registers had revealed that he had numerous conversations with other people who the Albright Affidavit named as "Subjects." Since the Affidavit had already made clear that these people were investors with Neuman in STOLI policies, this allegation did not add to the probable cause.

**C. Subsequent Applications for Wiretaps and Search Warrants for Electronic Mail**

After the January 11, 2010 wiretap application was approved, the government commenced secretly recording Moses Neuman's telephone conversations. The government applied for extensions of the wiretap on February 18, 2010 (the "Second Albright Affidavit") and March 19, 2010 (the "Third Albright Affidavit").[20] Included in the Second Albright Affidavit was a request to intercept the

---

[20] The Second and Third Albright Affidavits are attached as Exhibits D and E to the Necheles Declaration.

communications to and from a telephone subscribed to by Avigdor Gutwein.  Second Albright Affidavit ¶ 4(b).

The Second and Third Albright Affidavit incorporated by reference the original Albright Affidavit.  In addition to relying on the information provided in the original Albright Affidavit, the Second Albright Affidavit also relied upon information obtained from the recording of Moses Neuman's conversations pursuant to the original wiretap order.  For example, the Second Albright Affidavit discussed an intercepted February 3, 2010 call between Moses Neuman and an Abraham Grunbaum, who tells Mr. Neuman that he might have an investor interested in purchasing an ING policy on the life settlement market.  Second Albright Affidavit at ¶ 17.  Inspector Albright explained to the court that this intercepted call shows that "[t]he resale of the policies in the secondary market, as discussed in the [February 3, 2010] conversation, is an important aspect of the scheme."  *Id*.

These applications to continue to tape Neuman's phone and to also tape Gutwein's phone, were granted.  Thus, the successful applications for extensions of the wiretap were based both on the original Albright Affidavit, which was incorporated by reference, and on expanded theories of the alleged criminal scheme, based on conversations intercepted pursuant to the original wiretap order.

In addition, on February 5, 2010, the government applied for and obtained a search warrant for text messages from Moses Neuman's cell phone.  This application included many of the allegations from the original Albright Affidavit for a wiretap, as well as information from two intercepted calls pursuant to that original wiretap order.  Exhibit F to the Necheles Declaration (February 5, 2010 Affidavit in Support of Search Warrant).

Finally, on April 30, 2010, the government applied for an obtained a search warrant for the email accounts of Moses and Yudah Neuman.  The supporting application relied on information gained as a result of the wiretap, citing the intercepted calls of Moses Neuman and Arnold Cohen, who had become a subject of the wiretap investigation.  Exhibit G to the Necheles Declaration (April 30, 2010 Affidavit in Support of Search Warrant).

### III.     ARGUMENT

Title III established a "comprehensive scheme for the regulation of wiretapping and electronic surveillance," *Gelbard v. United States*, 408 U.S. 41, 46 (1972) (citing *United States v. United States District Court*, 407 U.S. 297, 301–06 (1972), by requiring the government to obtain advance approval for a wiretap by a neutral judicial officer.  18 U.S.C. §§ 2518(1) & (4); *see* 18 U.S.C. § 2510 note ("[I]nterception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.").

This regulatory scheme requires a Court order authorizing the wiretap which must be predicated on a finding of probable cause to believe that (i) the individual has committed or is about to commit one of the offenses specified by Congress in section 2516, (ii) communications concerning that offense will be intercepted, and (iii) the particular telephone or device being tapped is to be used in the commission of the crime or is commonly used by a person who committed or is committing the offense.  18 U.S.C. § 2518(3).  To permit fully informed review by the impartial judicial officer, Title III mandates that law enforcement provide the authorizing court with a "full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause as to the "particular offense" being investigated under Title III, 18 U.S.C. § 2518(1)(b)(i).

If the government fails to comply with these provisions are, Title III excludes from use in "in any trial, hearing, or other proceeding in or before any court" "any wire or oral communication [that] has been intercepted" in violation of Title III.  18 U.S.C. § 2515.  To enforce that prohibition, Title III authorizes an "aggrieved person" – an individual whose communications were intercepted, 18 U.S.C. § 2510(11) – to seek suppression of any communication that "was unlawfully intercepted" under Title III or the Fourth Amendment.  18 U.S.C. § 2518(10)(a).

