UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDNY Form May 5, 2008

- - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
CONTINUED INTERCEPTION OF WIRE
AND ELECTRONIC COMMUNICATIONS TO
AND FROM MOBILE TELEPHONE NUMBER
(917)    559-1800,    WITH    ESN
268435457600516523, SERVICED BY
SPRINT PCS, SUBSCRIBED TO IN THE
NAME OF MELISSA NEUMAN, 1181 44TH
STREET, BROOKLYN, NEW YORK 11219
(THE "SUBJECT 1800 TELEPHONE"),
AND THE CONTINUED INTERCEPTION
OF WIRE COMMUNICATIONS TO AND
FROM MOBILE TELEPHONE NUMBER
(347)    451-0546,    WITH    ESN
268435457311658314 SERVICED BY
SPRINT   AND SUBSCRIBED TO BY
AVIGDOR GUTWEIN, 1314 58TH
S=STREET, BROOKLYN, NEW YORK
11219  (THE  "SUBJECT  0546
TELEPHONE")

**A F F I D A V I T**

Misc. Docket No. 10-0007(SLT)

- - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

MARIA ALBRIGHT, a Postal Inspector of the United States Postal Inspection Service ("USPIS"), being duly sworn, deposes and says:

1.    I am a Postal Inspector of the USPIS, duly appointed according to law and acting as such.  I have been a Postal Inspector for approximately five and one half years and am currently assigned to a unit where I am tasked with investigating, among other things, fraud and money laundering offenses.  As such, I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct

E00000237

investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Among other duties, I am participating in an investigation relating to conspiracy, mail fraud, wire fraud and money laundering by MOSES NEUMAN, also known as MOISHE, YUDAH NEUMAN, also known as Lenny, MELISSA GOLDBERGER, also known as MELISSA NEUMAN, REUVEN SOBEL, LENNY LNU, EDWARD GRODSKY, AVIGDOR GUTWEIN, MOSES SCHLESINGER, CHAIM LEBOVITS, LIPSHITZ YEHUDA BRIZEL, *KENNY MAYER*, JEWEL STRADER, LEO FEKETE, ARNOLD COHEN, SOPHIA COHEN BRODSKY, DAVID LNU, ABRAHAM GRUNBAUM, *MYRNA ROBENO, MARTIN LIEBERMAN, RHODA LIEBERMAN, JOSEPH RIEGLER, BERNAT LEFKOWITZ, also known as Berish, LEVI KRAUS, ZALMEN LANDAU, YEHUDA BIKEL* and *SHIMSHON LNU* (the "SUBJECTS")[1] and others as yet unknown.

2. On January 11, 2010, as amended on January 19, 2010, the Honorable Sandra L. Townes, United States District Judge, Eastern District of New York, issued an order (the "Original Order") authorizing the interception of wire communications to and from (917) 559-1800, ESN 268435457600516523, serviced by Sprint PCS, subscribed to by MELISSA NEUMAN, 1181 44TH Street, Brooklyn, New York 11219 (the "SUBJECT 1800 TELEPHONE"). My affidavit, sworn

---

[1] Individuals whose names are italicized were added to the list of SUBJECTS since my First Renewal Affidavit dated February 18, 2010. The name of KENNY MAYER is italicized because, although he was identified previously as a SUBJECT, he was identified earlier only as KENNY LNU. I have since identified KENNY LNU as KENNY MAYER by obtaining subscriber information for the telephone over which KENNY LNU was known to speak.

3

to on January 11, 2010, and my Amended Affidavit, sworn to on January 19, 2010, in support of the application for the Original Order (collectively, the "Original Affidavit")[2], sworn to on January 20, 2010, are hereby incorporated by reference herein. On February 18, 2010, the Honorable Sandra L. Townes, United States District Judge, Eastern District of New York, issued an order (the "First Renewal Order") authorizing the continued interception of wire communications to and from the SUBJECT 1800 TELEPHONE, the interception of electronic communications to and from the SUBJECT 1800 TELEPHONE and the interception of wire communications to and from mobile telephone number (347) 451-0546, with ESN 268435457311658314 serviced by Sprint and subscribed to by AVIGDOR GUTWEIN, 1314 58TH Street, Brooklyn, New York 11219 (THE "SUBJECT 0546 TELEPHONE"). My affidavit, sworn to on February 18, 2010, in support of the application for the First Renewal Order, sworn to on February 18, 2010 is also hereby incorporated by reference herein.[3]

---

[2] The Affidavit was amended on January 19, 2010 to remove a typographical error which mistakenly listed the Drug Enforcement Administration as one of the Investigating Agencies and to add Immigration and Customs Enforcement ("ICE") as an Investigating Agency. Based upon the Amended Affidavit, the Court issued the Amended Order on January 19, 2010, incorporating the changes from the Amended Affidavit. Interceptions of wire communications to and from the SUBJECT 1800 TELEPHONE began at an ICE facility at JFK International Airport, located in the Eastern District of New York, on January 20, 2010.

[3] Interceptions of electronic communications to and from the SUBJECT 1800 TELEPHONE and of wire communications to and from the SUBJECT 0546 TELEPHONE commenced, respectively, on February 18 and February 19, 2010.

E00000239

4

3.   This application seeks authorization to continue to intercept the wire and electronic communications of the SUBJECTS and others involving offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving conspiracy, mail fraud, wire fraud and money laundering in violation of 18 U.S.C. §§ 371, 1341, 1343, 1349 and 1956 and 2 (the "SUBJECT OFFENSES"), among other crimes, that are being committed by the SUBJECTS and others as yet unknown.

4.   Based on the facts set forth below, there is probable cause to believe that:

(a)   the offenses set forth in paragraph 3 above are being committed and will continue to be committed by MOSES NEUMAN, also known as MOISHE, YUDAH NEUMAN, also known as Lenny, MELISSA GOLDBERGER, also known as MELISSA NEUMAN, REUVEN SOBEL, EDWARD GRODSKY, LENNY LNU, AVIGDOR GUTWEIN, MOSES SCHLESINGER, CHAIM LEBOVITS, LIPSHITZ YEHUDA BRIZEL, *KENNY MAYER*, JEWEL STRADER, LEO FEKETE, ARNOLD COHEN, SOPHIA COHEN BRODSKY, DAVID LNU, ABRAHAM GRUNBAUM, *MYRNA ROBENO, MARTIN LIEBERMAN, RHODA LIEBERMAN, JOSEPH RIEGLER, BERNAT LEFKOWITZ, also known as Berish, LEVI KRAUS, ZALMEN LANDAU, SHIMSHON LNU and YEHUDA BIKEL* (the "SUBJECTS") and others whose identities are presently unknown;

(b)   the particular wire and electronic communications of the SUBJECT INTERCEPTEES and others yet unknown concerning these offenses will be obtained through the continued interception of

E00000240

5

wire and electronic communications to and from the SUBJECT 1800 TELEPHONE and the continued interception of wire communications to and from the SUBJECT 0546 TELEPHONE)[4];

(c)  evidence of these offenses, including (I) the nature, extent, methods and locations of the herein-described criminal activities of the SUBJECTS and others; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities; (iii) the distribution and transfer of the money involved in these activities; (iv) the existence and location of relevant records; (v) the location and source of resources used to finance the illegal activities; (vi) the location and disposition of, and the financial transactions undertaken with, the proceeds of those activities; and (vii) the types and locations of items used in furtherance of those activities, will be obtained through the interception of wire communications occurring over the SUBJECT 1800 TELEPHONE and SUBJECT 0546 TELEPHONE and the interception of electronic communications over the SUBJECT 1800 TELEPHONE, which have been and are being used by the SUBJECT INTERCEPTEES in the commission of those offenses.  In addition, these wire and electronic communications are expected to constitute admissible evidence of

_____

[4] This Court has jurisdiction pursuant to 18 U.S.C. Section 2518(3) to authorize the interceptions because the SUBJECT TELEPHONES are being used in the Eastern District of New York, among other locations, and because the interceptions will take place in the Eastern District of New York.

E00000241

6

the commission of the above-described offenses.   The requested orders are sought for a period of time until the interceptions fully reveal the manner in which the above-described offenses are being committed, or for a period of 30 days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518.

5.  It is anticipated that during the requested wire and electronic surveillance, all monitoring will be performed or supervised by Postal Inspectors, Special Agents and Investigators (collectively, "Special Agents") of the USPIS, the Internal Revenue Service, Immigration and Customs Enforcement ("ICE") and the New York State Department of Insurance (collectively, the "Investigating Agencies") or other law enforcement officers assigned to this investigation, or employees or individuals operating under a contract with the government, all of whom will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interceptions.  It is requested that, if necessary, certain other individuals be authorized to assist in conducting this wire and electronic surveillance and to receive disclosure of intercepted communications.

