M-10-125

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X
IN THE MATTER OF THE APPLICATION
FOR A SEARCH WARRANT FOR:

UNDER SEAL

AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT
(T. 18 U.S.C. § 2703)

THE CONTENTS OF ELECTRONIC
COMMUNICATIONS SENT OR
RECEIVED OVER MOBILE
TELEPHONE NUMBER (917) 559-1800, WITH ESN
268435457600516523, SERVICED
BY SPRINT PCS, SUBSCRIBED TO
IN THE NAME OF MELISSA
NEUMAN, 1181 44TH STREET,
BROOKLYN, NEW YORK 11219 IN
ELECTRONIC STORAGE OR IN A
REMOTE COMMUTING SERVICE BY
SPRINT PCS, 6480 SPRINT
PARKWAY, OVERLAND, KANSAS
66251

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

    MARIA ALBRIGHT, being duly sworn, deposes and says that she is a Postal Inspector with the United States Postal Inspection Service ("USPIS"), duly appointed according to law and acting as such.

    Based on information and belief, there is probable cause to believe that the CONTENTS OF ELECTRONIC COMMUNICATIONS SENT OR RECEIVED OVER MOBILE TELEPHONE NUMBER (917) 559-1800, WITH ESN 268435457600516523, SERVICED BY SPRINT PCS, SUBSCRIBED TO IN THE NAME OF MELISSA NEUMAN, 1181 44TH STREET, BROOKLYN, NEW YORK 11219 IN ELECTRONIC STORAGE OR IN A REMOTE COMPUTING SERVICE BY SPRINT PCS, 6480 SPRINT PARKWAY, OVERLAND, KANSAS 66251 (the "SUBJECT 1800

1

TELEPHONE") contain electronic communications, including numeric, alphanumeric and text messages, concerning the participation of MOSES NEUMAN also known as MOISHE, in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349 and 1956.

The source of your deponent's information and the grounds for her belief are as follows[1]:

### The Subject Telephone and the Preservation of Historical Text Messages

1. On December 22 and December 31, 2009, the government served Sprint PCS with demands for preservation of historical text messages to and from the SUBJECT 1800 TELEPHONE, pursuant to 18 U.S.C. § 2703(f)(1). Sprint PCS notified the government that it is preserving the historical text messages. Sprint PCS recently advised the government that as of January 1, 2010 and thereafter it no longer retains text messages for any period of time, although it continues to retain the text messages that were sent from or received by the SUBJECT 1800 TELEPHONE prior to December 31, 2009, since it must do so as a result of the government's prior demands pursuant to 18 U.S.C. § 2703(f)(1).

---

[1] Because the purpose of this affidavit is only to establish probable cause to search, I have not set forth a description of all of the facts and circumstances of which I am aware.

2

## Legal Authority

2. Pursuant to 18 U.S.C. § 2703(a) and (b), this Court has jurisdiction to issue a search warrant for electronic communications in electronic storage or in a remote computing service because it has jurisdiction over the offense under investigation, namely, conspiracy, mail and wire fraud and money laundering in the Eastern District of New York.

## Background Of The Investigation

3. I am a Postal Inspector of the USPIS, duly appointed according to law and acting as such. I have been a Postal Inspector for approximately five and one half years and am currently assigned to a unit where I investigate, among other things, fraud and money laundering offenses. During my tenure with the USPIS I have participated in many mail fraud and money laundering investigations, which have included, among other investigative techniques, the use of physical surveillance, execution of search warrants, consensual recordings of individuals associated with fraud and money laundering schemes and debriefing of cooperating witnesses and oher informants. Except where otherwise noted, the information set forth in this Affidavit has been provided to me by Postal Inspectors and Special Agents of the USPIS, the Internal Revenue Service and the New York State Department of Insurance (the "Investigating Agencies"), and by confidential informants and other witnesses and relevant documents.

