M-10-501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
IN THE MATTER OF THE APPLICATION
FOR A SEARCH WARRANTS FOR:
THE CONTENTS OF ELECTRONIC
COMMUNICATIONS SENT OR RECEIVED
OVER THE EMAIL ACCOUNTS
david@adelphiadiabetic.com and
lenny@adelphiadiabetic.com, SERVICED          AFFIDAVIT IN SUPPORT OF
BY WEBHOSTINGPAD.COM INC.,                    SEARCH WARRANTS
SUBSCRIBED TO IN THE NAME OF YUDAH            (T. 18 U.S.C. § 2703)
NEUMAN, BROOKLYN, NEW YORK, IN
ELECTRONIC STORAGE OR IN A
REMOTE COMPUTING SERVICE BY
WEBHOSTINGPAD.COM INC., 5005
NEWPORT DRIVE, SUITE 503,
ROLLING MEADOWS, IL 60008,
AND CONTENTS OF ELECTRONIC
COMMUNICATIONS SENT OR RECEIVED OVER
THE EMAIL ACCOUNT
lenny@adelphiasupply.com, SERVICED
BY GODADDY.COM, Inc., SUBSCRIBED
TO IN THE NAME OF YUDAH NEUMAN,
BROOKLYN, NEW YORK, IN ELECTRONIC
STORAGE OR IN A REMOTE COMPUTING
SERVICE BY GODADDY.COM, Inc., 14455
N. HAYDEN ROAD, SUITE 219, SCOTTSDALE,
AZ 85260, AND CONTENTS OF
ELECTRONIC COMMUNICATIONS SENT OR
RECEIVED OVER THE EMAIL ACCOUNTS
5591800@gmail.com, SERVICED BY GOOGLE
INC., SUBSCRIBED TO IN THE NAME OF
MOSES NEUMAN a.k.a. MOISHE NEUMAN,
BROOKLYN, NEW YORK, and
kupshtik@gmail.com,  SERVICED BY
Google Inc., SUBSCRIBED TO IN THE
NAME OF YUDAH NEUMAN, BROOKLYN,
NEW YORK, IN ELECTRONIC STORAGE OR
IN A REMOTE COMPUTING SERVICE BY
GOOGLE INC., 1600 AMPHITHEATRE
PARKWAY, MOUNTAIN VIEW, CA 94043
- - - - - - - - - - - - - - - - - -X
EASTERN DISTRICT OF NEW YORK, SS:

      SHELDON TANG, being duly sworn, deposes and says that

he is a Special Agent with the Internal Revenue Service ("IRS"),

duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to

1

E00000796

believe that there is located in the PREMISES KNOWN AS ELECTRONIC MAIL ADDRESSES "DAVID@ADELPHIADIABETIC.COM" and "LENNY@ADELPHIADIABETIC.COM" (respectively, "PREMISES 1 and 2") controlled by the web-based electronic mail service provider WebHostingPad.com, Inc. (Provider 1) and subscribed to in the name of YUDAH NEUMAN, Brooklyn, New York; "LENNY@ADELPHIASUPPLY.COM" ("PREMISES 3") controlled by the web-based electronic mail service provider GoDaddy.com, Inc. (Provider 2) and subscribed to in the name of YUDAH NEUMAN, Brooklyn, New York, "5591800@GMAIL.COM" and "KUPSHTIK@GMAIL.COM" (respectively, "PREMISES 4 and 5") controlled by the web-based electronic mail service provider Google, Inc. (Provider 3) and subscribed to, respectively, in the names of MOSES NEUMAN, Brooklyn, New York, and YUDAH NEUMAN, Brooklyn, New York, subscriber/profile information, email transmission information, subject headings, to/from information, folders and email content (including all of the foregoing for deleted messages) as described more fully in Attachments A, B and C, for the dates between and including January 1, 2008 to the present with respect to PREMISES 1 and 2, and between and including January 1, 2009 to the present with respect to PREMISES 3, 4, and 5[1], which constitutes evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 371, 1341, 1343, 1349

---

[1] PREMISES 1,2,3,4 and 5 will sometimes be referred to collectively as the "PREMISES" or as the "five PREMISES" and Providers 1, 2 an 3 will sometimes be referred to collectively as the "Providers."

E00000797

and 1956 by MOSES NEUMAN, YUDAH NEUMAN, EDWARD GRODSKY and others.

1.  I am a Special Agent of the IRS, duly appointed according to law and acting as such.  I have been a Special Agent for approximately five and one half years.  During my tenure with the IRS I have participated in many fraud (including, tax fraud) and money laundering investigations, which have included, among other investigative techniques, the use of physical surveillance, execution of search warrants, consensual recordings of individuals associated with fraud and money laundering schemes and debriefing of cooperating witnesses and other informants.

2.  I make this Affidavit in support of the application of the United States of America for the issuance of search warrants to search the PREMISES controlled by the Providers. Based on information and belief, there is probable cause to believe that located in the PREMISES is evidence relating to the participation of MOSES NEUMAN, YUDAH NEUMAN (collectively, the "NEUMAN Brothers") and EDWARD GRODSKY, in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349 and 1956, and other items described in Attachments A, B and C, appended hereto.  MOSES NEUMAN is the subscriber of PREMISES 4 and YUDAH NEUMAN is the subscriber of PREMISES 1, 2, 3 and 5.

3.  The information contained in this affidavit is based, in part, on personal knowledge arising from my

3

E00000798

participation in this investigation, and, in part, on information and belief. The sources of my information and belief include, among other things: (a) statements made to me, and information provided to me by Special Agents of the IRS, Postal Inspectors of the United States Postal Inspection Service and investigators of the New York State Department of Insurance (collectively, "Agents of the Investigating Agencies") assigned to the investigation, confidential informants and other witnesses; and (b) my review of various documents and records. Where the statements of others or the contents of documents and records are related herein, they are related in substance and in part, and not verbatim, unless indicated otherwise. Since this affidavit is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the search warrants sought herein.

<u>APPLICABLE DEFINITIONS</u>

4.   The following terms have the indicated meaning in this affidavit:

a.   The term "computer," as used herein, is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

b.   The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic

4

form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bemoulli drivers, or electronic notebooks, as well as digital data files and printers or readouts from any magnetic, electrical or electronic storage device).

BACKGROUND INFORMATION REGARDING
THE INTERNET, COMPUTERS AND EMAIL

5.   I have had both training and experience in the investigation of crimes that involve the use of computers.  Based on my training, experience, knowledge, and conversations with other law enforcement agents familiar with computer crimes, I know the following:

a.   The internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities that connects computers and allows communications and the transfer of data and information across state and national boundaries.  The term computer includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or

5

storage functions, and includes any data storage facility or
communications facility directly related to or operating in
conjunction with such device.  In order to access the internet,
an individual computer user must subscribe to an access provider,
which operates a host computer system with direct access to the
Internet.  The world wide web ("www") is a functionality of the
Internet which allows users of the Internet to share information;

       b.  With a computer connected to the Internet, an
individual computer user can make electronic contact with
millions of computers around the world.  This connection can be
made by any number of means, including modem, local area network,
wireless, and numerous other methods; and

       c.  Electronic mail ("email") is a popular form of
transmitting messages and/or files in an electronic environment
between computer users.  When a computer user sends an email, the
email is initiated at the user's computer, transmitted to the
subscriber's mail server, and then transmitted to its final
destination.  A server is a computer attached to a dedicated
network and serves many users.  An Agents server may allow users
to post and to read messages and to communicate by electronic
means.

       d.  An instant messenger is a computer application
which allows real-time, instantaneous text communication between
two or more people -- much like an oral conversation -- through a
computer network, such as the Internet.  People communicating in
real-time through such application are said to be "instant-

E00000801

messaging" or "IM-ing" one another, or "chatting" with one another.

e. A "Newsgroup" is a site on the World Wide Web where any number of computer users can post messages to each other. These messages usually appear on an area of the screen next to the user's online nickname. The name of a "\\Newsgroup" generally stems from the topics discussed therein.

f. In addition to sending and receiving text messages and images, an individual can use the Internet to send or receive a video clip, which generally is in the form of an mpg file. A user can also use a webcam to capture live video images and then instantaneously transmit those images via the Internet to another user to be viewed on a computer at another location.

g. An Internet Service Provider ("ISP") is an organization or commercial service that provides individuals with access to the Internet computer network. The ISP assigns each user an Internet Protocol ("IP") number or address. This IP address is a multi-digit number (for instance, 209.209.171.80) that is required for a user to gain access to websites on the Internet or transmit files to other Internet users. An ISP assigns a unique IP address to each of its users accessing the Internet.

h. The user will maintain this same IP address for the period that he is connected to the Internet; for this reason, many Internet users with cable modems or Digital Subscriber Lines ("DSL" lines) maintain an IP address for long

7

periods of time because they maintain a constant connection to the Internet.