Additionally, Section 2518(10)(a) requires suppression if the government violated Title III's minimization requirements. *See United States v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746, at *9–15 (E.D.N.Y. July 2, 2009).

## A. Neuman's Intercepted Conversations Must Be Suppressed

The recordings of Neuman's intercepted telephone calls must be suppressed because (a) the Albright Affidavit contained multiple false statements and material omissions and (b) Neuman has made "a substantial preliminary showing (i) that the false statement or omission was knowingly and intentionally, or with reckless disregard for the truth, included by the government in [the wiretap affidavit], (ii) that the information was material, and (iii) with the affidavit's false or omitted material aside, the affidavit's remaining content is insufficient to [satisfy the requirements of Title III]." *See United States v. Bianco*, 998 F.2d 1112, 1125–26 (2d Cir. 1993) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).

### a. The Government Failed To Provide A "Full And Complete" Affidavit That Truthfully Established Probable Cause

The Albright Affidavit created the impression that Agent Albright was aware of evidence that Moses Neuman (i) was an insurance agent or principal in Liberty Planning and participated in creating or submitting false applications to ING for at least fifteen insureds in order to defraud ING into unknowingly issuing STOLI policies, (ii) then conspired with individuals associated with Liberty Planning to illegally pay the premiums on one of these STOLI policies, and (iii) continued to defraud insurance companies by submitting false doctors reports. Furthermore, according to the Albright Affidavit, this crime of submitting false insurance applications in order to obtain illegal STOLI policies was an ongoing crime and there was probable cause to believe that the numerous conversations between

Neuman and others named as subjects in the Albright Affidavit were about this ongoing crime and would continue in the future.

This impression, however, was created by false statements and material omissions.  As explained above, the Albright Affidavit was pervaded with material false statements and omissions.  The false statements and omissions can be categorized as follows:

(1) Extensive discussion of Liberty Planning and allegedly false applications submitted by Liberty Planning coupled with a failure to inform the Court that Agent Albright had no evidence that Neuman (a) was a principal or insurance agent associated with Liberty Planning, (b) had any involvement with fourteen of the fifteen insureds who allegedly submitted false insurance applications through Liberty Planning, or (c) had been involved in creating or submitting *any* fraudulent insurance applications to an insurance company.  *See supra* at 6–7.

(2) Falsely creating the impression that any investment in a STOLI policy was illegal and failing to disclose that there was a booming *legal* market investing in STOLI policies, thereby falsely creating the impression that Neuman's payments for policy premiums were evidence of criminality.  *See supra* at 8–9.

(3) Omitting the dates that insurance applications were submitted to insurance companies and transfers of money were made to create false impression that the crimes of submitting false insurance applications to insurance companies and money laundering were ongoing and would continue into the future.  *See supra* at 7–8.

(4) Falsely creating the impression that the scheme to create false doctor's reports involved submission of false documents to insurance companies, failing to disclose (a) the significant problems with the credibility of CI-2, and (b) that CI-2's claim that Neuman was aware that CI-2 had lied to the doctor to create a false doctor report was contradicted by taped evidence,

and falsely stating that on a taped conversation Siegel told Neuman that Siegel had

"pretended" to have symptoms of illness.  *See supra* at 9–16.

### b. When The False and Misleading Statements Are Stripped Out of the Albright Affidavit the Remaining Content of the Affidavit Is Insufficient To Establish Probable Cause

This court must excise from the Albright Affidavit the false statements and supplement the

misleading statements with information that is necessary to make them not misleading, and then

determine whether the remaining information is sufficient to establish probable cause to believe that (a)

Neuman committed the crime of mail or wire fraud by deceiving the insurance companies with respect to

insurance applications, and (b) there would be discussions of this criminal conduct on Neuman's

telephone.  *See United States v. Bianco*, 998 F.2d 1112, 1125–26 (2d Cir. 1993) (citing *Franks v.

Delaware*, 438 U.S. 154, 155–56 (1978)).

A truthful Albright Affidavit would have stated the following:

- Neuman appeared to be the head of a group of people who had invested in STOLI policies. Some of the investors worked for Liberty Planning, a general insurance agent that submitted at least fifteen STOLI policies to ING which included fraudulent statements.  The agent did not know of any evidence that Neuman was involved in preparing or submitting any of those fraudulent policies.

- There was a widespread and entirely legal market that involved investing in STOLI policies.