6.  I personally participated in the investigation of the offenses referred to in paragraph 3 above, and from my personal participation in this investigation, reports made to me by other Special Agents, interviews with confidential informants and other witnesses and review of various documents obtained during the

E00000242

course of the investigation, I am familiar with the facts and circumstances of this investigation. Except where otherwise noted, the information set forth in this Affidavit has been provided to me by Special Agents of the Investigating Agencies, confidential informants and other witnesses and relevant documents. Because this Affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire and electronic communications, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause to conduct the requested wire and electronic surveillance. Where specific recorded conversations of SUBJECT INTERCEPTEES are described, they are set forth in part and in substance. Based upon this knowledge, I allege the facts contained in the paragraphs below to demonstrate that:

## SUBJECTS AND OFFENSES

7. There is probable cause to believe that the SUBJECT INTERCEPTEES and others yet unknown, have committed, are committing and will continue to commit the following offenses: (a) mail fraud; (b) wire fraud; (c) money laundering, (d) conspiracy to do the same, (e) blackmail, and (f) aiding and abetting these offenses, all in violation of Title 18 United States Code, Sections 371, 873, 1341, 1343, 1349, 1956 and 2.

### THE SUBJECT TELEPHONES

8.   There is probable cause to believe that the SUBJECT INTERCEPTEES and others whose identities are presently unknown will, over the SUBJECT 1800 TELEPHONE and the SUBJECT 0546 TELEPHONE, be communicating by wire, and, will, over the SUBJECT 1800 TELEPHONE, be communicating by electronic communication, including text messaging, during the period of interception, in furtherance of, in connection with, to facilitate, to accomplish and to commit the offenses described in paragraph 7 above.

### OBJECTIVES

9.   There is probable cause to believe that the interception of wire and electronic communications, the authorization for which is sought herein, will reveal: (I) the nature, extent, methods and locations of the herein-described criminal activities of the SUBJECT INTERCEPTEES and others; (ii) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in the illegal activities; (iii) the distribution and transfer of the money involved in these activities; (iv) the existence and location of relevant records; (v) the location and source of resources used to finance the illegal activities; (vi) the location and disposition of, and the financial transactions undertaken with, the proceeds of those activities; and (vii) the types and locations of items used in furtherance of those activities.   In addition, these wire and

electronic communications are expected to constitute admissible evidence of the commission of the above-described offenses.

## PRIOR APPLICATIONS

10. On January 11, 2010, as amended on January 19, 2010, the Honorable Sandra L. Townes, United States District Judge, Eastern District of New York, issued the Original Order authorizing the interception of wire communications to and from the SUBJECT 1800 TELEPHONE. A check of the ELSUR wire surveillance indices run by ICE as of January 5, 2010, revealed that, there have been no prior applications for wire, oral or electronic surveillance with respect to the SUBJECT 1800 TELEPHONE or the SUBJECT INTERCEPTEES then identified. No ELSUR check could be run on DAVID LNU at that time because the Investigating Agencies had no last name or other identifying information for DAVID LNU then. The new SUBJECT INTERCEPTEES identified in the First Renewal Affidavit were ARNOLD COHEN, SOPHIA COHEN BRODSKY, KENNY LNU and ARNOLD GRUNBAUM. A check of the ELSUR wire surveillance indices run by ICE as of February 17, 2010, revealed that there have been no prior applications for wire, oral or electronic surveillance with respect to the SUBJECT 0546 TELEPHONE or SUBJECT INTERCEPTEES ARNOLD COHEN, SOPHIA COHEN BRODSKY, and ABRAHAM GRUNBAUM. No check could be done of KENNY LNU since the Investigating Agencies have been unable to identify him in any way other than by his first name. The new SUBJECT INTERCEPTEES identified in the instant affidavit (the

E00000245

"Second Renewal Affidavit") are *MYRNA ROBENO, MARTIN LIEBERMAN, RHODA LIEBERMAN, JOSEPH RIEGLER, BERNAT LEFKOWITZ, also known as Berish, LEVI KRAUS, ZALMEN LANDAU, YEHUDA BIKEL, SHIMSHON LNU and KENNY MAYER,* the last of whom has now been identified as the SUBJECT previously identified only as KENNY LNU.  A check of the ELSUR wire surveillance indices run by ICE as of March 18, 2010, revealed that, there have been no prior applications for wire, oral or electronic surveillance with respect to *MYRNA ROBENO, MARTIN LIEBERMAN, RHODA LIEBERMAN, JOSEPH RIEGLER, BERNAT LEFKOWITZ, also known as Berish, LEVI KRAUS, ZALMEN LANDAU, YEHUDA BIKEL and KENNY MAYER.*  No check could be done of SHIMSHON LNU since, as of the present time, the Investigating Agencies have been unable to identify him in any way other than by his first name.

## SOURCES OF PROBABLE CAUSE
### BACKGROUND

11.  The government sets forth additional background evidence that was not set forth in my earlier affidavits.  MARTIN LIEBERMAN is an elderly individual whose wife is RHODA LIEBERMAN. LIEBERMAN currently has two life insurance policies in his name, one with Phoenix Life and the other with ING totaling $10 Million. RHODA LIEBERMAN is listed as the trustee on both of the MARTIN LIEBERMAN life insurance policies.  In ING's internal fraud investigation report, which it forwarded to the New York State Department of Insurance, ING stated that there were numerous

E00000246

material misrepresentations made on the MARTIN LIEBERMAN application including incorrect financial information. For example, LIEBERMAN claimed that he never filed for bankruptcy when in fact he filed for bankruptcy in 2005. In addition, according to ING, when ING, during its investigation, requested an interview with LIEBERMAN, LIEBERMAN failed to comply. As a result of the financial investigation being conducted by Special Agents of the Investigating Agencies, the government has learned that MOSES NEUMAN and YUDAH NEUMAN, MOSES NEUMAN's brother, are listed as the trustees on two of the four LIEBERMAN life insurance trust bank accounts. RHODA LIEBERMAN is listed as the trustee on the other two LIEBERMAN life insurance trust bank accounts.

12.   JOSEPH RIEGLER, another one of the Five Agents, See Original Affidavit ¶ 14, that is, RIEGLER is a Liberty Planning Agent who was terminated as a broker by ING for having submitted false and misleading information on insurance applications. Financial analysis to date has shown that Ador Mazal is a company controlled by MOSES NEUMAN that has engaged in many transactions in support of the life insurance scheme under investigation. A person called BERISH has, as seen below, been intercepted communicating with AVIGDOR GUTWEIN at the SUBJECT 0546 TELEPHONE about the insurance fraud scheme. BERISH has been identified as BERNAT LEFKOWITZ, a licensed insurance agent. Financial analysis to date demonstrates that LEFKOWITZ has paid approximately $400,000 to Bold

12

Associates.  Bold Assocaites is a company that has repeatedly been shown to have been used by the co-conspirators to funnel money to the various life insurance trusts that are supposed to be paying life insurance premiums to insurance companies without using investor money.  See, e.g., Original Affidavit ¶ 13.  LEFKOWITZ also paid GUTWEIN and two of GUTWEIN's companies over $1 million. Approximately $183,000 in checks have been sent back to LEFKOWITZ by GUTWEIN and these two GUTWEIN companies.

### Telephone Calls Over the Subject 1800 Telephone

13.  Since the interceptions of telephone calls over the SUBJECT 1800 TELEPHONE were continued under the First Renewal Order on February 18, 2010, through March 16, 2010 at 11:25 p.m. (The "1800 Covered Period"), there have been 94 telephone calls intercepted that appear to be pertinent to the fraudulent scheme being investigated.  The calls intercepted have provided additional evidence against some of the SUBJECTS identified in the Original and the First Renewal Affidavit and has helped to identify additional SUBJECTS.  The intercepted calls have also identified new criminal acts in furtherance of the fraudulent scheme.

14.  On February 22, 2010 at approximately 2:23 PM, MOSES NEUMAN ("MN") called a Doctor's office from the SUBJECT 1800 TELEPHONE and inquired about medical records for "a patient, Myrna Robeno."   MOSES NEUMAN, in attempting to obtain medical

E00000248

records for MYRA ROBENO, asked, "How should I go about ordering those records?"  He then stated that he had "a signed (UI) from the client" and that he would fax it to the doctor's office. The next day at approximately 1:28 PM, MOSES NEUMAN, using the SUBJECT 1800 TELEPHONE, contacted the same doctor's office and identified himself as "Josh" from "Global Life".  NEUMAN again inquired about the medical records and when he was told that the doctor had not even looked at the paperwork that "Josh" sent yesterday, he asked, "Can I still expect it today?  It is a really big decision we have to make…."  In these communications, I believe that MOSES NEUMAN was attempting to obtain medical records for ROBENO in preparation for selling her life insurance policy.  A life insurance policy was issued to ROBENO by Lincoln Financial Group on January 28, 2008 in the amount of $8 Million. In other words, the two-year contestability period had just expired and the policy could, at the time of the call, then be resold on the secondary market.  Based on calls previously intercepted over the Subject 1800 Telephone, I believe that Global Life Settlements is a company that facilitates the selling of these policies.

    15.  On February 23, 2010 at approximately 7:19 p.m., MOSES NEUMAN received a call at the SUBJECT 1800 TELEPHONE from a man who, during the call, was identified as "Martin".  The call was as follows:

14

Martin:      ...I just got a call from
             Lincoln Benefits….