E00000753

4. Since approximately the Summer of 2009, the USPIS has been investigating Liberty Planning, Incorporated, an insurance agency, for wire and mail fraud concerning fraudulent life insurance policies. The USPIS began its investigation when it received a report of an internal fraud investigation conducted by ING Group, N.V., a life insurance company, concerning a large number of multi-million dollar life insurance policies that the company believed Liberty Planning had fraudulently induced it to issue.

5. ING is an international financial services company that sells, among other things, life insurance. Liberty Planning is a general insurance agency located in Monsey, New York.[2] ING enters into agreements with a number of licensed insurance agents, such as the agents affiliated with Liberty Planning, whom ING has approved to act as insurance agents on ING life insurance policies. Each insurance agent is supposed to find potential insureds (or other persons with an insurable interest in the insured's life, such as a close relative of the insured) who wish to purchase life policies from ING. If ING approves an insured's application for a policy, the agent receives a commission out of the premiums that

---

[2] CHAIM LEBOVITS is listed on the Liberty Planning letterhead as the Vice-President of Liberty Planning and, based upon my understanding to date as a result of speaking with an ING investigator, LEBOVITS acts as the company's General Agent who is in charge of all of the other agents. In the report of ING's internal investigation, ING described MOSES SCHLESINGER as the Office Manager of Liberty Planning. SCHLESINGER reported on his passport application that he is Office Manager of Liberty Planning.

4

the insured (or the owner of the policy on the insured's life) pays to ING. In short, the ING insurance agent is a salesman for ING life insurance policies who is compensated by commission.

6. The investigation has uncovered facts indicating that CHAIM LEBOVITS, MOSES SCHLESINGER, a number of agents associated with Liberty Planning (the "SUBJECTS")[3] and others have been defrauding ING and other life insurance companies by submitting applications containing false statements to induce the insurance companies to enter into life insurance contracts. Specifically, Liberty Planning has submitted to ING and other insurance carriers numerous fraudulent applications to purchase multi-million dollar life insurance policies on elderly persons which the insurance companies would not have issued if they had known that: (1) the insureds' net worths were vastly overstated; (2) the insureds were not going to pay the enormous premiums on the policies but, instead, unrelated investors were going to pay the premiums; and (3) the intent of the applicants when they purchased the policies was to resell the policies at a profit on the open market after two years, instead of providing the insureds' families with financial protection in the event of the insureds' premature deaths.

---

[3]MOSES NEUMAN, also known as MOISHE, YUDAH NEUMAN, MELISSA GOLDBERGER, also known as MELISSA NEUMAN, REUVEN SOBEL, EDWARD GRODSKY, LENNY LNU, AVIGDOR GUTWEIN, MOSES SCHLESINGER, CHAIM LEBOVITS, LIPSHITZ YEHUDA BRIZEL, DAVID LNU, KENNY LNU, JEWEL STRADER, LEO FEKETE, ARNOLD COHEN, SOPHIA BRODSKY and ABRAHAM GREENBAUM are collectively referred to as the "SUBJECTS."

E00000755

7. Bank records show that the SUBJECTS and others created a complex financial network to funnel the premiums paid and the profits earned from the scheme. For instance, MOSES NEUMAN is the co-owner of Bold Associates, which funds other companies, including the Blue Rock Group, which in turn fund the life insurance trust [MA] bank accounts of some of Liberty Planning's clients, [from which premiums on the life insurance policies were paid. MA] The Blue Rock Group bank account at Bank of America is co-owned by MOSES NEUMAN and his brother YUDAH NEUMAN. Further, records show that a company called N.S. BP Realty LLC ("N.S. BP"), has a bank account that is co-owned by MOSES NEUMAN and REUVEN SOBEL. N.S. BP purports to be a real estate firm, but it partially funded at least one of the life insurance policies discussed below. Records also show that CHAIM LEBOVITS is also the Chief Executive Officer of a company called the Rocklyn Group, Ltd., which has the same address in Monsey, New York as Liberty Planning. Based upon financial analysis to date, the Rocklyn Group has paid at least $370,000 to Bold Associates and LEBOVITS has wire transferred at least $240,000 to Bold Associates from his personal account. AVIGDOR GUTWEIN, the Liberty Planning agent on many of the life insurance trusts of elderly Liberty Planning clients, also made payments of at least $5,800,000 to Bold Associates from his personal accounts. The premiums on the life insurance policies were paid by mail and by interstate wire transfer.