      6.   I have also learned the following about the Internet Service Provider:

      a.   The Provider operates Agents services which are available to Internet users.  Subscribers obtain an account by registering on the Internet with the Provider.  The Provider requests subscribers to provide basic information, such as name, gender, zip code and other personal/biographical information.  However, the Provider does not verify the information provided.

      b.   The Provider maintains electronic records pertaining to the individuals and companies for which it maintains subscriber accounts.  These records include account access information, email transaction information, and account application information.

      c.   Subscribers to the Provider may access their accounts on servers maintained and/or owned by the Provider from any computer connected to the Internet located anywhere in the world.

      d.   Any email that is sent to the Provider's subscriber is stored in the subscriber's "mailbox" on the Provider's servers until the subscriber deletes the email or the subscriber's mailbox exceeds the storage limits preset by the Provider.

      e.   When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to

8

E00000803

the Provider's servers, and then transmitted to its end
destination.  The Provider's users have the option of saving a
copy of the email sent.  Unless the sender of the email
specifically deletes the email from the Provider's server, the
email can remain on the system indefinitely.  The sender can
delete the stored email message thereby eliminating it from the
email box maintained at the Provider, but that message will
remain in the recipient's Agents box unless the recipient deletes
it as well or unless the recipient's account is subject to
account size limitations.

   f.  A Provider's subscriber can store files,
including emails and image files, on servers maintained and/or
owned by the Provider.

   g.  Emails and image files stored on a Provider's
server by a subscriber may not necessarily be located in the
subscriber's home computer.  The subscriber may store emails
and/or other files on the Provider's server for which there is
insufficient storage space in the subscriber's computer and/or
which he/she does not wish to maintain in the computer in his/her
residence.  A search of the files in the computer in the
subscriber's residence will not necessarily uncover the files
that the subscriber has stored on the Provider's server.

   h.  Computers located at the Provider contain
information and other stored electronic communications belonging
to unrelated third parties.  Accordingly, this affidavit and
application for search warrants seeks authorization solely to

E00000804

search the computer accounts and/or designated files and following the procedures described herein and in Attachments A, B and C.

STATUTORY PROVISIONS

7.   Title 18, United States Code, Sections 2701 through 2711, is entitled "Stored Wire and Electronic Communications and Transactional Records Access."

a.   Title 18, United States Code, Section 2703{a} provides, in part:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant.  A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

b. Title 18, United States Code, Section 2703(b) provides, in part:

> (1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection-
>
> > (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant.

10

E00000805

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service-

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

c. The government may also obtain records and other information pertaining to a subscriber or customer of an electronic communication service or remote computing service by way of a search warrant. 18 U.S.C. § 2703(c) (2). No notice to the subscriber or customer is required. 18 U.S.C. § 2703 (c) (3).

## THE INVESTIGATION

8. Since the summer of 2009, the Investigating Agencies have been investigating Liberty Planning, Incorporated, a general insurance agency, for possible tax fraud, fraud and money laundering crimes relating to fraudulent life insurance policies. The Investigating Agencies began their investigation when they received information concerning an internal fraud investigation conducted by ING Group, N.V., a life insurance company, concerning a large number of multi-million dollar life insurance policies that the company believed Liberty Planning had fraudulently induced it to issue.

11

E00000806

9.   ING is an international financial services company that sells, among other things, life insurance.   Liberty Planning is a general insurance agency located in Monsey, New York.   ING enters into agreements with a number of licensed insurance agents, such as the agents affiliated with Liberty Planning, whom ING has approved to act as insurance agents on ING life insurance policies.   Each insurance agent is supposed to find potential insureds (or other persons with an insurable interest in the insured's life, such as a close relative of the insured) who wish to purchase life policies from ING.   If ING approves an insured's application for a policy, the agent and the general insurance agency receive commissions out of the premiums that the insured (or the owner of the policy on the insured's life) pays to ING.   In short, in this case, the Liberty Planning agent is a salesman for ING life insurance policies who is compensated by commission.   The investigation has uncovered facts indicating that CHAIM LEBOVITS, the Vice President and General Agent for Liberty Planning, MOSES SCHLESINGER, the office Manager for Liberty Planning, a number of agents associated with Liberty Planning, including AVIGDOR GUTWEIN, and other persons who are not insurance agents and who are not employed by Liberty Planning, including MOSES NEUMAN, YUDAH NEUMAN and EDWARD GRODSKY, have been defrauding ING and other life insurance companies by submitting applications containing false statements to induce the insurance companies to issue life insurance policies.   Specifically, Liberty Planning

12

E00000807

has submitted to ING and other insurance carriers numerous fraudulent applications to purchase multi-million dollar life insurance policies on elderly persons which the insurance companies would not have issued if they had known that: (1) the insureds' net worths were vastly overstated; (2) the insureds were not going to pay the enormous premiums on the policies but, instead, unrelated investors were going to pay the premiums; and (3) the intent of the applicants when they purchased the policies was to resell the policies at a profit on the secondary life insurance market after two years,[2] instead of providing the insureds' families with financial protection in the event of the insureds' premature deaths.  The applications were approved and life insurance policies were issued.  The premiums on the fraudulent life insurance policies were paid by mail and by interstate wire transfer.

10.   ING, during its internal fraud investigation, initially identified policy applications submitted by Liberty Planning to ING on at least fifteen different elderly insureds (referred to collectively as the "Fifteen Insureds," when speaking about these fifteen elderly persons, and referred to

_____

[2]  Under New York law, an insurance company can rescind a life insurance policy based upon fraud within two years of the date that the policy was issued.  However, at the end of the two-year period, the policy can no longer be rescinded even if the company later discovers that the policy was fraudulently obtained.  After the two-year period, the insured may be able to resell the policy at a profit on the secondary market for life insurance policies.

collectively as the "Fifteen Insureds' Applications," when speaking of the insurance applications submitted by Liberty Planning to ING on behalf of these Fifteen Insureds). The Fifteen Insureds' Applications sought (and ultimately were granted) ING life insurance policies that totaled over $135,000,000. Subsequent to issuing these policies, ING investigated the Fifteen Insureds' Applications and, as a result, it terminated for cause its relationship with the five Liberty Planning agents (the "Five Agents") responsible for submitting the Fifteen Insureds' Applications. AVIGDOR GUTWEIN was one of the Five Agents and he was listed as the licensed insurance agent on seven of the Fifteen Insureds' Applications. The "cause" that ING believed that it had for terminating the Five Agents was "misconduct," to wit, the Five Agents' misconduct in submitting applications for stranger owned life insurance ("STOLI") policies[3] to ING containing significant incorrect and/or misleading information. None of the Five Agents cooperated with ING's investigation. On some of the Fifteen Insureds' Applications, including the application of ARNOLD COHEN, Liberty Planning submitted to ING false identifying information for the insureds, such as a false social security number. Two of the Fifteen Insureds are Confidential Informants ("CI1" and "CI2"). Liberty Planning submitted an

---

[3] Insurance companies in general, and ING in particular, will not knowingly issue life insurance policies to persons who are "strangers" to the insured, that is, persons who have no interest in the continued health of the insured and to whom the insured is worth more dead than alive.

14

application for a $3,500,000 life insurance policy on behalf of CI1 and an application for a $10,000,000 life insurance policy on behalf of CI2.  ING approved the CI1 and CI2 applications.