- At the same time, sometimes the STOLI policies were obtained by committing fraud on insurance companies, and doing so was illegal.

- One of the policies in which Neuman invested was for an insured named Morton Siegel.  This was one of the policies submitted to ING by Liberty Planning that was obtained as a result of the insured making false statements to the insurance company.

- The agent did not know of any evidence that Neuman knew that this policy was obtained by means of fraud. In fact, the evidence established that if the policy was obtained by fraud, and if ING discovered this fraud, Neuman stood to lose hundreds of thousands of dollars that he had paid for premiums on the policy.

- Siegel also alleged that Neuman was involved in a different fraudulent scheme on potential purchasers of the insurance policies but there was no corroboration for that allegation and tape recorded conversations contradicted Siegel's allegation.

In the Rider which immediately follows this brief we set forth in detail how the allegations that were in the Albright Affidavit would appear in a truthful "corrected" affidavit.

These allegations, taken together, would *not* have provided probable cause to wiretap Neuman's telephone because they did not establish that it was more likely than not that Neuman was involved in illegal activity, or would be discussing illegal activity on the telephone. A truthful affidavit would not have provided probable cause to wiretap Neuman's phone for two reasons:

   i.    *There Was Not Probable Cause To Believe That Neuman Was Involved In Criminal Conduct*

Neuman's conduct of investing in Siegel's STOLI policy was *legal* if Neuman did not know that Siegel's policy was obtained by fraud. It was *illegal* if Neuman was aware and participated in causing Siegel's policy to be obtained by fraud. *See United States v. Dupre*, 339 F.Supp.2d 534, 540 (S.D.N.Y. 2004) (an "essential element" of wire fraud "is intent to defraud. The Government must prove that the defendant engaged or participated in a fraudulent scheme with an understanding of its fraudulent or deceptive character and with an intention to be involved in the scheme and to help it succeed with a purpose of causing actual financial harm to another.") (*citing United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999)).

An honest affidavit would have explained this essential fact to the reviewing Judge, and would have also explained that the Postal Inspector did not have any evidence that Neuman knew that the Siegel

policy was obtained by fraud, and that in fact Neuman stood to lose hundreds of thousands of dollars (the money he had paid for premiums) as a result of Siegel's fraud, and therefore it would not have made sense for Neuman to have knowingly participated in Siegel's fraud.

The *sine qua non* of whether Neuman's act of investing in the policies was illegal was evidence that he knew that the policies were illegally obtained. Because a truthful Affidavit would have made it clear that Agent Albright did not have any evidence that Neuman knew that Siegel's policy was obtained by fraud, there was not probable cause to believe that Neuman was involved in wire fraud or money laundering or that a wiretap of his phone would provide evidence of criminal activity.

ii.     *The Allegations Concerning Criminal Conduct Were Stale*

To satisfy Title III, an order authorizing a wiretap must be predicating on a finding of probable cause to believe not only that a person who commonly used the phone to be tapped had committed, or was committing a specified crime, but that "communications concerning that offense will be intercepted." 18 U.S.C. § 2518(3). A truthful affidavit would have revealed to the reviewing Judge that the factual allegations concerning fraudulent insurance applications and money laundering all involved conduct that occurred at least eighteen months earlier with respect to the submission of false applications to insurance companies, and six months earlier with respect to the transfers of money.

These allegations of criminal conduct were stale. The Second Circuit has explained that "[w]hile there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).

Here, there were no facts in the affidavit to support the allegation that the subjects of the investigation were continuing to file false life insurance applications and there was no reason to believe that eighteen months after the submission of the most recent false life insurance applications the

defendants would be discussing false statements in that life insurance application. Nor was there reason to believe that the subjects would be discussing monetary transfers that occurred six months previously.

The government may assert that this staleness was cured by the pen register evidence that the subjects continued to speak to each other. But this evidence merely showed that Gutwein and Neuman continued to speak, and that Neuman spoke with his wife, his brother, and his business partner on a regular basis. This is not evidence of continuing criminal conduct and does not cure the staleness problem of the Albright Affidavit.

Accordingly, the Albright Affidavit failed to set forth facts which established probable cause to believe that Neuman or anyone else would be discussing criminal conduct on the telephone.