MN:          Yeah Yeah. That's the problem
             one, the one that we're having
             a problem with about…

Martin:      Yeah, so they were looking for
             me and they were looking for
             Rhoda but uh, Rhoda said you
             know we're not here so he said
             alright he'll call back
             tomorrow, whatever.

MN:          Yeah Okay, so tomorrow you
             should take a phone number.

             ****

MN:          Yeah, don't, don't talk
             anything, if he asks questions

Martin:      What?  Don't ans…I'm not even
             gonna answer the phone, Rhoda,
             he said he would call back
             tomorrow

MN:          Rhoda shouldn't answer any
             questions.  Listen Martin,
             this is very important.  Rhoda
             shouldn't answer any questions
             at all, not even her age, his
             age, his age, that a, nada.
             All she should say um, um, she
             wants to talk to you, Martin's
             not in, I'm running out to the
             store now. I'll call right,
             I'm coming right back.  I'll
             call you in a half an hour.  I
             can't talk now.  That's all
             she should say. Take a name
             and number.

Martin:      Got You, Okay.

MN:          That's all she should say, if
             he doesn't want to give a

E00000250

number than she should ignore
him, Okay?

About fifteen minutes later, "Martin" called the
SUBJECT 1800 TELEPHONE back and the following conversation
between LIEBERMAN and NEUMAN ensued:

Martin:     Yeah, I just want to ask you,
            is this the outfit, this
            Lincoln, that the one where
            they gave our address in
            Jersey?

MN:         Yeah Yeah Yeah

Martin:     So if he called here already
            and Rhoda told him I wasn't
            here, it's a 212 number.
            They're no dopes either.

MN:         Yeah, but the policy is not
            enforced. They want to talk to
            you about it. Don't worry,
            nothing to be worried about
            the policy is not here.

Martin:     Ah…I see.

MN:         The policy is not enforced.
            We're trying to make it
            enforced.

16. Based on reverse phone and address searches, I
have determined that "Martin" is in fact MARTIN LIEBERMAN.
LIEBERMAN and his wife RHODA are discussed above, and in
particular, LIEBERMAN failed to comply with ING's request for an
interview when ING was investigating LIEBERMAN's ING policy for
fraud. In the above conversation, I believe that MOSES NEUMAN

was advising MARTIN LIEBERMAN not to comply with the requests of
another life insurance company (Lincoln Benefit Life) to
interview him regarding another possible fraudulent policy.

17.   As a result of the above interceptions, the
government has established connections between MOSES NEUMAN and
two additional insureds, namely, MYRNA ROBENO and MARTIN
LIEBERMAN, and with two additional insurance companies, namely
Lincoln Financial Group and Lincoln Benefit Life (they are not
associated with one another).   In addition, as a result of the
financial investigation being conducted by the agents, the agents
have determined that MOSES NEUMAN and YUDAH NEUMAN, MOSES
NEUMAN's brother, are listed as the trustees on two of the four
LIEBERMAN life insurance trust bank accounts.   RHODA LIEBERMAN is
listed as the trustee on the other two LIEBERMAN life insurance
trust bank accounts.

18.   The government has also identified MARTIN
LIEBERMAN, RHODA LIEBERMAN and MYRA ROBENO as additional
SUBJECTS.   As other policies reach their contestability
deadlines, the government expects to intercept communications
that will identify further SUBJECTS.

19.   In the following four calls, which were made from
or received by the Subject 1800 Telephone and which were between
MOSES NEUMAN and ARNOLD COHEN, NEUMAN and COHEN discussed COHEN's
life insurance policy with ING: four calls on March 2, 2010 at,

respectively, 4:11 p.m. ("MN Call 1"); 4:15 p.m. ("MN Call 2");
4:17 ("MN Call 3"); and 4:23 p.m. (MN Call 4").  The underlying
theme of these calls was that ING sent COHEN a letter in November
2009 asking for verification of COHEN's personal identifying
information and verification that he is indeed alive, rather than
dead.  (The COHEN ING application for life insurance and other
submissions from Liberty Planning to ING concerning COHEN
contained false and contradictory identifying information, such
as a false social security number, and ING, in its internal
investigative report relating to the Fifteen Insureds[5], expressed
concern that COHEN may have died before ING issued the policy to
insure COHEN's life.)  COHEN, during the calls, expressed worry
that his policy with ING was no longer active and NEUMAN
reassured COHEN that his ING policy was still active and that it
was the only ING policy of the insureds with whom NEUMAN was
involved that was not the subject of an ING lawsuit.  NEUMAN
further stated that he hoped that COHEN's ING policy was still
active not simply because COHEN's ING policy was already over two
years old.  Nonetheless, NEUMAN stated to COHEN that since
COHEN's ING policy _was_ already over two years old, NEUMAN did not

---

[5]   As defined in the Original Affidavit paragraph 14, the
"Fifteen Insured" are the elderly insureds on whose behalf Liberty
Planning submitted applications for large life insurance policies
to ING, which applications ING, as a result of its internal fraud
investigation, concluded to be applications for stranger owned life
insurance policy that contained significant incorrect and/or
misleading information.

think that ING would complain about or take action against the policy.  According to an ING investigator with whom I have spoken, ING has stopped accepting payments on the ARNOLD COHEN policy, among other life insurance policies submitted by Liberty Planning, because ING suspects that the policies are being funded by investors.  I believe that the calls between COHEN and MOSES NEUMAN show that the COHEN ING policy is investor owned and that the co-conspirators still intend to resell the policy notwithstanding ING's efforts to freeze the policy.

20.  In MN Call 1, COHEN advised NEUMAN that COHEN received a letter from ING which stated that ING was provided with the wrong social security number for COHEN in the COHEN life insurance application.  The letter also claimed that the "Arnold Cohen who listed 40 Durand Road, Huntington Valley, PA [as his address on his life insurance application to ING] died on July 21st 2007."

21.  IN MN Call 2, COHEN asked NEUMAN whether "the people," which I believe to mean investors in the COHEN policy, are "still paying the premium?"  NEUMAN responded, "No, the people over here stopped] paying premium now because the company froze the policy".  I believe that NEUMAN, in saying that, meant that the investors stopped paying the premiums because ING had placed the policy in limbo status pending an investigation.  The

quoted statement above in MN Call 2 confirms that the ING ARNOLD
COHEN policy is investor owned.

22.   In MN Call 3, COHEN revealed that he had received
a letter from ING addressed to EDWARD GRODSKY, who was listed
with ING as the trustee of the ARNOLD COHEN life insurance trust.
The letter asked GRODSKY to explain the discrepancies in COHEN's
identifying information and also asked GRODSKY "if there are any
facts or circumstances that lead [GRODSKY] as the trustee . . .
to believe that [the] Arnold Cohen listed on the application for
this policy is alive. . ."   COHEN reported to NEUMAN that the
letter requested a response by December 10, 2009 and warned
GRODSKY that it might be necessary for an ING representative to
meet with COHEN to verify his identity.   In MN Call 4, COHEN
advised NEUMAN that the letter came to COHEN's house on November
24, 2009.

23.   In a call from MARTIN LIEBERMAN to MOSES NEUMAN at
the Subject 1800 Telephone on March 4, 2010 at 11:13 a.m. ("MN
Call 5") and a call from NEUMAN, using the Subject 1800
telephone, to LIEBERMAN on March 8, 2010 at 9:30 a.m. ("MN Call
6"), NEUMAN and LIEBERMAN discussed a letter that LIEBERMAN had
received, which I believe to be a letter from a company to which
a LIEBERMAN life insurance policy was resold.   In MN Call 5,
LIEBERMAN asked NEUMAN to review the letter.   In MN Call 6,
NEUMAN stated "OK yeah that matters, old policies that we sold.

They just want to verify.  They need, they going to send letters
every couple months, every three, four months."  LIEBERMAN
replied that "they want to see that I am alive."  NEUMAN agreed.
NEUMAN instructed LIEBERMAN to fill out the paperwork and fax it
back to NEUMAN.  NEUMAN stated that he wanted to see the
paperwork before LIEBERMAN sent it back because NEUMAN wanted to
"approve it."  The agents believe that these calls demonstrate
that even  after the fraudulent policies have been resold on the
secondary market, the co-conspirators continue to monitor all
communications concerning the fraudulent policies to insure that
the fraud is not discovered.