E00000756

8. ING, during its internal fraud investigation, initially identified policy applications submitted by Liberty Planning to ING on at least fifteen different elderly insureds (referred to collectively as the "Fifteen Insureds," when speaking about these fifteen elderly persons, and referred to collectively as the "Fifteen Insureds' Applications," when speaking of the insurance applications submitted by Liberty Planning to ING on behalf of these Fifteen Insureds). The Fifteen Insureds' Applications sought (and ultimately were granted) ING life insurance policies that totaled over $135,000,000. Subsequent to issuing these policies, ING investigated the Fifteen Insureds' Applications and, as a result, it terminated for cause its relationship with the five Liberty Planning agents (the "Five Agents") responsible for submitting the Fifteen Insureds' Applications. The "cause" that ING believed that it had for terminating the Five Agents was "misconduct," to wit, the Five Agents' misconduct in submitting applications for stranger owned life insurance policies to ING[4] containing significant incorrect and/or misleading information. None of the Five Agents cooperated with ING's investigation.[5] On some of the Fifteen

---

[4] Insurance companies in general, and ING in particular, will not knowingly issue life insurance policies to persons who are "strangers" to the insured, that is, persons who have no interest in the continued health of the insured and to whom the insured is worth more dead than alive.

[5] Liberty Planning, in addition to submitting applications to ING for each of the Fifteen Insureds, also submitted, on behalf of many of the Fifteen Insureds, applications for life insurance

7

Insureds' Applications, Liberty Planning submitted to ING false identifying information for the insureds. For example, it submitted a false social security number on the life of ARNOLD COHEN. Two of the Fifteen Insureds are Confidential Informants ("CI1" and "CI2"). Liberty Planning submitted an application for a $3,500,000 life insurance policy to ING on behalf of CI1. Liberty Planning submitted an application for a $10,000,000 life insurance policy on behalf of CI2. ING approved both of these applications.

9. CI2 stated that in late 2007, CI3[6], who is CI2's accountant, contacted CI2 and told him that he knew someone named

---

policies to life insurance companies other than ING.

[6] Neither CI2 nor CI3 have criminal records. Both are expected to enter into agreements with the government to testify. CI3 is cooperating out of concern for criminal exposure. CI2 agreed to cooperate when he was first interviewed by the United States Attorney's Office. CI2 feels that he was being used by the persons who approached him, as described in the text. Both CI2 and CI3, when they were first interviewed by the government, provided evidence of Liberty Planning's fraud against ING with respect to the CI2 life insurance policy. Their statements were corroborated, as shown below, by certain documents that CI3 turned over to the government, including copies of application documents that Liberty Planning directed CI2 and CI3 to sign in blank. Their statements were also corroborated by the fully filled out documents that Liberty Planning submitted to ING to apply for insurance on CI2's life, and by the evidence of Liberty Planning's fraud with respect to the other fourteen insureds' applications under investigation, including the evidence of the fraud with respect to the life insurance application on CI1's life, which is described below. While CI2 and CI3, who were always interviewed separately by the government, each made false statements about their own involvement in the fraud in their initial interviews with the government, each of them later corrected these statements, without having had any apparent contact with each other, and the corrected statement that each made to the government further corroborated the corrected statement that the other made to the government.