11.  CI2 stated that in late 2007, CI3,[4] who is CI2's accountant, contacted CI2 and told him that he knew someone named EDWARD GRODSKY who was looking for healthy elderly persons who were willing to purchase life insurance.  According to CI3, he knew GRODSKY because GRODSKY was also an accountant who sold accounting software to CI3.  GRODSKY called CI2 and told him that: (1) CI2 could obtain life insurance since he was healthy and between the ages of 81 and 84; (2) "investors," whom GRODSKY

---

[4]  Neither CI2 nor CI3 have criminal records.  Both are expected to enter into agreements with the government to testify. CI3 is cooperating out of concern for criminal exposure.  CI2 agreed to cooperate when he was first interviewed by the United States Attorney's Office.  CI2 feels that he was being used by the persons who approached him, as described in the text.  Both CI2 and CI3, when they were first interviewed by the government, provided evidence of Liberty Planning's fraud against ING with respect to the CI2 life insurance policy.  Their statements were corroborated, as shown below, by certain documents that CI3 turned over to the government, including copies of application documents that Liberty Planning directed CI2 and CI3 to sign in blank.  Their statements were also corroborated by the fully filled out documents that Liberty Planning submitted to ING to apply for insurance on CI2's life, and by the evidence of Liberty Planning's fraud with respect to the other fourteen insureds' applications under investigation, including the evidence of the fraud with respect to the life insurance application on CI1's life, which is described below.  While CI2 and CI3, who were always interviewed separately by the government, each made false statements about their own involvement in the fraud in their initial interviews with the government, each of them later corrected these statements, without having had any apparent contact with each other, and the corrected statement that each made to the government further corroborated the corrected statement that the other made to the government.

15

E00000810

did not otherwise identify, rather than CI2 himself, would be paying the premiums on this policy; (3) the policy would be resold after two years at which time CI2 would be paid $2 million; and (4) CI2 would be paid $500 per month until the policy was resold. GRODSKY later told CI2 that CI2's net worth would be inflated in his insurance application. CI2 told the government that, in fact, his net worth is "very little," that he rents his apartment, and that from social security and his pension his total annual income is about $36,000. CI3, in substance, confirmed the above facts. The CI2 life insurance application that Liberty Planning submitted to ING, shows that the net worth and annual income figures that Liberty Planning listed for CI2 on CI2's insurance application to ING were, respectively, $17,400,000 and $475,000.[5] As in the case of the CI1 policy discussed below, the completed applications which Liberty Planning submitted for CI2 falsely stated that CI2 had not had any discussions about reselling the policy and that the premiums were going to be paid from income and savings (when in fact, they were going to be paid, and were paid, by investors). CI3, at GRODSKY's direction, was made the trustee of the CI2 life insurance trust and the trust bank account paid the premiums. According to CI3, he signed a number of starter checks for the trust bank account in blank at GRODSKY's

---

[5] GRODSKY is not, as far as I know, a Liberty Planning employee, nor is he an insurance agent. The Liberty Planning agent who was listed on the CI2 Application was AVIGDOR GUTWEIN, who was also listed as the Liberty Planning Agent on six of the other Fifteen Insureds' Applications.

E00000811

direction, but otherwise played no part in making deposits into
or disbursing funds from this bank account.  The trust bank
account was funded by organizations of which CI3 had never
heard, including a company called the Blue Rock Group, LLC.  The
Blue Rock Group also made $500 monthly payments to CI2 for six
months.[6]  Based upon my investigation thus far, I believe that
the Blue Rock Group, which appears to be funded by Bold
Associates, is controlled by the subjects of this investigation.

      12.  According to CI2, two individuals named "MOISHE"
and "LENNY", who said that they were associates of GRODSKY,
visited CI2 and spoke with him over the telephone about the
policies he had obtained through GRODSKY.  MOISHE stated to CI2
over the telephone that his last name is "NEUMAN."  As a result
of the investigation I have come to believe that MOISHE is MOSES
NEUMAN and LENNY is YUDAH NEUMAN, MOSES NEUMAN's brother.

      13.  In the summer of 2009, MOSES NEUMAN and YUDAH
NEUMAN told CI2 that they wanted to resell the CI2 life

---

    [6]  CI1 told a similar story to that told by CI2 and CI3.
According to CI1, he was contacted by LEO FEKETE who convinced
CI1 to obtain life insurance by telling CI1 that investors,
rather than CI1, would pay the premiums, that CI1 would make
money up front and would share the profits with FEKETE when the
policy was later resold, and that FEKETE would inflate CI1's
financial information in the application for life insurance since
that would increase the money that would be made.  FEKETE made
CI1's wife the "trustee" of the CI1 life insurance trust bank
account that paid the premiums on the policy, but neither CI1 nor
CI1's wife controlled deposits into or withdrawals from that bank
account.  Bank records of that account show that N.S. BP, a MOSES
NEUMAN controlled company, and two "Congregations," none of which
were entities of which CI1 had ever heard, helped fund that
account.

E00000812

insurance policies that CI2 already owned and that, in order to get more money for the policy when it was resold, CI2 would have to appear "unhealthy." Specifically, they instructed CI2 to go to his doctor and complain of a list of symptoms they provided to him which were supposedly symptoms of "TIA" ("Transient Ischemic Attacks"), a serious illness which CI2 did not in fact have. MOSES NEUMAN and YUDAH NEUMAN also told CI2 that, before the doctor's visit, YUDAH NEUMAN would prepare "strong cups of coffee" for CI2 to drink in order to raise CI2's blood pressure and that after the doctor's visit, YUDAH NEUMAN would give CI2 the "cure" to get CI2's blood pressure back down. CI2 became concerned that YUDAH NEUMAN, whom he only knew as Lenny, and MOSES NEUMAN were trying to kill him to collect the full amount of the life policy on him.

14. MOSES SCHLESINGER, the Office Manager of Liberty Planning, ordered an Inspection Report ("IR") on the CI1 application to ING for a $10,000,000 life insurance policy (See, previous footnote for a description of the CI1 ING life insurance policy). An IR is a supposedly "independent" report to the insurance company, prepared by a supposedly "independent" source, which is supposed to confirm or refute for the insurance company the accuracy of the information set forth by the applicant/insured in an insurance application. SCHLESINGER ordered the IR on the CI1 application to ING from JEWEL STRADER. STRADER has "confirmed" the accuracy of information in other applications that were subsequently investigated and are, after

18

investigation, believed to be fraudulent.  In the email SCHLESINGER sent to STRADER, he provided STRADER with grossly exaggerated net worth and annual income figures for CI1, namely $5,300,000 and $325,000 respectively.  STRADER, in her subsequent IR to ING on the CI1 application, confirmed these grossly exaggerated financial figures for CI1.  On or about June 11, 2008, at approximately 3:05 p.m., SCHLESINGER forwarded the email with the exaggerated financial figures that he had previously sent to STRADER to "Lenny Neuman", which I believe is YUDAH NEUMAN'S screen name for his email accounts.

15.  Based upon my investigation thus far, I believe that CHAIM LEBOVITS, MOSES SCHLESINGER, AVIGDOR GUTWEIN, the NEUMAN Brothers and EDWARD GRODSKY are involved, along with others, in a fraudulent scheme in which (1) elderly persons of modest means are convinced to take out multi-million dollar life insurance policies, (2) the applications for the insurance contain lies to induce the insurance companies to issue the policies, (3) after the policies are issued, the conspirators try to resell the policies at huge profits on the secondary life insurance market and (4) the conspirators set up a complex financial network to conceal the source of the monies that funded the premium payments on these policies and the profits earned from the scheme.  The financial network, which involves companies that are controlled by the NEUMAN Brothers and that are funded, in part, by LEBOVITS and GUTWEIN, is described below.