Because the Albright Affidavit and its successors contained multiple material misrepresentations and omissions at the heart of the government's assertions of probable cause, suppression is required under both Title III and the Fourth Amendment.

**B. Evidence From Wiretap Extensions And The Search Warrant for Moses Neuman's Text Messages And Emails Must Be Suppressed Because It Is Derived From The Initial Unlawful Wiretap Interception**

Where communications are "unlawfully intercepted," section 2518(10)(a) provides for suppression not only of the intercepted communications, but also of "evidence derived therefrom." 18 U.S.C. § 2518(10)(a). Pursuant to this provision of Title III, the calls intercepted pursuant to subsequent wiretaps, including the calls intercepted on the Gutwein phone, which were authorized based on the Second Albright Affidavit, and the text messages seized pursuant to the February 5, 2010 order must be suppressed.

_Calls Intercepted Pursuant to Wiretap Extensions_:  In _United States v. Giordano_, 416 U.S. 505, 529–33 (1974), the Supreme Court held that "evidence derived" from an initial unlawful interception includes, of course, communications intercepted pursuant to subsequent applications that rely upon the initial submission and intervening wiretaps to establish probable cause. _Id_. Thus, all of Neuman's

wiretapped phone conversations, and all of the wiretapped conversations of Avigdor Gutwein, which were also derived from the initial unlawful interception of Neuman's calls, must be suppressed.

_Text Messages Seized Pursuant to February 5, 2010 Order:_  The government also relied on the Albright Affidavit's allegations and evidence obtained from the resulting wiretaps in Inspector Albright's February 5, 2010 affidavit in support of a search warrant for text messages sent or received over Moses Neuman's cell phone.  _See_ Exhibit F (February 5, 2010 Affidavit).  The affidavit for a search warrant of text messages relied on intercepted conversations indicating that Moses Neuman made use of text messages in transactions allegedly related to insurance policies, and argued that these intercepted conversations supported probable cause for a search warrant of the text messages.  _See_ February 5, 2010 affidavit at ¶¶ 16, 17.

The text messages seized in reliance on this affidavit must also be suppressed pursuant to _Giordano_.  In _Giordano_, in addition to the evidence obtained under wiretap extension orders which relied on unlawfully intercepted communications, discussed supra, the Court also considered pen register evidence which was obtained in reliance on the same unlawfully intercepted communications.  Despite the dissent's argument that "a pen register device is not subject to the provisions of Title III" but is governed by the Fourth Amendment, 416 U.S. at 553–54 (Powell, J., dissenting), the Court held that the pen register evidence must be suppressed because it was "tainted by the use of unlawfully intercepted communications." _Id_. at 512 n.2; _see also id_. at 533 n.19.

Like the pen register evidence in _Giordano_, the text messages here were seized pursuant to an order which relied on an affidavit "tainted by the use of unlawfully intercepted communications."  _Id_. Accordingly, the text messages seized pursuant to the February 5, 2010 order must be suppressed.

_Emails Seized Pursuant to April 30, 2010 Order:_ Like the affidavit in support of the application for the search warrant for Moses Neuman's text messages, the application seeking a search warrant for Moses Neuman and Yudah Neuman's email accounts relied on information gleaned from the conversations illegally intercepted pursuant to the original Albright Affidavit and the initial wiretap order.

In particular, the application cited as a basis for probable cause the intercepted calls between Moses Neuman and Arnold Cohen. *See* Exhibit G (April 30, 2010 Affidavit). The seized emails are therefore "evidence derived" from unlawfully intercepted wire communications and must be suppressed pursuant to section 2518(10)(a).

## C. The Wiretapped Conversations Must Be Suppressed Because the Government Failed To Comply With The Minimization Requirement of Title III

Key to Title III's individual privacy protections is its minimization provision, which dictates that every authorized interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). The statute further provides that "in the event any [] wire communications are conducted in a language other than English and/or are in code, and there is not reasonably available during the interception period an expert in the foreign language or code, minimization shall be accomplished as soon as practicable after such interception." *Id.*[21] Importantly, the latter provision "minimizes" by "restrict[ing] the *dissemination* of conversations the government has already intercepted, not the interception itself." *United States v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746, at *4 (E.D.N.Y. July 2, 2009) (citing Title III's legislative history) (emphasis in original). In other words, after-the-fact minimization is included in the statute as a stop-gap measure only, not as a substitute for compliance with the contemporaneous minimization requirement imposed by the statute in the first instance. *See United States v. David*, 940 F.2d 722 (1st Cir. 1991) (emphasizing that "[n]ormally, minimization is done extemporaneously and contemporaneously" and that any "after-the-fact minimization…must protect the suspect's privacy interests to approximately the same extent as would contemporaneous minimization").