        24.  On March 15, 2010, at approximately 4:36 p.m.,
MOSES NEUMAN ("MN") made a call from the SUBJECT 1800 TELEPHONE
to his brother, YUDAH NEUMAN ("YN").  During that call MN stated
to YN, "I got bad news.  It got declined.  Even $200,000 they
were not willing to give the Amalia Simon, UnionCentral . . .  It
was declined.  I mean all of it."  MN then states to YN, "I got
an offer of [unclear whether MN says $50,000 or $150,000].  Does
she have to pick up the contract over here."  YN states, "it has
to be done here, can't we just send it to him?"  MN replies
"drive him nuts, ask if a contract can be given for us."  Amalia
Simon is one of the Fifteen Insureds, who, through Liberty
Planning, obtained a policy from ING that ING, in its fraud
investigation, concluded to be fraudulent.  AVIGDOR GUTWEIN was

the insurance agent on the ING Simon policy.  According to the
Inspection Report ("IR") submitted by JEWEL STRADER of InfoLink
to ING, EDWARD GRODSKY was Simon's accountant.  According to that
IR, GRODSKY allegedly verified the $8,000,000 net worth and
$650,000 annual unearned income listed for Simon on the ING
application.  ING concluded, in its internal fraud investigation,
that the initial five premium checks, which were the only premium
checks at the time of the ING report, had signatures on them
which did not match the signatures on the ING application.  When
ING tried to speak to Simon to clarify the questions it had
relating to the policy, Simon declined to answer questions
regarding the policy and terminated the conversation.  The
Investigating Agencies have learned that Liberty Planning also
obtained a policy to insure SIMON's life from UnionCentral Life
Insurance Company on February 5, 2008 for $5,000,000, with
AVIGDOR GUTWEIN as the insurance agent.  On the UnionCentral
policy, SIMON's net worth was again listed as $8,000,000 and
Simon's unearned annual income was again listed as $650,000.  The
IR was submitted to UnionCentral by InfoLink.  The IR stated that
GRODSKY was Simon's accountant for the past ten years and that
GRODSKY verified the financial data in the UnionCentral
application.  The Simon application to UnionCentral stated that
Simon did not intend to sell the policy for which she was
applying, that she had not spoken to anyone offering to pay her

22

for her life insurance policy and that the premiums for the
policy will not be financed in any way.   I believe that the
foregoing call discusses the attempts of MOSES NEUMAN and his
brother, YUDAH NEUMAN, to obtain money back on the UnionCentral
policy by reselling it on the open market after two years for
$150,000 to $200,000.

**Text Messages Over The SUBJECT 1800 TELEPHONE**

25.  During the 1800 Covered Period, there have been 22
text messages intercepted that appear to be about the fraudulent
scheme being investigated.  The text messages intercepted have
provided additional evidence against some of the SUBJECTS
identified in the Original Affidavit and has helped to identify
additional SUBJECTS.  The intercepted calls have also identified
new criminal acts in furtherance of the fraudulent scheme.

26.  On February 22, 2010 at approximately 3:12 PM, an
incoming text message was received by the Subject 1800 Telephone
from a phone number subscribed to by CHAIM LEBOVITS which read as
follows:

> "We need to talk about the lerner phoenix,
> it is already the last second."

I believe that LEBOVITS is referring to a Phoenix Life insurance
policy in the name of Sheldon Lerner.  This policy went into
effect on February 22, 2008 which would mean that the two-year
contestability period expired on or about February 22, 2010.

LEBOVITS most likely wanted to speak about selling the policy since the contestability period had just expired.

    27.  On February 23, 2010 at approximately 12:40 PM, SOPHIA BRODSKY (SB) called NEUMAN at the Subject 1800 Telephone and left the following voice message:

> Ah, Joe, Hi.  This is Sophia I'm gonna text you
> again I didn't get anything today again
> and I, I, I just feel this is just ah not
> a game, and I understand you're not
> involved. But if I don't get anything
> by tomorrow, I'm going to Brooklyn. So,
> I'm going text you with exactly what I
> am saying.

    28.  Beginning at 12:48 p.m. on February 23, 2010, the following text message exchange occurred between SB and MN, the latter at the Subject 1800 Telephone:

> 12:48 p.m. from SB to MN: They did not send me anything im going to NY to pick up my money if I did not get by tomorrow

> 12:49 p.m. from MN to SB: Ok

> 12:55 p.m. from SB to MN: They did not send me anything im going to NY to pick up my money if I did not get by tomorrow

> 1:06 p.m. from SB:  I just Spock [sic] to Arnold we both going to the distrek [sic] attorney on Friday

> 1:08 p.m. from MN to SB: I have no ide what you r talking about im in a meeting ill call u later in the afternoon

                                * * *

> 1:17 p.m. from SB to MN: Ok what?

E00000259

5:16 p.m. from MN to SB: Ok I spoke to them it went out yesterday if u don't get if by Thursday they will wire ok?

5:18 p.m. from MN to SB: But why wire if they send already.

29.   The following day, February 24, 2010, the following text message conversation occurred between NEUMAN at the SUBJECT 1800 TELEPHONE and BRODSKY:

1:05 p.m. from SB to MN: Dear sir I read ur email from yesterday my question to u if they send money by mail I should get it already but I did not which meens [sic] they lying so

* * *

1:09 p.m. from MN to SB: I told u that if you don't get it by tomorrow mail they will stop the check and wire it but we have to wait for tomorrow to make sure you don't get in the mail ok

1:11 p.m. from SB to MN: Did they sended? Or not just answer me

1:12 p.m. from MN to SB:  Yes I told u yesterday yes yes yes they did send wait for tommorows mail if not there text me

1:22 p.m. from SB to MN: U gus think people is dam unitet [sic] postal work perfect in usa

5:48 p.m. from SB to MN: I want to give an account number where u can wire the money

30.   In the above exchange, SOPHIA BRODSKY was upset that she still had not been paid the blackmail money she was promised in order to insure she would not go to the authorities

E00000260

25

(See, First Renewal Affidavit ¶ 14).   BRODSKY even threatened

NEUMAN that if she did not received the money that she would

report him to the Brooklyn District Attorney's Office.

31.   In addition, NEUMAN clearly stated that he sent

the money via mail, which confirms that NEUMAN is committing mail

fraud by using the U.S. mails in furtherance of the insurance

fraud scheme.

32.   On March 1, 2010, between 11:48 a.m. and 5:51

p.m., a series of three text messages were exchanged between  the

Subject 1800 Telephone, and a telephone number that is subscribed

to in the name of LEVI KRAUS.   In these text messages the person

using the LEVI KRAUS cell phone advised NEUMAN that he gave a

check to be delivered to NEUMAN that is for NEUMAN and that is

made out to Ador Mazal.   Financial analysis concerning Ador Mazal

is discussed above in the background probable cause section.   I

believe that these three calls describe money transfers that are

in furtherance of the life insurance fraud and money laundering

schemes that are under investigation.   I further believe that

KRAUS is a new SUBJECT.

33.   As of March 16, 2010, no pertinent text messages

had been intercepted over the SUBJECT 1800 TELEPHONE within the

previous seven days.   However, as seen from ¶¶ 26 through 32

above, the SUBJECT 1800 TELEPHONE is still being used to further

the offenses described in paragraph 3 above.   MOSES NEUMAN's wife

had a baby on March 12, 2010 and recently there have been fewer
pertinent telephone calls as well as text messages over the
SUBJECT 1800 TELEPHONE.  Nonetheless, pertinent telephone calls
over the SUBJECT 1800 TELEPHONE have begun to increase, <u>see</u>
paragraph, and there have always been fewer pertinent text
messages than telephone calls over the SUBJECT 1800 TELEPHONE.
Thus, I believe that pertinent text messages over the SUBJECT
1800 TELEPHONE will also soon increase.  I believe that there is
probable cause to believe that if the Order herein applied for is
issued then pertinent text messages over the SUBJECT 1800
TELEPHONE will be intercepted.

### Telephone Calls Over the SUBJECT 0546 TELEPHONE

34.  Since the interceptions of telephone calls over
the SUBJECT 0546 TELEPHONE commenced under the First Renewal
Order on February 19, 2010, through March 16, 2010 at 11:00 a.m.
(The "0546 Covered Period"), there have been 83 telephone calls
intercepted that appear to be about the fraudulent scheme being
investigated.  The calls intercepted have provided additional
evidence against some of the SUBJECTS identified in the Original
Affidavit and has helped to identify additional SUBJECTS.  The
intercepted calls have also identified new criminal acts in
furtherance of the fraudulent scheme.

35.  On February 25, 2010 at approximately 12:15 p.m.,
AVIGDOR GUTWEIN (AG) received a call from an individual named

"BERISH" on the SUBJECT 0546 TELEPHONE.  BERISH advised GUTWEIN

that he spoke with a male named "Mark" and that they sent "it,"

likely meaning a life insurance application to two persons,

including "Phoenix."  I believe that "it" means a life insurance

application and that "Phoenix" refers to Phoenix Life Insurance

Company.  GUTWEIN and BERISH then spoke about "White House", "the

biggest investor" who, according to BERISH, settled a different

policy in the past.  Later during the same call, BERISH told

GUTWEIN that if the policy were sold after the two years, "he"

would get his money within less than three months.  Although it

is not clear whether GUTWEIN and BERISH are arranging investors

for a new policy to be purchased or are brokering a deal for an

investor to purchase an existing policy, I believe that during

this conversation GUTWEIN and BERISH  are speaking about

investors, such as, e.g., "White House," putting money in and

someone making "1.2" (probably referring to $1.2 Million) from

investor owned life insurance policy deals.  Discussions among

co-conspirators about investors secretly purchasing new policies

or repurchasing existing policies after two years is an act in

furtherance of the conspiracy under investigation - - a

conspiracy in which, contrary to the false statements placed in

the inusreds' applications for life insurance, investor owned

life insurance policies were being purchased from insurance

companies with the intention of reselling the policies on the

secondary market after two years.  As noted in the background
section, BERISH has been identified as BERNAT LEFKOWITZ, a
licensed insurance broker who has paid over $1,400,000 to Bold
Associates, GUTWEIN and two of GUTWEIN's companies and who has
received over $180,000 from GUTWEIN and the same two GUTWEIN
companies.