8

EDWARD GRODSKY who was looking for healthy elderly persons who were willing to purchase life insurance. According to CI3, he knew GRODSKY because GRODSKY was also an accountant who sold accounting software to CI3. GRODSKY called CI2 and told him that: (1) CI2 could obtain life insurance since he was healthy and between the ages of 81 and 84; (2) "investors," whom GRODSKY did not otherwise identify, rather than CI2 himself, would be paying the premiums on this policy; (3) the policy would be resold after two years at which time CI2 would be paid $2 million; and (4) CI2 would be paid $500 per month until the policy was resold. GRODSKY later told CI2 that CI2's net worth would be inflated in his insurance application. CI2 told the government that, in fact, his net worth is "very little," that he rents his apartment, and that from social security and his pension his total annual income is about $36,000. CI3, in substance, confirmed the above facts. The CI2 life insurance application that Liberty Planning submitted to ING, shows that the net worth and annual income figures that Liberty Planning listed for CI2 on CI2's insurance application to ING were, respectively, $17,400,000 and $475,000.[7] As in the case of the CI1 policy discussed below, the completed applications which Liberty Planning submitted for CI2 falsely stated that CI2 had not

---

[7]GRODSKY is not, as far as I know, a Liberty Planning agent, nor is he an insurance agent. The Liberty Planning agent who was listed on the CI2 Application was AVIGDOR GUTWEIN, who was also listed as the Liberty Planning Agent on six of the other Fifteen Insureds' Applications.

9

had any discussions about reselling the policy and that the premiums were going to be paid from income and savings (when in fact, they were going to be paid, and were paid, by investors). CI3, at GRODSKY's direction, was made the trustee of the CI2 life insurance trust and the trust bank account paid the premiums. According to CI3, he signed a number of starter checks for the trust bank account in blank at GRODSKY's direction, but otherwise played no part in making deposits into or disbursing funds from this bank account. The trust bank account was funded by organizations of which CI3 had never heard, including a company called the Blue Rock Group, LLC. The Blue Rock Group also made $500 monthly payments to CI2 for five months. Based upon my investigation thus far, I believe that the Blue Rock Group, which appears to be funded by Bold Associates, is controlled by the SUBJECTS.[8]

    10. According to CI2, two individuals named "MOISHE" and "LENNY", who said that they were associates of GRODSKY, visited CI2

---

[8] CI1 told a similar story to that told by CI2 and CI3. According to CI1, he was contacted by LEO FEKETE who convinced CI1 to obtain life insurance by telling CI1 that investors, rather than CI1, would pay the premiums, that CI1 would make money up front and would share the profits with FEKETE when the policy was later resold, and that FEKETE would inflate CI1's financial information in the application for life insurance since that would increase the money that would be made. FEKETE made CI1's wife the "trustee" of the CI1 life insurance trust bank account that paid the premiums on the policy, but neither CI1 nor CI1's wife controlled deposits into or withdrawals from that bank account. Bank records of that account show that N.S. BP and two "Congregations," none of which were entities of which CI1 had ever heard, helped fund that account.

10

CI2 advised that CI2 has caller ID and he saw the number of the SUBJECT 1800 TELEPHONE when MOISHE called him. In addition, MOISHE told CI2 that his telephone number was that of the SUBJECT 1800 TELEPHONE and CI2 later called MOISHE at the SUBJECT 1800 TELEPHONE and spoke with him over the telephone about the policies he had obtained through GRODSKY. ~~Indeed, MOISHE spoke with CI2 using the SUBJECT 1800 TELEPHONE.~~ (MA) MOISHE later stated to CI2 over the SUBJECT 1800 TELEPHONE that his last name is "NEUMAN." Based upon the investigation, I believe that "MOISHE" is MOSES NEUMAN.