E00000814

16.  a.  Records show that the NEUMAN Brothers and EDWARD GRODSKY are the trustees of a number of life insurance trusts' bank accounts purportedly opened and funded by the insureds and/or the beneficiaries of the fraudulent insurance policies.  These trust bank accounts pay the premiums to the insurance companies.  Investigation revealed that the NEUMAN Brothers, GRODSKY and other co-conspirators were really the ones who controlled the insurance trusts' bank accounts.  The insureds were merely nominees being used for the purposes of purchasing life insurance policies and opening trust bank accounts.  Some of the Fifteen Insureds' and many other insureds' trust bank accounts received monies from the Blue Rock Group LLC, whose bank account is controlled by YUDAH NEUMAN, and the Brooklyn Life Group, whose bank account is controlled by MOSES NEUMAN'S wife, MELISSA NEUMAN.  The Blue Rock Group and Brooklyn Life are both in turn funded by the Bold Associates Inc.  MOSES NEUMAN is the co-signer of the Bold Associates bank account and I believe that he is its co-owner.  Bold Associates is, as explained below, funded in part by CHAIM LEBOVITS and AVIGDOR GUTWEIN.  Records show that CHAIM LEBOVITS, in addition to being the Vice President and General Insurance Agent of Liberty Planning, is also the Chief Executive Officer of a company called the Rocklyn Group, Ltd., which has the same address in Monsey, New York as Liberty Planning.  Based upon financial analysis to date, the Rocklyn Group has paid at least $370,000 to Bold Associates and LEBOVITS has wire transferred at

20

E00000815

least $601,000 to Bold Associates from his personal account.  A
few months after the $601,000 was wire transferred from
LEBOVITS's personal account to Bold Associates, Bold Associates
issued a check in the amount of $370,000 to LEBOVITS.  Financial
analysis to date of records pertaining to GUTWEIN has shown that
in 2008 and 2009, GUTWEIN earned approximately $15,000,000 in
commissions from insurance companies.  However, during the same
time frame, he transferred approximately $5,800,000 from his
personal accounts to Bold Associates, and four limited liability
companies of which he is a member transferred an additional
$1,800,000 to Bold Associates.

          b.   The Blue Rock Group and Brooklyn Life Group also
made periodic "incentive payments" to some of the Fifteen
Insureds, such as CI2, as described above, and many other
insureds.  For example, examination of bank records showed that
during years 2008 and 2009, ARNOLD COHEN, and MYRNA ROBENO were
among the insureds who received checks in amounts of $250, $500,
or $750 from the bank account of the Blue Rock Group.  During
the same time period, BERYL BELL, EMY ADLER and MYRNA ROBENO
were among the many insureds who received checks in amounts of
$250 or $500 from the bank account of Brooklyn Life Group.

          c.  According to Transamerica Life Insurance Co., it
issued an insurance policy on the life of ARNOLD COHEN in the
amount of $10,000,000 that was later resold on the secondary
market.  According to ING, it issued an insurance policy on the

E00000816

life of ARNOLD COHEN[7] in the amount of $10,000,000.  ARNOLD

COHEN is one of the Fifteen Insureds.  GRODSKY is listed as the

trustee of both policies.  Records show that between March 2008

and August 2009 a series of "incentive" checks totaling

approximately $5,200 were issued from Blue Rock Group to ARNOLD

COHEN.  Blue Rock Group and Brooklyn Life also made payments to

two ARNOLD COHEN insurance trust bank accounts in the amounts,

respectively, of $221,250 and $10,000.  The insurance trust

accounts subsequently paid the monies to Transamerica Life

Insurance Company as premiums.  CHAIM LEBOVITS also paid

$350,000 to one of the ARNOLD COHEN insurance trust bank

accounts, and those monies were subsequently paid from the

ARNOLD COHEN trust bank accounts to ING.

      d.  Records show that a series of $250 checks were

issued from Brooklyn Life to BERYL BELL each month from

September 2008 to March 2009.  Brooklyn Life paid approximately

---

[7] On January 11, 2010, as amended on January 19, 2010, the
Honorable Sandra L. Townes, United States District Judge, Eastern
District of New York issued an order (the "Original Title III
Order") authorizing the interception of wire communications to
and from MOSES NEUMAN's cellular telephone.  In a series of calls
intercepted over MOSES NEUMAN's cellular telephone, including
calls as early as January 20, 2010 and calls as late as February
8, 2010, MOSES NEUMAN discussed with several coconspirators the
fact that COHEN's ex-wife, SOPHIA COHEN BRODSKY, who may have
assisted MOSES NEUMAN and COHEN in connection with the fraudulent
life policies on COHEN's life, was threatening to black mail them
by going to the authorities unless she was paid what she was
promised.  As a result of calls between MOSES NEUMAN and COHEN
and between MOSES NEUMAN and GRODSKY, all of which were
intercepted, the three agreed to pay BRODSKY $10,000, consisting
of equal contributions from each of the three, to prevent BRODSKY
from going to the authorities.

E00000817

$78,000.00 to one of the BERYL BELL life insurance trust bank accounts.  While one of the BERYL BELL life insurance trust bank accounts was, as noted above, funded by Brooklyn Life, another BERYL BELL life insurance trust bank account received funds from one of the many ARNOLD COHEN life insurance trust bank accounts. The ARNOLD COHEN life insurance trust bank account that funded a BERYL BELL life insurance trust bank account was controlled by EDWARD GRODSKY.

17.  On February 5, 2010, the Honorable Steven Gold issued a search warrant to search EGSYS@aol.com, the email account of EDWARD GRODSKY, for the content of emails in that account (the "GRODSKY SW").  The government executed the GRODSKY SW on the same day it was issued.  Based on the content of the emails that the government obtained as a result of the GRODSKY SW, I believe that the NEUMAN Brothers used each of the five PREMISES in furtherance of the fraudulent insurance scheme being investigated.  The NEUMAN Brothers often used the five PREMISES to forward emails in furtherance of the fraudulent scheme to GRODSKY.  The government obtained these emails when it executed the GRODSKY SW.  There is probable cause to believe that each of the below-described emails between the NEUMAN Brothers and GRODSKY was sent in furtherance of the fraudulent scheme in light of: (1) the facts set forth above; (2) the facts set forth below in connection with specific emails; and (3) the fact that none of GRODSKY, MOSES NEUMAN and YUDAH NEUMAN was a licensed insurance agent or an employee of Liberty Planning and thus had

23

no legitimate reason to be communicating about the original issuance of, or the attempt to resell, life insurance policies that Liberty Planning had obtained on behalf of its clients from insurance companies.

## PREMISES 1

18. I learned about PREMISES 1 as follows. An application for a bank account in the name of Bold Associates at Signature Bank, a bank account that MOSES NEUMAN controlled, listed PREMISES 1 as the Bold Associates email address. On November 10, 2009, an internet domain search of adelphiadiabetic.com was performed to determine the registrant for the adelphiadiabetic.com website. The search result showed "Dave Neuman" at neu987654@aol.com as the administrative contact for adelphiadiabetic.com. The subscriber for neu987654@aol.com has been confirmed to be MOSES NEUMAN. I believe that MOSES NEUMAN created a screen name "Dave Neuman" or "David Neuman" for his email accounts. A subsequent search was performed on the same internet website, "adelphiadiabetic.com"; however, the administrative contact had, by the time of that subsequent search, been changed to YUDAH NEUMAN at PREMISES 5. Moreover, the subscribers for PREMISES 1 and PREMISES 2 have been confirmed to be, respectively, MOSES NEUMAN and YUDAH NEUMAN. From emails that I have reviewed as a result of the GRODSKY SW, there were several occasions on which the PREMISES 5 email address was listed together with the screen name "L Neuman". I believe YUDAH NEUMAN also created a screen name "L NEUMAN" or

24

E00000819

"Lenny Neuman" for his email accounts.

19. As shown below, MOSES NEUMAN and YUDAH NEUMAN utilized PREMISES 1 and PREMISES 2 to engage in email exchanges in furtherance of the fraudulent scheme:

a. On or about May 12, 2008 at approximately 10:18 a.m., MOSES SCHLESINGER forwarded an email he previously received from a third party to the NEUMAN Brothers. The original email was from a service representative of Union Central Life Insurance Company who sent an email to SCHLESINGER stating: "Hi Moses, We need the trust info. Please order an APS from Dr. O'Donnell. Please order an IR. Please provide statement from applicant's accountant verifying income and NW." The subject line of the email was "B Bell U43660". An "APS," as the term is used in the life insurance industry, is an Attending Physician's Statement from a life's insurance applicant's physician which contains medical information on the applicant that the company will use to decide whether or not to issue the policy. An IR is an Inspection Report which, as discussed above, is a report from an independent source that is supposed to confirm or refute the information in the application for life insurance. The term "NW" that is sought from "the applicant's accountant" in the above email refers to the applicant/insured's net worth. I believe that this email, and the other emails referred to in the remainder of this paragraph, relate to BERYL BELL applications for life insurance. As shown in paragraphs 16 c and 16 d above, there is probable cause to believe that BERYL