A conversation is "intercepted" under the statute "when its content is either overheard or acquired by electronic recording." *Simels*, 2009 WL 1924746, at *3. Thus, "[b]y definition, an agent cannot minimize the *interception* of communications that should not be intercepted by intercepting all

---

[21]This language, along with other core Title III provisions, was incorporated directly into Judge Townes's order authorizing the wiretap. Order at 5.

communications and sorting them out later." *Id.* (emphasis in original). As we show below, minimization by "sorting [] out later" was precisely the government's *modus operandi* in this case. Accordingly, the government violated the minimization provisions of Title III, and the intercepted calls should be suppressed in their entirety.

On January 20, 2010, the first full day the wiretap was operational, the government intercepted 17 calls in which Yiddish was spoken, many of which were conducted entirely in Yiddish. *See* Session Detail Reports 12–62. As late as April 8, 2010, nearly three months after the wiretap was initially authorized, the government continued to intercept non-pertinent Yiddish calls in full, to be translated and evaluated for relevance at a later time. *See, e.g.*, Session Detail Report 6736.[22] The government presumably justifies this wholesale interception by contending that Yiddish speakers were not "reasonably available," 18 U.S.C. § 2518(5). But according to 2007 data from the U.S. Census Bureau, more than 120,000 Yiddish speakers reside in the New York metropolitan area. *See* American Community Survey Reports, *Language Use in the United States: 2007*, http://www.census.gov/prod/2010pubs/acs-12.pdf, at 14. It strains the bounds of credulity to conclude that in nearly three months, with the resources of the Department of Justice, the New York Department of Insurance, the IRS, the USPIS, and ICE all available, the government was unable to locate the two or three Yiddish speakers necessary to ensure that the wire was monitored at all times by individuals capable of contemporaneous minimization.

The government's complacency in this case is a far cry from the circumstances under which courts have found that after-the-fact translation passed muster under Title III. For example, in *David*, when submitting the wiretap authorization, the government was already actively working to locate agents who were capable of understanding modern Hebrew as it pertained to drug dealings. *Id.* at 730. Less

---

[22] Numerous non-pertinent Yiddish calls lasting longer than three minutes were recorded in their entirety for translation later. *See* Exhibit H to the Necheles Declaration (chart of examples of non-minimized calls). This is well over the two minutes necessary to determine whether a call is pertinent when monitoring contemporaneously. *See United States v. Salas*, No. 07 Cr. 557(JGK), 2008 WL 4840872, at *6 (S.D.N.Y. Nov. 5, 2008). Moreover, while two minutes is a general guideline, the interception of non-pertinent calls under two minutes remains highly troublesome when such calls involve personal matters and it is clear from the beginning of the calls that they are non-pertinent. *See United States v. Goffer*, 756 F. Supp. 2d 588, 594-95 (S.D.N.Y. 2011).

than three weeks later, the government had borrowed police officers from the Israeli government and had employed those officers to assist with the monitoring of the intercepted calls. *Id.* In *United States v. Padilla-Pena*, 129 F.3d 457 (8th Cir. 1997), agents acted reasonably when they sought out Spanish speakers immediately upon intercepting conversations conducted partly in Spanish, and had interpreters monitoring the wiretap two to three weeks after the wire was activated. *See id.* at 463-64. In *United States v. Cale*, 508 F. Supp. 1038, 1041 (S.D.N.Y. 1981), the government made a "herculean effort" to obtain Croatian translators to monitor the wire "almost at once." *Id.* And in *United States v. Lopez*, No. 99-79-P-C, 2000 WL 761977, at *7 (D. Me. Apr. 28, 2000), *aff'd*, 300 F.3d 46 (1st Cir. 2002), translators worked sixteen hours per day, seven days per week, to monitor all wiretapped conversations, despite the fact that many conversations on the wire took place in English. *Id.* at *7. No such reasonable steps were taken here.[23] Thus, the wiretap violated Title III's contemporaneous minimization requirement.