36.  During the above intercepted conversation over the
SUBJECT 0546 TELEPHONE, the government identified an additional
SUBJECT, namely, BERNAT LEFKOWITZ, also known as Berish.

37.  On March 5, 2010 at approximately 1:30 p.m.,
AVIGDOR GUTWEIN received a call at the Subject 0546 Telephone
from an unidentified male ("UM"). whom I believe was ZALMEN
LANDAU, the trustee on an insurance trust bank account at HSBC.
I believe that this trust bank account is associated with a life
insurance policy issued by AIG on the life of a C. Fink.  UM
stated that "they," whom I believe to be HSBC bank, had asked UM
to explain the last incoming wire transfer and check into that
bank account.  GUTWEIN told UM that he "has to say that they owed
you money and I asked them to put into the trust, or they owed
your grandfather money."  UM asked what the request means and UM
then stated that he hoped that "there's nothing wrong with AIG."
When GUTWEIN stated, "you are asking what is the difference?," UM
replied that "they will ask what's mine and what's not mine . .
. ."  GUTWEIN replied by saying, "they will be apparently looking

into any 'money laundering.'"   UM then stated that there are two
checks, one from MOSES NEUMAN.   UM then asked, "what was the
other check they sent us?"  GUTWEIN asked if the other check was
"a congregation check," and UM stated that although he did not
know, he thought that the other check was a "check to the Cong."
UM and GUTWEIN ended the conversation by stating that they should
ask MOSES NEUMAN and JOSEPH RIEGLER about this other check.  To
explain the pertinence of this call, I will set forth below
certain relevant background information.

     38.  I have learned by speaking with a representative
of HSBC Bank that in December 2009, HSBC bank became concerned
that there was suspicious activity in an HSBC bank account in the
name of a C. Fink Family Trust (the "Trust Account") because of a
wire transfer of money sent to, and a check deposited into, the
Trust Account.  Thus, HSBC sent a letter of inquiry about these
transfers to the "trustee" of the account.  Financial analysis to
date has shown that one of GUTWEIN's companies paid money into
the Trust Account.  While the government has not yet received all
of the information it has requested from HSBC Bank and AIG, I
believe that in the conversation described in the last paragraph:
(1) GUTWEIN and UM were discussing the HSBC inquiry; (2) GUTWEIN
was telling UM, whom I believe to be ZALMEN LANDAU, the trustee
of the C. Fink account, to lie to HSBC about why money was wired
into the Trust Account from MOSES NEUMAN and maybe also from a

Congregation; and (3) UM was concerned that AIG may be behind the HSBC inquiry.  As to this last point, if AIG were behind the HSBC inquiry - - and the agents have confirmed that HSBC, rather than AIG, initiated the inquiry - - then that would be a cause for concern to persons who had fraudulently arranged for AIG to issue stranger owned life insurance policies, since, at least potentially, AIG might take action to prevent the persons committing the fraud from obtaining the illegal profits they sought.  GUTWEIN clearly stated during the conversation that the persons who were requesting the information "will be apparently . . . looking into any 'money laundering.'"

39.  A few minutes after the above call between GUTWEIN and UM was complete, GUTWEIN, at approximately 1:38 p.m. on March 5, 2010, received a call at the SUBJECT 0546 TELEPHONE from BERNAT LEFKOWITZ, also known as BERISH.  In that call, almost immediately after the call was connected, a three way call was initiated between GUTWEIN, LEFKOWITZ and HSBC Bank.  When HSBC answered, GUTWEIN asked for "Yehuda," and Yehuda got on the line. (I have confirmed that "YEHUDA" is YEHUDA BIKEL, an employee of HSBC.)  During the call, GUTWEIN asked BIKEL whether the HSBC inquiry concerning "the last incoming wire and check that [were] deposited" into the Trust Account had been instigated by AIG or was rather the result of "bank regulations."  BIKEL stated that the inquiry was initiated because of bank regulations.  BIKEL

then stated that "they need an explanation." When GUTWEIN asked
if he could ignore the inquiry, BIKEL stated that if GUTWEIN did
that "they gonna close the account."

40.  When GUTWEIN asked BIKEL if he could say that
somebody owed the money to the "grandfather," because this was
the grandfather's trust, BIKEL said that "this is an insurance
trust," and that a "trust account is a trust account . . . and if
[the bank] sees a second and third person went in, they gonna
know what it is.  A wire transfer.  They look very close at wire
transfers.  They look if there's no money laundering involved.
They want to know."  When BIKEL first stated that "this is an
insurance trust," GUTWEIN stated, "what if I denied it . . . the
grandfather provided the money for the trust account."  BIKEL
first replied by stating, "whatever you tell me, you tell them,"
but later stated "say whatever you like."  (I have learned from
the representative of HSBC with whom I spoke that, as of March
12, 2010, which is a full week after the call between BIKEL,
GUTWEIN and LEFKOWITZ, BIKEL had not reported this call to her.)
BIKEL confirmed that it was not AIG that was behind the inquiry
by HSBC, but that HSBC initiated the inquiry itself.  After BIKEL
hung up, LEFKOWITZ stated to GUTWEIN, who was still on the line,
that they must "come up with a good excuse."  GUTWEIN then again
suggested that they should say that "he" - - which I believe to
be a reference to the person who paid money into the Trust

Account - - owed the grandfather money, that they could take a couple of days to "think" before answering the request, but that, in any event, they had made sure that it was not AIG that had made the request. Based upon the above call and BIKEL's failure to notify his employer about the call, I believe that BIKEL is a SUBJECT because he knew that GUTWEIN and LEFKOWITZ were suggesting that they would lie to HSBC, but BIKEL never notified his employer, to whom he owed a fiduciary obligation, that he had received this call from GUTWEIN and LEFKOWITZ.

41. On March 3, 2010, at approximately 12:40 p.m., AVIGDOR GUTWEIN received a call from an unidentified male at the Subject 0546 Telephone. GUTWEIN and the unidentified male, during the call, discussed a particular life insurance trust. GUTWEIN stated, "we paid his premiums and now all we have is a lapsed policy." Nonetheless, GUTWEIN and the unidentified male then went on to discuss arrangements for the resale of the policy in question to a potential buyer. This call demonstrates that GUTWEIN invests in policies with his own money and also that he is involved in the resale of the policies on the secondary market after the two year deadline within which the insurance company may sue for rescission has passed.

42. On March 5, 2010 at approximately 1:54 p.m., AVIGDOR GUTWEIN called YUDAH NEUMAN, MOSES NEUMAN's brother, and thanked him profusely, addressing YUDAH NEUMAN as "Lenny." I

believe, based upon this conversation, that LENNY LNU, previously identified as MOSES NEUMAN's partner, who tried to convince CI2 to go to CI2's doctor and to lie to his doctor by saying that he (CI2) had symptoms that he did not, in fact, have, may be YUDAH NEUMAN.

43.  On March 16, 2010 at approximately 11:54 a.m., a man named SHIMSON LNU left a voice mail message for AVIGDOR GUTWEIN on the SUBJECT 0546 TELEPHONE.  In that message, SHIMSON stated, "the Transamerica has already passed two years already and she wants.  Anyway, Sheldon Lerner's wife will resign as trustee, I have her resignation papers right here.  I'm taking on as the trustee.  I'd like to change the address so I'll be getting the mailings.  I don't know where it stands, whether its in grace or not in grace.  I'm mean, maybe it collapsed.  So do me a favor and give me a call ASAP and I will make the change for company 1-2-3.  You can reach me by email or by regular mail or both.  I want to receive all the communications because the same story is happening to me with someone else . . .  I lost about a half a million dollars.  So please please, I beg you, it is extremely urgent, call me as soon as possible.  I want to give you these papers to send to the company.  It passed two years so it shouldn't be a problem . . ."  SHELDON LERNER is one of the Fifteen Insureds who obtained a $10,000,000 life insurance policy from ING through Liberty Planning, on which GUTWEIN was the

E00000269

insurance agent.  In the ING application, Lerner's net worth was listed as $18,000,000 and his unearned annual income was listed as $1,150,000.  The IR was submitted to ING by JEWEL STRADER, and, according to the IR, Lerner's accountant is a James Kulko. According to the IR, when Strader contacted Kulko, Kulko allegedly confirmed the financial data contained in the ING application.  When ING, during its internal fraud investigation, conducted a background check of Lerner using Lexis Nexus (Accurint), it could not confirm Lerner's reported net worth, finding that from 2000 to 2001, he was employed as a deli manager at Waldbaum's, that he and his wife owned their home, which had a market value of $532,000 and a mortgage of $210,000, and that he is the owner of a printing business that operates out of his residence.  As of the date of the ING internal fraud report, two premium checks had been paid on the policy, the signatures on both of which did not match the signatures on the policy.  When ING, during its internal fraud investigation, sought to clarify its concerns about the Lerner policy by sending letters to and leaving phone messages with Kulko and Lerner, ING was unsuccessful in its attempts to interview either.  The Investigating Agencies have learned that on January 14, 2008, Sheldon Lerner obtained, through Liberty Planning, a $10,000,000 life insurance policy from Transamerica Life Insurance Company, on which AVIGDOR GUTWEIN was the insurance agent.  The

Investigating Agencies have not yet obtained from Transamerica complete documentation on this policy.  I believe that in the above voice mail message, SHIMSHON LNU is leaving a message for GUTWEIN about this Lerner Transamerica policy and that the conspirators are trying to resell that policy now since the policy recently passed two years from its date of issuance.