11. In the summer of 2009, MOSES NEUMAN and LENNY told CI2 that they wanted to resell the CI2 life insurance policies that he already owned and that, in order to get more money for the policy when it was resold, CI2 would have to appear "unhealthy." Specifically, they instructed CI2 to go to his doctor and complain of a list of symptoms they provided to him which were supposedly symptoms of "TIA" ("Transient Ischemic Attacks"), a serious illness which CI2 did not in fact have. MOSES NEUMAN and LENNY also told CI2 that, before the doctor's visit, LENNY would prepare "strong cups of coffee" for CI2 to drink in order to raise CI2's blood pressure and that after the doctor's visit, LENNY would give CI2 the "cure" to get CI2's blood pressure back down. CI2 became concerned that LENNY and MOSES NEUMAN were trying to kill him to collect the full amount of the life policy on him.

12. During a telephone call that CI2 placed to MOSES NEUMAN at the SUBJECT 1800 TELEPHONE on November 3, 2009, which I consensually monitored, CI2 asked NEUMAN why CI2's $500 monthly payments had stopped a year earlier and NEUMAN responded that the monthly payments were an advance from the investors, that the

E00000761

investors had been dry for money but that money would be coming in soon. NEUMAN added that he would be able to send CI2 a payment in the next few days to a week. NEUMAN confirmed that EDWARD GRODSKY had told CI2 "when we started" that CI2 would make $2,000,000 in profits when the policy was resold after two years. NEUMAN further stated, however, that when those predictions had been made to CI2 the "market" was much better than it is now and that now the investors were going to try to get back the large amount of money that they had invested in the policies plus a profit. NEUMAN also stated that when the policies were resold, the money will go to CI2 and CI2 will have to sign the papers and then turn the money from the resale over to the investors. When CI2 asked about the purpose of his going to the doctor to complain of symptoms, MOSES NEUMAN replied that if CI2 suffered from medical problems that lowered his life expectancy then that would make CI2's life policy worth more money when they resold it to a potential buyer. Finally, when CI2 stated that the TIA symptoms that MOSES NEUMAN and LENNY told him to complain to the doctor about "were all made up" and not "real," MOSES NEUMAN stated that he (MOSES NEUMAN) thought that CI2 really suffered from those symptoms. CI2 reaffirmed to me after the phone call, that MOSES NEUMAN was well aware that CI2 did not have the symptoms about which MOSES NEUMAN and LENNY told him to complain to his doctor.[9] In particular, during the November 3 call, the

---

[9] CI2 provided to me the computer printout of TIA symptoms that LENNY, in MOSES NEUMAN's presence, had provided to CI2. According

E00000762

following specific exchange took place between CI2 and MOSES NEUMAN concerning who would get the money that was received from the purchaser when the CI2 policy was resold:

> CI2: And, and when you sell it then who gets the money, you do and ah
>
> MN: You, you get the money. You, you sign (UI) the (UI) over to the investors and everything.
>
> CI2: I'm sorry I missed that.
>
> MN: You get the money, you, you get money you have to sign everything it goes to you, you get the money.
>
> CI2: And then I give you the money, is that the idea?
>
> MN: You give the investors the money.
>
> CI2: I give the investors.
>
> MN: Right.

13. During a call between CI3 and LENNY on October 29, 2009, which I consensually monitored and which is discussed above, LENNY told CI2, in response to CI2's request to speak with MOSES NEUMAN, that LENNY would text message MOSES NEUMAN to make sure that MOSES NEUMAN called CI2 that day.

### PEN REGISTER ANALYSIS FOR THE SUBJECT 1800 TELEPHONE

14. Law enforcement obtained pen register records for the SUBJECT 1800 TELEPHONE from October 21, 2009 through December 30, 2009 (the "covered period.") These records show

---

to CI2, CI2 did not even know what TIA was or what its symptoms were prior to receiving that printout.