E00000820

BELL applications for life insurance are part of the fraudulent scheme being investigated because BERYL BELL received incentive payments from Brooklyn Life and because the BERYL BELL Life Insurance Trust Banks Accounts that paid premiums were funded by Brooklyn Life and by an ARNOLD COHEN Life Insurance Trust Bank Account.  On or about May 12, 2008 at approximately 11:18 a.m., MOSES NEUMAN forwarded the email mentioned above from PREMISES 1 to GRODSKY.  GRODSKY is an accountant and I believe that the email was being forwarded to him to "certify" the insured's net worth.  On or about August 15, 2008 at approximately 11:18 a.m., MOSES SCHLESINGER forwarded an email he previously received from a third party to the NEUMAN Brothers and CHAIM LEBOVITS.   The original email, which had the subject line "B Bell U000043660," was from another service representative of Union Central Life Insurance Company who sent an email to SCHLESINGER stating: "Hi Moses, The facility we are trying to obtain records from requires a special authorization be completed.  I've attached a copy below.  Please have the client complete this and return to us or the facility.  Also, per the underwriter:  For the financial information, we must have something signed by the accountant listing assets and their value to accept."  On or about August 18, 2008 at approximately 1:39 p.m., MOSES NEUMAN forwarded the previous email from PREMISES 1 to GRODSDKY.  The attachment was a form titled "Authorization to Disclose Health Information" where at the field for Patient's Name, it listed "Mr. B Bell".

26

b.  On or about December 24, 2008 at approximately
2:59 p.m., MOSES NEUMAN sent an email with an attachment from
PREMISES I to GRODSKY.  The attachment is a DHL shipping label
which showed the sender and address as "e grotzky 231 vermont
ave Oceanside, NY 11572 United States Phone: 5166786519".  The
label showed the destination as "Fran Fuertes 44-30 Douglaston
Pkwy Apt 7L Douglaston, NY 11363".

c.  According to Lincoln Financial Life Insurance
Company, it issued a $1,500,000 life insurance policy on the
life of AMPARO FUERTES.  "Fransisco Fuertes" is listed as the
trustee of that policy.  Brooklyn Life paid approximately
$109,340 to an insurance trust bank account opened in the name
of AMPARO FUERTES.  The insurance trust bank account
subsequently paid approximately $109,340 in premiums to Lincoln
Financial Group.  The bank statements show that AMPARO FUERTES
resides at 44-30 Douglaston Pkwy, Douglaston, NY 11363-1853.  I
believe that the email referred to in "b" related to an
insurance policy issued on the life of AMPARO FUERTES that was
fraudulent because the premiums on the policy were paid by
Brooklyn Life, and because GRODSKY and MOSES NEUMAN, who had no
legitimate reason to be involved in insurance policies,
exchanged shipping information about the trustee of that policy.

d.  On or about February 6, 2009 at approximately
2:00 p.m., GRODSKY sent to PREMISES 1 and 2 an email (the
"original email") which contained the subject line "saul
Schneider memo," and which stated: "You must make sure that the

27

E00000822

attached has been taken care of." The Investigating Agencies
do not have the attachment to the previous email but it appears
from the previous email subject line that the attachment was
related to the "Saul Schneider Memo." On or about February 9,
2009 at approximately 2:13 p.m., MOSES NEUMAN, using PREMISES 1,
sent back to GRODSKY a copy of the original email stating to
GRODSKY: "I need a copy of the statement to see which account he
is talking about".

    e.  There is an EILEEN SCHNEIDER life insurance policy
issued by Union Central for $5,000,000. Saul Schneider is
listed as the trustee on the policy. Records show that monthly
$500 "incentive" checks were issued from Brooklyn Life to
EILEEN SCHNEIDER from September 2008 to March 2009. Brooklyn
Life paid approximately $590,000 to EILEEN SCHNEIDER insurance
trust bank accounts. Saul Schneider is listed as the trustee on
two of the EILEEN SCHNEIDER insurance trust bank accounts. One
of the EILEEN SCHNEIDER insurance trust bank accounts
subsequently paid approximately $236,000 to Union Central
Insurance Company in premiums. I believe that the emails in "d"
above related to a fraudulent insurance policy issued on the
life of EILEEN SCHNEIDER. I believe that the policy was
fraudulent because the insured received monthly incentive
payments, the premiums on the policy were secretly paid by
Brooklyn Life, and the NEUMAN Brothers and GRODSKY, who have no
legitimate reason to be involved with life insurance policies,

E00000823

were involved with "taking care of" a memo concerning the
trustee of this insurance policy.

### PREMISES 2

f.   On or about September 9, 2009 at
approximately 1:09 p.m., YUDAH NEUMAN, using PREMISES 2,
forwarded an email to GRODSKY.   The subject line of the
forwarding email was "FW: LAURIANA MORALES U-572U".   The
original email was apparently sent by a representative of Union
Central Life Insurance to SCHLESINGER, although the header
information of the original email, including the recipient's
email address, was deleted.   The original email stated: "Hello
Moses, Per the underwriter, since the case is 6 months old we
need the following: 1. New application 2. Blood 3. HOS 4. MD
Exam  5. EKG  6. IR."  The items in 2 through 6 of the email are
precisely the kinds of underwriting information that an
insurance company would ask the insurance agent of an
applicant/insured for life insurance to supply before deciding
whether to issue the policy.  We have not yet received all
pertinent records from Union Central Life Insurance Co., and
thus, at present we cannot yet confirm whether Union Central
issued a life insurance policy on LAURIANA MORALES.
Nonetheless, we can confirm that members of the conspiracy being
investigated have succeeded in getting life insurance in the
name of LAURIANA MORALES from different insurance companies.[8]

---

[8]According to Phoenix Life Insurance Company, it issued a
life insurance policy in the amount of $1,000,000 on the life of
LAURIANA MORALES.  The insurance agencies that handled the

29

E00000824

g.  On or about September 21, 2009 at approximately
7:24 p.m., YUDAH NEUMAN, using PREMISES 2, sent an email with an
attachment to GRODSKY.  The subject line of the email was "hippa
form for JAMES CALDERON".  The attachment was a form titled
Authorization for Release of Health-Related Information.
Underneath the title, it contains the sentence, "This
authorization complies with the Health Insurance Portability and
Accountability Act (.HIPAA.)"  The first paragraph on the form
stated, in part: "I (we) hereby authorize any physician; medical
practitioners . . . which has the type of data defined below to
provide Liberty Planning, Inc. its agents, employees and
representatives and any Insurance Company they represent . . . "

h.  On or about June 1, 2009 at approximately 5:16
p.m., MOSES SCHLESINGER sent an email to the NEUMAN brothers at
PREMISES 2 and PREMISES 4.  The subject line of the email was
"THERESA FERRARO APS Summary.pdf".  On or about June 1, 2009 at
approximately 9:30 p.m., MOSES NEUMAN sent an email with an
attachment from PREMISES 4 to GRODSKY.  The subject line of the
email was "THERESA FERRARO APS Summary.pdf".  The attachment was
a detailed medical report titled "Underwriting Assessment
06/01/2009 Proposed Insured THERESA FERRARO Age/Gender F 76
01/10/33", where at the field for General Agent, it listed CHAIM
LEBOVITS.  As previously stated, LEBOVITS is listed on the

purchase of that particular policy were Liberty Planning and EG
Planning, the latter being a limited liability corporation
controlled by GUTWEIN.

30

E00000825

Liberty Planning letterhead as the Vice-President of Liberty Planning and he is its General Agent.  I believe that the emails mentioned above in paragraphs 19f - h are attempts by the NEUMAN Brothers and GRODSKY to purchase fraudulent insurance policies issued on the lives of Morales, Calderon, and Ferraro.  In paragraphs 19f - h, the Office Manager of Liberty Planning, SCHLESINGER, provided highly confidential information, including a detailed medical report, necessary for the underwriting of the policies to YUDAH NEUMAN.  YUDAH NEUMAN provided that information to GRODSKY.  The NEUMAN Brothers and GRODSKY are not licensed insurance agents and are not employed by Liberty Planning. Indeed, GRODSKY is an accountant.  The NEUMAN Brothers and GRODSKY had no right to receive highly confidential information on these life insurance applicants from the Office Manager of Liberty Planning.  I believe that the NEUMAN Brothers and GRODSKY were sent these documents because of their central roles in the fraudulent scheme under investigation.  As seen in the case of CI2, they sometimes were the conspirators who made the direct contacts with the insureds.

       i.  As seen in paragraphs19d & e above, the February 6, 2009 email sent by GRODSKY concerning the Saul Schneider memo was in furtherance of the fraudulent scheme being investigated and GRODSKY sent that email to PREMISES 2 as well as PREMISES 1.