This leaves the question of the appropriate remedy. Title III provides for suppression of communications that are unlawfully intercepted, s*ee* 18 U.S.C. § 2518(10)(a), but the Second Circuit has not decided whether a violation of Title III's minimization requirement warrants total suppression of the wiretap, or merely suppression of the offending calls. *See United States v. Goffer,* 756 F. Supp. 2d 588, 594-95 (S.D.N.Y. 2011). There is appellate authority outside the Second Circuit that only non-pertinent communications should be suppressed. *See United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972). However, other courts (within this Circuit and elsewhere) have suppressed the intercepted communications in their entirety, reasoning that the minimization inquiry takes into account the conduct of the surveillance viewed as a whole. *See, e.g., United States v. Renzi*, 722 F. Supp. 2d 1100, 1118 (D. Ariz. 2010) (suppression of entire wiretap warranted for "unreasonable wholesale interception of calls"); *Simels,* 2009 WL 1924746, at *13-15. Here, the government's persistent and continuous flaunting of the minimization requirement throughout the 90-day period for which interceptions were authorized merits

---

[23] The government has the burden to show that it properly minimized intercepts. *See United States v. Rizzo*, 491 F.2d 215, 217 n.7 (2d Cir. 1974). In its only statement on the subject, the government noted that calls were recorded in their entirety when translators were "not available," but made no representations regarding any efforts to obtain such translators. *See* 6/28/11 Gov't Letter at 5.

suppression of the entire wiretap. *Cf. United States v. Prada*, No. 90 Cr. 306–S–1 (KMW), 1991 WL 161323, at *5 (S.D.N.Y. Aug. 13, 1991) (noting, in finding the government's minimization efforts reasonable, that they improved dramatically over the course of the investigation as agents became more knowledgeable about the case).

Moreover, particularly disturbing in this case is the government's carelessness with the recordings of the intercepted calls. On May 11, 2011, the Government produced Rule 16 discovery to the defendants. This discovery included all wire communications intercepted on Moses Neuman's phone pursuant to the wiretap orders, including conversations which should have been contemporaneously monitored and minimized by Yiddish speakers but were instead recorded in full. More than one month later, on June 28, 2011, the government sent a letter to all defendants in the case admitting that it had wrongfully produced Moses Neuman's "privileged and non-pertinent calls" to all the defendants in the case:

> The government, under cover of its May 11, 2011 discovery letter (the "May 11 Letter"), mistakenly made Disks 44 and 45, including the privileged and non-pertinent calls contained thereon, available to all of the defendants, instead of making the Neuman privileged and non-pertinent calls available only to Moses Neuman . . . .

6/28/11 Gov't Letter at 3. This egregious misstep further underscores the need for a full and comprehensive remedy. *See Simels*, 2009 WL 1924746, at *4 (noting that a primary goal of minimization procedures is to prevent later dissemination of non-pertinent calls).

"Nothing places the extraordinary intrusiveness of electronic surveillance in clearer relief than the recording of communications that bear no relationship to the criminal activity giving rise to the surveillance itself. All one has to do to appreciate the wisdom of Title III's stringent approval requirements is listen to a recording of a wholly innocent conversation that should never have been recorded." *Id.* at *11. So it is here. Among the non-pertinent communications intercepted in full by the government (and later distributed indiscriminately to all co-defendants) are calls pertaining to religious matters, real estate, conversations between husband and wife regarding a child, and numerous social conversations (by the government's own descriptions in its session detail reports). *See* Exhibit H (chart of

non-minimized calls).  These interceptions were an enormous invasion of privacy, resulting from the government's complete abdication of its statutory obligation to contemporaneously minimize.  We ask for the intercepted communications to be suppressed in their entirety, or at the very least, we request a hearing to determine how this gross failure occurred.[24]

**D.  Moses Neuman Joins In The Motions Of Co-Defendants To The Extent That Those Motions Are Applicable To Him**

We join in the motions of co-defendants to the extent that those motions are applicable to Mr. Neuman, and specifically join in the motions that have been filed by Chaim Lebovits for a bill of particulars, Avigdor Gutwein for suppression of illegally obtained evidence and other relief, and Yudah Neuman for the suppression of evidence derived from seized emails and for the issuance of an Order to compel pre-trial production of materials called for by subpoenas *duces tecum*.