### ALTERNATIVE INVESTIGATIVE TECHNIQUES HAVE BEEN TRIED AND FAILED OR APPEAR REASONABLY UNLIKELY TO SUCCEED IF TRIED OR ARE TOO DANGEROUS TO EMPLOY

44.  The goals of this investigation are set forth above.  Several investigative techniques have been tried and failed, reasonably appear likely to fail to achieve all the goals of this investigation, or are too dangerous to employ.

### Confidential Informants

45.  As explained in the Original Affidavit ¶ 34 and the First Renewal Affidavit ¶ 48, "I believe that the confidential sources utilized to date can not enable law enforcement to uncover the full scope of the criminal conspiracy."  To date, no additional confidential informants have been found and the other reasons stated in the First Renewal Affidavit and the Original Affidavit as to why the use of confidential informants is not a feasible alternative investigative technique remain true.  I believe that it would not be feasible for an undercover agent to penetrate the conspiracy in any meaningful way that would in itself achieve the goals of

the investigation.  The conspirators are not likely to trust any
of the three confidential informants, CI1, CI2 or CI3, enough so
as to make it feasible for one of the confidential informants to
successfully introduce an undercover agent to any of the
SUBJECTS.  For example, during telephone calls that I
consensually monitored that were placed by CI2 to MOSES NEUMAN at
the SUBJECT 1800 TELEPHONE and by CI3 to EDWARD GRODSKY, which
occurred, respectively, on November 3, 2009 and January 29, 2010,
CI2 and CI3 asked to be paid money on the CI2 policies.  After
CI3 asked GRODSKY for money during the January 29, 2010 call that
I consensually monitored, NEUMAN, using the SUBJECT 1800
TELEPHONE, called GRODSKY at approximately 12:08 p.m.  on January
29, 2010 to ask him if he had spoken to CI3.  GRODSKY told NEUMAN
that GRODSKY told CI3 that "we're surrendering the [CI2 ING
policy][6]" and that CI3 (who is the trustee of the CI2 ING policy)
has to sign the surrender papers.  GRODSKY further told NEUMAN
that CI3 asked for a "referral fee," and GRODSKY complained that
"somebody's losing a half million dollars and he can't ask for a
referral fee."  When GRODSKY asks NEUMAN if he really wants to
give CI3 money, NEUMAN replies, "Maybe . . . we have no choice."

---

[6] Because ING has brought rescission actions against five of
the Fifteen Inusreds, NEUMAN has had discussions about possibly
surrendering the ING policies.  But the conspirators are actively
trying to resell the life policies that were issued by companies
other than ING, including one on the life of CI2, and have
apparently recently resold an ARNOLD COHEN policy at a profit.

On February 1, 2010 at 5:21 p.m., NEUMAN called GRODSKY to again ask him if he had spoken to CI3.  NEUMAN told GRODSKY, "There's no money.  There's no money to give him.  If he wants to sign or he doesn't, then he's going to get personally sued [by ING, which has already brought suits seeking rescission of the ING life policies against the owners and trustees of five of the Fifteen Insureds].  It's up to him."  Thus, neither CI2 nor CI3 is in any position to introduce an undercover agent to members of the conspiracy.  Nor is CI1 in a position to do so, since, prior to the date of my Original Affidavit, he surrendered to ING the life insurance policy that Liberty Planning obtained on CI1's life.  Thus, the possibility of undercover agents infiltrating the organization is no more a feasible option now than it was at the time that the ORIGINAL ORDER was issued.

### Undercover Agents

46.  As explained in the Original Affidavit ¶ 36 and the First Renewal Affidavit ¶ 49, and in the preceding paragraph, I believe that it would not be feasible for an undercover agent to penetrate the conspiracy in any meaningful way that would in itself achieve the goals of the investigation.  As in the foregoing paragraph, the government is not in a position to introduce an undercover agent into the conspiracy through the means usually utilized when such a technique is feasible.

### Surveillance

47.  As explained in the Original Affidavit ¶ 39 and
the First Renewal Affidavit ¶ 50, "surveillance is not expected
to provide detailed evidence regarding the fraud and money
laundering activity."  Surveillance has provided limited
information during the period of the Original Order and during
the period of the First Renewal Order.  Beginning on January 20,
2010 through the expiration of the Original Order authorizing the
interception of telephones calls to and from the SUBJECT 1800
TELEPHONE, the Investigating Agencies utilized surveillance teams
whenever telephone calls were being intercepted.  Nonetheless,
during that  time, agents were able to successfully conduct
surveillance of any of the SUBJECTS on only a few occasions.  The
successful surveillance attempts resulted in agents taking a few
photographs, such as ones of MOSES NEUMAN and of the back of the
head of REUVEN SOBEL, but little else.  The SUBJECTS talked,
during telephone calls that were intercepted over the SUBJECT
1800 TELEPHONE, about meetings that they were planning to attend,
but the SUBJECTS did not usually provide the times or locations
of the meetings and cell-site information was not specific enough
to identify the specific locations of the SUBJECTS during these
meetings.  As a result, during the period of the First Renewal
Order, the agents have not able to conduct any meaningful
surveillance at all.  Surveillance has not succeeded in

E00000274

identifying new co-conspirators or the specific locations of

MOSES NEUMAN's business.  Moreover, physical surveillance of the

SUBJECTS cannot possibly substitute for interception of the

contents of communications among the SUBJECTS.

**Search/Arrest Warrants, Grand Jury
and/or Witness Interviews**

48.  As explained in the Original Affidavit ¶¶ 41-43

and the First Renewal Affidavit ¶ 51, the goals of the

investigation will not be achieved through the use of search

warrants, arrest warrants, grand jury proceedings and witness

interviews.  On February 5, 2010, the government obtained search

warrants to seize the contents of historical text messages sent

or received over the SUBJECT 1800 TELEPHONE and historical emails

sent from or received by the email address of EDWARD GRODSKY.

However, applications for search warrants for historical text

messages and emails will not, by themselves, achieve the goals of

this investigation.  First, applications for search warrants for

historical text messages over the SUBJECT 1800 TELEPHONE are no

longer an available option.  Sprint has notified the government

that as of January 1, 2010 and thereafter it no longer retains

text messages for any period of time.  In short, the government

will not be able to obtain the contents of text messages sent

from and received by the SUBJECT 1800 TELEPHONE on or after

January 1, 2010, through the use of search warrants.  The only

way that the government can obtain the content of text messages
sent or received in the future over the SUBJECT 1800 TELEPHONE is
by obtaining the order herein applied for to the extent it seeks
authorization to intercept electronic communications sent or
received over the SUBJECT 1800 TELEPHONE.  Moreover, as explained
in the Original Affidavit ¶¶ 41-43, the goals of the
investigation will not be achieved through the use of search
warrants, arrest warrants, grand jury proceedings and witness
interviews.  The conspirators have not, based upon the results of
the emails we have obtained through search warrants, repeated in
emails all of the communications that the Investigating Agencies
have intercepted as a result of the Original Order or the First
Renewal Order.  Evidence of the crimes being investigated has
been obtained by searches of emails, but that evidence has not
substituted for the breadth and variety of evidence that has been
obtained by the interception of wire and electronic
communications, either in terms of the number of different
parties whom the conspirators contact over the SUBJECT
TELEPHONES or the breadth of the topics discussed over the
SUBJECT TELEPHONES.  Moreover, obtaining probable cause to search
email addresses is time consuming and can be facilitated through
intercepted communications.  My training and experience lead me
to believe that persons will not use emails to repeat what they
have already stated over the telephone and the experience of the

E00000276

Investigating Agencies in this investigation has revealed nothing that indicates that this common sense conclusion is erroneous in this case.

### Pen Register and Toll Data

49.   As explained in the Original Affidavit ¶44 and the First Renewal Affidavit ¶ 52, toll records and pen register records will not achieve the goals of the investigation, although Special Agents of the Investigating Agencies continue to utilize such records.   Pen register and toll records will not reveal the contents of co-conspirator conversations.