13

> The Majority of these contacts according to call site information occurred while the SUBJECT 1800 TELEPHONE was in Brooklyn NY. (MP)

that the SUBJECT 1800 TELEPHONE made and received approximately 465 contacts with the telephones of other SUBJECTS, including at least 21 contacts as recently as December 29 and 30, 2009, the last two days of the covered period. There is probable cause to believe that each of the SUBJECTS is a co-conspirator in the above described life insurance fraud scheme.[10]

---

[10] MELISSA GOLDBERGER, also known as MELISSA NEUMAN, is believed to be the wife of MOSES NEUMAN. She is the subscriber of the SUBJECT !800 TELEPHONE. She is the owner of the Brooklyn Life bank account. REUVEN SOBEL is the co-owner of the N.S. BP bank account. MOSES SCHELESINGER, the Office Manager of Liberty Planning, sent the New Business Transmittals to ING for each of the Fifteen Insureds, including the Fifteen Insureds' Applications. He sent an email to JEWEL STRADER which contained CI1's falsely inflated financial figures. STRADER prepared and sent to ING an Independent Report ("IR") that incorporated the falsely inflated financial figures for CI1 as CI1's actual financial figures. (An IR is a supposedly independent review prepared for an insurance company that either confirms or refutes the information that an applicant for life insurance places in his application. The IR is ordered by the general insurance agency.) Strader prepared the IRs for ING on seven of the Fifteen Insureds' Applications. LIPSHITZ YEHUDA BRIZEL is listed as the contact person for the Blue Rock Group on an application for a mail box that the Blue Rock Group opened. In addition, BRIZEL is listed on a deposit slip, depositing a $5,000 Bold Associates check into the Blue Rock Group bank account. According to CI2, DAVID LNU is a person who works with GRODSKY and who "calmed him down" when he became "upset" about his life insurance policy. ARNOLD COHEN is one of the Fifteen Insureds. In calls intercepted over the SUBJECT 1800 TELEPHONE between COHEN and MOSES NEUMAN (see paragraph 15), NEUMAN and COHEN discuss the fact that COHEN's ex-wife, SOPHIA COHEN BRODSKY, who apparently assisted NEUMAN and COHEN in connection with the fraudulent life policies on COHEN's life, was threatening to black mail them by going to the authorities unless she was paid what she was promised. NEUMAN and COHEN agree to pay BRODSKY $10,000, consisting of $3,500 each to be contributed by NEUMAN, COHEN and GRODSKY, to prevent BRODSKY from going to the authorities. AVIGDOR GUTWEIN is one of the Five Agents who was the insurance agent on seven of the Fifteen Insureds' Applications. He refused to cooperate with ING's internal fraud investigation and paid at least $5,800,000 of his own money into the account of Bold Associates. During a call

E00000764

15. The Pen Register information shows that eight percent of the approximately 465 contacts between the SUBJECT 1800 TELEPHONE and the telephones of other SUBJECTS during the Covered Period are text messages, rather than telephone calls. In other words, the SUBJECT 1800 TELEPHONE has been in contact via text messages with some of the same SUBJECTS that the SUBJECT 1800 TELEPHONE has been in contact with via telephone call over the same period. I have conferred with other Special Agents of the Investigating Agencies who have experience in the use of mobile telephones in the commission of crimes involving fraud, and, in their opinion and mine, MOSES NEUMAN and those with whom he is text messaging are probably using text messages in addition to telephone calls to further the above-described offenses.

### The Title III Intercepts

16. Commencing on January 20, 2010, the Investigating Agencies have been intercepting wire communications on the SUBJECT 1800 TELEPHONE (the "Intercepted Calls"), pursuant to an order issued under 18 U.S.C. § 2518 by the Honorable Sandra Townes. In an intercepted call that took place on January 21, 2010 between MOSES NEUMAN and an unknown individual who wanted an

---

intercepted over the SUBJECT 1800 TELEPHONE between NEUMAN, and KENNY LNU, NEUMAN and KENNY LNU discuss getting two policies for a guy and they agree that they will not "cooperate" against GITWEIN if a lawyer requests them to do so. During a call intercepted over the SUBJECT 1800 TELEPHONE between NEUMAN and ABRAHAM GREENBAUM, GREENBAUM and NEUMAN talk about arranging to resell life insurance policies.