31

E00000826

## PREMISES 3

20. YUDAH NEUMAN sent from and received at PREMISES 3 several emails, including, among others, the following:

a. On or about December 31, 2009 at approximately 12:06 p.m., YUDAH NEUMAN, using PREMISES 3, sent an email with an attachment from PREMISES 3 to GRODSKY. The attachment was a blank insurance form from ING titled "Surrender Application." Among other information, the form contained fields for information about the policy's owner and surrender proceeds payment options.

b. On or about January 20, 2010 at approximately 3:33 p.m., YUDAH NEUMAN, using PREMISES 3, sent an email with an attachment to GRODSKY. The attachment was a blank insurance form from ING titled "Surrender Application".

c. On or about January 20, 2010 at approximately 3:38 p.m., GRODSKY, in response to the email referred to in paragraph "b," sent an email to YUDAH NEUMAN at PREMISES 3, stating: "file still not coming through Ed."

d. Beginning on December 17, 2009, ING started filing lawsuits to rescind the life insurance policies of insureds whose applications were submitted by insurance agents affiliated with Liberty Planning. The lawsuits alleged that the policies were issued as a result of fraud. Pursuant to an extension of the Original Title III Order, on March 24, 2010, a telephone call from EDWARD GRODSKY to MOSES NEUMAN was intercepted. During that call, NEUMAN and GRODSKY discussed the

32

E00000827

ING life insurance policy on one of the Fifteen Insureds, AMALIA SIMON, which ING had brought suit to rescind.  NEUMAN told GRODSKY that he did not want ING to obtain a default judgment [for fraud] in the suits ING brought, because "its not good to have a judgment."  I believe that, when he said that, NEUMAN meant that if ING obtained default judgments for fraud that such a judgment would make it difficult for the coconspirators to resell the non-ING policies on the secondary market.  NEUMAN told GRODSKY that what he wanted to be able to do to resolve the SIMON suit was to demand that ING return the premiums previously paid to it on the SIMON policy[9] and negotiate a settlement with ING under which ING would not receive a judgment, but that instead, the policy would be surrendered to ING and ING would pay a monetary settlement to the owner of the policy.  I believe that the emails in paragraphs 20a-c were in furtherance of the fraudulent scheme because they were transmittals of blank ING surrender forms that the conspirators intended to use to surrender other policies which ING had sued to rescind, thus avoiding judgments in those other lawsuits.

### PREMISES 4 and 5

21.  The NEUMAN Brothers sent and received numerous emails over PREMISES 4 and PREMISES 5, including, among others, the following:

---

[9] That would not be a frivolous position to take with ING because, ordinarily, when an insurance company succeeds in rescinding a policy it must return to the owner of the policy the premiums that had already been paid to the insurance company.

33

E00000828

a.   On or about August 25, 2009 at approximately
12:43 p.m., MOSES NEUMAN forwarded a partially deleted email from
PREMISES 4 to GRODSKY.  The subject line of the email was "Fwd:
We are not done but here is what we have so far - MYRNA ROBENO."
The original email was sent by a representative of MediSummary, a
firm specializing in the underwriting of life settlements cases,
that is, the resale of life policies on the secondary insurance
market.  The body of the original email is a detailed medical
report concerning MYRNA ROBENO's current medical condition and
past medical history.  There is also a section in the report
entitled "MORE DETAIL THAT COULD LOWER LIFE EXPECTANCY".
According to Lincoln Financial, it issued a life insurance policy
on the life of MYRNA ROBENO in the amount of $8,000,000, and
Stacy Wasserman was listed as the trustee of that policy.
Records show that a series of $250 checks were issued monthly
between November 2008 and March 2009 from Blue Rock Group to
MYRNA ROBENO.  When one of the $250 checks was returned for
insufficient funds in February 2009, a replacement check of $250
from Brooklyn Life was paid to Robeno.  Blue Rock Group also paid
$263,660 to a MYRNA ROBENO life insurance trust bank account.
The insurance trust bank account subsequently paid approximately
$263,760 in premiums to Lincoln Financial Group.  In March 2008,
a STEVE WASSERMAN, who may be related to the Robeno trustee,
Stacy Wasserman, was paid $500 by the Blue Rock Group, and in
September 2008 he was paid $500 by Brooklyn Life.  I believe that
the above email was in furtherance of the fraudulent scheme,

34

E00000829

because it involved an attempt to resell the Robeno policy - -
life settlement companies arrange resales of policies on the
secondary market - - and there is probable cause to believe that
the Robeno policy was part of the fraudulent scheme.[10]

      b.  On or about September 21, 2009 at approximately
10:07 a.m., an employee of Global Life Settlement, another
company involved in the resale of insurance policies on the
secondary market, forwarded to MOSES NEUMAN at PREMISES 4 an
email from a third party.  The original email was sent by a
representative of MediSummary to this Global Life employee.  The
body of the original email discussed "Medicals that could lower
the LE".  The subject line of the original email was "TARQUINIO
VETURINO MediSummary for Global Life Settlements 09/19/2009."  On
or about September 21, 2009 at approximately 1:09 p.m., MOSES
NEUMAN, using PREMISES 4, forwarded the email to GRODSKY.  The
term "LE" is an abbreviation for Life Expectancy, which is an
important consideration in the resale of life insurance policies.
According to Lincoln Financial, it issued a life insurance policy
on the life of TARQUINIO VETURINO in the amount of $5,000,000.
EDWARD GRODSKY is listed as the trustee of the policy.  Records

---

    [10]  The fact that the Blue Rock Group and Brooklyn Life made
incentive payments to ROBENO and WASSERMAN and the fact that the
Blue Rock Group secretly paid the premiums on the policy
establish probable cause without more.  Also, on February 23,
2010, pursuant to an extension of the Original Title III Order, a
call from MOSES NEUMAN to the office of the doctor of MYRNA
ROBENO was intercepted.  During the call, MOSES NEUMAN falsely
posed as a person named "Josh" from a life settlement company in
order to obtain confidential medical information on Robeno that
would assist in reselling the policy.

show that Brooklyn Life paid $282,200 to a TARQUINIO VETURINO
insurance trust bank account.  The insurance trust account
subsequently paid approximately $282,200 to Lincoln Financial
Group.  I believe that the email mentioned above is in
furtherance of the fraudulent scheme in that it represents an
attempt to market one of the policies involved in the fraudulent
scheme on the secondary market.

   c.  On or about September 13, 2009 at approximately
8:51 a.m., a representative of Medisummary sent an email, the
subject line of which was "EMY ADLER," to MOSES NEUMAN at
PREMISES 4.  The email stated: "The new meds for EMY ADLER do not
reveal any new findings however I see in the notes from the old
underwriter that the insured has Bell's Palsy.  We need to follow
up on this and see if this is right and if so what was the cause
of her Bells Palsy.  I didn't see this anywhere in the medicals,
could I be missing meds?"  On or about September 13, 2009 at
approximately 3:23 p.m., MOSES NEUMAN, using PREMISES 4,
forwarded the message mentioned above to GRODSKY.  On or about
September 13, 2009, GRODSKY sent an email to MOSES NEUMAN at
Premises 4 stating: "I am sure that further investigation will
not reveal anything.  She never even mentioned it to me.  Ed."
According to Union Central, it issued a life insurance policy on
the life of EMY ADLER in the amount of $5,000,000.  BERNARD ADLER
is listed as the trustee on that policy.  Records show that from
September 2008 through March 2009, Brooklyn Life issued monthly
$500 checks to EMY ADLER.  In August 2009, another $500 check

E00000831

from the Blue Rock Group was paid to Adler.  Bold Associates and Brooklyn Life also made payments in the amounts, respectively, of $219,000 and $291,000 into an EMY ADLER Insurance Trust bank account.  The EMY ADLER Insurance Trust bank account subsequently paid approximately $220,000 to Lincoln Financial Group and approximately $290,000 to Union Central Insurance Company.  Thus, the emails referred to in this paragraph are in furtherance of an attempt to resell on the secondary market the EMY ADLER policy which, there is probable cause to believe, was part of the fraudulent scheme being investigated.

     d.  On or about October 30, 2009 at approximately 8:29 a.m., an employee of Global Life Settlements, JOEL ECKSTEIN sent an email, whose subject line was "Cohen," with an attachment to MOSES NEUMAN at PREMISES 4.  The email stated: "Need page 2 signed I need wire info".  The attachment was a blank form entitled "Life Beneficiary and Name Change Form" from Lincoln Financial Group.

     e.  On or about October 30, 2009 at approximately 12:12 p.m., MOSES NEUMAN forwarded the email mentioned above in paragraph 21d from PREMISES 4 to GRODSKY.

     f.  On or about October 30, 2009 at approximately 9:19 a.m., JOEL ECKSTEIN from Global Life sent an email with an attachment to MOSES NEUMAN at PREMISES 4 stating: "Need him to sign just first page, need a new one".  The attachment was a blank insurance form entitled "Verification of Coverage for Life Insurance Policies" from Lincoln Financial Group.