## IV.  CONCLUSION

Wherefore, defendant Moses Neuman moves this Court (1) to suppress the evidence obtained from the Title III wiretaps and the search of his text messages and emails, (2) grant a bill of particulars, (3) suppress tapes obtained from wiretapping defendant Gutwein's phone, (4) dismiss the indictment, (5) issue an Order compelling production of materials called for by a subpoena *duces tecum*, and (6) for such other relief as is just and proper.

---

[24] Among other things, a hearing would be useful to clarify the government's notations on session detail reports, which are often confusing and contradictory.  *See Lopez*, 2000 WL 761977, at *7 (noting that brevity of line sheets and apparent inconsistencies are cause for concern).

Dated:  New York, New York
        October 14, 2011

                                        HAFETZ NECHELES & ROCCO

                                        s/Susan R. Necheles
                                        _____
                                        Susan R. Necheles
                                        Joshua R. Geller
                                        500 Fifth Avenue
                                        29th Floor
                                        New York, New York 10110§
                                        212-997-7595
                                        snecheles@hnrlawoffices.com
                                        jgeller@hnrlawoffices.com

                                        *Attorneys for Defendant Moses Neuman*

**- RIDER -**

**"Corrected" Albright Affidavit**

1.  There was a widespread market in which investors were investing in STOLI policies.  In order to do this, the investors encouraged people to obtain insurance policies, paid the premiums on the policies, and then resold those policies to other investors, mainly funds and life settlement companies. The insurance companies were very aware of this business and at times they participated in investing in third party life insurance policies, and at other times they attempted to prevent anyone from purchasing STOLI policies from them.

2.  Neuman invested in STOLI policies for himself and on behalf of others.  He did so by paying the premiums on insurance policies out of a company called Bold Associates.

3.  Over a two year time period, ending approximately six months before the date of the Affidavit, Chaim Lebovits and Avigdor Gutwein transferred substantial sums of money to a company controlled by Neuman.  This money was used to pay insurance policy premiums on STOLI policies.  Neuman also transferred money back to Lebovits in 2008.

4.  Lebovits is a principal of, and Gutwein is an insurance agent associated with a company called Liberty Planning.  An investigation by ING has revealed that Liberty Planning submitted STOLI insurance policies for fifteen individuals which contained false information.  The last such application was submitted approximately two years prior to the date of this Affidavit.

4.  One STOLI policy that Neuman is paying the premiums on is a $10 million policy that was taken out in the name of Morton Siegel.  The application that Siegel submitted in order to obtain this policy contained false statements, including a statement that Siegel did not intend to resell the policy, and false financial information about Siegel's assets.  There is no evidence that Neuman was aware that this policy contained these false statements and indeed Siegel is a cooperating witness with the government who has tape recorded Neuman on numerous occasions in order to obtain information helpful for a

1

criminal prosecution of Neuman.  Siegel in these conversations has not elicited any information that Neuman was aware of any false statements in Siegel's application.

5.  Neuman is, however, tied to a person who was instrumental in causing Siegel to make these false statements.  Siegel initially became involved in this fraudulent scheme because his accountant was approached by another accountant who he knew, named Edward Grodsky.  Grodsky told Siegel's accountant, and then Siegel, that if Siegel applied for a STOLI policy the premiums would be paid by investors, Siegel would receive $500 per month, and Siegel would make a profit when the policy was sold.  Grodsky later told Siegel that Siegel would have to lie about his finances on the application.

6.  Siegel's STOLI application also falsely stated that he had no intention to resell the policy. However, Siegel's agreement with Grodsky from the beginning was that Siegel would resell the policy. From the beginning Grodsky told Siegel that he would receive payment from an investor and that the investor would pay the premiums.  That investor turned out to be Moses Neuman.

7.  In the three months leading up to the date of this Affidavit, Grodsky and Neuman have spoken by phone on approximately 150 occasions.  Grodsky also confirmed in a consensually recorded conversation between himself and Siegel that he and Neuman "kind of work together."  However, Grodsky never said to Siegel that Neuman was aware that Siegel's application for an insurance policy contained false information.  Instead, Grodsky appeared to state that Moses Neuman and Yudah Neuman relied on the false information that Siegel provided in the insurance application, stating the following: "They don't, you know, everything's based on information you submitted in your application." (December 30 phone call between Siegel and Grodsky).