### Consensually Recorded Calls

50.   As explained in the Original Affidavit ¶45 and the First Renewal Affidavit ¶ 53, "consensual recordings are not sufficient to accomplish all of the goals of this investigation." Nothing has changed to make consensual recordings a sufficient means of accomplishing all of the goals of the investigation. Since the time of the First Renewal Affidavit, the government has not developed any new confidential informants or other persons who can assist in making consensual recordings.   Moreover, the three confidential informants are presently not trusted by the co-conspirators, as shown in paragraph 45 above.   Finally, the confidential informants do not know previously unidentified co-conspirators.   Thus, the possibility of additional undercover

telephone calls in the future is limited and could not achieve the remaining goals of the investigation.

### Trash Inspection

51. As explained in the Original Affidavit ¶46 and the First Renewal Affidavit ¶ 54, trash inspections will not achieve the goals of the investigation. Based upon my knowledge of the investigation to date, I believe that it is unlikely that a refuse inspection of the SUBJECTS' trash would reveal any information about the members of the organization, or their respective roles, nor would it provide probable cause for a search warrant. At this time, the informants and agents have been unable to identify a trash inspection would even be appropriate.

### Criminal Database Checks

52. As explained in the Original Affidavit ¶ 47 and the First renewal Affidavit ¶ 55, criminal database checks will not achieve the goals of the investigation. Fellow agents, analysts and I have run the names of the SUBJECT INTERCEPTEES through various databases. For example, as noted above, we have caused Immigration and Customs enforcement to run all the names of the SUBJECT INDIVIDUALS through the ELSUR wire surveillance database. Moreover, those names have been run through other databases, such as the DCJS database. While database checks are useful in that they inform us of past investigations and to some

extent the history of the SUBJECT INTERCEPTEES, to date, database checks, standing alone, are not sufficient to allow the Investigating Agencies to achieve all of their objectives of this investigation.  Database checks alone cannot be expected to achieve all the goals of the instant investigation, such as identifying the employees, co-conspirators, sources of money to fund the scheme, persons who receive the proceeds of the scheme and locations where records and money currently are stored.

### Financial Investigations

53.  The financial investigation described in the Original Affidavit ¶48 and in the First Renewal Affidavit ¶ 56 has continued after interceptions commenced under the First Renewal Order and after additional bank records were received and analyzed.  The financial analysis is not complete and the time needed to collect additional bank records will be lengthy.  Some of the additional financial analysis that has been conducted is summarized in paragraphs 11 and 12 above.  Other additional financial analysis that has been conducted shows, to give a few examples, that: (1) after learning through interceptions of wire communications over the SUBJECT 1800 TELEPHONE that one of the ARNOLD COHEN life policies had been resold, the Investigating Agencies traced a $25,000 check from one of the ARNOLD COHEN life insurance trust bank account to ARNOLD COHEN; (2) a $213,470 check has been discovered from The Rocklyn Group, a company of

which CHAIM LEBOVITS is the president and which is largely funded by Liberty Planning, to Congregation Ahavas Chaveirim, which was then sent by the "Congregation" to ING to pay premiums on a life insurance policy issued by ING to a Frieda Feig; (3) The Rocklyn Group also wrote a check for $131,000 to the Sheldon Lerner Irrevocable Life Insurance Trust, which was set up to pay premium for one of the Fifteen Insureds, namely Sheldon Lerner; and (4) One Touch Developers, Inc., a company that was registered by MOSES NEUMAN, paid money to the MARTIN LIEBERMAN 2007 Trust Bank Account that was used to pay premiums on behalf of MARTIN LIEBERMAN. While the financial investigation has provided and will continue to provide useful evidence, nonetheless, for all of the reasons explained in the Original Affidavit ¶48 and the First Renewal Affidavit ¶ 56, financial analysis itself will not identify all of the conspirators and will not substitute for interception of wire and electronic communications in providing evidence of fraud and money laundering. Indeed, as seen above, the financial analysis has been aided by information obtained from the interceptions. The Investigating Agencies still do not know of all of the life insurance policies that are involved in the scheme or all of the participants in the scheme. In particular, although progress has been made in this area, the roles and identities of most of the so called "Congregations" that pay premiums for some of the life insurance policies is

E00000280

still not known.  To the extent that continued financial
investigation can lead to the identification of additional co-
conspirators, it will do so far more slowly than will the
identification of these co-conspirators through the interception
of wire and electronic communications.  The time lost in
identifying new co-conspirators can cause the loss of
opportunities to develop evidence against these co-conspirators.

### Continued Interception of Wire and Electronic Communications Over the SUBJECT 1800 TELEPHONE and of Wire Communications Over the SUBJECT 0546 TELEPHONE

54.  As seen from paragraphs 14-24, 26-32, 35, 37-43,
since the interception of wire communications over the SUBJECT
1800 TELEPHONE continued and the interception of electronic
communications over the SUBJECT 1800 TELEPHONE and the
interception of wire communications over the SUBJECT 0546
TELEPHONE commenced under the First Renewal Order, each of these
three types of interceptions has separately and independently led
to the identification of additional co-conspirators and has
separately and independently provided additional very useful
evidence against the new co-conspirators and some of the co-
conspirators previously identified.  The new SUBJECTS and
additional evidence provided by each of the three types of
interceptions under the First Renewal Order has, as shown above,
often been different from the new SUBJECTS and additional
evidence provided by either of the remaining two types of

interceptions under the First Renewed Order.  MOSES NEUMAN and
AVIGDOR GUTWEIN have not communicated often during the period of
the First Renewal Order and, during that period, have often
communicated with different persons from the ones with whom the
other has communicated.[7]  For example, the intercepted calls and
text messages summarized above for NEUMAN's telephone, the
SUBJECT 1800 TELEPHONE include contacts with: the doctors office
of MYRA ROBENO (call); MARTIN LIEBERMAN (concerning one of
LIEBERMAN's policies)(call); ARNOLD COHEN (concerning COHEN's
policies, but not concerning SOPHIA COHEN BRODSKY, COHEN's ex-
wife)(call); YUDAH NEUMAN (concerning an AMALIA SIMON
policy)(call); CHAIM LEBOVITS (concerning a SHELDON LERNER policy
with PHOENIX Insurance Company)(text); SOPHIA COHEN BRODSKY
(concerning BRODSKY's blackmail of NEUMAN)(text); and LEVI KRAUS
(about Ador Mazal)(text).  By contrast, the intercepted calls
summarized above for GUTWEIN's telephone, the SUBJECT 0546
TELEPHONE), include contacts with: BERNAT LEFKOWITZ, also known
as Berish (concerning a policy in which White House might invest
and the C. Fink policy), ZALMEN LANDAU (concerning the C. Fink
policy), HSBC Bank and YEHUDA BIKEL (concerning the C. Fink
Policy), an unidentified male concerning a policy in which

---

[7] The sentence in the text was drafted on March 16, 2010.  On
March 17, 2010, there were telephone calls intercepted between
MOSES NEUMAN and AVIGDOR GUTWEIN.  However, notwithstanding those
telephone calls, the sentence in the text remains true.

GUTWEIN had invested and was seeking to resell); YUDAH NEUMAN;
and Shimson (concerning a SHELDON LERNER policy).  Thus, while
there are some overlaps, the persons contacted, and the subjects
discussed by NEUMAN and GUTWEIN are often different.  Similarly,
as seen above, the contacts NEUMAN made over the SUBJECT 1800
TELEPHONE by telephone and by text message were often different.
The Special Agents of the Investigating Agencies expect that if
the Order herein applied for is issued then each of the three
types of interceptions will continue to provide separate and new
SUBJECTS and additional evidence from that expected from either
of the other two types of interceptions.  For these reasons and
all of the reasons set forth in the First Renewed Affidavit ¶ 57,
it is necessary to continue the interceptions authorized in the
First Renewed Order for an additional thirty days to achieve all
of the goals of the investigation.  In particular, I believe that
the continued interception of telephone calls and text messages
to and from the SUBJECT 1800 TELEPHONE and the continued
interception of telephone calls to and from the SUBJECT 0546
TELEPHONE are all necessary to achieve all of the goals of the
investigation.

## MINIMIZATION

55.  Special Agents of the Investigating Agencies and
other authorized officers and monitors will only make such
interceptions as are consistent with the objectives of this

48

application and the Court's Orders.  All such interceptions will
be minimized in accordance with Chapter 119 of Title 18, United
States Code.  Interception will be suspended immediately if it is
determined through voice identification, physical surveillance or
otherwise that neither the named interceptees nor any other co-
conspirators are participants in the conversation, unless it is
determined during the portion of the conversation already
overheard that the conversation is criminal in nature.  Agents
will monitor all communications to determine if a party to the
conversation is a conspirator.  If, while making this
identification, a conversation concerning criminal activities is
overheard, monitoring may continue.  Monitoring will be
discontinued if, while making this identification, the agents
determine that the conversation does not involve a conspirator
and is not criminal in nature.  As a result of civil suits served
by ING, some of the conspirators appear to have consulted
lawyers.  All individuals conducting the interception will be
instructed concerning the steps they must take to avoid
infringing upon any attorney-client privilege or other recognized
privilege and to minimize attorney-client conversations between
SUBJECTS and any attorneys they have consulted.