15

invoice from MOSES NEUMAN, MOSES NEUMAN states, "[s]end me a text . . . next time send me a text its the best thing."[11]

17. Among the intercepted calls is also further evidence that MOSES NEUMAN uses the SUBJECT 1800 TELEPHONE to send text messages, as well as make telephone calls, in furtherance of the insurance fraud scheme. On January 26, 2010, NEUMAN placed a call over the Subject 1800 Telephone to CHAIM LEBOVITS. During that conversation with LEBOVITS, NEUMAN states:

> I'm sorry. <u>I've just sent you a text</u>. This guy gave me. I need to have money available . . . tomorrow to wire. Can you deposit it into the Bank of America . . . But I'll need it to be available in the Bank tomorrow. The Bank will do me a favor and make it available tomorrow, so I'll be able to wire back to this guy. Otherwise I'm paying crazy . . . money. I borrowed the money . . .

(emphasis added). Pen register records confirm that less than three minutes before MOSES NEUMAN placed the above call to CHAIM LEBOVITS over the SUBJECT 1800 TELEPHONE, NEUMAN sent a text message to CHAIM LEBOVITS over the SUBJECT 1800 TELEPHONE. I believe that in the above telephone call placed over the SUBJECT 1800 TELEPHONE, and in the text message that preceded it over the SUBJECT 1800 TELEPHONE, NEUMAN was trying to raise money from

---

[11] From January 20, 2010 until February 3, 2010, there were 81 pertinent telephone calls apparently related to the fraudulent scheme that were intercepted between the SUBJECT 1800 TELEPHONE and the telephones of other SUBJECTS. During the same time period, according to pen register data, there were 12 text messages between the SUBJECT 180 TELEPHONE and the telephones of other SUBJECTS.

16

E00000766

LEBOVITS, the Vice-President of Liberty Planning, who has wire transferred very significant amounts of money to Bold Associates, in order for NEUMAN to make payments in furtherance of the insurance fraud scheme.

## Conclusion

18. Based upon the facts described above, there is probable cause to believe that there will be found in the "SUBJECT 1800 TELEPHONE" certain electronic communications, including numeric, alphanumeric and text messages, concerning the participation of MOSES NEUMAN, also known as MOISHE, in a conspiracy to commit mail fraud and wire fraud, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349 and 1956.

WHEREFORE, your deponent respectfully requests that a warrant be issued allowing USPIS Postal Inspectors and Special Agents of the Investigating Agencies, with proper assistance from other law enforcement officers, to search for and seize ELECTRONIC COMMUNICATIONS *including numeric, alphanumeric and text messages* SENT OR RECEIVED OVER MOBILE TELEPHONE NUMBER (917) 559-1800 WITH ESN 268435457600516523, SERVICED BY *from November 3, 2009 to December 31, 2009* SPRINT PCS, SUBSCRIBED TO IN THE NAME OF MELISSA NEUMAN, 1181 44TH STREET, BROOKLYN, NEW YORK 11219 IN ELECTRONIC STORAGE OR IN A REMOTE COMMUTING SERVICE BY SPRINT PCS, 6480 SPRINT PARKWAY, OVERLAND, KANSAS 66251, *concerning the participation of Moses Neuman in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349 and 1956.*

17

E00000767

## Non-Disclosure

WHEREFORE, your deponent further respectfully requests that this affidavit be maintained under seal and that Sprint PCS be directed not to disclose the existence of this warrant or that records were provided pursuant to this search warrant.

Dated: Brooklyn, New York
February 5, 2010

_____
MARIA ALBRIGHT
Postal Inspectors
Untied States Postal Inspection
Service

Sworn to before me this
5 day of February, 2010

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

E00000768