E00000832

g.  On or about October 30, 2009 at approximately 12:16 p.m., MOSES NEUMAN forwarded the email mentioned above in paragraph 21f from PREMISES 4 to GRODSKY.

h.  On or about December 8, 2009 at approximately 8:06 a.m., a representative of All Financial Group, LLC sent an email, containing the subject line, "Cohen, Arnold," along with an attachment, to JOEL ECKSTEIN from Global Life Settlement.  The email stated: "Per our conversation this morning we will need a new VOC to show the policy out of Grace. Please have the policy owner sign the attached form and return to me ASAP.  We are also waiting for the return of L/E reports that were ordered."  The attachment is a blank insurance form entitled "Verification of Coverage for Life Insurance Policies" from Lincoln Financial Group.  Approximately 25 minutes later, Eckstein then forwarded the email and attachment to MOSES NEUMAN at PREMISES 4.

i.  On or about December 8, 2009 at approximately 10:46 a.m., MOSES NEUMAN forwarded the email and attachment mentioned above in paragraph 21h from PREMISES 4 to GRODSKY.

j.  In response to MOSES NEUMAN'S email sent on the same day, GRODSKY returned to MOSES NEUMAN at PREMISES 4 the attached form "Verification of Coverage for Life Insurance Policies" from Lincoln Financial Group.  The first page of the form provided a space for the Signature of Policy Owner, which was previously empty, but was then signed by EDWARD GRODSKY.

k.  On or about December 21, 2009 at approximately 1:31 p.m., YUDAH NEUMAN sent an email from PREMISES 5 to GRODSKY

E00000833

with an attachment.  The attachment was a blank payment form from
Life Partners Inc. concerning "The ARNOLD COHEN Estate
Irrevocable Life Insurance Trust, dtd 8/10/07."  The form
referred to Policy No. 65069297 Transamerica Life Insurance
Company.  The subject line of the email was "please sign asap and
return".  The first paragraph of the form stated: "With regard to
the disbursement of funds under the Life Settlement Purchase
Agreement relating to the above-referenced policy . . . ."  The
third paragraph further stated: "Checks to the policy owner are
sent from Dunnam & Dunnam L.L.P. . . ."  The second page of the
form began with the header "Bank Wiring Instructions".  In
response to YUDAH NEUMAN'S email, GRODSKY sent an email to YUDAH
NEUMAN at PREMISES 5 stating: "Done".  On or about December 21,
2009 at approximately 2:00 p.m., YUDAH NEUMAN sent an email from
PREMISES 5 to GRODSKY stating: "Where did you send it?"  I
believe that in this email YUDAH NEUMAN was referring to the
payment form that was attached to the first email mentioned in
this paragraph.  Life Partners Inc. is a life settlement company
that the NEUMAN Brothers used in reselling the ARNOLD COHEN
Transamerica Life Insurance policy to a third party investor.  I
further believe that in the emails mentioned in this paragraph
that YUDAH NEUMAN, who is responsible for managing the financial
aspects of the scheme, needed to provide banking information to
complete the deposit of the proceeds of the resale of the ARNOLD
COHEN Transamerica policy and that YUDAH NEUMAN asked GRODSKY, as
the trustee of the policy, to sign the wire instruction form.

39

E00000834

Records show that on December 23, 2009, one of the many ARNOLD COHEN insurance trust bank accounts received $975,000 from Dunnam & Dunnam. Afterward, the insurance trust bank account disbursed the monies to multiple persons, including: Cong Yesode Hatora, in the amount of $500,000; ARNOLD COHEN, in the amount of $25,000; N.S. BP Realty, a MOSES NEUMAN company, in the amount of $65,000; BERYL BELL Planning insurance trust, in the amount of $30,750; Bold Associates, another MOSES NEUMAN company, in the amount of $23,000; and Sophia Brodsky, ARNOLD COHEN's ex-wife, in the amount of $10,000. In addition, on January 4, 2010, $649,941 of the $975,000 was wire transferred to a firm called Adler, Fink, P.C., only to have Adler, Fink return that exact amount of money the very next day by wire transfer, with a memo notation saying "per NEUMAN." These payments provide an instructive example of how the coconspirators divided up the money that they received from reselling the fraudulent policies to third party investors. Companies controlled by the conspirators, the insured, ARNOLD COHEN, and COHEN's blackmailing ex-wife all shared in the proceeds of the sale, some of the money was reinvested in another fraudulent policy, a policy issued to BERYL BELL, but most of the money was paid to a mysterious "congregation" that appears to have been an investor in the fraudulent ARNOLD COHEN policy.

     1.   I further believe that the emails mentioned in paragraphs 21d - l were in furtherance of the fraudulent scheme in that they all concerned attempts to resell fraudulent ARNOLD COHEN policies on the secondary market. I reiterate that, as

E00000835

shown in paragraph 16c above, there is probable cause to believe that the ARNOLD COHEN policies were fraudulent.  I also reiterate that MOSES NEUMAN was blackmailed by COHEN's former wife, who agreed not to go to the authorities concerning the COHEN policies only if MOSES NEUMAN gave her a payoff.  MOSES NEUMAN ultimately did give her a payoff out of the proceeds of the resale of the ARNOLD COHEN Transamerica policy, as shown in paragraph 21k.

m.  On or about December 9, 2009 at approximately 11:09 am, YUDAH NEUMAN sent an email from PREMISES 5 to MOSES NEUMAN at PREMISES 4 stating: "Monte Nussbaum MD 516-593-3535 Island Urological Associate 516-766-2929 Linda Barron 516-255-8220".  The subject line of the email was "bell dr's," referring to the doctors of BERYL BELL.  Approximately 1 minute later, MOSES NEUMAN then forwarded this email from PREMISES 4 to GRODSKY.

n.  On or about January 15, 2010 at approximately 12:56 p.m., YUDAH NEUMAN sent an email from PREMISES 5 with an attachment to GRODSKY stating: "please use this label when u send the ck to Lincoln for bell".  The attachment is a UPS shipping label which showed the sender and address as "Chaim Lebovits 845-425-1000 Liberty Planning, Inc. 17 Monsey Blvd., Monsey, NY 10952".  The label showed the destination as "Inforce Business 800-487-1485 Lincoln National Life Department 5000 100 North Greene Street Greensboro NC 27401-2547".

o.  On or about December 17, 2009 at approximately 1:01 p.m., YUDAH NEUMAN forwarded a partially deleted email from

E00000836

PREMISES 5 to MOSES NEUMAN at PREMISES 4 stating: "dr. brahmbhatt 446 hungry harbor road n. woodmere I think he is a vascular surgeon for her legs  Ed".  The original email apparently was sent to YUDAH NEUMAN by GRODSKY, but the header information for the original email that shows the email addresses of the sender and recipient has been deleted.  The subject line of the original email was "another doctor for bell".

      p.  On or about December 17, 2009 at approximately 1:10 p.m., YUDAH NEUMAN forwarded a copy of the email mentioned above in "o" to JOEL ECKSTEIN of Global Life Settlement.  I believe that the emails referred to in paragraphs 21m - p were in furtherance of the fraudulent scheme in that they relate to attempts to resell life insurance policies in the name of BERYL BELL.  As shown in paragraphs 16c and 16d, there is probable cause to believe that the BERYL BELL policies were fraudulent. BERYL BELL policy premium payments were secretly funded by Brooklyn Life and by a fraudulent ARNOLD COHEN life insurance trust bank account controlled by GRODSKY.  Bell also received incentive payments from Brooklyn Life.