8.  Grodsky and Dan Halpern, Siegel's accountant, discussed in a consensually recorded conversation that in return for referring Siegel to the investors, they were supposed to be paid a commission out of whatever profit the investors made on the resale of Siegel's policy but that now the investors might lose all of their money on Siegel's policies. While Grodsky was talking with Halpern, Moses Neuman called Grodsky to say that Mort was "being sort of a pain in the ass."  (December 21 telephone call between Halpern and Grodsky).

2

9.   In a different conversation, Grodsky told Siegel that ING was trying to void the policies and that if ING voided the policy, the investors might lose all the money they had invested.  Grodsky stated that the investors had to pay the premiums.  Grodsky told Siegel that if the investors lost their investment this would not be Grodsky and Siegel's problem.  This conversation made it clear that only the investors were at risk, and that the other participants would not be harmed if the investors lost money on the Siegel policy, with one of the participants stating:  "And personally, I don't give a shit if the investor loses his money.  That's not my problem you know?  That was the risk the investor took.  Correct?"  (December 30 conversation between Grodsky and Siegel).

10.   Thus, the consensual recordings do not provide any evidence that Neuman knew that the Siegel policy was obtained by means of false statements, but instead establish that investing in a policy that was obtained by fraud placed the investor's substantial investment at risk, and that this risk fell entirely on the investors like Neuman.  Siegel and his accountant, on the other hand, would benefit from making false statements on the insurance application since these false statements would make it possible for them to earn money if and when the policy was resold.  And Siegel and his accountant Dan Halpern would not lose any money if ING discovered the fraud because they had not invested any money.  Thus, Siegel and Halpern had an incentive to make false statements on the policy applications without Neuman's knowledge.

11.   Siegel further alleges that Neuman and Grodsky were involved in another false scheme which involved attempting to obtain fraudulent doctor's reports in order to deceive potential purchasers of Siegel's insurance policy.  The tape recorded conversations corroborate that there was discussion between Neuman and Siegel about Siegel going to the doctor and telling the doctor that he suffered from vertigo and a disease called "TIA." The recorded conversations also corroborate that the reason for this doctor's report was that if Siegel was unhealthy, his insurance policy would sell for a higher amount.  This would benefit Siegel financially as well as Grodsky and Neuman and the other investors.

12.   Siegel has stated that Neuman and an individual named "Lenny", who is an associate of Neuman, were the ones who suggested this scheme to falsely state that Siegel had TIA.  Siegel further

claimed that Neuman and Lenny proposed creating false symptoms in Siegel by having him drink very strong coffee before he went to the doctor.

13. The tape recordings do not corroborate Siegel's claims that this scheme was initiated by Neuman, or that Neuman was aware that Siegel's statements to the doctor about TIA were false. In a tape recorded conversation between Neuman and Siegel on November 3, 2009, Neuman told Siegel that all that Neuman had wanted to Siegel to say to the doctor was "that you had vertigo and that you have the problems that you're having and we'll take it from there." Neuman said he would pay for Siegel's doctor's bill. Later in the conversation, Siegel told Neuman "I'm just saying that all the TI symptoms were made up. I, I didn't have that." Neuman responded with surprise, asking Siegel, "Oh, you don't have vertigo and TIA?" Siegel said he did not, but that he had had a little vertigo in the past but didn't have it any more. Neuman responded, "but I thought you told me you had it" and Siegel responded, "Well I did but I don't get up every day with vertigo."

14. Siegel made no attempt during his taped telephone conversation with Neuman to get Neuman to corroborate Siegel's story that Neuman had planned to attempt to cause Siegel to have false symptoms of TIA by giving Siegel very strong coffee just before Siegel went to the doctor.

15. Neuman's statements on the tape recording thus contradict Siegel's claim that Neuman knew that Siegel was lying to the doctor.

16. Siegel does not have a prior criminal record but he has lied to the government in the past, denying his involvement in conspiring with his accountant to submit false applications to the insurance company. He also lied under oath to the insurance company when he submitted the insurance forms. And he lied to the doctor when he told the doctor he had TIA.

17. Pen registers have revealed that there have been numerous telephone conversations between Neuman and other subjects of this investigation over the three months leading up to this affidavit, and specifically Lebovits and Gutwein, other investors in the STOLI policies, and Grodsky.