          56.  With regard to the text messaging/simple message
service of the SUBJECT 1800 TELEPHONE, all text or electronic
messages will be reviewed, in the first instance, by one or more

49

monitoring agents, who will read all of the messages.  The monitoring agents then will review the contents of messages in accordance with the standards set forth in the proceeding paragraph, and will forward only the pertinent, non-privileged passages to the rest of the agents and prosecutors.  The monitoring agents will be instructed not to pass minimized information to the other agents or prosecutors.  The minimized messages will be retained and filed under seal with the Court.  A copy of the application and Order, will be provided to all monitors.

<u>CONCLUSION</u>

**<u>Request for Permission to Intercept</u>**.  Based on the allegations set forth in this Affidavit and the application of Assistant U.S. Attorney CHARLES S. KLEINBERG, attached, the affiant requests this Court to issue an order pursuant to the power conferred upon it by Section 2518 of Title 18, United States Code, authorizing the Investigating Agencies to continue to intercept wire and electronic communications to and from the above-described SUBJECT 1800 TELEPHONE and wire communications to and from the SUBJECT 0546 TELEPHONE until such communications are intercepted that reveal the manner in which the named violators and others unknown participate in the specified offenses and reveal the identities of their coconspirators, places of operation, and nature of the

conspiracy, or for a period of 30 days measured from the date of this Order.

**Authorization to Intercept**.  WHEREFORE, IT IS REQUESTED THAT THE COURT ORDER that Special Agents of the Investigating AGENCIES and any such federal and local law enforcement officers participating in the investigation are authorized, pursuant to an application authorized by a duly designated official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, to continue to intercept wire and electronic communications sent from and received by the SUBJECT 1800 TELEPHONE and wire communications sent from and received by the SUBJECT 0546 TELEPHONE.

**Period of Interception**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that such interception shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature

of the conspiracy involved therein, or for a period of thirty
(30) days measured from the day of this Order.

**Portability**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that
the authorization applies not only to the telephone numbers
currently assigned to the two SUBJECT TELEPHONES, but also to any
changed telephone number or any other telephone number
subsequently assigned to or used by the instrument bearing the
same ESN as one of the SUBJECT TELEPHONES and to any changed IMSI
or ESN accessed through one of the SUBJECT TELEPHONES within the
thirty (30) day period.  In the event that the service provider
changes during the course of the interception, it is requested
that interception be permitted to continue with the new service
provider without further Order of the Court.  Accordingly, it is
requested that the Court's Order be binding on any subsequent
service provider which provides service to either of the two
SUBJECT TELEPHONES upon service of a certified copy of the
Court's Order, without further Order of this Court required,
including but not limited to: Nextel Communications, Verizon New
York, Inc., Verizon New Jersey, Inc., AT&T, AT&T Wireless,
Verizon Wireless, MCI Telecommunications Corp., MCI WorldCom,
Cingular Wireless, T Mobile U.S.A. and Sprint Spectrum, L.P.
(hereafter referred to collectively as the "Other Relevant
Providers").  The United States will advise the Court of the

change of service provider in the periodic progress reports submitted to this Court.

**Background Conversation**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that the authorization apply to background conversations intercepted in the vicinity of either of the two SUBJECT TELEPHONES while either SUBJECT TELEPHONE is off the hook or otherwise in use.

**Use of Interpreters**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that in the event any of the communications are conducted in a language other than English, all law enforcement officers described above may utilize an interpreter in the language being spoken to interpret, monitor, intercept and record any such conversations under the direct supervision of a Special Agent of the Investigating Agencies or other deputized law enforcement officer in the event an interpreter who is a federal agent is unavailable.

IT IS REQUESTED FURTHER THAT THE COURT ORDER that, in the event any of the communications are conducted in a language other than English and/or are in code, and there is not reasonably available during the interception period an expert in the foreign language or code, minimization shall be accomplished as soon as practicable after such interception.

**Transfer of the SUBJECT TELEPHONES Outside the Eastern District of New York**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that

53

in the event that either of the two SUBJECT TELEPHONES is transferred outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

**Providing Technical and Other Assistance**.   IT IS REQUESTED FURTHER THAT THE COURT ORDER that, pursuant to Section 2518(4) of Title 18, United States Code, Sprint and the Other Relevant Providers, electronic communications service providers as defined in Section 2510(15) of Title 18, United States Code, shall furnish and continue to furnish the Investigating Agencies with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire and electronic communications over the SUBJECT 1800 TELEPHONE and wire communications over the SUBJECT 0546 TELEPHONE.

**Compensation**.   IT IS REQUESTED FURTHER THAT THE COURT ORDER that Sprint and the Other Relevant Providers shall be compensated by the Applicant for reasonable expenses incurred in providing such facilities or assistance.

**Disclosure.**   IT IS REQUESTED FURTHER THAT THE COURT ORDER that in order to avoid prejudice to this criminal investigation, Sprint

and the Other Relevant Providers and their agents and employees
shall not disclose or cause a disclosure of this Court's Orders
or the request for information, facilities, and assistance by the
Investigating Agencies or the existence of the investigation to
any person other than those of their agents and employees who
require this information to accomplish the services requested.
In particular, Sprint, the Other Relevant Providers and their
agents and employees shall not make such disclosure to a lessee,
telephone subscriber, or any interceptee or participant in the
intercepted communications.

**Subscriber and Toll Record Information**.  IT IS REQUESTED FURTHER
THAT THE COURT ORDER that, pursuant to Title 18, United States
Code, Section 2703(c)(1)(B), Sprint and the Other Relevant
Providers, providers of electronic communications services as
defined in Title 18, United States Code, Section 2510(15), shall
disclose to the applicant and the Investigating Agencies all
published and non-published subscriber information and toll
records and information relevant to this investigation, that is,
all such information pertaining to the telephone numbers
associated with telephones, digital display devices, and mobile
telephones which place calls or text messages into or which
receive calls or text messages from the SUBJECT TELEPHONES, which
may be requested in furtherance of this investigation, within 24
hours of said request, including weekends and holidays, there

being reason to believe that the contents of the information sought are relevant and material to a legitimate law enforcement inquiry as set forth more fully above.

**Cell Site Information**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that Sprint and the Other Relevant Providers shall enter the SUBJECT TELEPHONE numbers into a pen register, and supply originating and terminating cell site information pursuant to Title 18, United States Code, Sections 2703(d), 3122 and 3123.

**Notification of Change**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that Sprint and the Other Relevant Providers shall notify the applicant immediately if and when the ESN or telephone number for either of the two SUBJECT TELEPHONES changes or is supplied to another service provider.

**Minimization and Period of Authorization**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that its Orders shall be executed as soon as practicable after they are signed and that all monitoring of wire and electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code.  All individuals conducting the interception will be instructed concerning the steps they must take to avoid infringing upon any attorney-client privilege or other recognized privilege and to

56

minimize attorney-client conversations between SUBJECTS and any attorneys they have consulted or may consult.  The interception of communications authorized by this Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day on which this order is issued.

Monitoring of conversations will immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code.  Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.

With regard to the text messaging/simple message service of the SUBJECT 1800 TELEPHONE, all text or electronic messages will be reviewed, in the first instance, by one or more monitoring agents, who will read all of the messages.  The monitoring agents then will review the contents of messages in accordance with the standards set forth in the proceeding paragraph, and will forward only the pertinent, non-privileged passages to the rest of the agents and prosecutors.  The monitoring agents will be instructed

not to pass minimized information to the other agents or prosecutors.  The minimized messages will be retained and filed under seal with the Court.  A copy of the application and Order, will be provided to all monitors.

**Progress Reports.**  IT IS REQUESTED FURTHER THAT THE COURT ORDER that an Assistant U.S. Attorney familiar with the facts of the case shall provide the Court with a report on or about the tenth and twentieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception.  If any of the aforementioned reports should become due on a weekend or holiday, it is requested further that such report become due on the next business day thereafter.

**Service of Inventory/Return.**  IT IS REQUESTED FURTHER THAT THE COURT ORDER that no inventory or return of the results of the foregoing surveillance and interception is required to be made, other than the above-required reports, before 90 days from the date of the expiration of the Court's Order, or any extension of the Court's Order.  It is requested further that, upon an _ex parte_ showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

**Sealing**.  IT IS REQUESTED FURTHER THAT THE COURT ORDER that the application, affidavit, Orders, and all interim reports filed

E00000293

58

with the Court with regard to this matter be sealed until further
order of this Court, except that copies of the Orders, in full or
redacted form, may be served on the Investigating Agencies,
Sprint PCS and the Other Relevant Providers as necessary to
effectuate the Court's Orders.

Dated:     Brooklyn, New York
           March 19, 2010

                                    _____
                                    MARIA ALBRIGHT
                                    Postal Inspector
                                    United States Postal
                                    Inspection Service


Sworn to before me on March 19, 2010

_____
HONORABLE SANDRA L. TOWNES
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

E00000294