<u>CONCLUSION</u>

      22.  Based upon the information set forth above there is probable cause to believe that on the computer systems owned, maintained, and/or operated by Provider 1, Provider 2, and Provider 3, there exists evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371, 1341, 1343, 1349 and 1956.  By this affidavit and application, I

42

E00000837

request that the Court issue search warrants directed to Provider 1, Provider 2, and Provider 3, allowing Agents of the Investigating Agencies to seize the contents of emails and other information stored on the servers of the respective Providers for the computer accounts and files specified in Attachments A, B and C respectively, using the search procedures specified in Attachments A, B and C.  The warrant will be faxed to personnel of the Providers who will be directed to produce those accounts and files.

    23.  As this investigation is continuing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will seriously jeopardize the investigation.  Accordingly, I request that the Court issue an order that the search warrants, this affidavit in support of the application for a search warrant and all attachments thereto be filed under seal until further order of the Court.  In addition, because notification of the existence of this order will seriously jeopardize an investigation, I request that the Court issue an order pursuant to 18 U.S.C. Section 2705(b) ordering Provider 1, Provider 2, and Provider 3 not to notify any person of the existence of the warrant.

<u>SEARCH PROCEDURE FOR THE PREMISES</u>

    24.  In order to ensure that agents search only those computer accounts and/or files described in Attachments A, B or C, this affidavit and application for search warrants seeks authorization to permit employees of the Provider to assist

agents in the execution of this warrant.  The search warrant will be faxed to personnel of Providers who will be directed to produce those accounts and files described in Section II of the appropriate Attachment A, B or C.

WHEREFORE, I respectfully request that search warrants issue, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a), authorizing Agents of the Investigative Agencies, to search the contents of the PREMISES KNOWN AS ELECTRONIC MAIL ADDRESSES PREMISES 1 and 2 controlled by the web-based electronic mail service provider Provider 1, PREMISES 3 controlled by the web-based electronic mail service provider Provider 2, PREMISES 4 and 5 controlled by the web-based electronic mail service provider Provider 3, authorizing Agents of the Investigative Agencies to seize the items described in, respectively, Attachment A, B and C concerning the participation of MOSES NEUMAN, YUDAH NEUMAN, EDWARD GRODSKY and others in a

44

scheme to commit violations of Title 18, United States Codes,

Sections 371, 1341, 1343, 1349 and 1956.


Dated:

April 30, 2010
Brooklyn, New York

Sheldon Tang
Special Agent
Internal Revenue Service


Sworn to before me this
30 Day of April, 2010


UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

45

E00000840

ATTACHMENT A FOR "PREMISES 1 and 2" - WebHostingPad.com

I. Search Procedure

The search warrant will be faxed to Provider personnel who will be directed to produce those accounts and files described in Section II below.

II. Files and Accounts to be Produced

For the period from January 1, 2008 to the present:

a. All stored electronic mail and other stored content information presently contained in, or on behalf of, the WebHostingPad.com accounts for the Agents addresses "DAVID@ADELPHIADIABETIC.COM" and "LENNY@ADELPHIADIABETIC.COM" (hereinafter, the "Accounts");

b. All histories, profiles and "buddy lists" and/or "Friends lists" (including electronic mail addresses, screen names and/or ID's and other information stored) associated with the Accounts described above in Section II(a);

c. All existing printouts from original storage of all of the electronic mail described above in Section II(a);

d. All transactional information of all activity of the Accounts described above in Section II(a), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

e. All business records and subscriber information, in any form kept, pertaining to the Accounts described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records;

f. All records indicating the services available to subscribers of the Accounts described above in Section II(a); and

g. All email, including any attachments, sent by or received by the Accounts described above in Section II(a), whether saved or deleted, whether contained in the email accounts or in a customized "folder";

h. All instant messenger messages, calendar items, screen names, member profiles, contacts, buddy lists and the content of any WebhostingPad.com Inc. online account features, or related to the Accounts described above in Section II(a); and

I. All web-pages, including any associated links, that were created or maintained by the user(s) of the Accounts

46

E00000841

described above in Section II(a).

III. <u>Minimization</u>

The items above will be produced to taint Agents, not connected with this investigation, to make sure that only items that concern the participation of MOSES NEUMAN, YUDAH NEUMAN, EDWARD GRODSKY and others in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349, and 1956 are produced to the Investigative Agents and the prosecution team.

E00000842

<u>ATTACHMENT B FOR "PREMISES 3" - GoDaddy.com</u>

I. <u>Search Procedure</u>

The search warrant will be faxed to Provider personnel who will be directed to produce those accounts and files described in Section II below.

II. <u>Files and Accounts to be Produced</u>

For the period from January 1, 2009 to the present:

a. All stored electronic mail and other stored content information presently contained in, or on behalf of, the GoDaddy.com account for the Agents address "LENNY@ADELPHIASUPPLY.COM" (hereinafter, the "Account");

b. All histories, profiles and "buddy lists" and/or "Friends lists" (including electronic mail addresses, screen names and/or ID's and other information stored) associated with the Account described above in Section II(a);

c. All existing printouts from original storage of all of the electronic mail described above in Section II(a);

d. All transactional information of all activity of the Account described above in Section II(a), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

e. All business records and subscriber information, in any form kept, pertaining to the Account described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records;

f. All records indicating the services available to subscribers of the Account described above in Section II(a); and

g. All emails, including any attachments, sent by or received by the Account described above in Section II(a), whether saved or deleted, whether contained in the email accounts or in a customized "folder";

h. All instant messenger messages, calendar items, screen names, member profiles, contacts, buddy lists and the content of any GoDaddy.com Inc. online account features, or related to the Account described above in Section II(a); and

I. All web-pages, including any associated links, that were created or maintained by the user(s) of the Account described above in Section II(a).

48

E00000843

III. <u>Minimization</u>

The items above will be produced to taint Agents, not connected with this investigation, to make sure that only items that concern the participation of MOSES NEUMAN, YUDAH NEUMAN, EDWARD GRODSKY and others in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349, and 1956 are produced to the Investigative Agents and the prosecution team.

E00000844

### ATTACHMENT C FOR "PREMISES 4 and 5" - Google Inc.

I. Search Procedure

   The search warrant will be faxed to Provider personnel who will be directed to produce those accounts and files described in Section II below.

II. Files and Accounts to be Produced

   For the period from January 1, 2009 to the present:

   a. All stored electronic mail and other stored content information presently contained in, or on behalf of, the Google Inc. accounts for the Agents addresses "5591800@GMAIL.COM" and "KUPSHTIK@GMAIL.COM" (hereinafter, the "Accounts");

   b. All histories, profiles and "buddy lists" and/or "Friends lists" (including electronic mail addresses, screen names and/or ID's and other information stored) associated with the Accounts described above in Section II(a);

   c. All existing printouts from original storage of all of the electronic mail described above in Section II(a);

   d. All transactional information of all activity of the Accounts described above in Section II(a), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

   e. All business records and subscriber information, in any form kept, pertaining to the Accounts described above in Section II(a), including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing records;

   f. All records indicating the services available to subscribers of the Accounts described above in Section II(a); and

   g. All emails, including any attachments, sent by or received by the Account described above in Section II(a), whether saved or deleted, whether contained in the email accounts or in a customized "folder";

   h. All instant messenger messages, calendar items, screen names, member profiles, contacts, buddy lists and the content of any Google online account features such as Google Docs, Talk, Chat, Orkut, Tasks, or related to the Accounts described above in Section II(a); and

   I. All web-pages, including any associated links, that were created or maintained by the user(s) of the Accounts

E00000845

described above in Section II(a).

III. <u>Minimization</u>

   The items above will be produced to taint Agents, not connected with this investigation, to make sure that only items that concern the participation of MOSES NEUMAN, YUDAH NEUMAN, EDWARD GRODSKY and others in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of Title 18, United States Code, Sections 371, 1341, 1343, 1349, and 1956 are produced to the Investigative Agents and the prosecution team.

E00000846