AB:CSK
F.#2009RO1998

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      Docket No.  CR 11-134 (SJ)(SMG)

CHAIM LEBOVITS, et al.,

            Defendants.

- - - - - - - - - - - - - - - - -- - - - - - - - - - -X

THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANTS' MOTIONS TO SUPPRESS AND FOR OTHER RELIEF

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201

CHARLES S. KLEINBERG
Assistant U.S. Attorney
    of Counsel

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STOLI POLICIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE CHRONOLOGY OF THE GOVERNMENT'S
   APPLICATIONS FOR WARRANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I -  DUE TO LACK OF STANDING, NO DEFENDANT MAY SUPPRESS EMAILS
   OR TEXT MESSAGES OBTAINED BY SEARCH WARRANT FROM THE
   EMAIL OR TEXT MESSAGE ACCOUNT OF ANOTHER DEFENDANT, NOR
   MAY ANY DEFENDANT SUPPRESS ANY COMMUNICATIONS OBTAINED
   FROM A WIRETAP ON THE GROUNDS OF IMPROPER MINIMIZATION IF
   THE COMMUNICATIONS WERE OBTAINED AS A RESULT OF A WIRETAP
   OF ANOTHER DEFENDANT'S TELEPHONE . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT II - M. NEUMAN'S MOTIONS TO SUPPRESS HIS TELEPHONE
   CALLS, TEXT MESSAGES AND EMAILS SHOULD BE DENIED . . . . . . . . . . 8

   A.     The Initial Wiretap Affidavit Established Probable Cause . . . . . . . . . . . . . . . . . 9

      1.     The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      2.     The Affidavits Sufficiently Supported Judge
             Townes's Probable Cause Finding . . . . . . . . . . . . . . . . . . . . . . . . . 10

      3.      Judge Townes Correctly Determined That MA Aff I Set
             Forth Sufficient Evidence of Probable Cause . . . . . . . . . . . . . . . . . . . 18

      4.     MA Aff I Did Not Contain Any Intentional or Reckless
             Material False  Statements or Omissions . . . . . . . . . . . . . . . . . . . . . . . 28

      5.     Since the Interceptions Obtained as a Result of the Original
             Interception Order Should Not Be Suppressed, Derivative
             Suppression of Subsequent Interception Orders and Search
             Warrants Are Not Warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   B.     The Government Did Not Improperly Minimize Calls Intercepted
          Over the M. Neuman or Gutwein Phones . . . . . . . . . . . . . . . . . . . . . . . . . . 35

POINT II - GUTWEIN'S MOTIONS TO DISMISS AND TO
   SUPPRESS HIS TELEPHONE CALLS SHOULD BE DENIED . . . . . . . . . . . . . 52

   A.     Gutwein is Not Entitled to Dismissal of the Indictment or the
          Striking of Paragraph 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

   B.     Gutwein is Not Entitled to Suppression of His Intercepted Calls . . . . . . . . . . . 53

1.    Congress Expressly Authorized the Use of Title III Surveillance to Investigate Mail Fraud, Wire Fraud, Money Laundering and Conspiracy to Commit These Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

2.    The Interception Orders Established Probable Cause to Believe that Crimes Had Been Committed . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    a.    The Evidence Against Gutwein in MA Aff I and Facts Proved In MAAff II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    b.    MA Aff II Established Probable Cause That Gutwein Had Criminal Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.    The Evidence of Probable Cause In Aff II Was Not Stale . . . . . . . . . 62

4.    The Affidavits Established the Necessity for the Interception Orders . . . 63

    a.    Statements in the Necessity Sections of MA Aff I . . . . . . . . . . . 66

    b.    Judge Townes Did Not Abuse her Discretion in Finding Necessity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

5.    The Government Did Not Intentionally or Recklessly Fail to Disclose Material Facts Relating to the Arnold Cohen Inspection Report . . . . . . . 76

POINT IV - Y, NEUMAN'S MOTION TO SUPPRESS HIS EMAILS SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

A.    Neumans SW Aff Establishes Probable Cause to Believe that Y. Neuman Committed a Crime and That the Y. Neuman Premises Contained Evidence of That Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

1.    There Was Probable Cause to Believe that Y. Neuman Committed Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

2.    There Was Probable Cause to Believe that There Was Evidence of Y. Neuman's Crimes in Premises 2, 3 and 5 . . . . . . . . . . . . . . . . . . 88

    a.    Premises 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    b.    Premises 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    c.    Premises 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

B.    Y. Neuman's Motion to Suppress the Emails Obtained Pursuant to the Y.Neuman Search Warrants on the Grounds that the Warrants were Overbroad Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

POINT V - LEBOVITS IS NOT ENTITLED TO A BILL OF PARTICULARS . . . . . . . . . . . 94

POINT VI - Y. NEUMAN IS NOT ENTITLED TO THE ISSUANCE OF RULE 17 (c) SUBPOENAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

## TABLE OF AUTHORITIES

Page

## CASES

Alderman v. U.S.,
  394 U.S. 165 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Franks v. Delaware,
  438 U.S. 154 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 53, 83, 84

Illinois v. Gates,
  462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kramer v. Lockwood Pension Services, Inc.,
  653 F. Supp. 2d 354 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . 3, 4, 53

Kramer v. Phoenix Life Ins. Co.,
  15 N.Y.3d 539 (N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 52

Kramer v. Phoenix Life Insurance Co.,
  15 N.Y. 3d 539 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Massachusetts v. Sheppard,
  468 U.S. 981 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Neder v. United States,
  527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Raffone v. Adams,
  468 F.2d 860 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SEC v. Mayhew,
  121 F.3d 44 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Scott v. United States,
  436 U.S. 128 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 44, 45, 46, 48, 49

United State v.Vest,
  842 F.2d 1319 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . 10, 76, 77, 79

United States v. Acosta,
  807 F. Supp. 2d 1154 (N.D. Ga. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 73

United States v. Ambrosio,
  898 F. Supp. 177 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Andrews,
  381 F.2d 377 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Batista,
  2009 U.S. Dist. LEXIS 27437 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . 35

United States v. Bellomo,
954 F. Supp. 630 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Bernstein,
533 F.2d 775 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Bortnovsky,
620 F.2d 572 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Bowen,
689 F. Supp. 2d 675 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 93

United States v. Bryant,
2009 WL 5103306 (W.D. Mo. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Buck,
813 F.2d 588 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

United States v. Campos,
541 F.3d 735 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Canales-Gomez,
358 F.3d 1221 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Capra,
501 F.2d 267 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States v. Casamento,
587 F.2d 1141 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Cioffi,
628 F. Supp. 2d 385 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 92, 93

United States v. Cioffi,
668 F. Supp. 2d 385 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Colombo,
No. 04 Cr. 273 (NRB), 2006 WL 2012511 (S.D.N.Y 2006) . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Concepcion,
579 F.3d 214 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 63, 73, 74

United States v. Coronia,
576 F. Supp. 2d 385 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

United States v. Cox,
462 F.2d 1291 (8th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. David,
940 F.2d 722 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 40, 41

United States v. Diaz,
176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25, 27

United States v. Digeronimo,
598 F.2d 746 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Drakopoulos,
2003 WL 21143080 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99

United States v. Eppolito,
543 F.3d 25 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

United States v. Facciolo,
753 F. Supp. 449 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Fleishman,
2011 WL 4000987 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Funderburk,
492 F. Supp. 2d 223 (W.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Gambino,
741 F. Supp. 412 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 38, 39, 40, 41

United States v. Gangi,
33 F. Supp. 2d 303 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Giordano,
259 F. Supp. 2d 146 (D. Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States v. Gleason,
616 F.2d 2 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Godsey,
2010 U.S. Dist. LEXIS 136240 (N.D. Ohio 2010) . . . . . . . . . . . . . . . 64, 65, 66, 67, 68, 69, 70

United States v. Goffer,
756 F. Supp. 2d 588 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48

United States v. Greyling,
2002 WL 424655 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Goldberg,
756 F.2d 949 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

United States v. Gotti,
42 F. Supp. 2d 252 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 94

United States v. Gravel,
645 F.3d 549 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 54

United States v. Haque,
315 Fed. Appx. 510, 2009 WL 484600 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Hinton,
543 F.2d 1002 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

United States v. Horowitz,
806 F.2d 1222 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Howard,
350 Fed. App'x 517, 519 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

vi

United States v. Jiminez,
  2011 WL 308401 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. King,
  55 F.3d 1193 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Kuhn,
  415 U.S. 143 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Labate,
  2001 WL 533714 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57, 59, 60, 61

United States v. Leon,
  468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 35, 39, 44, 76, 88, 91, 93

United States v. Malekzadeh,
  855 F.2d 1492 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 76

United States v. Marcus,
  193 F. Supp. 2d 552 (E.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

United States v. Martin,
  599 F.2d 880 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. McDarrah,
  351 Fed. Appx. 558, 2009 WL 3645400 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 92, 93

United States v. McGuire,
  307 F.3d 1192 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 74

United States v. Mermelstein,
  457 F. Supp. 2d 242 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Milan-Colon,
  1992 WL 236218 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Mitlof,
  165 F. Supp. 2d 558 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Mohammad,
  2010 WL 2232438 (D. Conn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 28

United States v. Moore,
  41 F.3d 370 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 76

United States v. Mullen,
  651 F. Supp. 2d 509 (W.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Neadeau,
  2009 WL 2155680 (D. Minn. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Nichols,
  912 F.2d 598 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Nicki,
427 F.3d 1286 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Nixon,
418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99

United States v. Nova-Nunez, 1997 WL 30965 (S.D.N.Y. ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Ozar,
50 F.3d 1440 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85

United States v. Padilla-Pena,
129 F.3d 457 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 41

United States v. Padin,
2005 U.S. Dist. LEXIS 5994 (W.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Pantoja,
2011 WL 1363979 (D. Minn.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Papadakis,
510 F.2d 287 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Parks,
1997 WL 136761 (N.D. Ill.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Payden,
613 F. Supp. 800 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 95

United States v. Plescia,
48 F.3d 1452 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Powell,
903 F.2d 899 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Principle,
531 F.2d 1132 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. Ramirez-Encarnacion,
291 F.3d 1219 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Regent Office Supply Co.,
421 F.2d 1174 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Richards,
94 F. Supp. 2d 304 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Rowell,
903 F.2d 899 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19, 20

United States v. Ruggiero,
726 F.2d 913 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 74

United States v. Ruggiero,
928 F.2d 1289 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Salazar,
485 F.2d 1272 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States; v. Scala,
388 F. Supp. 396 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Scibeli,
549 F.2d 222 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Simmels,
2009 WL 1924746 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 39, 43, 51

United States v. Solomonyan,
451 F. Supp. 2d 626 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . 9, 10, 12, 13, 14, 15

United States v. Soto-Nava,
2002 WL 432084 (S.D. Ind. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Starr,
816 F.2d 94 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Stein,
488 F. Supp. 2d 350 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

United States v. Steinberg,
525 F.2d 1126 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

United States v. Thomas,
377 F.3d 232 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

United States v. Tomero,
462 F. Supp. 2d 565 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Torres,
901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 70, 71

United States v. Tutino,
883 F.2d 1125 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

United States v. Vento,
533 F.2d 838 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 71

United States v. Villarman-Oviedo,
325 F.3d 1 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 73

United States v. Volpe,
42 F. Supp. 2d 204 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

United States v. Wagner,
989 F.2d 69 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 25, 27

United States v. Wilson,
2002 WL 21236320 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Wilson,
484 F.3d 267 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

United States v. Winkle,
  477 F.3d 407 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

United States v. Yannotti,
  541 F.3d 112 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

United States v. Yarbrough,
  527 F.3d 1092 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 49

United States v. Nachamie,
  91 F. Supp. 2d 552 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Warnock v. Davis,
  104 U.S. 775 (1881) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATUTES

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 1956(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 2516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 54, 70

18 U.S.C. § 2518 (3)(a), (b) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 35, 36, 42

18 U.S.C. § 2518 (5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42

1986 U.S.C.C.A.N. 3553 at 3584 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

N.Y. Ins. Law § 3205 (b)(1),(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

N.Y. Ins. Law § 7815 (a),(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## MISCELLANEOUS

Federal Rule of Criminal Procedure 17 (c) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 97

Restatement of Torts (Second) § 538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

S. Rep. No. 99-541 at 30-31, 32 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Numerous Articles and Task Force Reports . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the motions of four of the six defendants (the "Moving Defendants") in this case. In particular, the government herein opposes the following five motions filed by: (1) Moses Neuman ("M. Neuman") to suppress wiretap interceptions over his cell phone (the "M. Neuman Phone"); (2) Yudah Neuman ("Y. Neuman"), M. Neuman's brother, (a) to suppress the results of search warrants to obtain evidence of historical emails sent and received from his email accounts and (b) for the issuance of subpoenas pursuant to Federal Rule of Criminal Procedure 17 (c); (3) Avigdor Gutwein to dismiss the indictment, or in the alternative to strike Paragraph 8 of the indictment, and to suppress wiretap interceptions over his cell phone (the "Gutwein Phone"); and (4) Chaim Lebovits to compel the government to provide a bill of particulars. Each of the Moving Defendants joins in the motions of the other Moving Defendants. For the reasons provided below, the defendants' motions should be denied.

## BACKGROUND

The indictment in this case charges the defendants with conspiracy, mail fraud, wire fraud and money laundering for their involvement in a conspiracy to fraudulently obtain, and fraudulently profit from reselling, life insurance policies. The investigation into the defendants' crimes included the use of court-authorized wiretaps and search warrants, some of which are the subject of the defendants' motion.

In support of their motions, several of the defendants' arguments are premised on the creation of a straw man: that the government relied on the per se illegality of stranger-originated (or owned) life insurance ("STOLI") policies to establish probable cause for interception of various telephones. In so doing, defendants misconstrue both the history of the life insurance industry's view of STOLI policies and, more fundamentally, ignore that the government had established probable cause to believe that the policies at issue here had been procured by fraud, which is a crime regardless whether STOLI policies were legal or illegal.

1

<u>STOLI POLICIES</u>

A STOLI policy is one in which the owner of the policy, at the time he originally purchased it from an insurance company, had the intent to later resell or transfer the policy to an investor. STOLI policies have negative economic consequences for insurance companies. Specifically, STOLI policies impose costs on insurers as the insurers' pricing assumptions do not match the reality of STOLI policies. A policy that is, unbeknownst to the insurer, a STOLI policy, will cause the insurer to set the premiums much too low. For example, an insured's net worth and income has a direct bearing on whether the insurer will issue a policy for estate planning purposes (meaning to cover the insured's estate obligations) and in what amount, because all insurers' underwriting guidelines prescribe higher policy amounts to estimates of the estate taxes that would be due on the insured's death, which, in turn, are derived from the insured's net worth and income. For other types of policies, an insured's finances also will help determine the economic loss to a beneficiary of an insured's early death. With STOLI policies procured by fraud, insurers have no idea that the policies are being sought as "investments" to be sold at a much higher secondary market price to investors for purposes having nothing to do with estate planning or other legitimate insurance needs. The difference between what the insurance company believes it is selling and what a STOLI applicant knows he is buying imposes costs on and reduces gains to the insurer. Among other items, lapse (voluntary termination) rates and investment income can be expected to be lower under STOLI. <u>See, e.g.,</u> "STOLI on the Rocks: Why States Should Eliminate the Abusive Practice of Stranger-Owned Life Insurance," Connecticut Insurance Law Journal, Vol. 14:2, 2008 at 529-531. For example, if the policy is resold on the secondary market, it will not be allowed to lapse, whereas, if it is not resold, it may lapse before the insurance company will have to pay the multi-million dollar death benefits on the policy. MA Aff II ¶ 17. In other words, due to lack of policy lapses before the insureds die and other reasons, the company will set premiums too low on policies which, unbeknownst to it, are STOLI.

Insurers also believe STOLI policies pose a threat to the present tax-favored treatment of life insurance cash values, designed to encourage family members to provide for their family's financial welfare. The insurance industry is also concerned that STOLI policies could harm its

reputation by life insurance becoming associated more with wagering on human life, see Warnock v. Davis, 104 U.S. 775, 779 (1881), and, e.g., Nat'l Ass. for Ins. Fin'l Advisors, *STOLI: The Problem and the Appropriate State Response* at www.naifa.org/ advocacy/ stolialert/ pdf/STOLI_ primer.pd, and create an incentive for the owner to hasten the insured's death.

Notwithstanding the defendants' statements to the contrary, the insurance industry's opposition to STOLI policies has been well documented for many years. For example, in 2006, before any of the policies in this case were issued, the American Council of Life Insurers ("ACLI"), a trade association representing almost all major life insurers in the United States, and the trade associations representing life insurance agents and life insurance agencies, stated that it was their position and that of their members that STOLI transactions "are contrived transactions, where policies are obtained that circumvent the intent of state insurable interest laws," are "in direct opposition to the true intent of life insurance" and should be prohibited by state legislation. Life Companies, Agents, Brokers Call for Action to Halt Speculative Uses of Life Insurance, www.nailba.org/sites/default/files/20061128.pdf ("ACLI Article"), among other such releases.

At the time the government sought the wiretaps relevant to this case, the Southern District of New York had held that, under New York State Insurance Law, it was illegal for an insured to purchase a policy on the primary market if his intent, from the outset, was to transfer the policy to a person without an insurable interest immediately after its purchase. Kramer v. Lockwood Pension Services, Inc., 653 F. Supp. 2d 354, 386-88, 397 (S.D.N.Y. 2009) ("Kramer I"). The court recommended that the Second Circuit certify the question to the New York State Court of Appeals, which the Second Circuit did. Kramer II, infra.., 15 N.Y. 3d at 545.

Just two and one half months after the Southern District opinion, on November 19, 2009, a separate, newly enacted provision of New York law, N.Y. Ins. Law § 7815 (a),(c) (the "Anti-STOLI Law"), became effective and expressly rendered STOLI policies illegal. This law, however, was not retroactive. The government submitted its first application for a wiretap in this case on January 11, 2010. As of that date, although the law was not yet settled as to the legality of STOLI policies which had been issued prior to November 19, 2009, the Southern District of

New York had held that they were illegal and, moreover, it was already settled that STOLI policies issued on or after November 19, 2009 were categorically illegal.

In <u>Kramer v. Phoenix Life Ins. Co.</u>, 15 N.Y.3d 539 (N.Y. 2010) ("<u>Kramer</u> II"), the New York Court of Appeals, in response to the certification by the Second Circuit, held contrary to <u>Kramer</u> I. Specifically, it held that under N.Y. Ins. Law § 3205 (b)(1), (b)(2), for policies issued prior to November 19, 2009, it was legal (in the absence of fraud) for an insured to have purchased a policy on his life with the intent to immediately transfer the policy to another without an insurable interest. But the New York State Court of Appeals did not decide <u>Kramer</u> II until November 2010, which is seven months after the government's wiretaps had already gone down. Regardless, the legality of STOLI policies under New York state law is completely irrelevant to the government's applications for wiretaps submitted between January and March 2010 since, as is explained below, those were premised on a conspiracy to obtain STOLI policies through fraud, which has <u>always</u> been illegal.

The effort by defendants to suggest that life insurers were willing participants in issuing policies to be sold in the secondary market is wrong. Insurers never "embraced the life settlement and STOLI businesses" or "engaged with the market willingly," as the defendants contend. Y. Neuman Motion to Compel at 5; M. Neuman Motion at 8. Indeed, when insurance companies began to realize the scope and nature of STOLI schemes, they undertook both individual[1] and collective actions via their various trade associations to raise awareness of the techniques used by STOLI promoters to deceive insurer underwriters and to urge and support regulatory action to limit related abuses. <u>See</u>, <u>e.g.</u>, Susan Lorde Martin, "Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization," *University of Pennsylvania Journal of Business Law* Vol. 13:1 (2010) at 173-219.

---

[1]     These actions included revising their applications or adding supplements to them to discourage and detect STOLI applications. Linda Koco, "Senior Supplements on the Rise in Life Insurance Applications," *National Underwriter: Life & Health Ed.*, November 12, 2007. It also included fraud actions to rescind already-issued STOLI policies that could be identified as such, like the lawsuits brought by ING in this case, with approximately 300 such rescission lawsuits said to be in active litigation as of July 2010. Securities and Exchange Commission, *Report of the Life Settlements Task Force* (July 22, 2010) at ww.sec.gov/news/studies/2010/lifesettlements-report.pdf ("SEC Task Force Report") at 14.

It took life insurance companies some time to realize that some of the policies sold by them for seemingly traditional family purposes were procured for the express purpose of being sold in the secondary market; i.e., were STOLI. Moreover, even after they realized this and adopted policies against the issuance of STOLI policies, they heavily relied upon the insurance agents who brought applications for policies to them to prevent such policies from being issued. Most insurance agents are honest and had agreements with the insurance companies to prevent STOLI applications from being presented to the insurance companies. As noted, the association of insurance agents, like the insurance companies, was opposed to STOLI and sought its outright prohibition as early as 2006. In a case such as this one, where the insurance agents or general insurance agencies are corrupt, that fact significantly increases the likelihood that STOLI applicants will succeed in fraudulently obtaining STOLI policies from the insurers.[2]

While insurance companies uniformly oppose STOLI business, they do not oppose normal life settlements, which are the normal secondary market resales of life insurance policies which were initially purchased for traditional reasons. Defendants wrongfully attempt to conflate these ordinary secondary market resales with STOLI policies.

THE CHRONOLOGY OF THE GOVERNMENT'S APPLICATIONS FOR WARRANTS

On January 11, 2010, Postal Inspector Maria Albright swore to an Affidavit (the "MA Albright Aff I") in support of the government's application for an order authorizing the government to intercept wire communications over the M. Neuman Phone. On January 11, 2010 the Honorable Sandra L. Townes issued an order (the "Original Interception Order") granting that

---

[2]/Further, defendant's statement that "insurance companies themselves set up investment funds which purchased policies in the life settlements market, including STOLI policies" M. Neuman Motion at 5, lends itself to an erroneous impression. These insurers were offering a legitimate service in terms of ordinary life settlements. They were not seeking STOLI business, as erroneously implied by defendants, although it can be "very difficult for investors to determine" that a settled policy is STOLI. See Task Force Report at 14. Only a small handful of the 1,009 U.S. domiciled life insurers in 2007, Fact Book at Chapter 1 Overview, were involved in the secondary life insurance market, some of which were property and casualty insurers, rather than life insurers. One of the very few life insurance companies that became involved in the secondary market, Phoenix Life, in launching its operation in conjunction with four life settlement brokerage firms, said explicitly that it would not purchase STOLI policies. See "Phoenix Launches Life Settlement Origination in Partnership with Four Brokerages General Agents" (April 1, 2008) at www.reuters.com/article/2008/04/01/idUS178862+01-Apr-2008+BW20080401.

application.  On January 19, 2010, based upon MA Aff I and the Supplemental Application of

Charles Kleinberg, sworn to on January 19, 2010 (the "CK App IA"), Judge Townes issued an

amended version of the Original Interception Order.

On February 5, 2010, the government applied to Chief Magistrate Judge Gold for

the issuance of two search warrants: (1) a warrant to obtain from the appropriate service provider

historical text messages for about one month sent from or received by the M. Neuman Phone (the

"M. Neuman Text SW"); and (2) a warrant to obtain from the appropriate service provider

historical emails for three years sent from or received by defendant Edward Grodsky (the

"Grodsky Email SW").  The M. Neuman Text SW Application was supported by the Affidavit of

Postal Inspector Albright sworn to on February 5, 2010 (the "M. Neuman Text SW Aff") and the

Grodsky Email SW Application was supported by an affidavit of the same day sworn to by

Special Agent Sheldon Tang of the Internal Revenue Service.  Judge Gold requested certain

amendments to the M. Neuman Text SW Aff, the Grodsky Email SW Aff and the proposed

versions of the M. Newman Text SW and the Grodsky Email SW before he would issue the M.

Neuman Text SW and the Grodsky Email SW.  These amendments appear in handwritten print on

the signed versions of each of the two search warrants and the two supporting affidavits.  When

those amendments were made, Judge Gold then issued the two search warrants.  Judge Gold

explained that he was requesting the amendments in order to insure that the warrants complied

with Judge Block's decision in United States v. Cioffi, 668 F. Supp. 2d 385 (E.D.N.Y. 2009).

On February 18, 2010, Postal Inspector Albright swore to an affidavit (the "MA

Aff II") in support of the government's application for an order (the "First Renewal Interception

order") authorizing the continued interception of wire communications made from or received by

the M. Neuman Phone and also authorizing the interception of: (1) electronic communications

(i.e., text messages) sent from or received by the M. Neuman Phone; and (2) wire

communications made from or received by the Gutwein Phone.  On the same day, Judge Townes

issued the First Renewal Interception Order.  On March 19, 2010, Postal Inspector Albright swore

to an affidavit (the "MA Aff III") in support of the government's application for an order (the

"Second Renewal Interception Order") authorizing the continued interception of wire

communications made from or received by the M. Neuman and the Gutwein Phones and the continued interception of electronic communications sent from or received by the Neuman Phone. On the same day, Judge Townes issued the Second Renewal Interception Order.

On April 30, 2010, Special Agent Tang swore to an affidavit (the "Neumans SW Aff") in support of the government's application for search warrants to the appropriate email providers (the "M. Neuman and Y. Neuman Email SWs") to obtain emails sent from or received by five email addresses (called "Premises"), two of which were in the name of M. Neuman (Premises 1 and 4) and three of which were in the name of Y. Neuman (premises 2, 3 and 5). In drafting the Neumans SW Aff and the proposed search warrants for Premises 1, 2, 3, 4 and 5, the government used the language suggested by Judge Gold when he issued the M. Neuman Text SW and the Grodsky Email SW. On April 30, 2010, Judge Azrack issued search warrants for Premises 1 through 5. [3/]

## ARGUMENT

### POINT I

DUE TO LACK OF STANDING, NO DEFENDANT MAY SUPPRESS EMAILS OR TEXT MESSAGES OBTAINED BY SEARCH WARRANT FROM THE EMAIL OR TEXT MESSAGE ACCOUNT OF ANOTHER DEFENDANT, NOR MAY ANY DEFENDANT SUPPRESS ANY COMMUNICATIONS OBTAINED FROM A WIRETAP ON THE GROUNDS OF IMPROPER MINIMIZATION IF THE COMMUNICATIONS WERE OBTAINED AS A RESULT OF A WIRETAP OF ANOTHER DEFENDANT'S TELEPHONE

Each of the Moving Defendants moves for the suppression of his communications (telephone calls or emails) which were obtained or intercepted as a result of any of the Interception Orders or search warrants challenged by any of the Moving Defendants.

It is well-settled with respect to wiretaps that any defendant whose voice was intercepted or who was a target of the tap has standing to make a motion to suppress on the

---

[3/] The MA Affs. I, II and III are annexed to the Gutwein Motion as, respectively, Exhibits G, H and I. The M. Neuman Text SW Aff is annexed to the M. Neuman Motion as Exhibit F. The M. Neuman Text SW is annexed hereto as Exhibit 1. The Grodsky Email SW Aff is annexed hereto as Exhibit 2. The Grodsky Email SW is annexed hereto as Exhibit 3. The Neumans' SW Aff is annexed to the Y. Neuman Motion as Exhibir A and the M. Neuman and Y. Neuman SWs are annexed to the Y.Neuman Motion as Exhibit B. The Original Interception Order, the First Renewal Interception Order and the Second Renewal Interception Order, all issued by Judge Townes, are annexed hereto as, respectively, Exhibits 4, 5 and 6. The Amended Original Interception Order is annexed hereto as Exhibit 12. The application for that Amended Order ("App Amended Original Order") is annexed hereto is annexed hereto as Exhibit 13.

grounds of lack of probable cause or necessity. However, no defendant has standing to suppress on the grounds of lack of minimization unless his or her telephone was tapped. United States v. Colombo, No. 04 Cr. 273(NRB), 2006 WL 2012511 at *8 (S.D.N.Y. 2006)("only individuals with a proprietary or possessory interest in the premises on which the subject telephone . . . is located have standing to challenge minimization procedures"), citing United States v. Ruggiero, 928 F.2d 1289, 1303 (2nd Cir. 1991). Similarly, it is well settled that if a defendant sends an email to the email address of another, he has no standing to suppress that email if the government obtained it as a result of a search warrant for emails received by that other email address. See, e.g., United States v. King, 55 F.3d 1193, 1196 (6th Cir. 1995) (sender's expectation of privacy in letter terminates upon delivery); United States v. Horowitz, 806 F.2d 1222 (4th Cir. 1986)(email). The Supreme Court has held that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Alderman v. U.S., 394 U.S. 165, 171-72 (1969).

Thus, no defendant other than M. Neuman has standing to suppress, on the grounds of improper minimization, the telephone calls or text messages which were intercepted over the M. Neuman Phone. By the same token, no defendant other than Gutwein has standing to suppress, on the grounds of improper minimization, the telephone calls which the government intercepted over the Gutwein Phone. Similarly, no defendant other than M. Neuman has standing to suppress those of his emails which the government obtained as a result of a search warrant for emails to and from an M. Neuman email address. Nor does M. Neuman nor any defendant other than Y. Neuman, have standing to suppress those of his emails which the government obtained as a result of a search warrant for emails to and from a Y. Neuman email address. Finally, none of the defendants, not even Grodsky himself, who has not made any motions, may suppress those of his emails which the government obtained as a result of a search warrant of Grodsky's email address.

POINT II

M. NEUMAN'S MOTIONS TO SUPPRESS HIS TELEPHONE
CALLS, TEXT MESSAGES AND EMAILS SHOULD BE DENIED

Even to the extent that M. Neuman has standing to make such suppression motions, his motions for suppression of his calls, text messages and emails should be denied.

8

### A.  The Initial Wiretap Affidavit Established Probable Cause

M. Neuman argues that MA Aff I did not establish probable cause to support

Judge Townes' decision to issue the Original Interception Order.  M. Neuman is wrong.

### 1.  The Applicable Law

In deciding whether the affidavit in support of a wiretap order established probable

cause, the reviewing court should "grant considerable deference to the district court's decision

whether to allow a wiretap, ensuring only that 'the facts set forth in the [affidavit] were minimally

adequate to support the determination that was made.'" United States v. Concepcion, 579 F.3d

214, 217 and n.1 (2d Cir. 2009).  Indeed, the issuing judge's determination of probable cause is

entitled to "great deference."  United States v. Nichols, 912 F.2d 598, 602 (2d Cir. 1990); United

States v. Mullen, 651 F. Supp. 2d 509, 527 (W.D.N.Y. 2006).  In fact, absent an "abuse of

discretion" by the issuing judge, the issuing judge's determination of probable cause must be

accepted.  Any doubts about the existence of probable cause must be resolved in favor of

upholding the issuing court's interception order.  Illinois v. Gates, 462 U.S. 213, 237 n. 10

(1983); Concepcion,  579 F.3d at 217, n. 1; United States v. Solomonyan, 451 F. Supp. 2d 626,

636 (S.D.N.Y. 2006); United States v. Wagner, 989 F. 2d 69 (2d Cir. 1993).

In making the determination of probable cause, the reliability of statements of a

confidential informant in an affidavit can be established through the presence of one or more of

the following four factors: (1) the informant's statements qualify as statements against penal

interest by admitting to personal involvement in the alleged criminal activity; (2) the informant

was a witness to the alleged criminal activity; (3) the statements were corroborated by other

investigative techniques, such as pen registers; and (4) the informant was not a professional

informant.  United States v. Funderburk, 492 F. Supp. 2d 223, 238 (W.D.N.Y. 2007) citing

United States v. Powell, 903 F.2d 899, 903 (2d Cir. 1990).  Further, the Second Circuit has

cautioned that in determining whether there was probable cause, a court should consider the

totality of the circumstances rather than viewing each fact in isolation.  Raffone v. Adams, 468

F.2d 860, 866-67 (2d Cir. 1972).

Moreover, even if the Court were to find, under this very deferential standard of

review, that there was no probable cause on the basis of which Judge Townes could issue the

Original Interception Order, the Court could still not suppress the calls intercepted pursuant to that Order unless it also finds that the government agents did not reasonably rely in objective good faith on Judge Townes's issuance of the Original Interception Order. United States v. Leon, 468 U.S. 897 (1984); United States v. Moore, 41 F.3d 370 (8th Cir. 1994); United States v. Malekzadeh, 855 F.2d 1492 (11th Cir. 1988); United State v.Vest, 842 F.2d 1319, 1344 (1st Cir. 1988); United States v. Pantoja, 2011 WL 1363979 (D. Minn.); United States v. Bryant, 2009 WL 5103306 (W.D. Mo. 2009); United States v. Neadeau, 2009 WL 2155680 (D. Minn. 2009); United States v. Tomero, 462 F. Supp. 2d 565 (S.D.N.Y. 2006); United States v. Solomonyan,451 F. Supp. 2d 626 (S.D.N.Y. 2006); United States; v. Scala, 388 F. Supp. 2d 396 (S.D.N.Y. 2005); United States v. Padin, 2005 U.S. Dist. LEXIS 5994 (W.D.N.Y.); United States v. Gotti, 42 F. Supp. 2d 252 (S.D.N.Y. 1999); United States v. Gangi, 33 F. Supp. 2d 303 (S.D.N.Y. 1999); United States v. Bellomo, 954 F. Supp. 630 (S.D.N.Y. 1997); United States v. Ambrosio, 898 F. Supp. 177 (S.D.N.Y. 1995) United States v. Milan-Colon, 1992 WL 236218 (S.D.N.Y.); United States v. Gambino, 741 F. Supp. 412 (S.D.N.Y. 1990).

Under the Leon rule, the Court cannot suppress the calls intercepted pursuant to the Original Interception Order even if it finds probable cause lacking, unless it also finds that (1) Judge Townes abandoned her detached judicial role; (2) Postal Inspector Albright intentionally or with reckless disregard for the truth made false statements about material facts in MA Aff I; or (3) the agents' reliance on the warrant was not objectively reasonable. Leon, 468 U.S. at 922-25; Scala, 388 F. Supp. at 403; Solomonyan, 451 F. Supp. 2d at 638.

2. The Affidavits Sufficiently Supported Judge Townes's Probable Cause Finding

Judge Townes, in each of the Interception Orders, found that there was probable cause to believe that M. Neuman and the other subjects were committing conspiracy, mail fraud, wire fraud and money laundering and that the telephone line sought to be intercepted was used and would continue to be used in connection with these offenses. Ex. 4 at ¶¶ a, b and d; Ex. 5 at ¶¶ a, b and d; and Ex. at ¶¶ a, b and d.   Especially under the great deference accorded to Judge Townes determinations, MA Aff I clearly sets forth sufficient facts to support her determination that there was probable cause to believe that M. Neuman was engaged in a conspiracy to commit mail fraud, wire fraud and money laundering and that the Original Interception Order would likely

provide evidence of those crimes.  As MA Aff I made clear, the targets were involved in a scheme by which they fraudulently obtained, on behalf of elderly insureds, life insurance policies through misrepresentations of the net worth of the insureds and other facts that concealed that the conspirators intended from the outset to obtain STOLI policies, facts that would objectively be important to a reasonable insurer evaluating whether and in what amount to issue the life insurance policies.  Through these misrepresentations, the conspirators would profit by obtaining insurance policies at higher amounts than the insureds would otherwise warrant and then selling the fraudulently obtained policies on the secondary market.  MA Aff I also provided probable cause to believe that M. Neuman and others fraudulently sought to increase the resale prices of these policies through the creation of false medical records.  MA Aff I showed that M. Neuman was involved in the fraudulent scheme rather than simply being an investor - - specifically, it provided direct, corroborated evidence of M. Neuman's involvement in the creation of the false medical records and very  strong circumstantial evidence linking him to the direct, corroborated evidence of his coconspirators' efforts to submit fraudulent insurance applications.

MA Aff I states as follows.  In the summer of 2009 the United States Postal Inspection Service ("USPIS") received from ING, N.V., a life insurance company, a report of an internal ING fraud investigation concerning a large number of multi-million dollar life insurance policies that Liberty Planning, a general insurance agency, had fraudulently induced ING to issue. MA Aff I ¶¶ 11-12.  The USPIS investigation had uncovered facts indicating that Chaim Lebovits, the Vice-President and General Agent for Liberty Planning, insurance agents associated with Liberty Planning and others had fraudulently induced ING and other insurance companies to issue life insurance policies to elderly persons based upon false statements in the applications for those policies, namely statements that (1) vastly overstated the net worth of the insureds;[4/] (2) falsely stated that the insureds were going to pay the premiums on the policies themselves, when in fact, unrelated investors were going to pay the premiums; and (3) falsely denied that the

---

[4/]       As MA Aff I ¶ 18, n. 9 further states, the higher that an insured's net worth is, the higher the amount for which the insurance company will insure his life, thereby increasing the amount for which the life insurance policy can be resold on the secondary market.

applicants' intents were, from the outset, to resell the policies at a profit after two years[5/] on the secondary market, rather than to provide financial protection to the insureds' families in the event of the insureds' premature deaths. Id. at ¶ 12. If the insurance companies had known the truth they would not have issued the policies. Id. Indeed, insurance companies will not knowingly issue life insurance policies to persons who are "strangers" to the insured, that is, persons who have no interest in the continued health of the insured and to whom the insured is worth more dead than alive. Id. at n. 3 and ¶ 14.

ING, in its internal fraud investigation, initially identified policy applications on at least fifteen different elderly insureds (the "Fifteen Insureds") totaling over $135,000,000 which Liberty Planning had submitted to ING. For many of the Fifteen Insureds, Liberty Planning also submitted life insurance policy applications to insurance companies other than ING. Id. at 14 and n. 4. ING, as a result of its investigation, terminated "for cause" its relationship with the five Liberty Planning insurance agents (the "Five Agents") responsible for submitting the applications for the Fifteen Insureds to Liberty Planning. The "cause" for the terminations was that the Five Agents engaged in misconduct when they submitted to ING STOLI policies containing significant incorrect and/or misleading information. Id. None of the Five Agents cooperated with ING's investigation. The defendant Avigdor Gutwein was the Liberty Planning insurance agent for seven of the Fifteen Insureds. Id. at ¶ 15 and n. 6.

MA Aff I ¶ 13 explained that the subjects of the investigation, which included, among others, defendants Lebovits, M. Neuman, Y. Neuman, Gutwein, Grodsky and Leo Fekete (Id. at ¶ 1), created a "complex financial network to funnel the premiums paid and the profits earned from the scheme." Indeed, MA Aff I ¶ 48 states that the "individuals involved in this scheme have left a very difficult to follow money laundering trail behind them [which] will be very difficult to trace ..." For example, MA Aff I noted that M. Neuman is a co-signor of a Bold Associates bank account and is believed to be its co-owner. Lebovits is also the CEO of a company named the Rocklyn Group, which had paid at least $370,000 to Bold Associates.

---

[5/]   Under New York law, an insurance company can rescind a policy based upon fraud within two years of the date on which the policy was issued. After the two year period has expired, the insurance company can no longer rescind the policy based upon fraud, even if the company first learns thereafter that the policy was fraudulently obtained. Id. at ¶ 18, n.8.

Lebovits had personally paid to Bold Associates at least $240,000. Two months after the $240,000 transfer from Lebovits to Bold Associates, Bold Associates transferred $370,000 to Lebovits. Gutwein also transferred into Bold Associates $3,500,000 from his personal bank account and $1,000,000 from the bank accounts of companies that Gutwein created. Bold Associates, in turn, funds other companies, including the Blue Rock Group, whose bank account at Bank of America is controlled by M. Neuman's brother, Y.Neuman, and Brooklyn Life Group, whose bank account is controlled by Melissa Neuman, M. Neuman's wife. The Blue Rock Group and Brooklyn Life Group, in turn, were funding the life insurance trusts of, and had made $500 payments to, some of the Fifteen Insureds. The premiums on the policies were paid from the insureds' life insurance trust bank accounts by mail and interstate wire. Id. at ¶¶ 13, 27, 48.

As examples of how the scheme involved false representations regarding income and whether the policy was intended to be a STOLI policy, MA Aff I described the policies obtained for two of the Fifteen Insureds, who were also confidential informants, CI1 and CI2. Liberty Planning submitted to ING applications for a $3,500,000 and a $10,000,000 life insurance policy on, respectively, the lives of CI1 and CI2. ING approved both of these applications. Id. at ¶ 14. These and other policies of the Fifteen Insureds exemplified the circuitous and devious transfers of funds discussed above. N.S. BP Realty LLC ("N.S. BP"), which purports to be a real estate firm and has a bank account co-owned by M. Neuman, paid and received money from the CI1 life insurance trust bank account. Bank records show that three purported religious organizations had funded the premium payments from the life insurance trust bank accounts of some of the Fifteen Insureds. In particular, Congregation Harchuvas Hadas KN, Inc. and Congregation Shlomo Golda Berkowitz, of which CI1 told the government that he had never heard, made payments to the CI1 life insurance trust bank account that, in turn, made premium payments to ING. Congregation Khal Torath Chaim directly made premium payments to ING on the life insurance policy of another of the Fifteen Insureds. An attorney in Little Rock, Arkansas was the co-trustee on a policy of one of the Fifteen Insureds who lives in Brooklyn, N.Y. and the attorney wire transferred one of the premium payments on that policy. Bold Associates has three different bank accounts at three different banks. Id. at ¶¶ 13, 48.

13

CI2 and CI3, the latter being another confidential informant who was CI2's accountant, both related the following facts to the government, even though the government always interviewed them separately.  In late 2007, CI3 contacted CI2 and told him that he knew someone named Edward Grodsky who was looking for healthy persons who were willing to purchase life insurance.  (CI3 knew the defendant Grodsky because the latter was also an accountant who sold accounting software to CI3.)  Grodsky called CI2 and told him that: (1) CI2 could obtain life insurance since he was healthy and between the ages of 81 and 84; (2) "investors," rather than CI2 himself, would pay the premiums on the policy; (3) the policy would be resold after two years, at which time CI2 would be paid $2 million; and (4) CI2 would be paid $ 500 per month until the policy was resold.  According to CI2, Grodsky later told CI2 that CI2's net worth would have to be inflated in his insurance application.  On CI2's application for life insurance that Liberty Planning submitted to ING, CI2's net worth and annual income were listed, respectively, as $17,400,000 and $475,000.  CI2 told the government that his net worth is "very little," that he rents his apartment and that his annual income, which consists of social security benefits and a pension, is about $36,000.  Id. at ¶ 15.  The completed application which Liberty Planning submitted for CI2 also falsely stated that CI2 had not had any discussions about reselling the policies and that the premiums were going to be paid from CI2's income and savings, when, in fact, they were going to be paid and were paid by investors.  Id.

According to CI3, at Grodsky's direction, he was made the trustee of the CI2 life insurance trust and the trust bank account paid the premiums.  CI3 signed a number of starter checks in blank at Grodsky's direction, but otherwise played no part in making deposits into or disbursing funds from that bank account.  A review of bank records shows that the trust bank account was funded by organizations of which CI3 stated that he had never heard, including the Blue Rock Group, which, as shown above, is controlled by Y. Neuman, and which, as also shown above, is funded by Bold Associates, which is controlled by M. Neuman.  The Blue Rock Group also made $500 monthly payments to CI2 for five months.  Id. at ¶ 15.  Grodsky, who acted like the insurance agent on the policy, was, as far as Postal Inspector Albright knew, neither a Liberty Planning Agent nor an insurance agent.  The Liberty Planning agent who was listed on the CI2

14

application was Gutwein. Id. at n. 6. However, neither CI2 nor CI3 had ever spoken to or communicated with Gutwein. Id. at n. 11.

According to CI2, two individuals who said that they were "associates of Grodsky," namely, M. Neuman and Lenny LNU, visited CI2 and spoke with him about the policies CI2 "had obtained from Grodsky." Indeed, M. Neuman spoke with CI2 over the M. Neuman Phone. Id. at ¶ 16. (Lenny LNU has, since the submission of MA Aff I, been identified as Y. Neuman. MA Aff III ¶ 42). In the summer of 2009, M. Neuman and Lenny told CI2 that they wanted to resell the policies CI2 already owned and that in order to get more money for the policy he would have to appear unhealthy. They gave CI2 a list of symptoms of "Transient Ischemic Attacks," a serious illness which CI2 did not have, and told CI2 to go to the doctor and complain about those symptoms. M. Neuman and Lenny told CI2 that before the doctor's visit, Lenny would give CI2 "strong cups of coffee" to raise his blood pressure and that after the visit Lenny would give CI2 the cure to get his blood pressure back down. CI2 became concerned that Neuman and Lenny were trying to kill him to get the full amount of the policy. MA Aff. I at ¶ 17.

During a November 3, 2009 consensually recorded call between CI2 and M. Neuman, M. Neuman claimed that he thought that CI2 really did suffer from TIA symptoms,[6] but when CI2 asked M. Neuman what the purpose was for him to go to the doctor to complain of symptoms, M. Neuman replied that if he suffered from medical problems that lowered his life expectancy, then that would make CI2's policy worth more money when they resold it to a potential buyer. During a consensually monitored telephone call between Lenny and CI2 on October 29, 2009, Lenny provided very strong corroboration of CI2's statements that M. Neuman and Lenny had asked CI2 to pretend to have symptoms from which he did not suffer. During that telephone call, when CI2 brought up the time that he and M. Neuman had asked him to go to the doctors complaining of TIA symptoms, Lenny tried to falsely get CI2 to agree that it was M. Neuman, rather than Lenny, who had acted out the symptoms and tried to get CI2 to go to the doctor and that he, Lenny, was the "one sitting on the left." After the call, CI2 stated that Lenny

---

[6]      After the call, CI2 reaffirmed that M. Neuman was "well aware" that CI2 did not have the symptoms about which M. Neuman and Lenny wanted him to complain to the doctor. CI2 provided the government with the computer printout of TIA symptoms that Lenny, in M. Neuman's presence, gave to him. CI2 stated that CI2 did not previously know what TIA is or what its symptoms are. Id. at ¶ 20 and n.12.

played the lead role in acting out the symptoms that CI2 was to pretend to have, but Lenny did all of that in front of M. Neuman. Id. at ¶¶ 20, 28.

CI1 told the government about a fraudulent scheme which was virtually identical to the one that CI2 and CI3 described. CI1 told the government that he was approached by defendant Leo Fekete, who is a distant relative of CI1, in or around March 2008, regarding the purchase of a policy on CI1's life. Fekete told CI1 that: (1) if CI1 obtained life insurance, both Fekete and CI1 would receive profits from that life insurance; (2) investors, rather than CI1, would pay the premiums; (3) CI1 would make money up front; and (4) CI1 would make additional money two years later when the policy was resold. Fekete also told CI1 that he would inflate CI1's financial information on the life insurance application since that would generate more income for them. The completed application for life insurance that Liberty Planning submitted to ING stated that CI1's net worth and annual income were, respectively, $5,300,000 and $325,000, which amounts, according to CI1, were grossly inflated. The applications also falsely stated that CI1 had not had any discussions with anyone about reselling the policy and that the premiums were going to be paid from CI1's income and savings, when, in fact, they were going to be paid, and were paid, by outside investors. Bank records show that the CI1 life insurance trust, which Fekete arranged to open with CI1's wife as the "on paper" trustee, paid the premiums to ING, but that neither CI1 nor his wife controlled deposits into or payments from the trust bank account. CI1's wife signed one check from that account in blank which was later used to make a premium payment. Another check that was used to pay a premium contained a signature that purported to be that of CI1's wife, but according to CI1, his wife did not sign it. As shown above, the CI1 trust bank account was funded by organizations which were unknown to either CI or his wife, including alleged religious congregations and N.S. BP, the realty company whose bank account is co-owned by M. Neuman. Id. at ¶ 18.

On December 17, 2009, ING filed suit to rescind four of the policies it had issued to the Fifteen Insureds. That evening, M. Neuman left a message for CI2 to call M. Neuman, and the next day, Grodsky left a message for CI3 to call Grodsky about CI2. On December 22, 2009,

CI3 spoke to Grodsky on Grodsky's land line during a consensually recorded call.[2/]  During that call Grodsky told CI3 that ING was accusing everybody of fraud and "we" have attorneys who "will respond to it."  Grodsky then "admitted," in the following exchange, that he and CI3 had engaged in fraud.  In response to CI3's question whether he (CI3) and Grodsky would get in trouble because CI2's "assets are overstated" on CI2's insurance application, Grodsky first tried to avoid CI3's question.  Grodsky then answered the question by simply stating, "no."  Grodsky stated that they expected to make money on the CI2 policies other than the CI2 ING policy, although much less money than they originally anticipated.  Grodsky stated that "everybody," which Postal Inspector Albright interpreted to mean the investors, Grodsky, CI2 and CI3, would make "some" money, but that the investors would make the bulk of the money.  Grodsky told CI3 that he could expect to be served with legal papers by ING, but that he should say absolutely nothing to ING, and should call Grodsky after he got served.  When CI3 stated that CI2 originally had to be healthy just to get the policy, Grodsky stated that "now ... we don't want him to be healthy."  When CI3 stated that he got a call from CI2 a few months back saying "now he has to ... say he's not healthy," Grodsky stated that you can increase the value of the policy and make more money if you "go for not healthy."  Pen register records show that during that call, M. Neuman's Phone placed a call to Grodsky's cell phone, at which time Grodsky told CI3, "hold on I got a call."  Postal Inspector Albright believed that during the call between the two cell phones, Grodsky and M. Neuman discussed the scheme as it related to the conversation between Grodsky and CI3 that was then on hold.  Id. at ¶ 24.

During the November 3, 2009 consensually recorded telephone call between CI2 and M. Neuman, M. Neuman told CI2 that when the policy was resold, CI2 would receive and have to sign for the money, but then he would give the money to the investors.  During that call, M. Neuman also confirmed that he (Neuman) knew that Grodsky had told CI2 "when we started" that CI2 would make $2,000,000 in profits when the policy was resold after two years, but that those predictions had been made to CI2 when the market was much better.  On December 22,

---

[2/]     The consensual call between Grodsky and CI3 referred to in the text actually occurred on December 21, 2009 and not on December 22, 2009, as MA Aff I mistakenly stated.  To avoid confusion in cross-referencing between MA Aff I and this memorandum of law, we will continue to incorrectly refer to this consensual call as having occurred on December 22.

2009, CI2 called M. Neuman on M.Neuman's Phone, and thirty minutes later M. Neuman, using his Phone, called CI2 back.  Both of these calls were consensually recorded.  During those calls, M. Neuman falsely told CI2 that CI2 only had a policy with ING and that their attempts to obtain another policy with Union Central did not work out.  This was false, CI2 <u>did</u> have a policy with Union Central and, as explained above, Grodsky told CI3 on December 22, 2009 that they still expected to make money on the CI2 policies other than the one issued by ING. <u>Id.</u> at ¶ 20, 21. Pen Register records which the government obtained for the period October 21, 2009 through December 30, 2009 (the "Covered Period"), show that during that 70 day period, M. Neuman, using his Phone, was in contact with Grodsky on Grodsky's cell phone or land line, 151 times, most recently on December 28, 2009. In addition, during the Covered Period, M. Neuman's Phone was in contact with: (1) Gutwein's Phone 76 times, most recently on December 28, 2009; (2) the phone at which CI2 spoke with Lenny 39 times, most recently on December 30, 2009; (3) Lebovits on 53 occasions, most recently on December 17, 2009; and (4) Moses Schlesinger, the Office Manager of Liberty Planning, on 6 occasions, most recently on December 29, 2009. Schlesinger was responsible for sending out New Business Transmittals, to which Liberty Planning attaches applications for life insurance, medical reports that document the applicant's health status, HIPPA releases and the insurance agent's report.  To further the scheme, Schlesinger emailed the exaggerated net worth and income figures to an independent contractor, Jewel Strader, who prepared inaccurate but purportedly independent Inspection Reports on six of the Fifteen Insureds' applications. <u>Id.</u> t ¶ 31.  The Inspection Reports for CI1's application, for example, falsely confirmed that the exaggerated numbers on CI1's application were correct. <u>Id.</u> Schlesinger also refused to cooperate with ING's investigation. <u>Id.</u> at ¶¶ 24, 27, 28, 30 and 31.

### 3. <u>Judge Townes Correctly Determined That MA Aff I Set Forth Sufficient Evidence of Probable Cause</u>

The foregoing provisions of MA Aff I clearly set forth sufficient facts to support Judge Townes's determination that there was probable cause to believe that M. Neuman had engaged in and was engaging in a conspiracy to violate the mail fraud, wire fraud and money laundering statutes and that, if the wiretap order of M. Neuman's Phone were issued, that evidence of those crimes would be intercepted.  This is especially so under the highly deferential standard of review that must be applied to Judge Townes's probable cause determination.

There were clearly sufficient facts to support the conclusion that CI2 and CI3 were reliable informants. Neither was a professional informant, their information was based upon personal knowledge and they both made statements that were against their penal interest by stating that they knew of, and participated in, the fraud. Further, the statements of CI2 and CI3 are substantially corroborated in many ways and in many important respects. First, CI2 and CI3, who were always interviewed separately, corroborated each other and were corroborated by records. The statement of CI1 corroborated the statements of CI2 and CI3 by describing an almost identical scheme involving Liberty Planning to the one CI2 and CI3 described. Id. at n.5. The statements of CI2 and CI3 were also corroborated by the ING report, which terminated for cause the Five Agents, including Gutwein, for providing false and misleading information on the STOLI applications of the Fifteen Insureds (including on CI2's application to ING). The statements of CI2 and CI3 were also corroborated by many other factors discussed below (including bank records), only one of which is pen register records. Thus, the corroboration here is far more substantial than that found to be sufficient in United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990), in which two confidential informants were found sufficiently reliable where one of them made a statement against penal interest and both had first hand knowledge, were not professional informants, and were corroborated solely by pen register records.

CI2's statements that M. Neuman and Lenny tried to convince CI2 to go to the doctor to complain of symptoms from which CI2 did not suffer are strongly corroborated by Lenny. Lenny, during an October 29, 2009 consensually monitored conversation, admitted that he (Lenny) and M. Neuman were both present when symptoms of TIA were acted out for CI2 to complain about to the doctor (although Lenny falsely tried to get CI2 to agree that it was M. Neuman, rather than Lenny, who acted out the symptoms for CI2).

M. Neuman argues that his alleged conduct, in which he sought to get CI2 to complain to a doctor about symptoms that he did not have, was not a fraud on the insurance companies. But this argument completely misses the mark.[8] M. Neuman's attempt to get CI2 to

---

[8]/Fraudulently inflating the resale price of a policy does economically harm the insurance company, because it increases the chances that the policy will be resold on the secondary market. If the policy is resold on the secondary market, it will not be allowed to lapse, whereas, if it is not resold by the STOLI investors, it may lapse before the insurance company will have to pay the multi-million dollar death benefits on the policy. MA Aff II ¶ 17. In other words, if the policy

falsely complain to a doctor of symptoms which he did not have was an attempt to resell CI2's policies at higher prices on the secondary market than could be obtained in the absence of those lies. The goal of the entire scheme described in MA Aff I was to resell the policies at a profit on the secondary market after two years, Id at ¶¶ 12, 15 and 18, and a conspiracy is not completed while the conspirators are still trying to obtain the object of the conspiracy, United States v. Eppolito, 543 F. 3d 25, 47 (2d Cir. 2008), namely, in this case, obtaining as high a resale profit as possible. Evidence that a conspirator is engaging in further overt acts necessary to achieve the aims of the conspiracy certainly is relevant to the determination whether there is probable cause to believe that person is a knowing and willing participant in the conspiracy. Moreover, even if the only fraud that MA Aff I had described had been the fraud involving false symptoms - as it was not - probable cause to believe that that fraud had taken place would have been a sufficient basis, by itself, for the issuance of the Original Interception Order. A conspiracy to commit mail and/or wire fraud is a crime on the basis of which a wiretap may be issued under 18 U.S.C. § 2516. Moreover, a conspiracy to resell a policy at a higher price through the use of fraud, where the policy is kept in effect until the time of resale by paying premiums through the mails and interstate wires, is a conspiracy to commit mail and/or wire fraud. As noted, the probable cause showing that M. Neuman and Lenny engaged in that conspiracy is extremely strong, consisting not only of the first hand statements of CI2, but also of the strongly corroborating statements of Lenny and Grodsky during consensually monitored statements made by each of them on, respectively, October 29 and December 22, 2009.

      M. Neuman further states that the government presented Judge Townes with absolutely no evidence that M. Neuman was aware that the CI2 applications contained false statements. M. Neuman's claim is completely wrong, although, as seen in the last paragraph, the clear showing of probable cause that M. Neuman participated in a conspiracy to raise the resale prices of the CI2 policies through the creation of false medical records was sufficient, by itself, to sustain the issuance of the Original Interception Order. Nonetheless, the government did present Judge Townes with facts that were sufficient to support a determination that M. Neuman was

---

lapses before the insured dies, the company will never have to pay the multi-million death benefits it was induced, through fraud, to agree to pay on the insured's death.

aware of and participated in the submission of fraudulent applications for CI2's life insurance policies. Although "a conspiracy by its very nature is a secretive operation [and thus] a particular defendant's participation in ... a conspiracy may be established through circumstantial evidence." United States v. Diaz, 176 F.3d 52, 108 (2d Cir. 1999), sufficient direct evidence was certainly presented to Judge Townes to establish probable cause to believe that Grodsky, CI2 and CI3 were part of the conspiracy to submit false applications to insurance companies, MA Aff I at ¶¶ 17 and 24, and sufficient circumstantial evidence that M. Neuman knew of and participated in the scheme to submit fraudulent insurance applications was also presented: Grodsky approached CI2 about fraudulent insurance applications directly. While Grodsky and M. Neuman spoke with CI2 separately, they clearly kept apprised of each other's dealings with CI2. M. Neuman and Lenny introduced themselves to CI2 as Grodsky's "associates." M. Neuman and Grodsky were in constant contact, calling each other an astonishing 151 times during the final 70 days of 2009. During the December 22, 2009 call between Grodsky, using his land line, and CI3, in which Grodsky admitted that he and CI3 inflated CI2's assets on CI2's insurance applications, Grodsky was simultaneously in contact, via his cell phone, with M. Neuman's Phone. M. Neuman and Grodsky were then, in the agent's opinion, discussing, via cell phone, the fraudulent scheme as it related to the conversation between Grodsky and CI3 that was then taking place, a conversation about, inter alia, the inflation of CI2's assets on insurance applications. Also, M. Neuman knew that Grodsky, when he first contacted CI2, had promised CI2 that if CI2 purchased an insurance policy, CI2 would make $2,000,000 when the policy was resold two years later. Grodsky, during his December 22, 2009 phone call with CI3, participated in the attempt, initiated by M. Neuman, to encourage CI2 to complain about symptoms from which CI2 did not suffer. Grodsky and M. Neuman clearly worked as a team and that team solicited CI2 to participate in both (1) the submission of fraudulent insurance applications and (2) the complaints to doctors of fake symptoms. It is highly likely that M. Neuman, like his fellow conspirators Grodsky and CI2, knew not only of the second aspect of the scheme, but of the first as well. United States v. Casamento, 587 F.2d 1141, 1156 (2d Cir. 1989) ("once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming.").

M. Neuman admits that MA Aff I shows that M. Neuman was the "head of a group of [persons] who invested in STOLI policies," including Lebovits, who was the Liberty Planning Vice President and General Agent and who submitted at least fifteen fraudulent STOLI applications to ING. M. Neuman Motion at 21. Bank records show that Gutwein was also among the group of investors that M. Neuman headed. Gutwein was the insurance agent for seven of the Fifteen Insureds and ING terminated him for cause for submitting those fraudulent STOLI applications and for failing to cooperate with the ING investigation. Bank records also show that the investors, who were headed by M. Neuman, left a "very difficult to follow money laundering trail," by "creat[ing] a complex financial network to funnel the premiums paid and the profits earned from the scheme." MA Aff I, ¶¶ 13 (emphasis added), 48. The "difficult to follow money laundering trail" through which the premiums were paid, in which bank records show that Bold Associates, controlled by M. Neuman, played a central role, provide convincing circumstantial evidence that M. Neuman, Gutwein and Lebovits sought to deceive the insurance companies into believing that the premiums on the insurance policies of the Fifteen Insureds were being paid by the insureds, including CI1 and CI2, when in fact, those premiums were being paid by investors.[2] M. Neuman's actions in transmitting investor money to insurance companies to pay premiums through a circuitous, difficult-to-follow route speaks volumes as to his fraudulent intent.

The fact that M. Neuman was the head of a group of investors that included two persons central to Liberty Planning, Lebovits and Gutwein, who were responsible for submitting at least fifteen fraudulent insurance applications is also very significant. It is one thing for M. Neuman to say that he was involved only as an innocent investor with a fraudulent STOLI policy purchased for a single insured, namely, CI2, without knowing that that policy was obtained

---

[2]    M. Neuman creates a smokescreen by asserting that STOLI policies are perfectly legal and are no different from the resale of any life insurance policy. As shown at the outset, M. Neuman intentionally confuses the ordinary secondary market, which is legal, and the STOLI market, which has often been characterized by fraud, and also omits to mention that until the decision of the New York State Court of Appeals in late 2010, which is after the Interception Orders had expired, the prevailing view was that STOLI policies, even without fraud, were illegal. But this is all irrelevant to M. Neuman's motion. It has always been, and continues to be illegal to obtain a STOLI policy through fraud, and conspiring to do so in violation of the mail fraud or wire fraud statutes is an offense which can form the basis of a Title III application under 18 U.S.C. section 2516. The Interception Orders presented to and approved by Judge Townes are premised solely upon violations of the mail fraud, wire fraud and conspiracy statutes, and not on the illegality of STOLI policies under state law.

through fraud. It is quite another thing for M. Neuman to say that he was innocently involved with fifteen different fraudulently obtained STOLI policies. Indeed, M. Neuman's relationship with these two persons who were intimately connected with these fifteen frauds, including the fraud on the CI2 applications, involves not just circuitously funneling huge amounts of their money for the payment of premiums, but also frequent telephone contact. Pen register records confirm that M. Neuman was in constant and frequent contact with Lebovits and Gutwein.[10]

Further, M. Neuman and Lenny "visited CI2," id. at ¶ 16, and thus, they saw the apartment that CI2 could afford to rent with his annual salary of only $ 36,000 and his net worth of "very little." Id. at ¶ 15. (As an investor, which M. Neuman admits that he was, he would have to have known the size of CI2's insurance policy, namely $10,000,000 (Id. at ¶ 14), since the size of the policy would affect its potential resale value). The blatant inconsistency between a $10,000,000 life insurance policy and any apartment that could be afforded by a person with an annual income of $36,000 and with very little net worth is highly probative of M. Neuman's knowledge of the application fraud. Further, M. Neuman lied to CI2 and told CI2 that he only had an ING policy and did not have a Union Central policy, when, in fact, CI2 did have a Union Central policy, and, according to Grodsky, they were trying to resell that latter policy at a profit. M. Neuman's lies to CI2 were clearly an attempt to cheat CI2 out of any share in the profits they were still trying to make. Thus, there is more than sufficient evidence that M. Neuman was a willing participant in the fraudulent conspiracy alleged in the affidavit.

But the most important factor concerning M. Neuman's knowledge of and participation in the submission of fraudulent insurance applications, is that there is strong, highly corroborated direct evidence that M. Neuman was an active participant in the scheme to fraudulently inflate the resale prices of the CI2 policies through the creation of false medical records. It is this thus clear that M. Neuman was not an innocent participant in the scheme. The nature of M. Neuman's contact with Lebovits, Gutwein and Grodsky, who were participants in

[10]/ Further, focusing solely on the CI2 policies, the relationship between M. Neuman, Grodsky and Gutwein is highly suspicious. Grodsky functioned as the insurance agent on the CI2 policies, yet he was neither a Liberty Planning Agent nor an insurance agent at all. Gutwein, who was deeply involved in the Liberty Planning fraud, was listed as the Liberty Planning Agent on the CI2 policies, but CI2 and CI3 never had any contact with Gutwein. CI2 and CI3 dealt only with Grodsky, M. Neuman and Lenny.

the scheme to submit false insurance applications, including, in particular, the submission of false insurance applications on behalf of CI2, the sheer number of these false applications, the devious, difficult to follow route through which he ensured that investor money would be used to pay premiums to insurance companies, the other highly probative factors listed above and M. Neuman's demonstrated fraudulent intent with respect to other aspects of the scheme are at the very least, certainly minimally sufficient to support the conclusion that M.Neuman was aware of the application fraud.  Clearly, Judge Townes' did not abuse her discretion by so finding.

Indeed, even if we were to assume arguendo, that M.Neuman did not know of the fraudulent statements on the insurance applications, he was still part of the same conspiracy as those who participated in the submission of fraudulent applications.  Both the persons who participated in the submission of fraudulent applications and those who tried to increase the resale prices by creating fraudulent medical records about the insureds' health were participants in a single conspiracy to fraudulently increase the resale prices of the STOLI polices in question. Even if different means were sometimes used to achieve that single criminal goal, that does not change the fact that both of these means are in furtherance of the same criminal scheme.  The lies on the insurance applications permitted the participants in the scheme to obtain the policies in the first place and also permitted the participants to increase the size of each of the policies, which in turn increased the resale prices of the policies.  The fraudulent attempts to make the insureds appear less healthy than they, in fact, were also constituted attempts to fraudulently increase the resale prices of these STOLI policies.  That some members of a conspiracy were not aware of all of the means through which other members of the conspiracy were seeking to achieve the goals of the conspiracy does not prevent them from being members of the conspiracy.  United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979); Eppolito, 543 F. 2d at 48 ("Nor need the goals of all the participants be congruent for a single conspiracy to exist, so long as the participants agree on the 'essential nature' of the enterprise and 'their goals are not at cross purposes.'").  Focusing on the CI2 policies, CI2 and Grodsky sought to achieve the goal of increasing the resale price of the CI2 policies both by means of false statements on the applications and false complaints of poor health, and even if we assume that M. Neuman was aware only of the attempts to achieve the goal of increased resale prices by means of false complaints of poor health, he is a co-conspirator with

24

other members of the conspiracy. United States v. Bernstein, 533 F.2d 775, 793-94 (2d Cir. 1976) (in finding that Cardona could be convicted of a multi-object conspiracy to obtain FHA insured mortgages, by: (1) bribing FHA appraisers; and (2) submitting false credit statements to FHA, it did not matter that Cardona knew nothing of the bribes, because "in order to find that a particular defendant has become a member of a conspiracy, it is not necessary to find that the [particular] defendant knew or was aware of both objects of the alleged conspiracy if . . . the scope of the particular defendant's agreement included one object of the conspiracy" and "the scope of the agreement made by at least any two of the defendants included both objects of the conspiracy"); United States v. Digeronimo, 598 F.2d 746, 755 (2d Cir. 1979) ("when a conspiracy has more than one objective the government need prove as to a particular defendant that he 'agreed to accomplish at least one of the criminal objectives'"); United States v. Papadakis, 510 F.2d 287, 297 (2d Cir. 1975)(same).

    M. Neuman next claims that the evidence of probable cause presented in MA Aff 1 was "stale" - - a claim which means that there was insufficient evidence to conclude that there was probable cause to believe that the proposed interception order would lead to interceptions "concerning [the] offense" that "an individual is committing, has committed or is about to commit." 18 U.S.C. § 2518 (3) (a), (b) (emphasis added). M. Neuman's claim is wrong. Where the supporting affidavit paints a "picture of continuing conduct, as opposed to an isolated instance of wrongdoing, ... the passage of time between the last described act and the presentation of the application becomes less significant. " United States v. Diaz, 176 F.3d 52, 109 (2d Cir. 1999), quoting United States v. Gallo, 863 F.2d 185, 192 (2d Cir. 1988).  Moreover, "to the extent that there are acts of past criminal activity that in and of themselves might be stale, such acts 'can be sufficient if [an] affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was not a one-time occurrence.' " Diaz, 176 F.3d at 109-10 (quoting United States v. Wagner, 989 F.2d 69, 75 (2d Cir. 1993)); United States v. Mohammad, 2010 WL 2232438, *5 (D. Conn. 2010).  Indeed, where there is relevant evidence of the criminal activity within one month of the application and there is evidence that the defendants used the telephone to conduct their criminal activities then the claim of staleness will be rejected. Mohammad, at *5, citing Diaz, 176 F.3d at 109-10.

In this case, on December 22, 2009, three weeks before the application for the Original Interception Order was made to Judge Townes on January 11, 2010, the government obtained consensually recorded conversations of: (1) Grodsky, who, using his land line, was speaking to CI3, and, using his cell phone, was simultaneously speaking to M. Neuman; and (2) M. Neuman, who was using his Phone to speak to CI2. During the M. Neuman telephone call with CI2 on December 22, CI2 stated that he had not gotten the $500 check from the investors that M. Neuman had previously told CI2 that he had sent. M. Neuman then stated that he would look into it. MA Aff I ¶ 21.[11/] During the December 22 call between Neuman and CI2, CI2 asked M. Neuman if Grodsky or M. Neuman was supposed to send CI2 the $500 payments and M. Neuman ducked the question by stating that it was a loan from the investors. MA Aff I ¶ 22.

In the December 22 call between Grodsky and CI3, during which Grodsky was simultaneously in touch with M. Neuman's Cell Phone, Grodsky told CI3 that ING was accusing everybody of fraud, Grodsky acknowledged that CI2's assets had been overstated in CI2's insurance applications, Grodsky encouraged CI2 and CI3 to say that CI2 is not healthy in order to make more money on the resale of CI2's policies, Grodsky told CI3 that they were still trying to resell CI2's policies from insurance companies other than ING - records show that CI2 had such another policy with Union Central - and that "everybody" would make money on that policy, although not as much as was originally expected. MA Aff I ¶ 24. Indeed, the fact that there were fraudulently obtained policies through other insurance companies demonstrates that the scheme was broad and likely to continue, as only ING had uncovered evidence of fraud in some policies. Grodsky also told CI3 that CI2 was being a pain in the ass by asking a ton of questions; and Grodsky told CI3 to expect to be served with legal papers and to not tell ING anything. Id. The entire discussion between Grodsky and CI3 on December 22, which Postal Inspector Albright believes that Grodsky was also simultaneously discussing with M. Neuman, was in furtherance of

---

[11/] When Grodsky originally contacted CI2 in late 2007, Grodsky told CI2 that until his policy was resold, CI2 would receive $500 per month. Bank records show that CI2 received the $500 payments for five months from the Blue Rock Group, which in turn was funded by Bold Associates. During consensually monitored calls between M. Neuman, using his Cell Phone, and CI2 of October 29 and November 3, 2009, CI2 asked M. Neuman about the $500 monthly payments and why they had stopped a year earlier. M. Neuman responded that the $500 payments were an advance from the investors, that money had been "dry" lately, but that the investors were expecting money soon and M. Neuman would be sending a check to CI2 in the next few days. MA Aff I ¶¶ 19, 20.

the fraudulent conspiracy. So too was M. Neuman's December 22 discussion with CI2 about M. Neuman supposedly sending CI2 a renewed $500 monthly payment, since the $500 monthly payments "until the policy was resold" was one of the incentives which the conspirators had provided to CI2 from the outset in exchange for participating in the fraudulent scheme. Finally, as all of the consensually recorded calls and the pen register records discussed in the affidavit show, the conspirators used the M. Neuman Phone in furtherance of their crimes. MA Aff I ¶¶ 16, 19 - 24, 27, 28, 30 - 32. For these reasons alone, M. Neuman's claim of staleness should be rejected. Mohammad at *5.

      Moreover, MA Aff I paints a picture of ongoing criminal conduct, rather than an isolated instance of wrongdoing. The fraudulent conduct involving the CI2 policy began in late 2007 and continued until at least a few weeks before January 11, 2010, the date on which the application for the Original Interception Order was made. The CI1 application, to which M. Neuman was linked through N.S. BP, also involved significant fraudulent conduct beginning in March, 2008. Indeed, M. Neuman is linked to all of the Liberty Planning fraudulent applications discussed in the ING report through pen register records with Liberty Planning principals, through M. Neuman's central role in funding those policies via a circuitous route and in receiving money from Lebovits, the Liberty Planning Vice-President and General Agent on those fraudulent policies, and Gutwein, the most prolific of the Five Agents who were terminated for cause by ING and the absentee Liberty Planning insurance agent on the CI2 policy. Thus, given the ongoing criminal conduct, M. Neuman's claim of staleness should be rejected. Diaz, 176 F.3d at 109-10, quoting Gallo, 863 F.2d at 192 and Wagner, 989 F.2d at 75; Mohammad, at *5.

      There was clearly probable cause to believe that if the Original Interception Order was granted, calls would be intercepted over the M. Neuman Cell Phone concerning the fraudulent scheme under investigation. On December 22, 2009, Grodsky told CI3 that "we" were still going to try and sell other CI2 policies and that "everybody" could expect to make some money, although the investors would make the most. Moreover, M. Neuman had previously told CI2 that when his policy is sold they would need CI2 to receive the money and turn it over to the investors. If the Original Interception Order were granted, there was probable cause to believe that there would be calls between M. Neuman, the chief investor, and "everybody," including

Grodsky, Lenny, CI2, CI3 and other investors, including Lebovits and Gutwein, about the potential or actual sale of a CI2 policy. Further, since M. Neuman was the leader of the investors in the fraudulent scheme, he, as MA Aff I shows, would play a crucial role in disbursing the profits from all of the policies through the complex, difficult to follow financial network the investors created. In addition to the CI2 policy, other policies would be approaching their sale dates by early 2010. The sale of a policy would not be until two years after the policy was issued and the insurance company could no longer rescind it. Indeed, M. Neuman states in his Motion at 7 that there were policies which were issued only 18 months before the application for the Original Interception Order was made, and those policies, at the time of MA Aff I, would be six months away from any contemplated sale. If the Original Interception Order were issued, there was probable cause to believe that calls would be intercepted over the M. Neuman Phone with additional investors and participants about the potential sale of the unsold policies among the Fifteen Insureds and other fraudulent policies that were part of the scheme but which the government had not yet identified. Id. at ¶ 48. Thus, the evidence presented in MA Aff I was clearly not stale.

> ### 4. MA Aff I Did Not Contain Any Intentional or Reckless Material False Statements or Omissions

M. Neuman argues that the government intentionally and recklessly made materially false statements and omissions in MA Aff I. He is wrong.

First, M. Neuman argues that Postal Inspector Albright intentionally made false statements in MA Aff I because she stated that the subjects "are ... commit[ting]," inter alia, "conspiracy, mail fraud, wire fraud and money laundering," MA Aff I ¶ 3, and yet, she did not disclose in MA Aff I the dates on which the policies were issued or that, according to M. Neuman's calculation, the last specific fraudulent application mentioned in the ING report that was submitted occurred eighteen months before MA Aff I was presented to the Court. M. Neuman at 7-8. According to M. Neuman, the government intentionally failed to disclose the dates of the insurance policies and the dates of the transfers among the defendants that it referred to in the affidavit in order to conceal from Judge Townes that its case was stale.

The government did not intentionally or recklessly withhold any material information from Judge Townes. Indeed, the affidavit states that CI2 was first approached about

participating in the scheme in "late 2007," and CI1 was first approached in "March 2008." Id. at ¶¶ 15, 18. The affidavit also notes that the evidence of fraud from ING's internal investigation was received in the summer of 2009. Id. at ¶ 11. Moreover, the affidavit describes the reasons why the showing of probable cause was not stale. Three weeks before the affidavit was submitted, the conspirators were engaging in plans to sell the CI2 policy. Indeed, the affidavit also makes clear that on December 17, 2010, ING sued to rescind only four of the policies of the Fifteen Insureds and that the conspirators expected CI2 and CI3 to be sued in the future. Id. at ¶¶ 21, 24. The conspirators planned to resell policies only after their periods of contestability had lapsed. Any scheme or conspiracy to defraud includes plans to make money from the fraud. At the time MA Aff I was submitted, the subjects, as the affidavit makes clear, were still making plans to sell at a profit policies obtained through fraud. M. Neuman told CI2 that when the policy was resold, CI2 would get the money and he would have to turn it over to the investors, whom CI2 did not know. The fraud and money laundering scheme was still very much alive and still being engaged in by the subjects on January 11, 2010.[12] The lies on the insurance policies also remained alive for two independent reasons: (1) until the periods of contestability ended, the insurance companies could still rescind the policies if they learned of the fraud; and (2) as long as the subjects were still endeavoring to sell the policies, the scheme was still being committed so that the conspirators could profit from it. Thus, even if information which M. Neuman states was intentionally omitted from the affidavit had been included, the showing that the government's case was not stale, as previously outlined, would still have established probable cause to believe that if the Original Interception Order were issued, evidence of the conspirators' crimes would be intercepted. The omissions were neither material nor intentional.

M. Neuman complains about MA Aff I, n. 3, which states that "[i]nsurance companies in general, and ING in particular, will not knowingly issue life insurance policies to persons who are 'strangers' to the insured, that is, persons who have no interest in the continued health of the insured and to whom the insured is worth more dead than alive." M. Neuman

---

[12]     M. Neuman also complains that the government did not state in the affidavit that the most recent specific transfer referenced in the affidavit occurred six months before the day on which the affidavit was submitted to the Court. But this is all irrelevant because the affidavit shows that the subjects were still planning to pay premiums through a circuitous routes until the policies were resold.

complains that this statement, which the government supports, "falsely conveyed the impression that there was no legitimate way to invest in these policies," even though STOLI policies are not, in the absence of fraud, illegal under New York State law. M. Neuman at 9 (emphasis added). But the affidavit does not say anything about the legality of STOLI policies not obtained by fraud, it only discussed obtaining policies through the use of fraud, which, of course, is illegal. The quoted passage indicates only that insurers would find relevant and material the fact that an insurance applicant sought a STOLI policy. The affidavit then sets forth evidence of the fraud, initially by describing the ING report, which found fraud on applications submitted to ING by Fifteen Insureds, including CI1 and CI2.   MA Aff I does not allege the legality of STOLI policies under New York state law and did not imply anything about whether or not, in and of themselves, such policies are in any way illegal. The New York State Court of Appeals did not decide that STOLI policies are legal until ten months after MA Aff I was submitted, Kramer v. Phoenix Life Insurance Co., 15 N.Y. 3d 539 (2010), and even if the affidavit had stated that the New York Court of Appeals would shortly decide the legality of STOLI policies under state law, that would not have affected the clear showing of fraud in obtaining STOLI policies, a fraud that is illegal. The "omissions" of which M. Neuman complains were thus not material.

　　　　M. Neuman argues that MA Aff I created the false "impression" that he was a principal or insurance agent associated with Liberty Planning and failed to inform the Court that he was neither. The affidavit stated the facts, which show a very suspicious relationship between M. Neuman and Liberty Planning. The affidavit did not hide the fact that M. Neuman had no "on paper" affiliation with Liberty Planning, since it stated that "[t]he fact that Moses Neuman had access to CI2's medical records shows that he either had some affiliation with Liberty Planning or obtained the records from some person who was affiliated with Liberty Planning [since Liberty Planning had a release from CI2 allowing it to obtain CI2's medical records]. The Liberty Planning agent who was listed on the CI2 applications was [Gutwein], but neither CI2 nor CI3 ever spoke with or communicated with [Gutwein]."[13] Id. at n. 11 (emphasis added). But despite

---

[13]/M. Neuman asserts that the government falsely stated in MA Aff I, footnote 11, that the false doctor's reports that M. Neuman wanted CI2's doctors to create "would be sent to the insurance company." The government did not state that in footnote 11. It instead stated that Liberty Planning obtains a release from the insured to allow the agency to obtain and provide to the insurance company medical records. That is completely true. But it is the agency that obtains

the lack of an "on paper" affiliation between M. Neuman and Liberty Planning, the de facto affiliation between Liberty Planning and Grodsky, on the one hand, and M. Neuman, who introduced himself to CI2 as an "associate" of Grodsky (Id. at ¶ 16), on the other hand, is shown by far more than M. Neuman's access to CI2's medical records.

In addition, Grodsky, who also had no "on paper" relationship with Liberty Planning and was not an insurance agent, acted like an agent by soliciting CI2's application. Id. at n.6. As M. Neuman admits, the affidavit shows that M. Neuman was the leader of a group of investors who invested in STOLI policies. M. Neuman at 21. But it was not just any group of investors of which M. Neuman was the leader, it was a group of investors that: (1) invested in policies submitted to ING and other insurance companies by Liberty Planning, at least fifteen of which were proven to be fraudulent; (2) paid the premiums on these policies through a circuitous, difficult-to-follow route, using companies controlled by M. Neuman and his family; and (3) included the General Agent of Liberty Planning and the Liberty Planning insurance agent on the CI2 policies and six of the other Fifteen Insureds, who was terminated by insurance companies for submitting fraudulent STOLI insurance applications. It would have been false for the government to state that it had no evidence that M. Neuman was affiliated with Liberty Planning. MA Aff I made clear that while M. Neuman had no official affiliation with Liberty Planning, he did in fact have "some" affiliation with Liberty Planning, and the facts surrounding that affiliation are highly probative of his involvement with the fraudulent scheme involving Liberty Planning. It would be one thing for an investor to state that he was unaware of the fraud with respect to one fraudulent policy, but to make such claims with respect to all of these fraudulent policies that were circuitously invested in by principals of Liberty Planning who were subject to termination for such conduct is quite another. The affidavit's failure to explicitly state, what it nonetheless made clear, that M. Neuman had no on paper relationship with Liberty Planning, was not material and would not have affected the affidavit's showing of probable cause.

---

the release and the only release that the government knows of CI2 providing was the one he provided to Liberty Planning. To obtain this release, M. Neuman would have to have obtained it from someone affiliated with Liberty Planning. Indeed, pen register records show that in the last two months of 2009, M. Neuman and Moses Schlesinger, the general manager of Liberty planning, called each other 6 times, the last call occurring on December 29, 2009. Schlesinger's job at Liberty Planning included collecting items that would be needed to submit applications, like medical records, which could only be obtained with a medical release.

M. Neuman also claims that the government made intentionally false statements and omissions concerning CI2's credibility. M. Neuman is wrong. MA Aff I, footnote 5 clearly discloses CI2 and CI3's initial making of false statements to the government. Importantly, the affidavit emphasizes the ways in which CI2 and CI3's information was corroborated and confirmed and it cannot seriously be contended that the district court would cease reading the footnote before reaching the disclosure about their initial false statements.

Further, M. Neuman claims that MA Aff I made material omissions in that it failed to reveal that CI2 told M. Neuman on November 3, 2009 that CI2 did suffer from TIA. CI2 said nothing of the sort. On November 3, 2009, M. Neuman and CI2 had a discussion in which CI2 said to M. Neuman, "[y]ou know, you're asking me as though the TIA was real. They were all made up. I had nothing to do with the TIA. You know that ... Remember, Lenny came up with the TIA, he brought that into me, Hello?" M. Neuman responded , "...Hello? I can't hear you. I'm in the basement over here." CI2 then repeated, "...I'm just saying that all the TI[A] symptoms were made up. I didn't have that. M. Neuman then said, "Oh you don't have vertigo and TIA?" CI2 replied, "None of that. Well I had a little vertigo about 2 years ago but I, we can't live with that because I don't have it anymore." M. Neuman replied by saying, "I thought you told me you had it." CI2 said, "Well I did but I don't get up every day with vertigo." M. Neuman said, "No, not everybody with TIA and vertigo, don't get up every day, whenever they get up-" CI2 responded by saying, "Oh well, the last vertigo I had was about 2 years ago so-" Neuman responded, "Oh, I thought you had it, I didn't realize-I thought you just had it." Ex.7 (11/3/09 Tr.) (emphasis added). But in the above conversation, while M. Neuman keeps suggesting to CI2 that CI2 has "vertigo and TIA," CI2 denies that he presently has either and states that two years ago he had a little vertigo. TIA consists of an entire constellation of symptoms which mimic a stroke, not simply dizziness. There is absolutely nothing in this conversation which negatively affects CI2's credibility. MA Aff I did advise the Court that during the November 3, 2009 conversation, M. Neuman said that "he (M. Neuman) thought that CI2 really suffered from [TIA] symptoms." Id. at ¶ 20. But there was no need to describe any more of the conversation to the Court. If the entire conversation discussed in this paragraph had been included in MA Aff I, the probable cause analysis would not have changed even slightly. Lenny, M. Neuman's co-conspirator, admitted to

CI2 that Lenny and M. Neuman were both in the room when CI2 was told to go to the doctor and complain of symptoms of TIA that were acted out for CI2. Id. at ¶ 28 and n. 15.

M. Neuman complains that the government stated in MA Aff I that, on October 29, 2009, "CI2 spoke about the time he had gone to the doctor and pretended to have symptoms he did not have," Id. ¶ 19, although CI2 did not, on October 29, tell M. Neuman that he had "pretended" to have symptoms. That is true, but MA Aff I was, perhaps inartfully, referring to the fact that CI2 spoke to M. Neuman about his visit to the doctor in 2009, and that that was the visit during which, CI2, in fact, falsely told the doctor that he was experiencing dizziness. The affidavit did not intend to convey that CI2 told M. Neuman that he was "pretending" on October 29. The government had no motive to falsely tell the court that on October 29, CI2 told M. Neuman that his symptoms were "all made up," because CI2 did tell M. Neuman precisely that on November 3. Id. ¶ 20. In any event, the inartfully worded statement about the October 29 call was completely immaterial, as even excluding that statement from consideration the affidavit provided ample probable cause as discussed above.

M. Neuman next complains that MA Aff I intentionally omitted to state that M. Neuman and Lenny did not meet CI2 until after CI2's applications were submitted. In fact, the affidavit did state this. It stated that M. Neuman and Lenny, "who said that they were associates of Grodsky, visited CI2 and spoke with him ... about the policies [CI2] had obtained through Grodsky." Id at ¶ 16 (emphasis added). Thus, the affidavit does state that M. Neuman did not meet CI2 until the latter had already obtained insurance policies through Grodsky. Nonetheless, as previously shown, there was very strong circumstantial evidence to conclude that M. Neuman participated in the submission of fraudulent insurance applications and, further, even if M. Neuman was not directly involved in doing that, there was still probable cause in the affidavit to issue the Original Interception Order.

M. Neuman further states that MA Aff I intentionally omitted to state that M. Neuman's attempt to create false medical records in order to increase the resale price of CI2's policies was not a fraud on the insurance companies, but was rather a fraud on the purchasers of the policies on the secondary market. First, that fraudulent conduct did defraud the insurance company. See footnote 9 above. Second, the affidavit does clearly state that that conduct would

defraud potential purchasers of the policies on the secondary market.  According to MA Aff I, M. Neuman told CI2 that the purpose of CI2 complaining of TIA was that "if CI2 suffered from medical problems that lowered his life expectancy, <u>then that would make CI2's policy worth more money when they resold it to a potential buyer.</u>"  <u>Id.</u> at ¶ 20.  Finally, as explained in detail previously, irrespective of whether the fraudulent complaints of fake symptoms defrauded insurance companies, that conduct was in furtherance of the ultimate criminal goal established at the outset of the conspiracy, namely, to resell the policies at inflated prices on the secondary market in order to make money from the conspirators' fraudulent scheme.

M. Neuman also claims that the government should have advised the court that during a November 3 call between M. Neuman and CI2, M. Neuman told CI2 that he had received the report of CI2's doctor concerning the visit during which CI2 complained of symptoms and that he (Neuman) did not understand it and needed an underwriter to interpret it. M. Neuman claims that his November 3 statement that he did not understand CI2's doctor's report should have been disclosed to the court because it contradicts Postal Inspector Albright's statement that on October 29, 2009, M. Neuman told CI2 that he had received the doctor's report, that the report did <u>not</u> indicate that CI2 suffered from TIA and that was not good enough.  If the affidavit had disclosed that M. Neuman made a statement on November 3 which contradicted the statement he made on October 29, that fact would have further lowered Neuman's credibility, not enhanced it.  The affidavit advised the court that M. Neuman, on November 3, claimed that he thought that CI2 <u>did</u> suffer from TIA.  M. Neuman has not made a substantial showing that the government failed to disclose the exchange on November 3, about which M. Neuman complains, in a deliberate attempt to mislead the court.  Indeed, for the same reasons explained above, if M. Neuman's "omitted" November 3 statement were added to the affidavit, the affidavit would still establish probable cause that Neuman committed fraud, since among other reasons,  Lenny corroborated that fact.

In sum, none of the alleged omissions or the claimed falsehoods were made with the intent to mislead the court nor were any of these omissions or claimed falsehoods material.  If all of the alleged omissions and claimed misstatements were added to or corrected in MA Aff I, that affidavit would still provide sufficient probable cause to support the issuance of the Original

34

Interception Order. Thus, M. Neuman is not entitled to a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1974). <u>See</u>, <u>e.g.</u>, <u>United States v. Batista</u>, 2009 U.S. Dist. Lexis 27437 at *15-16 (E.D.N.Y. 2009) ("if, when the material that is the subject of the alleged falsity ... is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, <u>no hearing is required</u>." (emphasis added)).

Finally, since the government did not make any intentional or reckless false statements or omissions in MA Aff I that were material, it follows that even if this Court were to find that Judge Townes abused her broad discretion in finding that MA Aff I established probable cause, the Court could still not suppress the wiretap because the government was entitled, under <u>Leon</u>, to rely in good faith on the Judge Townes' Original Interception Order.

> 5. Since the Interceptions Obtained as a Result of the Original Interception Order Should Not Be Suppressed, Derivative Suppression of <u>Subsequent Interception Orders and Search Warrants Are Not Warranted</u>

M. Neuman seeks derivative suppression of subsequent Title III Orders and search warrants on the grounds that those orders and warrants relied, at least in part, on interceptions obtained as a result of the Original Interception Order. However, since, as shown above, suppression of the fruits of the Original Interception Order is not warranted, M. Neuman is also not entitled to suppress any of the communications obtained as a result of the subsequent Title III Orders or search warrants either.

> B. The Government Did Not Improperly Minimize Calls <u>Intercepted Over the M. Neuman or Gutwein Phones</u>

M. Neuman moves for the suppression of calls intercepted over his Phone, arguing that the government did not make sufficient efforts to obtain Yiddish interpreters to staff the wire room (the "Staffing Argument") and that these insufficient efforts to insure contemporaneous translations violated the minimization provisions of 18 U.S.C. § 2518(5). Gutwein argues for suppression of the wires on his Phone, arguing that (1) the Staffing Argument, as applied to the interceptions over his Phone, justify suppression; and (2) when the government relied upon after the fact minimization due to the unavailability of an interpreter in the wire room, the interpreter who performed the after the fact minimization of the fully taped call did not, according to Gutwein, fast forward through non-pertinent portions of the conversation, but rather, listened to the entire tape and only translated and passed on to the case

35

agents those portions of the call that were pertinent (the "Fast Forward Argument"). These arguments are unavailing.

As shown in Point I, no defendant other than one who has a possessory or proprietary interest in the phone intercepted has standing to suppress any calls on the grounds of improper minimization. So, for example, Y. Neuman cannot make any minimization argument.

Second, both the Staffing Argument and the Fast forward Argument are without merit. Section 2518 (5) provides, in pertinent part, that:

> Every order [for a wiretap] and extension thereof shall contain a provision that the authority to intercept ... shall be conducted in such a way as to <u>minimize the interception of communications not otherwise subject to interception under this chapter</u> ["Contemporaneous Minimization"] [and] ... <u>[i]n the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not immediately available during the interception period, minimization may be accomplished as soon as practicable after such interception</u> (["After the Fact Minimization"] ...

<u>Id</u>. (emphasis added).

As seen from the above text, the statute uses the term "minimization" twice, first, to refer to the minimization of ordinary, non-foreign language, non-coded communications, and second, to refer to the minimization of communications that are in a code or foreign language where there is no person immediately available to minimize the communications contemporaneously while the interceptions are taking place. These two provisions refer to different types of minimization. <u>See United States v. Simmels</u>, 2009 WL 1924746 at *4 (E.D.N.Y. 2009), explaining that: (1) the first use of "minimization" in the statute refers to the contemporaneous minimization of non-pertinent calls, where the agent in the wire room stops intercepting the call (<u>i.e.</u>, stops recording the call) when he determines that it is not pertinent to the investigation; and (2) the second use of "minimization" in the statute refers to situations in which no interpreter is available in the wire room to contemporaneously minimize the telephone call and thus a special after the fact minimization rule applies. Judge Gleeson explained that the legislative history of § 2815 (5) "likens [what we have called 'After the Fact Minimization']" to "minimization for computer [<u>e.g.</u>, email] transmissions ... in which 'the initial law enforcement agents' review the interception in its entirety, 'delete all non-relevant materials and disseminate

36

to other officials only that information which is relevant to the investigation." Simmels at *4, quoting S. Rep. No. 99-541 at 30-31, 32 (1986).

Both the Staffing Argument and the Fast Forward Argument are directed at the government's use of After the Fact Minimization with respect to some of the calls intercepted over the M.Neuman and Gutwein Phones. The Staffing Argument essentially argues that the government should have had sufficient Yiddish interpreters available to perform Contemporaneous Minimization of all of the Yiddish calls and that thus the government should not have engaged in After the Fact Minimization of any of the Yiddish calls. The Fast Forward Argument argues that even when the government had sufficient reason to engage in After the Fact Minimization of Yiddish calls, it did not engage in that minimization properly because it did not fast forward. Thus, Gutwein and M. Neuman do not complain about the government's minimization efforts with respect to: (1) any of the many calls intercepted in English; (2) any of the calls in Yiddish or English that were deemed privileged; or (3) any of the many Yiddish calls that were contemporaneously minimized because a Yiddish interpreter was available during the time that a call was being interpreted. M. Neuman and Gutwein challenge only the government's minimization of those Yiddish calls during which no interpreter was available to contemporaneously minimize the call.

Gutwein and M. Neuman mistakenly claim that the government has not shown that it made sufficient reasonable efforts to have Yiddish interpreters in the wire room to perform Contemporaneous Minimization of Yiddish calls. The U.S. Postal Inspection Service ("USPIS"), which does not have its own wire room, used an ICE wire room. The USPIS, prior to submitting MA Aff I, contacted a translation service with which ICE has a contract, Metropolitan Interpreters and Translators, Inc., and notified it that USPIS would need the services of Yiddish interpreters to staff the wire. ICE will not permit anyone in its wire room who does not have the Title III security clearance which ICE requires. Metropolitan had three Yiddish interpreters on staff (respectively referred to as "Int 1," "Int 2" and "Int 3"), only two of whom, Int 1 and Int 2, had the requisite security clearance. Metropolitan applied for security clearance for Int 3, but by the time Int 3 received security clearance, the wiretaps were down. Metropolitan sought to attract additional Yiddish interpreters to staff the wire, but its efforts resulted in very few applicants, all

of whom were in or around the target area of the investigation, namely, Borough Park, and Metropolitan decided that using applicants from those areas might compromise the investigation. Nonetheless, it would not have mattered if Metropolitan had immediately accepted these few applications because the security clearance process at ICE would have taken too long to be able to use any of these applicants while the wiretaps were operating.

Int 1 and Int 2 could be used in the wire room, but while Int 1 was generally available, Int 2 was available only on certain days. Int 1 labored as a Yiddish interpreter in the wire room for many hours, often working in the wire room during the entire time that the government was intercepting communications on a given day. (The wire room intercepted communications anywhere from 5 to 7 days per week, usually for 14 hours hours per day). Int 2 worked in the wire room during certain days. Int 2 and Int 3 were available to do After the Fact Minimization, mostly during the evening hours. If a Yiddish call came in at a time when no interpreter was available to contemporaneously minimize that call - - which included times when an interpreter was contemporaneously minimizing one Yiddish call and a second Yiddish call came in - - then that Yiddish call was taped in full for After the Fact Minimization. Under these circumstances, the government made reasonable efforts to contemporaneously minimize Yiddish calls and many were contemporaneously minimized. The Staffing Argument thus fails.

Gutwein pressed the Fast Forward Argument based upon three cases, United States v. Gambino, 1084, 1106 (S.D.N.Y. 1990), United States v. David, 940 F. 2d 722, 730 (1st Cir. 1991) and United States v. Padilla-Pena, 129 F. 3d 457, 464 (8th Cir. 1997). The first of the three cases does not support the Fast Forward Argument, but rather supports the position that the very procedure which Gutwein condemns and of which he accuses the government of implementing, to wit, listening to the entire taped conversation and only translating and conveying to the case agents the relevant portions (the "Non-Fast Forward Procedure"), is in fact proper After the Fact Minimization. Further, the other two cases Gutwein cites support the conclusion that while fast-forwarding would constitute a proper After the Fact procedure, they do not hold that fast-forwarding is the only method by which the government can properly implement After the Fact Minimization. None of these cases held that any calls should be

suppressed and we are aware of no cases in which any interception was suppressed for failing to fast forward.

In addition, the Fast Forward Argument is not supported by the plain language of § 2815 (5) and the legislative history of the statute supports the conclusion that the Non-Fast Forward Procedure is a fully proper method to minimize after the fact, which is precisely how Judge Gleeson interpreted that legislative history in Simmels at *4. Thus, even though the Non-Fast Forward Procedure is all that the law requires, at bare minimum, the government is entitled to the Leon good faith defense because, at the time the government's wires were up, there was no clearly established Second Circuit law preventing the use of the Non-Fast Forward Procedure and requiring fast forwarding. Either way, Gutwein is not entitled to suppression based upon the Fast Forward Argument, as explained below.

In Gambino, 734 F. Supp. at 1106, Judge Leisure considered a case in which only one agent who spoke Sicilian was in the wire room and, when he was unavailable, the Sicilian calls were taped in their entireties and the Sicilian-speaking agent, after the fact, "only translated into English those conversations which he deemed relevant to the investigation." Id. Judge Leisure held, relying on the same holding rendered by Judge Bechtle of the Eastern District of Pennsylvania in a related case, that "the process of post-interception minimization undertaken by Agent Salvo provides essentially the same protection of privacy interests as does simultaneous minimization; in each case, only one government agent is privy to all conversations, and only the relevant conversations are translated into English and preserved as potential evidence." Id. (emphasis added). Not a word was mentioned about fast forwarding or the need to engage in it. Thus, Judge Leisure of the S.D.N.Y., in Gambino and Judge Bechtle of the E.D. Pa., fully support the propriety of the Non-Fast Forward Procedure and do not require fast forwarding.

David also does not require suppression here. In David, 940 F. 2d at 730 (emphasis added), the First Circuit stated that:

> The key to after the fact minimization is that the process utilized must protect the suspects' privacy interests to approximately the same extent as would contemporaneous minimization, properly conducted. Accord United States v. Gambino, ... This criterion was fulfilled... the interpreters were told to stop listening to the tape once they determined that the conversation was beyond the scope of the investigation. By translating only the portions of the

39

> tapes that seemed relevant, the government's actions comported
> with the expectations of Congress.

The David court indicated it agreed with Gambino.[14] But Gambino expressly held that the government's After the Fact Minimization was sufficient because "in each case, only one government agent is privy to all conversations, and only the relevant conversations are translated into English and preserved as potential evidence." Id. at 1106 (emphasis added). That is, under Gambino, it is perfectly permissible that the translating agent is "privy to all conversations," whether relevant or irrelevant, as long as only the relevant conversations are translated and disclosed to the other agents.[15] There are thus only two possibilities. Either: (1) the David court found that the agents in David were engaging in proper After the Fact Minimization since they "stopped listening" to the taped conversation when it became irrelevant because, by doing that, the David agents did even more than the minimum that Gambino found acceptable, namely to "stop translating" the irrelevant portions of the conversation; or (2) the David court was holding, contrary to Gambino, that to engage in proper After the Fact Minimization, agents must "stop listening," as well as "stop translating" when they come across irrelevant portions of the conversation, in which case David was expressly disagreeing with Gambino, even though it claimed to agree with Gambino. Either way, it is clear that there was no well-settled law in the Second Circuit that interpreters listening to taped interceptions after the fact are required to "stop listening," rather than simply to "stop translating," when they get to irrelevant portions of the tape.

In Padilla-Pena, 129 F.3d at 463-464, the Eighth Circuit stated, as did David, that After the Fact Minimization should protect the suspect's privacy interests to approximately the same extent as contemporaneous minimization. Padilla-Pena cited only to David, which, in turn, cited only to Gambino, which, in turn, deemed acceptable that the translators "stop translating," even though they do not "stop listening," and remain "privy to all" portions of the tape that are

---

[14] Just before the quoted language, David states that after the fact minimization should be reasonable, but it only cites to standard cases noting that minimization should be reasonable, cases that do not discuss anything at all about After the Fact Minimization. The only case that David cites which specifically addresses After the Fact Minimization is Gambino.

[15] In this case, only relevant conversations and relevant portions of conversations that were translated after the fact were transcribed or disclosed to any member of the prosecution team.

irrelevant. Again, as in David, Padilla-Pena held that the agents in that case engaged in proper After the Fact Minimization when they stopped listening to the tape when the conversation became irrelevant. The Eighth Circuit then observed that in that case, "[i]f the conversation did not appear to be related to narcotics, the translators would fast forward through the tape to the next conversation," thus becoming the only court to even mention the technique of "fast forwarding," the technique which, according to the defendants, is legally required. 129 F.3d at 463-464. There are only two ways to interpret Padilla-Pena: (1) while fast forwarding will satisfy proper After the Fact Minimization, it is not necessarily required; or (2) fast forwarding is required, which conflicts with Gambino, the only case upon which David relies, and David, in turn, is the only case upon which Padilla-Pena relies.

Thus, based upon the cases discussed so far, most broadly construed, there are cases from the First and Eighth Circuits which hold that translators who translate after the fact must "stop listening" as well as "stop translating" when they come upon irrelevant portions of a conversation, but these two Circuit court cases, directly or indirectly, rely upon and appear to agree with a case from the Southern District of New York, which held that it is sufficient if the translators "stop translating" irrelevant portions of conversations even though they remain "privy to" these irrelevant portions. More narrowly construed, these two cases agree that a translator's procedure to "stop translating" is sufficient, by itself, to satisfy minimum standards of After the Fact Minimizations, but further hold that, obviously, if translators "stop listening" then they have certainly complied with these minimum standards.

Indeed, as recently as 2009, the Sixth Circuit, in United States v. Haque, 315 Fed. Appx. 510, 518-19, 2009 WL 484600 at *4 (6th Cir. 2009), held that the agents' minimization procedures were entirely proper, "[a]lthough many unrelated foreign language calls were initially intercepted, this was required because the topic of the calls could only be determined by a translator after the fact." (emphasis added.) Yet the Sixth Circuit did not explain or explore whether the after the fact translators "stopped listening and fast forwarded" when they came upon irrelevant portions of the conversations, which, according to the defendants, is a required finding for a court to make before it can hold, as the Sixth Circuit did, that minimization was properly conducted. Thus, based upon the cases discussed, there is no well-settled law in the Second

41

Circuit that after the fact translators were required to "stop listening" as well as "stop translating'" when they came upon irrelevant portions of the conversation.

Defendants are also not assisted by the plain meaning of § 2518(5).  United States v. Gravel, 645 F. 3d 549, 551 (2d Cir. 2011) (absent defined terms in the statute, the plain meaning of the statute controls).  All that that provision states is that "[i]n the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, [After the Fact] [M]inimization may be accomplished as soon as practicable thereafter." 18 U.S.C. § 2518(5) (emphasis added).  There is nothing in that provision which requires the After the Fact minimization to be accomplished by a technique of "stop listening," as opposed to a technique of "stop translating and not disclosing to the investigative team."  Thus, the plain meaning of the statute does not preclude using the latter technique of "stop translating."  Notably, the latter technique is universally accepted as proper with respect to emails.

The legislative history states, with respect to the After the Fact Minimization provision of the statute for foreign language calls, that "minimization may be accomplished as soon as practicable after the interception.  In this regard, it is contemplated that the translator or decoder will listen to the tapes of an interception and make available to the investigators the minimized portions preserving the rest for possible court perusal later."  Senate Report No. 99-541 at *30, reprinted in 1986 U.S.C.C.A.N. 3553 at 3584 (emphasis added).  That language makes very clear that the translator should  "listen to [all of] the tapes of an interception, and make available to the investigators the minimized [i.e., only the relevant] portions."  This is precisely what is done in the case of emails.  The legislative history goes on to contrast the contemporaneous minimization of telephone calls with the minimization of emails.  Moreover, the technique for minimizing emails discussed in the legislative history is very similar to the "stop translating" technique for After the Fact Minimization of telephone calls.

According to the legislative history, the contemporaneous minimization of telephone calls and the minimization of emails is different because it:

> is impossible to "listen" to a computer and determine when to stop
> listening and minimize as it is possible to do in listening to a
> telephone conversation.  For instance, a page displayed on a
> screen during a computer transmission might have five paragraphs

42

of which the second and third are relevant to the investigation and the others are not.  The printing technology is such that the whole page <u>including the irrelevant paragraphs</u>, would have to be printed and read ... Common sense would dictate, and it is the [Senate Judiciary] Committee's intention, that the minimization should be conducted by the initial law enforcement officials who review the transcript.  <u>These officials would delete all non-relevant materials and disseminate to other officials only that information which is relevant to the investigation</u>.

<u>Id</u>. at *30, 3585(emphasis added).

But if the object is, in minimizing emails, to come as close as possible to the contemporaneous minimization that is used for live telephone calls, then why would the "initial law enforcement officials who review the transcript [of the email]," in order to mimic the so called spot-checking procedure that is used in minimizing live telephone calls,  not be required, after reading <u>irrelevant</u> paragraph one, to "fast forward" through <u>relevant</u> paragraph two, either by not reading that relevant paragraph, or at the very least, by not disseminating it to other law enforcement officials?  The Senate Judiciary Committee, which authored the legislation, has made it very clear in the legislative history, that it did not intend to require that extreme a minimization procedure when minimizing emails.  Moreover, the Committee also made very clear that the procedure which it <u>did</u> require for emails, namely, reading them in their entireties and only disseminating the relevant portions to other law enforcement officials, is virtually identical to the procedure it intended for After-the Fact Minimization of telephone calls in a foreign language.  For the latter, the Committee "contemplated that the translator ... will listen to the tapes of an interception and only make available to the investigators the minimized portions."

In <u>Simmels</u> at *4, a case that the defendants emphasize, Judge Gleeson confirmed the above interpretation of the legislative history quoted above.  Judge Gleeson found that that legislative history "<u>likens</u> [the After the fact Minimization of telephone calls] to 'minimization for computer transmissions,' [because] computer communications, <u>like coded or foreign language conversations</u>, also require a 'somewhat different procedure than that used to [contemporaneously] minimize a telephone call,' in which '<u>the initial law enforcement agents review the interception in its entirety, 'delete' all non-relevant materials and <em>disseminate</em> to other officials only that information which is relevant to the investigation</u>.'" (Emphasis added).

In light of the foregoing, it appears that Congress did not intend to require fast forwarding during the After the Fact Minimization of taped telephone calls by interpreters, but only required the same procedure used for emails, namely, that they be listened to in their entireties, but only the relevant portions be translated and disclosed to other law enforcement officials. At the very least, there is no objective evidence that the law in the Second Circuit was well-settled and required fast-forwarding when the government's wiretaps were being used in early 2010. Thus, the government is entitled to the <u>Leon</u> good faith defense with respect to the defendants' fast forwarding argument.

Further, even assuming <u>arguendo,</u> that the government's foregoing arguments are not dispositive, for three different reasons, the defendants are still not entitled to suppression for lack of minimization of any calls other than the M. Neuman and Gutwein calls that the agents determined to be privileged or non-pertinent.

First, while the Supreme Court has <u>not</u> decided whether a defendant is <u>ever</u> entitled to suppression of an entire wire, as opposed to suppression of only the offending calls, <u>Scott v. United States</u>, 436 U.S. 128, 136 n. 10 (1978), the Eighth Circuit has expressly held that where there have been minimization violations, then suppression of the improperly minimized calls is the only remedy to which the defendant is entitled. <u>United States v. Cox</u>, 462 F. 2d 1291, 1301-02 (8th Cir. 1972). Indeed, in 2011, in <u>United States v. Goffer</u>, 756 F. Supp. 2d 588, 595 (S.D.N.Y. 2011), the court stated that "[e]ven in cases where a defendant is able to make ... a showing [that 'the agents' minimization efforts as a whole were not objectively reasonable], it is far from clear that he would be entitled to anything more than suppression of the offending wires'" (emphasis added). <u>Goffer</u>, 756 F. Supp. 2d at 595-96, observed that in <u>United States v. Principle</u>, 531 F. 2d 1132, 1140 (2d Cir. 1976), the Second Circuit explained that courts "<u>generally remit the defendant to civil remedies</u> for the interception of innocent conversations" and found that "[a]s a <u>general matter</u> ... district courts in this Circuit have <u>favored the approach of suppressing only the improperly minimized calls.</u>" (citations omitted) (emphasis added).

Second, the Supreme Court has clarified that to determine if a conversation is or is not pertinent, a reviewing court should apply an objective standard, namely, the Court should determine whether the agents' actions were objectively reasonable in light of the facts and

circumstances that confronted them at the time, and not based upon the agents' subjective intent. Scott, 436 U.S. at 136-37. In Scott, the agents intercepted and contemporaneously listened to every call made to or from the target telephone line during a one month period. Moreover, although only 40% of these intercepted calls were pertinent and although the district court had held, after conducting a hearing, that the agents were aware of the minimization requirement, but "made no attempt to comply therewith," the Supreme Court denied suppression of the wiretap, holding that the subjective intent of the agents was irrelevant to whether there was a minimization violation. Id. at 133 - 39. Scott also held that "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." Id. at 140. Scott also noted a number of other factors that could explain failure to minimize, Id. at 140 - 42, such as, whether the phone being tapped is a public phone or is the personal phone of major figures in the crime, the length of the calls (because a shorter call often requires listening to the entire call to determine if it is pertinent), whether the call occurred earlier during the interception period when the agents were first learning how to decide if calls were pertinent and whether the call was ambiguous in nature and thus required extended listening to determine if it was or was not pertinent. Scott also held that "'because of any ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law that will decide every case.'" Id. at 139 - 40. The only inquiry is whether the agents' monitoring as a whole was objectively reasonable. Scott, 136-37.

Further, as stated in United States v. Giordano, 259 F. Supp. 2d 146, 155 (D. Conn. 2003), "[t]he Second Circuit has held that calls lasting less than two minutes need not be minimized ... Thus, because all calls between Giordano and Jones were less than two minutes in length, the government was not required to minimize them." (emphasis added), citing United States v. Capra, 501 F. 2d 267, 275 - 76 (2d Cir. 1974) (holding that "two minutes is "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation"); accord United States v. Yarbrough, 527 F. 3d1092, 1098 (10th Cir. 2008) ("In analyzing the government's minimization efforts we exclude calls under two minutes.") Finally, after a call has been contemporaneously minimized for being non-pertinent - - namely, the

recorders were turned off and the agents stopped listening - - the Second Circuit permits periodic "spot checks" - - namely, turning the recording device back on - - to determine if the phone call has turned to pertinent subjects. United States v. Hinton, 543 F. 2d 1002, 1012 (2d Cir. 1976).

This case is, even on its face, far more favorable to the government than was Scott, in which no minimization violations were found even though no conversation was minimized contemporaneously or, for that matter, minimized at all for an entire month. In this case, over the M. Neuman line, approximately 266 non-pertinent calls that were less than 2 minutes in duration were contemporaneously minimized, approximately 154 of which were in English and approximately 111 of which were in Yiddish. Of the approximately 291 non-pertinent M. Neuman calls that were 2 minutes or over in length, 166 of these calls were contemporaneously minimized, 97 in Yiddish and 69 in English. There was thus a good deal of contemporaneous minimization over the M. Neuman wire. But in light of the case law that calls under 2 minutes need not be contemporaneously minimized, let us focus only on the non-pertinent Yiddish calls that were two minutes or over and not contemporaneously minimized, of which there were approximately 91. (Call 6039, was categorized as "unknown," rather than "non-pertinent," but for completeness, we include it among the 91.) But of these 91 Yiddish calls that were 2 minutes or over in length and not contemporaneously minimized, approximately 59 of these calls were ones for which no interpreter was available when the call was intercepted live, and thus, those calls were subjected to After the Fact Minimization, which is completely permissible under the statute. Of the remaining approximately 32 non-pertinent Yiddish calls, which were not minimized and for which an interpreter was available, in all but 3 cases there are explanations similar to the ones sanctioned in Scott for the failure to contemporaneously minimize the non-pertinent call, including explanations like there was no audio available, the call contains periods of dead air (such as when a call was left off the hook), the call was with another subject interceptee (see instructions to the agents, discussed later), the call involved ambiguous topics that could have related to the crimes being investigated and that required extended listening to determine that the call was not pertinent or the caller was checking his voice mail (in which case, each separate voice message checked had to be listened to because the next one was a different message and could be pertinent). Annexed as Exhibit 8 is a spread sheet that breaks

down all of the non-pertinent calls of 2 minutes or longer which were not contemporaneously minimized, which explains for all but 5 calls, only 3 of which were in Yiddish, why the call was not contemporaneously minimized.[16/] There were a total of approximately 3,529 total non-duplicate audio calls intercepted over the Neuman Cell Phone and 3 or 5 unexplained non-contemporaneously minimized non-pertinent calls of 2 minutes or longer constitutes <u>less than one percent of that total number of calls.</u>

       M. Neuman specifically complains only about 20 Yiddish calls that were determined to be non-pertinent by the agents, which were not contemporaneously minimized. M. Neuman Motion at Ex. H. However, approximately 14 of those 20 calls were calls for which no interpreter was available. This includes the call about M. Neuman's son's circumcision. One of these 14 calls, call 6279, although a call for which no interpreter was available, was actually minimized twice, once in English and once in Yiddish. See Ex. 8 at last page. Again, where no interpreter is available, the statute allows the call to be minimized after the fact. Of the remaining 6 calls, the monitoring agents'/interpreters' actions were reasonable in at least 5 cases.

- Call 439, during the first week of the wire, involved loans, and the agents were not sure if it was fully or partially pertinent until it was over.

- During call 577, call waiting was activated and there were multiple conversations going on at once, making minimization of the entire call in less than two minutes infeasible.

- Call 1052 occurred during the first week of the wire and addressed invoices, a topic initially thought to be pertinent.

- Call 2077 was between M. Neuman and Y. Neuman, two of the targets who had previously spoken about the fraud (<u>see</u> instructions to agents below) and the call was about checks; thus, as per the below instructions to agents, the call was not determined to be non-pertinent until it was over.

- During call 7320, except for less than two minutes of conversation, the line was left open without any conversation. Call 7171 was one of the handful of unexplained non-contemporaneously minimized calls over the M. Neuman Phone.

       In light of this background, there is no basis to conclude that it was objectively unreasonable for the agents to fail to minimize any but one of the forgoing six calls. In any event, it is quite clear that suppression is not an appropriate remedy unless the agents'

---

[16/] Exhibit 8 was prepared by persons who were not members of the prosecution team. No member of the prosecution team has listened to or will listen to any tape classified as non-pertinent or privileged.

minimization efforts <u>as a whole</u> were not objectively reasonable, <u>Goffer</u>, 756 F. Supp. 2d at 595 (citing <u>Scott</u>), which was not true here.

With respect to the Gutwein Phone, approximately 719 non-pertinent calls were contemporaneously minimized, approximately 367 of which were under 2 minutes and approximately 352 of which were 2 minutes or over. Of the approximately 367 non-pertinent contemporaneously minimized under 2 minute calls, approximately 175 were in Yiddish and approximately 190 were in English. Of the 352 non-pertinent calls that were contemporaneously minimized and were 2 minutes or longer, 233 were in Yiddish and 119 were in English. Thus, as was true of the M. Neuman wiretap, a great deal of contemporaneous minimization took place during the Gutwein wiretap. But turning to the non-pertinent calls in Yiddish that were not contemporaneously minimized and that were 2 minutes or over, there were 118 such calls over the Gutwein Phone, 46 of which occurred while no interpreter was available. These 46 calls were subjected to After the fact Minimization, which, again, is permissible under the statute. As shown by Exhibit 9 annexed hereto, which was prepared by non-prosecution team members, of the remaining 72 non-pertinent calls in this category, all but 21 have explanations for the failure to contemporaneously minimize the call. There were two additional unexplained non-minimized calls in English. The total number of non-duplicate audio files intercepted over the Gutwein wire was approximately 3,003 and 21 or 23 constitutes <u>less than one percent of that total</u>.

Thus, based upon the above statistics, there is yet a second alternative reason for rejecting the defendants' complaints of lack of minimization.

Of course, the government stipulates that it will not seek to introduce into evidence any calls or any portions of calls that were determined to be non-pertinent or privileged by the agents in the wire room. But as summarized above, the defendants have made no showing that the agents failed <u>as a whole </u>to engage in objectively reasonable minimization efforts, and thus, for this second reason, they are not entitled to any remedy beyond suppression of the calls or portions of calls that were determined to be non-pertinent and not effectively minimized. This is especially so given the breadth of the conspiracy being investigated and the government's need to determine the identity of all of the many as yet unknown co-conspirators. <u>Scott</u> at 140; <u>Yarbrough</u>, 527 F. 3d at 1098.

48

Third, a factor that strongly weighs against suppression is whether the monitoring agents were operating under a set of written instructions, which provided a plan pursuant to which they would minimize the interception of non-pertinent material. Yarbrough, 527 F. 3d at1096-97.  Annexed hereto as Exhibit 10 are the minimization procedures that were distributed to the monitoring agents and each of the three interpreters along with MA Aff I and the Original Interception Order.  The instructions direct the agents that there shall be no monitoring without recording, that the agents must take precautions to minimize the interception of conversations that are not related to criminal activity, that spot monitoring for a reasonable period not to exceed 2 minutes is permissible, as often as is reasonable, but that at least one minute should elapse between interceptions.  Ex. 10 at 6.  The instructions further provide that if a conversation involving one of the subjects named in the Order is engaged in a conversation that is unclear but that may be related to the criminal offenses named in the order, then interception may continue until such time as it is determined that the conversation no longer relates to that topic.  Ex. 10 at 6 -7.  The instructions further instruct the agents that they should flag certain parties over time if they believe that such parties will not engage in fraud or money laundering conversations, with use of spot monitoring. The instructions further advise that if the parties to the conversation have previously engaged in fraud or money laundering discussions then it is reasonable to believe that future conversations may be so and that monitoring such calls in their entirety is generally proper because relevant discussions may emerge at any time, although, even here circumstances may develop which demonstrate that the agents should "minimize" or "spot monitor."  These are reasonable minimization instructions.  Their existence and their insistence that the instructions, and the Order and the supporting Affidavit had to be read by each agent and translator, Ex. 10, strongly weighs in favor of the overall reasonableness of the monitoring of the wire. The Orders instructed: "in the event any of the wire communications are conducted in a language other than English and/or are in code, and there is not reasonably available during the interception period an expert in the foreign language or code, minimization shall be accomplished as soon as practicable after such interception." Ex. 4 at 5; Ex. 5 at 5-6; Ex. 6 at 5-6.  As shown above, it was objectively reasonable at the time the wires were up to interpret that language in the Order, which comes

49

directly from the statute, to require only the non-fast forwarding procedure. Thus, for three different alternate reasons, neither Gutwein nor M. Neuman is entitled to suppression of anything other than the non-pertinent and privileged calls intercepted over his own Phone

M. Neuman further claims that as an additional ground for suppression for lack of minimization, that the Court should consider that the government made the privileged and non-pertinent communications of M. Neuman available to all of the defendants. M. Neuman merely rehashes the same tired arguments that he raised in support of his motion for a protective order in which he asked the Court to order the government to destroy or file under seal with the Court all non-pertinent and privileged calls on the M. Neuman line. As explained in the government's successful response to that motion, Exhibit 11, annexed hereto, the true facts are as follows. The government, in response to the joint request of the defendants for Rule 16 discovery, made all of the M. Neuman and Gutwein calls and emails available to all of the defendants, including the privileged and non-pertinent calls and emails, so that each of the defendants could: (1) make motions challenging the government's interceptions and seizures; (2) obtain their own statements from these materials, as required by Rule 16; and (3) search these materials for any Brady material. The prosecution team has never reviewed any of the privileged and non-pertinent communications on these materials[17] In a cover letter to each of the defendants, the government announced very clearly that it was including in the discovery privileged and non-pertinent material that the prosecution team had never reviewed. M. Neuman, with this cover letter in hand, produced the communications to the other defendants, including his privileged and non-pertinent communications. Subsequently, M. Neuman and other defendants asked for additional

---

[17] Neither M. Neuman nor Gutwein has ever complained, on this motion or on the motion for a protective order, that the substance of their attorney client communications were recorded or turned over to anyone else. If a call was identified as being between Gutwein or M. Neuman and one of his attorneys, the agents were instructed to stop recording and listening to the call and we are unaware of any complaints that that was not done. Nonetheless, the call, up until it was minimized, was classified as privileged and that initial part of the call was turned over even though the prosecution team has never reviewed even those innocuous portions of calls involving attorneys. Moreover, although the government decided from the outset that the prosecution team would not review any calls classified as privileged or non-pertinent, the statute does not require that procedure. The statute does not prohibit the interception of privileged or non-pertinent calls, but requires only that reasonable attempts be taken to prevent their interceptions. Simels, at *5 (privileged calls) and *6 (non-pertinent calls).

privileged and non-pertinent communications of other defendants to be disseminated to all of the defendants. The government declined that request and asked each of the defendants to return to the government all privileged and non-pertinent communications of any other defendant. All of the defendants declined the government's request that they return the non-pertinent and privileged communications of Gutwein and M. Neuman and Gutwein and M. Neuman declined to ask the other defendants to return the aforesaid communications. The Court endorsed the position advanced by the government in its cross-motion and not the one advanced by M. Neuman in its motion for a protective order. For all of the above reasons, neither M. Neuman nor Gutwein is entitled to suppression on the grounds of minimization of any call other than the privileged and non-pertinent calls intercepted over his own phone. (See previous footnote.)

POINT III

GUTWEIN'S MOTIONS TO DISMISS AND TO<br>SUPPRESS HIS TELEPHONE CALLS SHOULD BE DENIED

Gutwein moves to dismiss the indictment, or, in the alternative, to strike paragraph eight of the indictment, and to suppress his telephone calls intercepted pursuant to any of the Interception Orders. As shown below, Gutwein is not entitled to any of this relief.

A. Gutwein is Not Entitled to Dismissal of the Indictment or the Striking of Paragraph 8

Paragraphs eight and nine of the indictment in this case provide that:

> 8. Under New York State law, only an insured or a bona fide owner such as a close relative could purchase an insurance policy on an insured's life. At a later time, however, an insured or owner could sell the policy to anyone.

> 9. Generally, insurance companies did not knowingly sell a life insurance policy if the purchaser of the policy intended, from the outset, to later resell the policy. Nor did insurance companies knowingly sell a life insurance policy where a third-party investor, rather than an insured or an owner, would pay the premium.

(emphasis added).

Gutwein claims that paragraph 8 is inconsistent with the November 17, 2010 holding of the New York State Court of Appeals, issued upon certification of the Second Circuit, that, "New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was

51

obtained for that very purpose." Kramer II, 15 N.Y. 3d at 545. Gutwein is wrong. Paragraph 8 simply explains that a person without an insurable interest in the life of another cannot purchase an insurance policy from an insurance company on the life of that other person. The policy can be purchased in the first instance, under New York law, only by the insured or by someone with an insurable interest in the insured. However, the insured may, after he procures the policy, later resell it to anyone. Paragraph 9 further explains that although an insured may later resell a policy he purchased on his own life to any other person, including one who has no insurable interest in the insured's life, "generally," an insurance company will not knowingly sell the policy to the insured if it knows that the insured intends from the outset to later resell the policy. The Indictment alleges that in this case, insurance companies were fraudulently induced through lies to sell insurance policies to insureds who, from the outset, intended to later resell the policies.

Paragraph 8 is not inconsistent with Kramer. While Kramer holds that an insured can procure a policy on his own life and can immediately transfer the policy to one without an insurable interest, the insured cannot "transfer" the policy to another until after he has first procured it himself. One cannot "transfer" something which he does not yet have. While under New York law, the insured can transfer the policy to another immediately after he procures it, even later on the very day he procures it, the person without an insurable interest on another person cannot directly purchase an insurance policy from an insurance company on the life of that other person. That is all that paragraph 8 says. Thus, Gutwein is not entitled to either a dismissal of the indictment because it includes paragraph 8, nor to an order striking paragraph 8. But even assuming, arguendo, that the Court were to strike paragraph 8, Gutwein is not entitled to an order of dismissal of the indictment because the indictment adequately alleges all of the essential elements of each crime charged therein and the Court, pretrial, must accept those allegations as true on this pretrial motion to dismiss. United States v. Coronia, 576 F. Supp. 2d 385, 390-91 (E.D.N.Y. 2008); United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985). Thus, there are no grounds to strike paragraph 8 or to dismiss the indictment.

### B. Gutwein is Not Entitled to Suppression of His Intercepted Calls

Gutwein moves to suppress the interception of his telephone calls on the grounds that: (1) Title III surveillance is not authorized for the investigation of insurance fraud; (2) the affidavits for the Interception Orders did not adequately establish probable cause that any crimes had been committed; (3) those affidavits failed to establish that the evidence of any crimes contained therein was not stale; (4) the affidavits failed to adequately show the necessity for Title III interceptions; (5) MA Aff I intentionally omitted facts about the insurance application of Arnold Cohen, thus requiring a Franks hearing; and (6) the government failed to properly minimize the interception of calls (which the government rebutted in Point II B above). As shown below, Gutwein is not entitled to suppression under any of grounds 1 through 5.

### 1. Congress Expressly Authorized the Use of Title III Surveillance to Investigate Mail Fraud, Wire Fraud, Money Laundering and Conspiracy to Commit These Crimes

Gutwein argues that electronic surveillance is not authorized to investigate insurance fraud, Gutwein Motion at 8, claiming that Title III surveillance is available only to investigate offenses involving organized crime or narcotics. While Congress limited the availability of Title III interceptions to the investigation of certain specifically enumerated serious crimes, those specifically enumerated serious crimes include "any offense which is punishable under the following sections of this title: ... 1956..., ... 1343 ..., .... 1341 ... [and] any conspiracy to commit any [of these] offense[s] ...," 18 U.S.C. § 2516 (c), (s), which were the offenses about which the government sought interceptions in this case. Needless to say, mail fraud and wire fraud apply to fraud in connection with any subject matter, including insurance, as long as the jurisdictional elements of attempting to execute the fraud through the use of the mails and the interstate wires are satisfied. By the express command of Congress, Title III is available to investigate this fraud and money laundering case involving the insurance industry and seeking

hundreds of millions of dollars in forfeiture.[18/]  United States v. Gravel, 645 F. 3d at 551 (plain

language of statute is controlling absent statutory definitions of statutory terms).

    2.  The Interception Orders Established Probable Cause to Believe that Crimes Had Been
       Committed

       As shown in detail in Point II, MA Aff I establishes probable cause to believe that

M. Neuman and others were committing the offenses mentioned in the Original Interception

Order and that interceptions concerning those crimes would be intercepted over the M. Neuman

Phone.  Nonetheless, since Gutwein claims that certain elements of fraud were not established,

including materiality and fraudulent intent, we address those issues with respect to MA Aff I.

       Gutwein argues that MA Aff I did not establish that the false statements in the

insurance applications described in the affidavit were material to the insurance companies,

because other than conclusorily stating that the insurance companies would not, in the absence of

the lies on the applications, have issued the policies, the affidavit set forth no proof of that fact.[19/]

First, the affidavit indicated that the insurance companies would not have issued the policies if

the lies had not been made on the applications, an assertion which is based upon discussions with

insurance companies.  But even more specifically, the affidavit explains that the higher the

insured's net worth, the higher the amount for which the insurance company would be willing to

insure the insured's life.  Thus, for example, as a result of CI2's net worth being inflated from

"very little" to over $46,000,000, ING issued a policy of $10,000,000 instead of one for "very

---

[18/]    Gutwein, in the course of making his facially frivolous argument that Title III may not be used to investigate cases involving insurance fraud, claims that the government's affidavits in support of the Interception Orders came from "drug-case template[s]," and cites as its source for that conclusion the fact that the Original Interception Order had to be amended from stating that the Order would be carried out by agents of the USPIS, the IRS, the New York State Department of Insurance and the "DEA" to stating that it would be carried out by the USPIS, the IRS, the New York State Department of Insurance and "ICE."  See Exs. 12 and 13.  The actual reason that DEA was changed to ICE is that USPIS, which does not have its own wire room, was negotiating with different federal agencies, including DEA and ICE, to use the wire room of those agencies. While the government ended up using the ICE wire room, in the unamended Original Interception Order, the DEA was named.  The prosecution team does not include agents from either DEA or ICE, but their agencies were named in the Order.

[19/]    Obviously, there is no question that the aspect of the fraudulent scheme that sought to create false medical records of illness were material.  Lies that falsely indicated that an insured's life expectancy was lower than it in fact was would cause a potential purchaser of the policy to pay more money for that policy than he would if he knew the truth, namely that the insured had a longer life expectancy than was indicated by the false medical records.  MA Aff I par. 20.

little." Thus, as a result of the lies on CI2's application, ING issued a policy that requires it to pay $10,000,000 upon CI2's death. That is very specific proof, for all of the fraudulent policies subject to the scheme and for the CI2 policy in particular, that the lies were material. In addition, MA Aff I established that ING, on December 17, 2009, sued to rescind four of the policies of the Fifteen Insureds on the grounds that those policies had been fraudulently obtained, providing additional evidence that the insurer viewed these lies as material. MA Aff I also established that as of December 22, 2009, ING planned to file additional rescission suits. Specifically, the affidavit noted that Grodsky told CI3, with M. Neuman simultaneously on the other line of Grodsky's cell phone, that CI3 should expect to be served with papers from ING. Thus, materiality was clearly established in this case from the face of MA Aff I.[20] Indeed, the fact that the conspirators created such a complex financial network to hide the fact that investors were paying the premiums clearly shows that the conspirators believed that insurers would treat the lies as important. Gutwein, citing United States v. Starr, 816 F. 2d 94 (2d Cir. 1987) and United States v. Regent Office Supply Co., 421 F. 2d 1174 (2d Cir. 1970), claims that the government needed to establish probable cause to believe that the conspirators intended that their lies would harm the insurers economically and would go to the essential nature of the bargain between the parties itself. But, as shown above, there was probable cause to believe that the lies induced the insurers to issue insurance policies with higher death benefits, indeed millions of dollars in death benefits, which of course would affect the insurance companies economically and would go to the very nature of the bargain, namely issuing a multi-million dollar life insurance policy. There was also probable cause to believe that the conspirators' lies caused the insurers to charge lower premiums than they would have charged if they had known the truth. MA Aff II ¶ 17.

Further, Gutwein states that the affidavits in support of the Interception Orders failed to establish that there was fraudulent intent. As already shown in Point II above, MA Aff I established probable cause to believe that Grodsky, M. Neuman and others were acting with fraudulent intent and there was no need to establish Gutwein's fraudulent intent to obtain the

---

[20]/    Gutwein argues that the government intentionally omitted to tell Judge Townes about facts concerning the application of Arnold Cohen and that the omitted facts were relevant to the question of whether the lies on the applications were material. The government addresses that argument in sub-section 5 below.

Original Interception Order, which only sought authority to intercept M. Neuman's Phone. The government need not establish probable cause to believe that each defendant is guilty before it can intercept and use that defendant's calls against him. U.S. v. Greyling, 2002 WL 424655 at *5 (S.D.N.Y. 2002); U.S. v. Labate, 2001 WL 533714 at *18 (S.D.N.Y. 2001) (same). To obtain a wiretap, the government need only establish probable cause to believe that: (1) a particular crime has been committed; (2) the wiretap will intercept oral communications concerning the crime; and (3) the phone being tapped is or will be used for criminal activities. United States v. Yannotti, 541 F. 3d 112, 124 (2d Cir. 2008); U.S. v. Martin, 599 F.2d 880, 884-85 (9th Cir. 1979) (neither the Fourth Amendment nor Title III requires that a Title III applicant establish probable cause as to every probable interceptee). The government can intercept a person's communications over a Title III order and use those communications against him even if it had no probable cause to believe that he was guilty of the crime and did not list that person in the interception order. United States v. Kuhn, 415 U.S. 143, 152-55 (1974). While the government did establish probable cause to believe that Gutwein was guilty in MA Aff I - - it did not need to do so because it established that some persons were committing crimes and that the M. Neuman Phone was being used, and would continue to be used during the interception period to commit those crimes, thus satisfying the Yannotti test. The government's mistaken naming in a Title III application of a person as a probable interceptee against whom it has probable cause does not warrant suppression because "[i]t would be anomalous to punish the government by suppressing the wiretap evidence for naming [the defendant] in the affidavit when it could constitutionally not have named him at all and still have intercepted his calls." Labate, at *19 and cases cited therein. The government first sought authority to intercept Gutwein's Phone in MA Aff II, in which it applied for the First Renewal Interception Order. MA Aff II clearly sets forth even more probable cause than does MA Aff I to believe that Gutwein acted with criminal intent.

a. The Evidence Against Gutwein in MA Aff I and Facts Proved In MA Aff II

First, MA Aff II incorporates by reference MA Aff I, and MA Aff I, by itself, establishes probable cause to believe that Gutwein acted with criminal intent. MA Aff I established that Gutwein was a major investor in the group of investors headed by M. Neuman, having transferred to Bold Associates $3,500,000 from his personal bank account and $1,000,000

from the accounts of companies he created. But MA Aff I also established that ING terminated Gutwein for cause for having submitted to ING STOLI policies that contained false or misleading information on seven of the Fifteen Insureds. The false and misleading STOLI applications submitted to ING on behalf of the other eight of the Fifteen Insureds were submitted by four other Liberty Planning agents. Thus, Gutwein was by far the most prolific offender among the Five Agents whom ING terminated for cause. Moreover, Gutwein was not only the Liberty Planning insurance agent on these seven ING policies, but he was also the insurance agent for policies submitted on behalf of these seven insureds to insurance companies other than ING, since MA Aff I states that he was the Liberty Planning insurance agent on both of the CI2 applications, MA Aff I at n.11, which included an application to Union Central. There were ample grounds to support the existence of probable cause to believe that Gutwein acted with fraudulent intent, given that he was the insurance agent not merely for one fraudulent policy, but for more than seven fraudulent insurance policies that were submitted by a general insurance agency that was under investigation for having engaged in a broad scheme to submit such fraudulent policies. Further, although Gutwein was the Liberty Planning insurance agent on both of CI2's policies, Gutwein never communicated with either CI2 or CI3. Instead, CI2 communicated with Grodsky, who acted like the insurance agent on the case, even though Grodsky is not an insurance agent. Pen register records show that M. Neuman was in very frequent content with both Grodsky and Gutwein. Finally, MA Aff I established that Gutwein refused to cooperate with the ING investigation that resulted in ING terminating him for cause.

Thus, MA Aff I by itself established probable cause of Gutwein's fraudulent intent. But MA Aff II, which incorporated MA Aff I, provided significant additional evidence of Gutwein's fraudulent intent. MA Aff II noted that Gutwein is affiliated with insurance agencies other than Liberty Planning, e.g., Innovative Brokers, and he acted as an insurance agent for many different insurance companies. During 2008 and 2009, Gutwein earned $15,000,000, and he transferred $5,800,000 from his own account and another $1,800,000 from the accounts of four limited liability companies of which he is a member to Bold Associates, which is controlled by M. Neuman and is the company that is central to the complex, difficult to follow financial network through which premiums were paid and profits distributed. Gutwein's "investment

numbers," which total $7,600,000, are higher than the ones the government reported in MA Aff I by $3,000,000. Moreover, MA Aff II reported that in addition to being terminated by ING for fraudulent conduct, as reported in MA Aff I, Gutwein was also terminated by John Hancock for suspicion of submitting STOLI policies on which he had falsely certified the policies as not being STOLI; and Lincoln Financial for concerns that he applied for and solicited applications for STOLI policies. Gutwein was the insurance agent on a policy on behalf of Arnold Cohen, one of the Fifteen Insureds, which Gutwein submitted to Lincoln. The trustee on the Arnold Cohen insurance trust (from which premiums are paid) is Gutwein's co-conspirator, Grodsky, who participated in the fraudulent insurance applications which Gutwein submitted to ING on behalf of CI2. Prior to his termination, Gutwein had submitted to ING, Lincoln Financial and John Hancock 51 policies worth $346,000,000 in death benefits. Judge Townes findings in each of the Interception Orders that there was probable cause to believe that Gutwein committed fraud, Exs. 4 at ¶ a, 5 at ¶ a and 6 at ¶ a, are entitled to great deference.

Intercepted calls over the M. Neuman Phone pursuant to the Original Interception Order also showed that the conspirators continued to try to further the scheme through the resale of various STOLI policies and that they would protect members of their scheme. Between January 20, 2010 through February 3, a series of calls between M. Neuman and Grodsky or Cohen discussed the fact that Cohen's ex-wife, Sophia Brodsky, was "blackmailing" the settlement company that had arranged a resale of an Arnold Cohen policy as well as Neuman, Grodsky and Cohen, and would go to the authorities unless she were paid more money. When M. Neuman explained that Brodsky "possesses information ... so we'll have to work it out . . .," Grodsky replied, "What are you going to give her $10,000 and then she is going to blackmail you again?" Grodsky stated that a Cohen policy that was recently resold or was in the process of being resold stood to make a profit of $600,000. Cohen also had another policy that they were trying to resell. Id. at ¶¶ 14-15. MA Aff II also cited an example of how the conspirators were trying to resell a STOLI policy on the secondary market that was two months away from reaching its two year anniversary date, at which time the insurer could no longer sue to rescind the policy on the grounds of fraud. Id. at ¶ 17. In another call intercepted over the M. Neuman Phone, Neuman stated that he was trying to sell his entire portfolio of policies. Id. at ¶ 19. During the

period January 20, 2010 through February 9, M. Neuman spoke over his Phone to Gutwein five times about the subject offenses and he also spoke with Lebovits to get the latter to make payments in furtherance of the scheme. Id. at ¶ ¶ 27, 34.

On January 27, 2010, two calls between Gutwein, using the Gutwein Phone, and M. Neuman were intercepted over M. Neuman's Phone. During the first call, M. Neuman complained to Gutwein that Lebovits became a partner with Neuman on an Arnold Cohen policy issued by Phoenix, that profits came in on that policy and that M. Neuman was missing money on that policy. During the second pertinent call between M. Neuman and Gutwein that same day, M. Neuman again complained that he was very upset because he did an accounting and he was missing money from policies. Gutwein told M. Neuman to take care of Gutwein like he would take care of himself.[21] Pen register records showed that from January 11, 2010 to February 5, 2011, Gutwein, using his Phone, was in contact multiple times with a number of persons, in addition to M. Neuman, who were participants in the scheme, including Lenny and Lebovits. Id. at ¶¶ 39, 40 and 42.

MA Aff II also discussed an intercepted call between M. Neuman and Grodsky about a policy owner named Risa Bellach whose policy ING had sued to rescind on the grounds of fraud. Neuman and Grodsky discuss how the subjects have agreed to pay Bellach's attorney's fees themselves. Postal Inspector Albright indicated that she believed that the conspirators were agreeing to pay Bellach's attorney fees because they were concerned that if Bellach incurred attorneys fees out of her own pocket, she might be motivated to provide information to the authorities or ING about the fraud that was committed to obtain the policy from ING. Id. at ¶ 18. During a consensually monitored call between Grodsky and CI3 on January 29, 2010, CI3 asked for money for referring CI2 as an insured. Shortly after that call, Grodsky called M. Neuman on M. Neuman's Phone and told M. Neuman that he (Grodsky) told CI3 that they had decided to

---

[21]/     Gutwein complains that the government was relying on mistaken translations of these two January 27 calls from Yiddish to English. However, these complaints do not affect the determination of whether MA Aff II, on its face, establishes probable cause to believe that Gutwein was committing a crime, because, in the text, we describe the two calls in question solely in terms that are consistent with both MA Aff II and Gutwein's version of how these two calls should be translated. See Gutwein Motion, Ex. A. Thus, even relying solely upon Gutwein's translations, the determination of probable cause would not be affected in the least.

surrender the ING CI2 policy and that they needed CI3, who was the trustee on the policy, to sign the surrender papers. Grodsky asked M. Neuman if he really wanted to pay CI3 money, to which Neuman replied that "we" may have no choice. On February 1, 2010, M. Neuman spoke with Grodsky on an intercepted call in which Neuman told Grodsky that there was no money to give CI3 (on the CI2 ING policy) and that if CI3 refused to sign, then he was going to get personally sued by ING, which had already sued five of the Fifteen Insureds. The conspirators were still actively trying to resell the non-ING policies, including one on the life of CI2. Id. at ¶ 49 & n. 6.

MA Aff II also explained additional ways, beyond those described in MA Aff I, in which insurance companies are economically harmed by investors who obtain STOLI policies from the companies through fraudulent applications. First, insurance companies assume that policies will lapse after the insureds outlive their statistically average life expectancy, but STOLI policies will not ordinarily be allowed to lapse. Thus, if the insurance companies are induced through fraud to unknowingly issue a STOLI policy, they will lose premium payments because they will have set their premium prices too low. Further, the insurance agent on a life insurance policy receives over 95% of the first year's premiums as his commission for that year. Thus, if he is involved in the fraud, he has an economic motive to ignore the insurance companies' directives against STOLI policies and ensure that the companies approve the fraudulent applications he has submitted for multi-million dollar, secretly STOLI, policies. Id. at ¶¶ 17, 36.

### b. MA Aff II Established Probable Cause That Gutwein Had Criminal Intent

MA Aff II clearly sets forth probable cause to believe that Gutwein acted with fraudulent intent. As seen in Point II, once a conspiracy has been established, as it has here, the evidence needed to link an additional defendant to the conspiracy need not be overwhelming and can be purely circumstantial. Here, there was more than sufficient proof of Gutwein's intent: Gutwein had submitted to insurance companies a very large number of very high dollar volume STOLI applications, which appear to contain fraudulent information, making it unlikely that Gutwein was innocently involved in all of these fraudulent policies. He was terminated for cause as an insurance agent by three different insurance companies for having fraudulently submitted STOLI applications to them There is no honest explanation for Gutwein's refusal to cooperate in the ING investigation that could have, and did in fact, result in his termination for cause.

Further, Gutwein was in constant touch with M. Neuman and Lebovits, who were central figures in the scheme. He was also in touch with Lenny, who, with M. Neuman, asked CI2 to go to the doctor and complain of symptoms of a serious illness that CI2 did not have in order to fraudulently increase the resale price of CI2's policies. Gutwein was the agent on the policies of two STOLI insureds, CI2 and Cohen, which, based upon the evidence, were rife with fraud.[22] Gutwein told M.Neuman to treat Gutwein as he would treat himself in dividing the profits of the scheme. In addition, the MA Aff II indicates there was a huge financial motive for Gutwein to participate in that fraud. By fraudulently inflating the insured's net worth, Gutwein would obtain a much higher face value for the policy and a much higher commission, which was 95% of the premiums during the first year of each policy. Indeed, he received an astonishing $15,000,000 in commissions in 2008 and 2009. In light of all these facts, Judge Townes's determination that there was probable cause against Gutwein was surely not an abuse of her broad discretion.

### 3. The Evidence of Probable Cause In Aff II Was Not Stale

Gutwein claims that the evidence of probable cause in MA Aff II was stale. He is wrong. MA Aff II, which incorporates MA Aff I by reference, provides evidence of an extensive fraudulent conspiracy which began no later than late 2007 and was continuing in early 2010. It is irrational to characterize the extensive fraud proved in MA Aff II, as Gutwein does, as amounting to only an "isolated criminal act." Approximately three weeks before MA Aff II was submitted, Gutwein used the Gutwein Phone to talk to M. Neuman about dividing up the profits of the scheme. The consensual calls and the calls intercepted over the M. Neuman Phone show that the conspirators used the telephone communications to commit their crimes. Indeed, M. Neuman, Grodsky and Arnold Cohen engaged in numerous telephone calls in which they discussed paying Cohen's ex-wife blackmail in order to prevent her from going to the authorities about their crimes. Further, the conspirators were still trying to resell the policies, as the calls intercepted over the M. Neuman Phone show. Indeed, they had just resold a Cohen policy at a profit. Gutwein was the insurance agent on that policy, as he was on the CI2 Union Central policy,

---

[22] Grodsky, who, by his own admission, was clearly guilty of fraud, was also connected with both the CI2 and the Cohen policies, as the de facto insurance agent for the absentee Gutwein on the CI2 policies, and as the trustee for the insurance trust that paid the premiums on the Cohen policies.

which the conspirators were still trying to sell.  MA Aff II detailed numerous additional calls intercepted pursuant to the Original Order that describe ongoing attempts in January and February 2010 to resell many additional policies.  Indeed, M. Neuman stated during one of those calls that he intended to sell his entire portfolio.  In addition, during the same period, the conspirators were using telephone communications to discuss paying the attorneys fees of those insureds whom ING had sued and the fact that they expected ING to serve additional suits on additional insureds. Pen register records show that the Gutwein Phone was in touch with a number of persons who were central to the scheme. MA Aff II contains a detailed discussion of why Gutwein could be expected to speak over the Gutwein Phone with members of the conspiracy with whom M. Neuman did not speak.  MA Aff II ¶ 57.  In light of the evidence of the ongoing nature of the scheme, the evidence of probable cause in MA Aff II was not stale.

### 4. The Affidavits Established the Necessity for the Interception Orders

Gutwein argues that the government did not adequately establish the necessity for the Interception Orders in the affidavits seeking those Orders.  Gutwein's argument lacks merit.

A wiretap cannot be suppressed based upon lack of an adequate showing of necessity for its issuance unless the reviewing court concludes that the issuing judge abused her discretion in finding that the government had made an adequate showing of necessity.  United States v. Jiminez, 2011 WL 308401 at *1 (S.D.N.Y. 2011) (court must "grant considerable deference to the district court's decision whether to allow a wiretap" and must decide "whether [the district judge] abused his discretion in approving the Government's operation."), citing United States v. Concepcion, 579 F.3d 214, 217 and n. 1  (2d Cir. 2009); accord United States v. Ramirez-Encarnacion, 291 F.3d 1219 (10th Cir. 2002).  Indeed, the Court "should reverse [Judge Townes'] decision to issue wiretaps only if that decision is arbitrary, capricious, or whimsical or results in a manifestly unreasonable judgment." United States v. Nicki, 427 F.3d 1286, 1300 (10th Cir. 2005).  To be adequate, the government's statement of necessity should "provide some basis for concluding that less intrusive investigative procedures are not adequate." United States v. Howard, 350 Fed. App'x 517, 519 (2d Cir. 2009)(emphasis added).  The statute requires only "that the agents inform the authorizing judicial officer of the nature and progress of the investigation and the difficulties inherent in the use of normal enforcement methods." United

States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990). Indeed, the reviewing court's role is only "'to decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" Id. (quoting United States v. Scibeli, 549 F.2d 222, 226 (1st Cir. 1977) (collecting cases)). As the Second Circuit has held, even where "the Government's affidavit was 'skimpy' in details as to whether other investigative techniques were likely to succeed," if it set forth facts minimally sufficient to support the issuing Judge's initial determination, the issuing Judge' determination must be affirmed. Concepcion, 579 F.3d at 219 (reversing the trial court's suppression of the wiretap).

A wiretap is more likely to be necessary where, as here, the government is investigating a large scale, complex conspiracy. Torres, 901 F.2d at 232; Concepcion, 579 F.3d at 218. Indeed, "[w]ith the government still unaware of the identity of many of the conspiracy's members as well as the organizational structure of the conspiracy, the district court permissibly allowed the government to employ electronic surveillance to uncover the complete range of operations of the target conspiracy." United States v. Villarman-Oviedo, 325 F.3d 1 (1st Cir. 2003). Further, "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." United States v. Fleishman, 2011 WL 4000987 at *3 (S.D.N.Y. 2011) (quoting United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975)). The government need not prove that the success of alternative investigative techniques is impossible, but only that such alternate techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those techniques. United States v. Vento, 533 F.2d 838 (3d Cir. 1976).

When evaluating other investigative techniques, the court may consider the government's heavy burden of proof at trial of beyond a reasonable doubt and the potential avenues of defense that are left open to the defense. United States v. Plescia, 48 F.3d 1452 (7th Cir. 1995); United States v. Soto-Nava, 2002 Wl 432084 (S.D. Ind. 2002); United States v. Wilson, 2002 WL 21236320 (4th Cir. 2002); United States v. Campos, 541 F.3d 735 (7th Cir. 2008) (even if the government had sufficient proof to indict the defendant before the wiretap, that would not prevent the issuance of a wiretap since the government's burden of proof at trial is substantially higher and the government is entitled to attempt to discover the full extent of the

organization); <u>United States v. Canales-Gomez</u>, 358 F.3d 1221 (7th Cir. 2004) (wiretap evidence plays a critical role in corroborating informant testimony).

"Although an extension affidavit must demonstrate the necessity of ongoing surveillance it need not set forth different information from that which is presented in the original application." <u>United States v. Parks</u>, 1997 WL 136761 at *5 (N.D. Ill.1997). Moreover, even when the defendant complains that the government's necessity showing is "boilerplate," "the reasons for using electronic surveillance are often similar from case to case. There are only so many ways someone can say 'we have not learned enough from informants.'" <u>United States v. Godsey</u>, 2010 U.S. Dist. LEXIS 136240 (N.D. Ohio 2010).

Judge Townes found that the issuance of each of the wiretaps was necessary. <u>See</u>, Ex. 4 at ¶ c; Ex. 5 at ¶ c; and Ex. 6 at ¶ c. Judge Townes did not abuse her broad discretion in finding that the government had established necessity for the Title III interceptions. As shown in Point II, in MA Aff I, the government established that the conspirators were still attempting to resell policies from companies other than ING on the secondary market and that the conspirators believed that ING, which had only served suits on four of the Fifteen Insureds, would serve additional suits, such as suits naming CI2 and CI3 as defendants. The section on "necessity," <u>Id.</u> at ¶¶ 33-48, makes clear that the government believed that "time [was] of the essence" in the investigation, <u>Id.</u> at ¶ 41, n.17, and it also was concerned that if the principals of the conspiracy were alerted to the existence of the government's investigation, they would become more cautious in their activities, would flee or compromise the investigation. <u>Id.</u> at ¶ 42.[23/] Moreover, as of just three weeks before the submission of MA Aff I, the conspirators were still talking over the phone about getting insureds, in particular, CI2, to complain to the doctor about symptoms that they did not have in order to fraudulently inflate the resale prices of their policies. <u>Id.</u> at ¶

---

[23/]     Gutwein suggests that time was not of the essence because the policies identified in the ING investigation had already been issued and ING had already sued to rescind some of those policies, namely four of the fifteen. However, as the government made very clear in MA Aff I, the government did not know all of the insurance companies, insureds, or insurance policies, but it did know that as of December 22, 2009, the conspirators were trying to resell policies, were trying to create inflated sales prices through the creation of phoney medical records, were aware that ING would be filing additional suits in the future, which implies that the periods of contestability on those policies had not yet lapsed. With intercepted telephone calls, it was probable that when a policy was about to be resold, telephone calls would identify further policies involved in the scheme and provide first hand evidence of criminal intent.

24. Further, the government was investigating a very large conspiracy which involved many insureds, insurance companies and insurance policies about which the government was not aware. The few CIs the government had did not have knowledge of the whole scheme, its participants or how money was laundered and, as explained in the affidavit, they were not sufficiently trusted or in the position to successfully introduce an undercover agent to the conspirators. In addition, the numerous consensual phone calls and the pen register records described in MA Aff I show that the conspirators routinely conducted their criminal scheme over the telephone. As discussed below, the affidavit adequately explained why financial analysis and witness interviews were not sufficient to achieve the goals of the investigation.

      a.  <u>Statements in the Necessity Sections of MA Aff I</u>

      In MA Aff I, ¶ 48, the government discussed whether financial analysis of available records would constitute an alternative investigative technique that would make a wiretap unnecessary. Postal Inspector Albright stated that based upon her training and experience such financial analysis would not achieve all of the goals of the investigation.[24/] She provided a general description with numerous specific examples of the complex, "very difficult to follow money laundering trail" that the conspirators had left behind them and noted that "it will be difficult to trace all of the financial records." She further stated that continued financial analysis, which had produced useful evidence in the past, "will not provide the investigating agencies with all of the life insurance policies, all of the participants or all of the sources of funds that are part of the scheme," <u>Id</u>. ¶ 48, including the role played by various supposed religious organizations. Some of the entities that the government had already identified had multiple bank accounts and the various sources of funds, policies and criminal participants did not necessarily intersect, making it difficult to rely on financial analysis. "While financial analysis will provide important evidence, only the interception of the wire communications that are sought will be able to tie together the various pieces of evidence and provide evidence of one overall scheme, in

---

[24/]    The objectives of the investigation included, <u>inter alia</u>, obtaining <u>admissible</u> evidence which revealed the nature, extent, methods and locations of the criminal activities, the identities and roles of all the co-conspirators and accomplices, the distribution and transfer of money involved in these activities, the existence and location of relevant records, the location and sources used to fund the crimes, the location and disposition of the proceeds of the crimes and the types and locations of items used in furtherance of the crimes. <u>Id</u>. at para. 9.

which various co-conspirators all play various roles." Financial analysis cannot determine the nature of the transactions that are occurring, such as whether the payments by the religious organizations are loans, investments, or something else. Nor can financial transactions establish sufficient evidence at trial of <u>criminal intent</u>. <u>Id</u>. at ¶ 48. The affidavit thus sufficiently explained why financial analysis was not adequate to achieve the goals of the investigation and Judge Townes did not abuse her discretion in agreeing with that conclusion.

In MA Aff I ¶¶ 41-43, the government also discussed the alternative techniques of obtaining search or arrest warrants, grand jury subpoenas and witness interviews. Again, as noted above, the government stated that "in investigations such as these, time is of the essence," and that "[if] principals of the conspiracy or their co-conspirators [were] alert[ed] ... to this investigation, [it would] caus[e] them to become cautious in their activities, to flee ... or to otherwise compromise the investigation." The government further noted that new developments of which it learned from a wiretap could be responded to by agents immediately, but that agents, without the benefit of the wiretap, could not respond to new developments immediately but could only learn of and respond to new developments well after those developments occurred. Thus, for example, the government could respond immediately to information it obtained from a wiretap, but not to information it learned of through the execution of a search warrant for historical text messages. With respect to search warrants, the government further noted that it did not know the location at which the co-conspirators kept their records, and, of course, establishing probable cause to believe that evidence will be found at the target location is needed to obtain a search warrant. The government noted that it intended to apply for a search warrant to obtain historical text messages, but that application for a search warrant would prevent the agents from learning of and responding immediately to communications as soon as they occurred. Postal Inspector Albright further explained that in the experience of the agents, persons are more likely to speak freely about criminal conduct via telephone than via text message, since the latter creates a written record of that conversation. MA Aff I further stated that based upon the Postal Inspector's experience and her conversations with the Assistant U.S. Attorney on the case, she did not believe that subpoenaing persons before a grand jury would be successful in achieving the goals of the investigation, because such witnesses would likely be

uncooperative (as witnesses had been during the ING investigation), would invoke their Fifth Amendment privilege - - granting immunity would be unwise because it might foreclose prosecution of the most culpable members of the conspiracy - - and would alert the principals of the conspiracy to the government's investigation. Similarly, Albright believed, based upon her experience, that interviewing witnesses would not produce sufficient information to identify other members of the conspiracy and to provide other pertinent information about the conspiracy. Further, she believed that any such interviews would contain a significant number of falsehoods. Id. at ¶¶ 41-43. The affidavit observed that the government had already conducted criminal database searches and reviewed pen register records and that such techniques were not adequate since they did not provide the content of any communication. Id. at ¶¶ 44, 47, 24-32.

MA Aff I discussed the use of confidential informants and undercover agents at ¶¶ 34-36. While CI1, CI2 and CI3 provided useful information, they could not achieve all of the goals of the investigation. They lacked the ability to identify the many unknown members of the conspiracy. CI2 had spoken and would continue to speak with M. Neuman, Lenny and Grodsky. CI3 would probably continue to speak to Grodsky. But the informants were not in a position to develop contact with the conspirators who were not yet known. Because persons who are part of a large organization that commits fraud and money laundering generally compartmentalize aspects of their operations so as to impede law information, Postal Inspector Albright, based upon her experience and her knowledge of this case and this organization, did not believe that the confidential informants were likely to achieve all of the objectives of the investigation. Indeed, during consensually recorded conversations that CI2 had with M. Neuman and Lenny, the latter two, in certain respects, each falsely minimized his role in the conspiracy. Moreover, informants can only be used to a limited degree to prevent members of the organization who were under investigation from suspecting that the informants were government agents. Further, the government was not in a position to introduce an undercover agent into the organization, as CI1, CI2 and CI3 were not in a position to facilitate such an introduction. Id. at ¶¶ 34 - 37, 45.

MA Aff I noted that surveillance of the subjects had not yet occurred because the locations they frequented were not yet known. Moreover, unless surveillance were done in conjunction with a wiretap, it would not be likely to disclose the identity and role of the other co-

conspirators and participants in the operation. With the aid of a wiretap, agents could anticipate when and where meetings would take place so as to facilitate the effective use of surveillance, but they could not do so without a wiretap.[25/] Based upon their experience and knowledge, the agents believed that most contacts between the co-conspirators would be by telephone. Intensive surveillance could alert the conspirators that they were being monitored.[26/] The agents believed that in time they would be able to conduct productive surveillance, but only with the aid of a wiretap. Moreover, even if surveillance could be accomplished, surveillance, by its very nature, would not disclose the content of any meetings that were surveilled. MA Aff I also explained that it was unlikely that inspection of the subjects' trash would reveal any information about the members of the organization or their roles, nor would it provide probable cause for a search warrant. MA Aff I stated that at that time, the informants and agents had been unable to identify locations where trash from criminal activity was placed. Id. at ¶¶ 38-40, 46.

### b. Judge Townes Did Not Abuse her Discretion in Finding Necessity

As already explained, this was a large conspiracy, that involved many co-conspirators who were not yet known. That fact strongly weighed in favor of Judge Townes' determination that a wiretap was "necessary." Moreover, the fact that, as shown by the consensual calls and the pen register records, the conspirators routinely used the telephone to conduct their crimes rendered Title III surveillance particularly appropriate. Judge Townes simply did not abuse her broad discretion, nor did she act arbitrarily or capriciously, in issuing the Interception Orders.

Gutwein principally argues that the government was required to pursue interviews of witnesses and seek documents from banks and insurance companies rather than applying for a

---

[25/]    Thus, for example, if a call was intercepted about the resale of a policy which identified a meeting where conspirators would meet, the government could seek surveillance in conjunction with the information received from the interception. The government had already stated in MA Aff I, that it would seek to conduct surveillance after it obtained the Title III authorization, but that it would not be feasible before it had the aid of the Title III order. Moreover, physical surveillance would not provide direct evidence of criminal intent and, in a conspiracy this large, would be very unlikely to result in the identification of all of the conspirators on any policy let alone on every policy. This was not a small conspiracy in which most or all of the conspirators could be expected to congregate together.

[26/]    M. Neuman's Phone was registered to an address in Borough Park, Brooklyn, an area in which it is well known that persons without orthodox Jewish attire would be noticeable.

wiretap. Gutwein Motion at 21. With respect to witness interviews, Gutwein concedes that the subjects identified in the wiretap order might themselves decline to be interviewed and that it was proper to exercise prudence about granting them immunity, but he claims that the government should have "interviewed the elderly insureds and learned from them the facts of their applications." Gutwein Motion at 25. Gutwein also relies upon his contentions that wiretaps are for narcotics and organized crime cases, rather than insurance fraud cases brought under "the pretextual nature of the utilization of 'wire fraud' and 'mail fraud' solely to circumvent Title III wiretapping restrictions." Id. at 25, n. 8.[27] Again, and significantly, the government stated in MA Aff I that time was of the essence, that it was concerned about the subjects being alerted to the existence of the government's investigation and that it wanted more evidence of criminal intent than financial analysis could provide.[28]

The government sought to accomplish two primary goals, namely: (1) find additional co-conspirators in this large complex scheme; and (2) find additional evidence of criminal intent. Id. at ¶ 48. While the government built a very convincing case under the probable cause standard showing the criminal intent of M. Neuman, Gutwein, Grodsky and Lenny (later identified as Y. Neuman (MA Aff III at ¶ 42)), in many ways, the conspirators acted through covers or in other ways to conceal their criminal scheme. For example, Gutwein, the insurance agent on the CI2 policies, never directly communicated with CI2 or CI3. Grodsky and the Neuman Brothers, who are not insurance agents, did the contacting. In light of the

---

[27]     Gutwein's continued refrain that wiretaps should only or mostly be used in drug or organized crime cases is obviously meritless. If wiretaps were only intended for organized crime or drug cases then Congress would have only authorized their use in drug and RICO investigations, rather than in the double column two page long list set forth in 18 U.S.C. § 2516 of crimes which could be investigated with wiretaps, including, for example, crimes relating to the destruction of a natural pipeline, § 2516 (j) . If Congress had intended that in most investigations involving crimes other than narcotics and RICO violations that wiretaps should rarely be used then it would have set forth additional requirements needed to justify a wiretap in those other investigations that would not be needed to justify wiretaps in narcotics or RICO investigations. Congress did not do that. There is nothing pretextual about prosecuting a defendant in federal court for committing any kind of fraud, including insurance fraud, accomplished through the use of the mails or the interstate wires.

[28]     The government did not repeat each of these three factors when it discussed each of the alternative investigative techniques that it considered in MA Aff I, but it did not have to so repeat each factor. It only had to "set forth [facts] in the application [that] were minimally adequate to support the determination that was made." Torres, 901 F.2d at 231 (emphasis added).

government's heavy burden of proof at trial, it was entitled to seek to obtain direct evidence of the conspirators' criminal intent that is based on more than the testimony of informants.

Interviewing additional elderly insureds (who might thereby become confidential informants) and engaging in a financial analysis based upon bank and insurance company records would not provide the government with direct evidence of criminal intent from sources other than confidential informants. Such direct evidence was not likely to be found anywhere except in interceptions. Consensual calls showed that M. Neuman and Lenny tried to minimize their roles with CI2 because they did not trust CI2. It would not be likely that co-conspirators, even ones who trust each other, would place direct evidence of criminal intent in a written communication such as a text message (or an email for that matter) (MA Aff I at n. 17). ("[In the agents experience], persons are more willing to speak freely about criminal conduct over the telephone than via text message.")). In explaining why a financial analysis would not achieve the goals of the investigation, the affidavit noted that "[t]here are many insurance policies that appear to be part of the scheme that the investigating agents have no information about ... [,] the various different sources and policies and participants do not necessarily intersect ... [and] the financial analysis itself will not identify who is making decisions for the organization. While financial evidence will provide important evidence, only the interception of the wire communications that are sought will be able to tie together the various pieces of evidence and provide evidence of one overall scheme." The government surely met the standard of showing that the pursuit of documentary evidence from banks and insurance companies would not suffice in the absence of a wiretap. Gutwein argues that mere "difficulty" in completing the financial analysis is not a sufficient showing of necessity. The statute, however, requires only "that the agents inform the authorizing judicial officer of the nature and progress of the investigation and the difficulties inherent in the use of normal enforcement methods." Torres, 901 F.2d at 231 (emphasis added). Indeed, the government need not prove that the success of alternative investigative techniques is impossible, but only that such alternate techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those techniques. See, e.g., Vento, 533 F.2d at

70

838. The government has met that standard. Gutwein also suggests that before seeking a Title III order the government was required to obtain from all insurance companies all large insurance policies on elderly insureds and investigate all of those with the assistance of bank records. But nothing in the case law required the government to undertake such a huge task.

Moreover, the government, as it stated in its necessity presentation in MA Aff I, was concerned that if it approached potential witnesses that the approach itself would alert the many central figures in the conspiracy of the government's investigation, which in turn would cause those central figures to become more cautious and to take steps to compromise the government's investigation. For example, Grodsky told CI3 to report any contacts he received from ING and, as seen from the ING investigation, ING investigators received very little cooperation when they attempted interviews. MA Aff I ¶¶ 24, 42. Gutwein states that contrary to what the government asserted in MA Aff I, persons are more likely to be cautious when speaking over the telephone. But criminals are more likely to be cautious when speaking over the telephone with their co-conspirators only if they suspect a government investigation (which could result in a wiretap) or when speaking to conspirators whom they do not really trust, like the elderly insureds in this case, who, in any event, were more like pawns than principal participants in the scheme. Thus, approaching additional elderly insureds, as Gutwein suggests, would not only be unlikely to provide direct evidence of fraudulent intent of many of the conspirators, but it would also create a big risk of rendering future Title III interceptions, which the government believed it needed to resort to in order to obtain such direct evidence, ineffectual. The government is not required to pursue a potential self-defeating alternative investigative technique before applying for Title III interceptions, which would render the future interceptions unfruitful. Even more crucially, if the principals of a conspiracy were alerted to the existence of the government investigation by a single elderly insured whom the government had approached, then those principles would be very unlikely to make incriminating statements during a consensual recording made by any other elderly insured whom the government induced to become a confidential informant. Thus, the strategy of approaching additional elderly insureds carried a

71

huge risk of ensuring that no effective recordings of the principals would ever be made, via a wiretap or even consensually. United States v. Ruggiero, 726 F. 2d 913, 924 (2d Cir. 1984) ("the use of search warrants, investigative grand juries or interviews would publicize the investigation . . . and perhaps jeopardize the investigation itself" (emphasis added)).

Further, the government was investigating a large scale, complex conspiracy, and, the Second Circuit has "approved of wiretaps in complex and sprawling criminal cases involving large conspiracies." Concepcion, 579 F.3d at 218. Indeed, "[w]ith the government still unaware of the identity of many of the conspiracy's members as well as the organizational structure of the conspiracy, the district court permissibly allowed the government to employ electronic surveillance to uncover the complete range of operations of the target conspiracy." Villarman-Oviedo, 325 F.3d 1, et seq. "[T]he prevailing view [is] ... that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy, and ... 'wiretaps' are necessary tools of law enforcement ... particularly where crimes are committed by large and sophisticated organizations.'" United States v. Acosta, 807 F. Supp. 2d 1154, 1245 (N.D. Ga. 2011), quoting United States v. Wilson, 484 F.3d 267, 281 (4th Cir. 2007). See also United States v. McGuire, 307 F.3d 1192, 1197-98 (9th Cir. 2002) ) ("Unlike individual criminal action, which comes to an end upon the capture of a criminal, collective criminal action has a life of its own ... Because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, the government is entitled to more leeway in [establishing necessity for a wiretap when it is investigating a conspiracy]."). The government, in MA Aff I, established that it was investigating a large complex conspiracy and that it was not aware of all of the insurance policies, insurance companies, insureds or participants in the scheme, that it did not know the organizational structure of the conspiracy and that traditional investigatory methods would be very difficult to pursue. Thus, in light of that, the government was not required to engage in the herculean and impractical task that Gutwein suggests of pouring through every large insurance policy submitted by Liberty Planning to every insurance company on behalf of an elderly insured, especially because, as discussed above, it would be unwise and threatening to the

72

investigation to approach the elderly insureds and try to interview them. Thus MA Aff I clearly set forth sufficient minimal facts to support Judge Townes' determination. Her decision was clearly not arbitrary or capricious or an abuse of discretion and it should be affirmed.

Gutwein also suggests that the government knew the names and addresses of the known subjects and of relevant businesses and should have searched those premises. Of course, knowing where a subject lives does not, by itself, create probable cause to believe that he keeps evidence of his crimes in his house. Moreover, the government did not have the names or addresses of all of the relevant subjects or all the relevant businesses and the execution of a search warrant on any the government did know of would reveal the existence of the investigation to the others, causing the others to destroy any private records they had and to be cautious over the phone. The conspirators had taken great steps to hide the identities of all the conspirators, including the identities of the investors. They did not tell the confidential informants who these other conspirators were. The issuance of a search warrant that might identify any other conspirator would not develop direct evidence of the criminal intent of that other co-conspirator and would create a big risk that any such direct evidence would be destroyed, or never developed over the telephone, by executing the original search warrant. Ruggiero, 726 F. 2d at 924 ( ("the use of search warrants . . . would publicize the investigation . . . and perhaps jeopardize the investigation itself" (emphasis added)). MA Aff I noted that search warrants were premature due to lack of probable cause or knowledge of where the subjects and their unknown co-conspirators keep their records and that is an acceptable reason not to pursue that alternative prior to seeking a Title III order. Concepcion, 579 F.3d at 216 & 219 n. 2.

The government did not believe that trash inspection would be fruitful or that it had any location to search. Gutwein suggests that the government should have searched the trash at the locations of the subjects' houses. Aside from the practical problems associated with searching in those areas and the risk of alerting subjects to the government's investigation, if it did succeed in searching the trash outside one of the subjects' residences and from that search established probable cause to search that residence – the object of a trash inspection is to develop

73

probable cause to search the residence from which the trash likely came – the execution of a search warrant at that residence would create a great risk that other conspirators, having learned of the government's investigation as a result of the search, would take steps to compromise the investigation by destroying any personal records they had of their crimes and by being cautious over the telephone when speaking with any co-conspirators, be they elderly insureds or trusted confederates in their large fraudulent scheme. McGuire, 307 F.3d at 1197-98 ("Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some of many conspirators are imprisoned, others may remain at large, free to recruit others to break the law and to pursue the conspiracy's illegal ends. Reflecting this concern, we have consistently upheld findings of necessity ...")(citations omitted).

In MA Aff II, the government described the results of its continued financial analysis, the additional consensual calls that had been made, the search warrants it obtained for the historical text messages of M. Neuman and the historical emails of Grodsky, its unsuccessful attempts at surveillance, the over 123 calls intercepted as a result of the wiretap on M.Neuman's Phone through which it identified additional subjects of the investigation, presented sufficient evidence to show that there was probable cause to believe that interception of calls over Gutwein's Phone would likely lead to further evidence of the conspiracy and it explained why it was likely that the conversations of different additional co-conspirators would be intercepted over the Gutwein line from those whose conversations would be intercepted over the M. Neuman Phone. MA Aff II at ¶¶ 13 - 46, 49 - 53, 56 and 57. Yet the government made clear that it still had not identified all of the policies, insurance companies and participants in the scheme, especially the elusive investors, but that continued interception of calls over the M. Neuman Phone and the interception of calls over the Gutwein Phone would be likely to identify additional co-conspirators that would not reasonably be discovered through other investigative methods. Id. at ¶ 57. MA Aff III similarly provided the court with the government's continued investigative efforts during the period of the First Renewed Interception Order, the additional subjects it had identified during that period and that the government had still not identified all of the policies,

74

participants and, in particular, the investors in the large conspiracy, but that the continued interception of calls over the M. Neuman Phone and the Gutwein Phone would identify and provide evidence against additional participants and investors who would not likely reasonably be identified through other methods. MA Aff III ¶¶ 13- 43, 53 - 54.

   For all of the foregoing reasons, when Judge Townes reviewed MA Aff I, MA Aff II and MA Aff III, in this investigation involving a complex, large financial conspiracy, many of the participants in which were unknown, as was its organizational structure, she did not abuse her broad discretion and certainly did not act arbitrarily or capriciously when she found that the government had made sufficient showings of necessity to issue each of the Interception Orders. Thus, for that reason alone, Gutwein's arguments for suppression based upon lack of necessity should be rejected.

   But even if the Court were to conclude that Judge Townes did act arbitrarily and capriciously in finding necessity, Gutwein's motion for suppression based upon lack of necessity could still not be granted because the government agents were entitled to rely in good faith on the Interception Orders that Judge Townes issued. See, e.g., United States v. Leon, 468 U.S. 897 (1984); United States. v. Moore, 41 F.3d 370 (8th Cir. 1994); United States v. Malekzadeh, 855 F.2d 1492 (11th Cir. 1988); United State v.Vest, 842 F.2d 1319, 1344 (1st Cir. 1988). In this case, the government submitted to Judge Townes, MA Aff I, consisting of 53 pages, including 13 pages on "necessity," MA Aff II, which incorporated MA Aff I by reference and consists of an additional 52 pages, including an additional 10 pages on "necessity," and MA Aff III, which incorporates both MA Aff I and MA Aff II by reference and consists of an additional 58 pages, including an additional 10 pages on "necessity." After reviewing each of those affidavits, Judge Townes issued each of the Interception Orders, finding each time that there was necessity for the wiretaps she authorized in each Interception Order. Even if the Court were to decide that Judge Townes abused her broad discretion in finding necessity and issuing any of the Interception Orders, the agents clearly acted in good faith by relying on Judge Townes' Interception Orders

and for that wholly separate reason Gutwein's motion to suppress the Interception Orders based upon lack of necessity must be denied.

### 5. The Government Did Not Intentionally or Recklessly Fail to Disclose Material Facts Relating to the Arnold Cohen Inspection Report

Gutwein argues that the government intentionally failed to disclose facts about the Arnold Cohen policy in order to conceal from the Court facts about the "Inspection Report ("IR")" performed on the Cohen policy that, according to Gutwein, show that ING would have issued the Cohen policy (and, presumably did) even if it had known the truth about the facts which were misrepresented on the Cohen application. Gutwein then extrapolates from this argument to claim that ING would therefore not have found <u>any</u> of these sort of misrepresentations to be material. Gutwein is wrong. While there may or may not have been a mistake in the Cohen case, the full set of facts show that Liberty Planning played a huge role in fraudulently convincing ING to issue the Cohen policy notwithstanding the disclosures in the IR and that ING <u>does</u> rely upon financial data in determining whether to issue policies.

First, MA Aff I, on its face, clearly showed that financial information on the insured is highly material to whether, and in what amount, an insurance company will issue a life policy on an insured. MA Aff I explained that the size of a policy the company will issue on an insured is directly related to his finances. <u>Id</u>. at n. 9. This, of course, makes sense. Why would an insurance company expose itself to $10,000,000 in death benefits upon the death of someone who was worth "very little?" Moreover, MA Aff I stated that conspirator Leo Fekete admitted to CI1 that the false inflation of CI1's financial information "would generate more income for them." <u>Id</u>. ¶ 18 and n. 9. Thus, MA Aff I explained that obtaining a higher death benefit amount on the insured was the conspirators' motive for lying about the insureds net worth and annual income, <u>Id</u>., which is strong circumstantial evidence that a reasonable insurer would consider the information that the conspirators lied about to be important Moreover, as MA Aff I also indicated, ING turned its internal fraud report over to prosecutors and began bringing suits to rescind the fraudulent STOLI policies it advised the government about in December 2009, facts which further support the conclusion that ING found this information to be important. <u>Id</u>. at ¶ 21.

In 2005, ING issued an internal directive, annexed hereto as Exhibit 14, indicating that ING will <u>not</u> issue life insurance policies intended at the outset to be resold on the secondary

market, i.e., STOLI policies.  It further instructed that its insurance agents are expected to determine that the insurance for which their clients have applied will serve an appropriate purpose, which does not include resale of the policy, and that general agents and agents who violate these rules could be terminated. Id. at 2-3.  ING, like every other insurance company, has guidelines as to what an insured's finances should approximate in order for the insured to qualify for a certain type and amount of insurance.  STOLI policies in general, indeed, most, if not all of the STOLI policies in this case, including the Arnold Cohen policies, were applied for as, and issued as, "estate planning" policies.  An estate planning policy is a policy the insured takes out to enable his estate to pay his estate taxes upon his death.  (The proceeds of life policies are not taxable).  Estate taxes are based upon the decedent's estate at the time of his death.  The underwriting guidelines of most insurance companies contain a formula which uses the insured's present net worth and income to predict the size of the insured's estate taxes at his death.  ING's underwriting guidelines contain such a formula based upon the insured's net worth and income to determine the amount of an estate planning policy it will issue.

Arnold Cohen was one of the Fifteen Insureds.  Cohen's application, which was dated July 11, 2007, stated that: (1) his net worth was $46,000,000; (2) his annual income was $2,300,000; (3) he wanted a $10,000,000 life insurance policy for estate planning purposes, meaning that he wanted a death benefit which would cover his expected estate taxes of $10,000,000 at the time of his death; and (4) he had never declared bankruptcy.  An Inspection Report ("IR") was ordered on Cohen's application from a company called Lab One.  The IR indicated that Arnold Cohen declined to speak about his finances, stating that he would have to consult with his accountant about that and he admitted that he had declared bankruptcy.  The IR also indicated that there was a high risk fraud alert, but not because, as Gutwein implies, of the risk that Cohen was lying about his finances.  Rather, the "high risk fraud" alert resulted from the fact that the social security number on the Cohen application had not been issued to Cohen, but was a social security number associated with a dead person.  Gutwein was the insurance agent on the Cohen policies.

The ING underwriter who reviewed the Cohen IR simply did not see in the IR, the high risk fraud alert, which, as noted above, was based upon the false social security number.

Nonetheless, the underwriter noted the fact that Cohen refused to discuss his finances without his accountant, that Cohen had filed for bankruptcy in 2002 and that the bankruptcy had been closed in 2005. The underwriter, in light of the discrepancy between the finances in the application and the IR, requested further financial information from a third party. ING contacted Moses Schlesinger, the Office Manager of Liberty Planning, and requested third party financials from the client's accountant with verification of current income and net worth. Schlesinger sent back to ING a letter by Edward Grodsky, the same Edward Grodsky who played such a crucial role in the fraud involving CI2. Grodsky stated in the letter that he was Cohen's accountant and he verified the accuracy of the net worth and annual income figures in Cohen's application. Gutwein Motion, Ex. E. Thus, far from establishing the alleged lack of materiality of the misrepresentations in the Cohen application, the background to this IR and ING's reaction to it establishes further proof of the fraudulent scheme, specifically, evidence of additional misrepresentations by co-conspirator Grodsky and others at Liberty Planning.

MA Aff I does not so as mention any of the Cohen policies. Nonetheless, Gutwein admits in his motion that he read the Grodsky letter which falsely confirmed that Cohen's application correctly reflects his finances, Gutwein Motion at 17, n. 6, and Gutwein uses this letter as proof that he had no criminal intent, because reading the Grodsky letter "was sufficient to meet [Gutwein's] burden of [verifying the financial information on the insured's application]." Id. While Gutwein's argument that the Grodsky letter shows that Gutwein had no criminal intent is comical in light of the probable cause established in MA Aff I that Gutwein and Grodsky were co-conspirators[23], it is difficult to understand why it was not sufficient for ING to rely upon the letter from Cohen's alleged accountant, especially given that the accountant's letter was secured and submitted by the ING agent and general agency on the Cohen policy.

Insurance companies rely upon the insurance agents as the first line of defense against fraud. ING's 2005 policy statement, Ex. 14, shows precisely that, requiring agents to determine if their clients have a legitimate, non-STOLI need for insurance. In mid-2007, ING had no reason to believe that Liberty Planning or Gutwein, the insurance agent for the Cohen

---

[23]/Indeed, while MA Aff I does not discuss the Cohen policy at all. in fact, Grodsky was the "trustee" on the fraudulent Cohen policies and Gutwein was the insurance agent, thus providing specific additional proof that Gutwein and Grodsky conspired on the Cohen policy.

application, was corrupt. When ING learned of the corruption through its investigation in 2009, it took action to terminate the corrupt agents. But in 2007, when ING saw the discrepancies between the IR and the application, it relied upon the insurance agents on the Cohen case as its first line of defense and asked Liberty Planning to provide the necessary information to explain Cohen's true financial situation. But agents of Liberty Planning instead provided what ING later determined to be a false report from a co-conspirator of the corrupt agents. The question is not whether the Cohen underwriter was negligent or whether he should or could have done more in response to the Cohen IR. The only relevant question is whether "a reasonable insurance company" would consider it important to know, in deciding whether to issue a life policy and at what amount, about the insured's true finances and whether the insured intended from the outset to resell the policy. The answer to this question is unquestionably "yes."

Under federal law, materiality is decided under an "objective" standard, namely what a reasonable victim would consider important in deciding how to act. Under the security laws a misrepresentation is material if a "reasonable investor" would have viewed the information as important in deciding whether to invest. SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1977). In Neder v. United States, 527 U.S. 1, 22 n.5, 23-24 (1999), the Supreme Court, in deciding that materiality is an element of the mail and wire fraud statutes and that the statutory term "scheme to defraud" has its common law meaning, including a materiality requirement, cited to the restatement of Torts (Second) § 538, which defines a statement as material if a "reasonable man would attach importance to its existence or non-existence in determining his choice of action" or if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." The Supreme Court explained that the mail and wire fraud statutes do not require proof of actual or justified reliance, because those statutes prohibit a "scheme to defraud" rather than a completed fraud. Id. at 24-25.

The Four Moving Defendants were sophisticated and knew the insurance industry very well. They engaged in extensive acts of deceit about their clients' finances and their intent to resell the policies in an effort to get many insurers, including ING, to issue these policies. As a simple matter of common sense, the extensive lies told by the defendants to convince the companies to issue the policies constitute strong circumstantial evidence that a reasonable

insurance company would consider the lies to be important in deciding whether to issue the policies and the extensive lies are direct evidence that, irrespective of what a reasonable insurer would consider important, that the defendants had <u>reason to believe that ING would likely consider the lies about the Cohen policy important</u> (even if ING did not <u>in fact</u> consider the lies important). Further, the 2006 ACLI Article, referred to in the section on STOLI policies, provides additional strong evidence to believe that a reasonable insurance company would consider - - indeed, that all insurance companies did consider - - STOLI lies important. The 2005 ING directions to its insurance agents, Ex. 14, constitutes additional strong evidence, beyond the defendants' actions, that ING considered information on whether a STOLI policy was sought to be important.

Moreover, it is also well-settled that it is no defense to a fraud charge that the victim failed to exercise ordinary prudence or was negligent in failing to detect the defendant's lies. <u>See</u> <u>United States v. Thomas</u>, 377 F.3d 232, 242-43 (2d Cir. 2004) (rejecting "unreasonable victim" defense). In addition, the actions of the underwriter are obviously not determinative of whether ING considered the lies important. <u>See</u>, <u>e.g.</u>, <u>United States v. Winkle</u>, 477 F. 3d 407, 414 (6th Cir. 2007) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank. . ."); <u>United States v. Jiminez</u>, 513 F.3d 62, 74 (3d Cir. 2008) ("It is the financial institution itself, - - not its officers or agents - - that is the victim of the fraud § 1344 proscribes."); <u>United States v. Yarmoluk</u>, 993 F. Supp. 206, 209 (S,D,N.Y. 1998) (an institution may be defrauded even its employees allow or participate in the fraudulent practice). ING spoke through its policy issuances, its underwriting guidelines, and the ACLI Article.

ING, like every other insurance company, has guidelines on the financial circumstances under which it will issue an estate planning policy of $10,000,000. Speaking in general, to justify an estate planning policy of $10,000,000, which would be in essence, a projected estate tax for the insured of $10,000,000 at the time of his death, the insured would need an expected net worth at death of $20,000,000. That insurance companies want these guidelines followed is not seriously in doubt. It is part of the general insurance practice, referenced and discussed in textbook after textbook, that an insurance company will not insure a loss for more

than its economic worth. See, e.g., Insurance Law, R. E. Keeton & A. I. Widliss (1988) at 135 ("The principle of indemnity is the concept that insurance contracts should confer a benefit no greater in value than the loss suffered by the insured."). Thus, a casualty insurance company will not insure a piece of property, say a ring worth $100, for a value significantly more than $100, say, e.g., $100,000. But issuing a $10,000,000 estate planning policy on someone with no estate of which to speak, which is exactly what happened repeatedly in this case, is akin to insuring a valueless ring for $10,000,000. It makes economic sense for a corrupt agent to induce a company to do so, since the agent is not responsible for paying the death benefits and he gets 95% of the huge first year's premiums, but it does not make sense for the insurer to do so.

Moreover, the underwriter did not see the fraud alert in the IR based upon the false social security number. The issue is what information a reasonable insurer would care about and not what the underwriter did in this single case. How could a reasonable insurer not care if it had issued a $10,000,000 policy to a person who listed a dead person's social security number as his own, without even obtaining the correct social security number. Suggesting that ING did not care, as Gutwein implicitly does, rather than criticizing the underwriter for not picking it up, is absurd.

For a reviewing court assessing the materiality of an omission, it must determine whether the affidavit for the wiretap would support the wiretap's issuance if the omitted material and all the surrounding circumstances relevant to the omission were placed into the affidavit. Here, the surrounding circumstances of the omitted material provides further evidence of fraud, not less, and provides additional reasons to conclude that the lies were material. The government did not mention the Cohen policy or the Cohen IR in MA Aff I, but it also did not discuss in MA Aff I, the IRs that ING received on those of the Fifteen Insureds other than Cohen. The IRs are usually ordered by the insurance agent or the general insurance agency. For the fourteen of the Fifteen Insureds other than Cohen, all but one fully confirmed the inflated financial figures on the applications. Nine of the IRs for the Fifteen Insureds that confirmed the inflated financial numbers of the applicants were completed by Jewel Strader or Sam Feder, independent contractors for a firm called Infolink. ING developed evidence that they were part of the fraud.

81

Indeed, Schlesinger, on the CI1 policy, provided Strader with the inflated figures for annual income and net worth which she concluded, in her IR, to be accurate. She also indicated in her IR that she spoke with CI1 and that CI1 confirmed the financial figures in his application. However, while CI1 did speak to a women over the telephone about his application, the woman never spoke to him about his finances. In other words, Liberty Planning and the insurance agents who ordered the IRs took steps to insure that the IRs continued to perpetuate and hide the fraud, a fact that suggests that the conspirators believed that this misrepresented information was important to insurers.[30]

Precisely because insurers will not knowingly issue STOLI policies, a STOLI application is often characterized by fraud so that the insurer will not learn that the application is one for a STOLI policy. But there is no serious dispute that insurers always opposed STOLI policies. Indeed, as noted above, as early as 2006, before any of the policies in this case were issued, ACLI, the trade association representing virtually all major life insurers, and the trade associations representing life insurance agents and agencies, publically opposed STOLI policies and called for their legislative prohibition. See, ACLI Article. That is a truly unusual way to be "in favor" of STOLI policies. The 2005 ING directive to its insurance agents directing that STOLI policies should not be issued and that agents who violated this policy could be terminated was also a truly unusal way to be in favor of STOLI policies. In light of these documented background facts, the actions of the underwriter on the Cohen policy do not change the conclusion that there was probable cause to believe that insurers considered significant misrepresentations about insureds' finances and STOLI to be material.

---

[30]    In the one IR, other than the Arnold Cohen IR, which disputed the false information in the application, the IR had been ordered by a former general agency, other than Liberty Planning, with which the insurance agent on the policy was affiliated. When the IR was received by ING, ING requested third party verification of the finances set forth in the application. After Liberty Planning became the general agency, the insurance agent on the case, one of the Five Agents, responded to ING by providing an accountant's report verifying the financial information in the application from an accountant named Aaron Gancfried, supposedly from the Tax Experts. When ING later conducted its fraud investigation, it could not reach Gancfried by phone nor find an office for the Tax Experts at the address provided.

Indeed, if the facts about the individual Cohen IR were added to MA Aff I, MA Aff I would still establish probable cause to believe that the conspirators made material misrepresentations in light of the facts set forth in MA Aff I concerning (1) ING's preparation of its internal fraud report and ING's transmission of it to law enforcement, (2) ING's termination of the Five Agents, (3) the rescission actions ING began to bring and planned to continue to bring, (4) the conspirators own statements about how the lies would cause the insurers to issue policies with higher death benefits than they otherwise would have issued and (5) the extensive and circuitous lies, transfers and other devious acts in which the conspirators engaged to prevent the insurers from learning that the policies were STOLI policies and that the insureds had very modest means.

The defendants are not entitled to a Franks hearing on the government's failure to disclose the Cohen IR and ING's reaction to it because materiality is defined by an objective standard, relying not on what the victim actually considers to be important, but rather on what a reasonable insurer would consider important or on what the defendant has reason to know that the insurer is likely to consider important. Neder, 527 U.S. at 22, n. 5; Restatement of Torts (Second) § 538. Even if we assume arguendo, that ING did not, in fact, care about the information that the defendants lied about, the foregoing five facts taken directly from MA Aff I, including the extensive efforts the defendants made to conceal the truth from the insurers, are sufficient to establish that a reasonable insurer would consider the lies important, or, at the very least, that the defendants had reason to know that it was likely that ING would consider the lies important. In other words, the defendants own actions are sufficient to establish the second prong of the objective standard even if we assume that ING did not, in fact, care about the information that the defendants concealed. Thus, no Franks hearing is required.

Indeed, as noted, MA Aff I does not make any mention of the Cohen policy, and while the other Title III affidavits and the affidavits in support of the search warrants do, the government can easily show, and the Court can easily conclude for itself by reviewing each of these affidavits, all of which are filed in connection with these motions, that if all mention of the Cohen policies are removed from those affidavits, then those affidavits would continue to establish probable cause. Given that, it is clear that no Franks hearing can be justified. Further, as

83

discussed above, the full circumstances surrounding the Cohen IR would only serve to strengthen the conclusion that there was probable cause to conclude that the lies were material.

Finally, even assuming that there were material omissions, which the government denies, it is still a mistake to equate material "falsehoods" and material "omissions" under Franks. "Rarely will an unintentional omission be grounds for Franks relief when complex economic crimes are the subject of the investigation. In such cases, unless the government has lied to the issuing judge, the suppression issue should turn on what was in the government's affidavit . . ." United States v. Ozar, 50 F.3d 1440, 1445 (8th Cir. 1995)(emphasis added). The government did not tell any lies to the Court about the Cohen policies, and thus even assuming material omissions, there was still no Franks violation. Id. Indeed, the government considered the facts surrounding the Cohen IR to establish more proof of the defendants' fraud, not less.

POINT IV

## Y. NEUMAN'S MOTION TO SUPPRESS HIS EMAILS SHOULD BE DENIED

On April 30, 2010, the Honorable Joan M. Azrack, United States Magistrate Judge, issued a search warrant for the government to obtain emails from five email accounts (called "Premises"), three of which were the email accounts of Y. Neuman (Premises 2, 3 and 5) and two of which were the email accounts of M. Neuman (Premises 1 and 4). Y. Neuman moves to suppress the emails obtained by the government as a result of the search of Premises 2, 3 and 5 (the "Y. Neuman Premises"). Y. Neuman argues that the affidavit in support of the search warrants ("Neumans SW Aff") failed to establish probable cause that Y. Neuman committed a crime or, assuming that it did establish that he committed a crime, that there was probable cause to believe that any of the Y. Neuman Premises contained evidence of that crime. Y. Neuman also claims that the warrants to search the Y. Neuman Premises were overbroad. Y. Neuman is, as shown below, incorrect and his motion to suppress should be denied.

### A. Neumans SW Aff Establishes Probable Cause to Believe that Y. Neuman Committed a Crime and That the Y. Neuman Premises Contained Evidence of That Crime

#### 1. There Was Probable Cause to Believe that Y. Neuman Committed Crimes

Neumans SW Aff clearly sets forth sufficient evidence to establish probable cause to believe that Y. Neuman committed crimes. Neumans SW Aff ¶¶ 8 - 13 sets forth the information contained in MA Aff I concerning the ING Investigation, the Fifteen Insureds and the

84

CI1and CI2 policies.  In addition,  Neumans SW Aff asserts that Lenny is in fact Y. Neuman. Id.
at ¶ 12.  Thus, there is direct evidence that Y. Neuman,  along with his brother M. Neuman, tried
to convince CI2 to complain to the doctor of symptoms which CI2 did not have "in order to get
more money for the [CI2] policy when it was resold." Neumans SW Aff at ¶ 13.  Thus, for the
reasons explained in Point II, there is sufficient probable cause to believe that Y. Neuman, M.
Neuman and CI2, conspired to commit mail and wire fraud to inflate the resale prices of CI2's
policies by creating false medical records.  Similarly, as shown in Point II, there is probable cause
to believe that Grodsky, M. Neuman, CI2 and CI3 also conspired to commit mail fraud to inflate
the resale prices of CI2's policies by submitting false applications to insurance companies.  Y.
Neuman and M. Neuman introduced themselves to CI2 as "Grodsky's associates."  Further, there
are numerous emails between Grodsky and Y. Neuman described in Neuman SW Aff concerning
STOLI policies in which the group of investors headed by M. Neuman invested.

　　　　Neumans SW Aff describes, as did MA Aff I, how the "conspirators set up a
complex financial network to conceal the source of the monies that funded the premium payments
on these policies and the profits earned by the scheme." Neumans SW Aff ¶ 15.  The financial
network, which included companies controlled by the Neuman Brothers that were funded by
Lebovits and Gutwein, was set forth in even more detail than it was in MA Aff I.  Neumans SW
Aff ¶¶ 15, et seq.  In short, Neumans SW Aff establishes that a group of investors headed by M.
Neuman indirectly paid the premiums on a large number of STOLI policies secured by fraud
through circuitous routes that concealed from the insurers that investors, rather than the insureds,
were paying the premiums on the policies.  The companies through which the investor payments
passed before reaching the insurance companies were controlled by M. Neuman, Y. Neuman and
M. Neuman's wife.  There are numerous examples in Neuman SW Aff of the Blue Rock Group,
which Y. Neuman controlled, circuitously funneling investor money to indirectly fund premium
payments and to make $500 monthly payments to insureds.  Id. at ¶¶ 8 -10, 14- 18.  The group of
investors headed by M. Neuman includes among its members Lebovits and Gutwein, principals of
Liberty Planning.  Liberty Planning submitted at least fifteen fraudulent STOLI applications to
ING and additional such applications to other insurance companies, and ING terminated the Five

Agents, including Gutwein, for submitting these policies and for refusing to cooperate with ING's investigation. Id. at 8 - 10.

Neumans SW Aff also establishes that Y. Neuman, using Premises 5, asked Grodsky to disguise the fact that Grodsky was sending a premium check on a Beryl Bell policy directly to Lincoln National Insurance Company. That is, Y. Neuman sent an email to Grodsky, attaching a shipping label that stated that the sender was Lebovits, at the Liberty Planning address, and that the intended recipient was Lincoln National. Further, Y. Neuman asked Grodsky to use that shipping label to send the check on the Beryl Bell policy to Lincoln National. SW Aff ¶ 21n. This is strong evidence that Y. Neuman was seeking to deceive the insurance company into believing that it was receiving Beryl Bell's premium payment from the General Agent on Bell's policy, which would not be abnormal, when in fact it was receiving the payment from a stranger to the policy, which made it a STOLI policy.

Neumans SW Aff also sets forth facts linking Y. Neuman to the CI1 policy that Liberty Planning fraudulently induced ING to issue through the submission of a fraudulent application. Essentially Moses Schlesinger, the General Manager of Liberty Planning, sent an email containing fraudulently inflated figures for CI1's net worth and annual income to Jewel Strader, a person who had previously "confirmed" fraudulently inflated financial figures in the insurance applications of other insureds for insurance companies. Schlesinger forwarded the email he sent to Strader, which contained the exaggerated financial figures for CI1, to Y. Neuman. Id. ¶ 14. Thus, Neumans SW Aff links Y. Neuman to the fraudulent CI1 policy as well as the fraudulent CI2 policy.

Neumans SW Aff also provides evidence linking Y. Neuman to fraudulent life policies on the life of Arnold Cohen, one of the Fifteen Insureds. Transamerica issued a $10,000,000 policy on Cohen's life, which was later resold, and ING also issued a $10,000,000 policy on Cohen's life. Grodsky was listed as the trustee on both policies. As a result of the Original Interception Order, telephone calls were intercepted between M. Neuman and Grodsky and between M. Neuman and Cohen in which they discussed the fact that Sophia Brodsky, Cohen's ex-wife, was blackmailing them by threatening to go to the authorities unless she was paid what she was promised, presumably for assisting in the fraudulent Cohen policies. Further,

calls that were intercepted showed that M. Neuman made arrangements to pay Brodsky $10,000 to prevent Brodsky from going to the authorities. Y. Neuman, using Premises 5, helped arrange the deposit and distribution of the funds obtained from the resale of the fraudulent Transamerica life policy on Cohen's life, pursuant to which funds were distributed to Cohen, Cohen's blackmailing ex-wife, a number of Neuman-controlled companies, including N.S. BP and Bold, and the Beryl Bell insurance trust.

Further, as seen in Neumans SW Aff ¶¶ 19g - 19h, Y. Neuman sent forms to Grodsky asking Grodsky to obtain medical releases from insureds which, when signed, would allow "Liberty Planning, its agents, employees and representatives and any insurance company they represent" to obtain medical reports on the insured. But Moses Schlesinger, the Office Manager of Liberty Planning, sent confidential medical reports to M. Neuman and Y. Neuman, even though neither of them was a licensed insurance agent nor an employee of Liberty Planning.

For all of the reasons stated in Point Two above with respect to M.Neuman, Neumans SW Aff, which provides more evidence than MA Aff I, presented sufficient evidence against Y. Neuman to establish probable cause to believe that Y. Neuman conspired with M. Neuman, Grodsky and others to commit mail fraud and wire fraud by fraudulently increasing the resale prices of secretly STOLI policies through the submission of false insurance applications to obtain STOLI policies and through the creation of false medical records to make it appear that the life expectancy of the insured was shorter than it in fact was.[31] Even if the Court were to decide that there was not sufficient evidence in Neumans SW Aff to support a probable cause finding, the agents, under the Leon good faith exception, objectively relied in good faith upon Magistrate Judge Azrack's warrants to seize the emails of Y. Neuman from Premises 2, 3 and 5. For that reason alone, Y. Neuman's motion for suppression must be denied.

---

[31]     The claims of Y. Neuman that Neumans SW Aff makes deliberate or reckless false statements or material omissions - - claims which, Y. Neuman asserts without argument but solely by reference to M. Neuman's argument to the same effect made with respect to MA Aff I, see Y. Neuman Motion at 3 - - are responded to in Point Two above.

2. There Was Probable Cause to Believe that There Was Evidence of
Y. Neuman's Crimes in Premises 2, 3 and 5

Y. Neuman further argues that Neumans SW Aff does not provide sufficient

evidence to establish probable cause that Premises 2, 3 and 5 contain evidence of Y. Neuman's

crimes. That argument is incorrect, as shown below.

a.      Premises 5

There were seven different emails described in Neumans SW Aff sent from or to

Y. Neuman at Premises 5, which related to the resale of policies of Arnold Cohen and Beryl Bell

on the secondary market, three relating to the resale of an Arnold Cohen policy (Neumans SW Aff

¶ 21k) and four relating to the resale of a Beryl Bell policy (Id at ¶¶ 21m - 21p).

As noted above, the Arnold Cohen policies were fraudulent, indeed they were the

subject of blackmail demands by Cohen's ex-wife.  In three separate emails between Y. Neuman

using Premises 5 and Grodsky, dated December 21, 2009 (which is four months before Neumans

SW Aff was submitted to the court), Y. Neuman arranged for the transfer of the proceeds of the

sale of a Cohen policy to that policy's  trust bank account.  Those proceeds were disbursed to

Cohen, Cohen's ex-wife, Grodsky, an M. Neuman company, a Y. Neuman company, a Beryl Bell

life insurance trust account (to pay a Bell insurance premium) and a "Congregation" that appeared

to be an investor. Id. at ¶ 21k.  In four emails sent from December 9, 2009 to January 15, 2010,

between Y. Neuman at Premises 5 and M. Neuman, Grodsky and Joel Eckstein of Global Life

Settlement Company, a company which arranges for the resale of policies on the secondary

market, Y. Neuman assisted in the resale of a Beryl Bell policy.  As noted above, in the January

15, 2010 email, Y. Neuman, at Premises 5, sent an email to Grodsky advising the latter to use the

attached label when he sends the check for Bell to Lincoln National Insurance Company, where

the attached label was a UPS shipping label from Lebovits at Liberty Planning, to the Lincoln Life

Insurance Life Department for "In Force Business."  Id. at ¶ 21n.  This was obviously an attempt

to deceive Lincoln into believing that a premium payment for the Bell policy, which would be

needed to ensure that the policy was in effect when it was resold, had been paid by the General

Agent for the policy, Liberty Planning, rather than by Grodsky, a stranger to the policy who was

neither a licensed insurance agent nor an employee of Liberty Planning.  Beryl Bell policies, in

addition to being funded by an Arnold Cohen policy, were funded indirectly, without the
knowledge of the insurance companies, by Brooklyn Life. Id. Clearly, reselling the policies to
obtain money back from the investment, the topic of all seven emails sent from or to Premises 5,
was a part of the criminal conspiracy.

b.     Premises 3

On December 31, 2009 and January 20, 2010, Y. Neuman at Premises 3, sent
three emails to Grodsky attempting to enclose blank surrender application forms used to surrender
life insurance policies to a life insurance company. Id. at ¶¶ 20a - 20c. During a call intercepted
on March 24, 2010, M. Neuman explained the significance of the surrender application to
Grodsky, noting that "it's not good" to have default judgements on the grounds of fraud, which
the agents understood to mean that a default judgment on the grounds of fraud of a policy issued
to a particular insured would make it more difficult to resell policies on the same insured that had
been issued by companies other than ING. M. Neuman further explained to Grodsky that he
preferred to get the insureds to surrender the policies to ING rather than get a judgment against the
insured on the grounds of fraud. Id. at ¶ 20d. The three emails sent from premises 3, which sought
to facilitate a surrender of fraudulent policies to avoid default judgments for rescission on the
grounds of fraud, were thus in furtherance of continuing the conspirators' fraudulent scheme.

c.     Premises 2

In Neumans SW Aff ¶¶ 19a - 19e, there is a discussion of three emails to or from
Y. Neuman at Premises 2, which relate to the purchase of policies as part of the conspirators'
scheme. On May 12, 2008, M. Neuman, using Premises 1, forwarded to Edward Grodsky an
email sent by Union Central Life Insurance Company to Moses Schlesinger, the Office Manager
of Liberty Planning, concerning the Beryl Bell policy (the "Original Email"). Schlesinger had
forwarded the Original Email to the Neuman Brothers at Premises 1 and 2 and to Lebovits. The
Original Email advised that a report from Bell's doctor was needed, as well as a statement from
Bell's accountant verifying Bell's income and net worth and an IR. It further requested for the
Bell policy an authorization to release medical information and a list of assets and their values
signed by an accountant. M. Neuman forwarded to Grodsky both of these requests from Union

89

Central to Liberty Planning for material on Beryl Bell. Neither the Neuman Brothers nor Grodsky was a licensed insurance agent nor an employee of Liberty Planning. The premiums on Bell's policies were, unbeknownst to the insurance companies, indirectly and secretly funded by an Arnold Cohen policy that was the subject of blackmail threats and by Brooklyn Life, which in turn was funded by Bold Associates, which in turn was funded by Lebovits and Gutwein. These emails were in furtherance of the conspirators' scheme to provide fraudulent information to obtain life insurance policies.

On February 6, 2009, Grodsky sent to the Neuman Brothers at Premises 1 and 2 an email about an Eileen Schneider Union Central policy in the amount of $5,000,000, on which Saul Schneider was the trustee, asking the Neuman Brothers to take care of the "Saul Schneider Memo." Again, neither Grodsky nor either of the Neuman Brothers was a licensed insurance agent nor an employee of Liberty Planning. The premiums on the policies were secretly and indirectly paid by Brooklyn Life. Id. at ¶¶ 19d and 19e. This email was also clearly in furtherance of the conspirators' scheme.

In short, as shown above, there was clearly probable cause to conclude that Premises 2, 3 and 5 contained evidence of acts in furtherance of the conspirators' scheme. Again, at a bare minimum, even if the Court were to conclude that Neumans SW Aff did not establish that Premises 2, 3 and 5 contain evidence of the conspirators' scheme, the agents clearly believed in good faith that Magistrate Judge Azrack's Y. Neuman Email SWs authorized them to seize the Y. Neuman emails in Premises 2, 3 and 5. Thus, under Leon, suppression should not be ordered.

### B. Y. Neuman's Motion to Suppress the Emails Obtained Pursuant to the Y.Neuman Search Warrants on the Grounds that the Warrants were Overbroad Should Be Denied

Finally, Y. Neuman claims that the Y. Neuman SWs for emails were overbroad and that therefore the evidence obtained from these search warrants should be suppressed. Y. Neuman is wrong. The Y. Neuman SWs instructed the service providers to produce to a government taint team all of various different specific categories of computer files in Premises 2, 3 and 5, including the category of "all emails, including any attachments, sent by or received by the Account described above ..., whether saved or deleted, whether saved in the email accounts or in a customized 'folder.'" Y. Neuman SWs, Attachment C at II. See United States v. Bowen, 689

F. Supp. 2d 675, 682 (S.D.N.Y. 2010) ("Nor does the Fourth Amendment require the executing authorities to delegate a pre-screening function to the internet service provider or to ascertain which e-mails are relevant before copies are obtained from the internet service provider for subsequent searching."). The taint team was to ensure that not all items from the specific categories of items, such as the item "all emails," would be produced to the prosecution team. Instead, the taint team would produce to the prosecution team only those "emails" in premises 2, 3 and 5, that concern "the participation of Grodsky, M. Neuman, Y. Neuman and others in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering." See Y. Neuman Email SW, Attachment C, Section III at pp. E773 - E776.

Y. Neuman argues, citing United States v. Cioffi, 628 F. Supp. 2d 385 (E.D.N.Y. 2009) and cases decided before Cioffi, that the description of the items to be seized set forth in the Y. Neuman Email SWs is overbroad. However, even assuming that under the present state of the law, the Y. Neuman Email SWs would be considered overbroad, there are two compelling reasons why the Court should conclude that the government, in this case, relied in objective good faith on the Y. Neuman Email SWs that Magistrate Judge Azrack issued, and thus, under the Leon good faith exception to the exclusionary rule, Y. Neuman's motion to suppress should be denied.

First, Cioffi was decided by Judge Block on November 2, 2009. In Cioffi, Judge Block suppressed a warrant to seize from the defendant's email account "'all e-mail up through April 12, 2007, including any attachments, and all instant messages, sent by or received by the accounts, whether saved or deleted, whether contained directly in the email account or a customized folder.' There was no provision limiting the emails to be seized to those emails containing evidence of the crimes charged in the indictment, or, indeed, any crime at all." Cioffi, 628 F. Supp. at 389 (emphasis added). On November 5, 2009, just four days after Judge Block decided Cioffi, the Second Circuit decided United States v. McDarrah, 351 Fed. Appx. 558, 2009 WL 3645400 (2d Cir. 2009). In McDarrah, the Second Circuit held that where the search warrant contained specific categories of computer files in McDarrah's AOL account, and "did not include a catch-all provision providing for the search of 'any other evidence,'" then even though the specific categories "encompassed much or all of the content within McDarrah's AOL account,"

the warrant was not overbroad. Id. at 561. Indeed, the specific categories of items set forth in the McDarrah search warrant are almost identical to the specific categories set forth in this case and in Cioffi, including the category of "Stored electronic mail, including unopened, read, sent, and deleted electronic mail, and other stored content information presently contained in, or on behalf of, the following electronic mail addresses ..." Compare Exhibit 9 (McDarrah search warrant) with, e.g., Y. Neuman SWs, Attachment C at II at E851. However, unlike the M. Neuman and Y. Neuman Email SWs in this case, and like the search warrants in Cioffi, which Judge Block held to be overbroad, the McDarrah search warrant of which the Circuit approved did not limit the emails that would be produced to the prosecution team to those emails which concerned the violation of the crime charged or any crime at all. That is, four days after Judge Block decided Cioffi, the Second Circuit decided that a search warrant which was identical to the one Judge Block had held to be overbroad was not, in fact, overbroad. Moreover, the search warrants in this case were even more specific than the search warrant which the Second Circuit upheld in McDarrah, because the search warrants in this case ensured that the prosecution team would not receive any email unless the email concerned "the participation of Grodsky, M. Neuman, Y. Neuman and others in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering," whereas the McDarrah warrants did not limit the emails to be seized to ones relevant to any crime at all. Compare Ex. 9 with Y. Neuman SWs, Attachment C at III at E852. Indeed, on February 17, 2010, in Bowen, 689 F. Supp. 2d at 681-85, about two months before the M. Neuman and Y. Neuman SWs were issued, the Bowen court held, relying on McDarrah, that a search warrant that was identical to the one Judge Block found overbroad in Cioffi, was in fact not overbroad at all. In the alternative, Bowen held that the agents acted in objective faith and were entitled to the Leon good faith defense to suppression. A fortiori, since the M. Neuman and Y. Neuman Email SWs were even more specific than the search warrants in Bowen, McDarrah and Cioffi, based upon the Leon good faith defense the M. Neuman and Y. Neuman Email SWs cannot be suppressed.

Second, the agents executed the Y. Neuman SWs in good faith based upon their reliance on the amendments to the search warrant suggested by Magistrate Judge Gold. On February 5, 2010, Magistrate Judge Gold refused to sign the Grodsky Email SW or the M.

92

Neuman Text SW until handwritten language was added to those search warrants which limited the Grodsky emails and M. Neuman text messages to be produced to the prosecution team to those text messages/emails "concerning the participation of Moses Neuman/Edward Grodsky in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering in violation of sections 371, 1341, 1343, 1349 and 1956." See Exs.1 (M. Neuman text SW) and 3 (Grodsky SW) at Rider (last page); see also M. Neuman Text SW Aff at E767 and Ex. 2 annexed hereto (Grodesky SW Aff) at 25. Magistrate Judge Gold advised the government at that time that the added handwritten language would be sufficient to deal with the concerns raised in Cioffi. In light of Magistrate Judge Gold's advice, the government used the Grodsky Email SW as the template for the M. Neuman and Y. Neuman Email SWs that were later presented to Magistrate Judge Azrack. The government, which relied on Magistrate Judge Gold's advice concerning how to avoid the Cioffi concerns, is entitled to the good faith defense to avoid suppression even if the court were to now determine that the Y. Neuman Email SWs are overbroad. United States v. Buck, 813 F.2d 588, 592 (2d Cir. 1987) (citing to Massachusetts v. Sheppard, 468 U.S. 981, 989-90 (1984), and holding that where a judge advises an agent that changes which were made to a warrant render the warrant sufficient, then, even if the changed warrant is later deemed overbroad, the government is entitled to the good faith defense and suppression should be denied).

In sum, even if we assume arguendo that the Y. Neuman SWs were overbroad, based upon the good faith defense, the motion to suppress the emails seized from Premises 2, 3 and 5 should be denied.

### POINT V

### LEBOVITS IS NOT ENTITLED TO A BILL OF PARTICULARS

Lebovits moves the Court for a bill of particulars claiming that he is entitled to every completed act of fraud through which the government will prove at trial that the defendants engaged in a conspiracy to commit mail and wire fraud and to every completed money laundering transaction through which the government will prove at trial that the defendants conspired to commit money laundering. Lebovits is wrong.

93

The law on bills of particulars is well-settled. If a defendant has received adequate notice of the charges against him in the indictment or in some other pretrial disclosure, then a bill of particulars is not required. United States v. Bortnovsky, 620 F.2d 572, 574 (2d Cir. 1987); United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973); United States v. Volpe, 42 F. Supp. 2d 204, 224 (E.D.N.Y. 1999). A bill of particulars is not meant to be a tool to compel disclosure of the government's case before trial; the government will not be compelled through this device to preview its evidence or legal theory; and the government is not required, in a bill of particulars or otherwise, to disclose the manner in which the crimes charged are alleged to have been committed, the means through which the government will prove the charges or the government's theory of the case. United States v. Gotti, 42 F. Supp. 2d 252, 293-94 (S.D.N.Y. 1999) (citations omitted) (the government will not be compelled through this device to preview its evidence, legal theory or the manner in which it will attempt to prove the charges); United States v. Mitlof, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)(same); United States v. Richards, 94 F. Supp. 2d 304, 316 (E.D.N.Y. 2000) (Nickerson, J.)(same); United States v. Facciolo, 753 F. Supp. 449, 450-451 (S.D.N.Y. 1990)(same); United States v. Nova-Nunez, 1997 WL 30965 (S.D.N.Y. )(same); United States v. Andrews, 381 F. 2d 377 (2d Cir. 1967).

It is not enough that the information sought would be helpful to the defense; if the information is not necessary to inform the defendant of the charges against him then the government need not disclose the information or any other particulars about its case. United States v. Marcus, 193 F. Supp. 2d 552, 561-62 (E.D.N.Y. 2001) (Hurley, J.); United States v. Payden, 613 F. Supp. 800, 816 (S.D.N.Y. 1985).

In this case, the indictment is very specific and detailed, consisting of 33 pages and 19 paragraphs. Moreover, the papers disclosed as part of discovery, including three extensive affidavits in support of Title III interceptions, ten and twenty day letters reporting on the interceptions and four affidavits in support of search warrants, See, e.g., Scan II, paper 14, Box 1, E61-145, provide a very detailed narrative description of the nature of the fraudulent scheme and the conspiracies with which the defendants are charged. The basic mistake which the defendants make is in confusing the usual need for a detailed bill of particulars for a count that charges, in

94

permissibly duplicitous fashion, a number of different offenses that are all part of a single continuing scheme, United States v. Tutino, 883 F. 2d 1125, 1141 (2d Cir. 1989) (can aggregate more than one offense in single count if they all arose out of a single scheme), and the lack of such a need for a conspiracy count.  When multiple substantive offenses are aggregated in a single general count then a bill of particulars which identifies each of the aggregated offenses is necessary, because the defendant is entitled to understand each offense with which he is charged. The jury can convict him of the count if it unanimously finds that he committed only one of the offenses that are aggregated in the single count. Indeed, the defendant can ask for a special verdict requiring the jury to specify the single offense which it unanimously finds that the defendant committed that makes him guilty of the count containing the aggregated offenses.  But in a conspiracy count the offense is defined solely by the agreement into which the conspirators entered, and not by the specific criminal acts through which the government proves the nature of the agreement into which the conspirators entered.

In the instant indictment, the defendants are charged in the indictment with three very specific substantive counts of mail fraud, four very specific substantive counts of wire fraud and four very specific substantive counts of money laundering, none of which requires any more particulars.[32/]  The remaining two counts, Counts One and Two, are conspiracy counts, namely a conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 and a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  These conspiracy counts, like all Section 1349 and Section 1956(h) conspiracy counts, are completely specified and defined by explaining the nature of the agreements into which the defendants entered.  Section 1349 and 1956(h) conspiracies are not defined by the specific fraudulent or money laundering acts that the defendants actually committed pursuant to the conspiracies into which they entered and which the government will use to prove that the defendants entered into these conspiracies.  Substantive fraudulent and money laundering acts are not elements of Section 1349 and 1956(h) crimes. The

_____

[32/]The indictment uses letter designations instead of the real names of the entities and persons referred to in the eleven specific substantive counts, but the government, in its responses to the defendants' request for a bill of particulars, has disclosed to the defendants the real names of those persons and entities.

95

evidence through which Counts One and Two will be proved is not something to which the defendants are entitled in a bill of particulars.

United States v. Mermelstein, 457 F. Supp. 2d 242 (E.D.N.Y. 2007) (Johnson, J.) was a case in which the defendant was charged with multiple aggregate health care offenses in a single count and multiple aggregate false statement offenses in a single count. Thus, the defendant in Mermelstein was entitled to detailed particulars identifying for the defendant each of the hundreds of aggregate offenses under which he could be found guilty of the single health care offense and each of the hundreds of aggregate false statement offenses under which he could be found guilty of the single false statements count. With respect to the two broad conspiracy counts with which the defendants are charged in this indictment however, each charge is thoroughly defined by the nature of each broad agreement and the nature of each broad agreement is fully specified in the detailed indictment itself and in the numerous detailed affidavits for Title III orders and search warrants. Hence, the defendants' motion for a bill of particulars should be denied. Finally, should the Court grant the defendants' motion for a bill of particulars, it should deny the defendants' request for the government's "basis for the conclusion that the false statements induced the insurance companies to issue the policies and to charge lower premiums than would otherwise apply,'" and the "transfers of money that the government will rely upon at trial." The government is not required to explain its basis for concluding that the false statements induced the issuance of the policies and the charging of lower premiums. The government is not required to disclose its theory of the case. The allegations that the false statements induced these consequences is an assertion of fact which must be accepted as true at this juncture and the government's proof at trial will either sufficiently demonstrate this fact or not. This assertion of fact is all that the defendants are entitled to in an indictment or a bill of particulars and they already have that assertion. What transfers the government will rely upon at trial is a question of evidence as to which the defendants are not entitled since the conspiracy to commit money laundering is defined by the agreement, which the indictment fully describes, and the four substantive money laundering counts thoroughly describe the specific transfers alleged.

<u>POINT VI</u>

<u>Y. NEUMAN IS NOT ENTITLED TO THE ISSUANCE OF RULE 17 (c) SUBPOENAS</u>

Y. Neuman moves for the issuance of subpoenas pursuant to Federal Rule of Criminal Procedure 17(c), arguing that he has met the standard for the issuance of such subpoenas because, <u>inter alia</u>, the subpoenas he seeks are relevant to the issue of materiality.  However, the defendants are not entitled to the issuance of the subpoenas in question.

Y. Neuman's discussion of this issue is replete with the incorrect irrelevancies that are discussed earlier.  For example, Y. Neuman: (1) misstates the history of the legality or illegality of STOLI policies under New York law, even though New York law is irrelevant to the federal fraud crimes with which the defendants are charged; (2) goes so far as to suggest that concepts of materiality under New York Insurance Law should be applied to this case, when the only understanding of "materiality" which has any applicability to this or any other mail fraud case is the federal case law under the mail fraud statute; (3) makes the same false and misleading allegations about insurance companies investing in STOLI policies as do his co-defendants and fails to explain that, as shown above, (a) all major insurers and the national association of insurance agents condemned and sought to outlaw STOLI policies long before the policies in this case were issued, and (b) insurers used their insurance agents as the first line of discovering and preventing STOLI applications from being submitted to the insurers; (4) tries to extrapolate from the single case of Arnold Cohen, a case in which the insurance agent, Gutwein, and the general insurance agency, Liberty Planning, were corrupt and ignored their responsibilities to the insurers to function as the first line of defense in preventing STOLI policies; and (5) further fails to mention that in the vast majority of cases, the defendants themselves, or persons associated with them, took steps - - through the ordering of IRs from persons who falsely confirmed the lies contained in the applications - - to ensure that the insurers would never learn of the lies on the applications that the defendants submitted to the insurers.  But the simple fact is that Y. Neuman has failed to meet the well-accepted standard for the issuance of 17(c) subpoenas as set forth in <u>United States v. Nixon</u>, 418 U.S. 683 (1974).

First, Y. Neuman suggests that this court should follow the relaxed standard for the issuance of a 17(c) subpoena suggested in dicta in United States v. Nachamie, 91 F. Supp. 2d 552 (S.D.N.Y. 2000). In Nachamie, a single district court judge suggested that when the defendant moves for the issuance of a 17(c) subpoena the standard should be weaker than the standard applied by the Supreme Court in Nixon. But Nachamie has not been followed. Indeed, "[t]here is no question that courts confronted with subpoenas in criminal cases, at least subpoenas seeking pretrial production, have applied Nixon almost without exception." United States v. Stein, 488 F. Supp. 2d 350, 365 (S.D.N.Y. 2007). This Court has declined to apply Nachamie, stating that "[t]he standard [of Nachamie], proposed in dicta by Judge Scheindlin of the Southern District of New York, is not binding on this Court." United States v. Drakopoulos, 2003 WL 21143080 at *2, n.1 (E.D.N.Y. 2003)(Johnson, J.) (emphasis added).

Under Nixon, 418 U.S. at 699 -700, to obtain a 17(c) subpoena the party seeking it must satisfy the following four part test: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable in advance of trial; (3) that the party cannot properly prepare for trial without them; and (4) that the application is made in good faith and is not a fishing expedition. In particular, under (4), the party must establish that there is "a sufficient likelihood that each of the [items requested] contains [information] relevant to the offenses charged in the indictment." Nixon, 418 U.S. at 700 (emphasis added). Y. Neuman cannot satisfy part 4 of the Nixon test.

Y. Neuman cannot establish that it is likely that each of the documents that he seeks is relevant to his alleged materiality defense. He hypothesizes that each document is relevant based upon the single case of Arnold Cohen in which a rare legitimate IR was completed, i.e., an IR which the corrupt co-conspirators did not have performed by persons, such as Jewel Strader, who routinely falsely confirmed the false information on the application. Moreover, once the IR reported information which was different from the information on the application, the co-conspirators took active steps to convince the insurance company to issue the policy anyway by generating the fraudulent report of a co-conspirator accountant. Given that most of the IRs helped to conceal the fraud and given that all major insurance companies and the national professional

98

association of insurance agents - - who were the insurers' first line of defense against STOLI applications - - had publicly denounced STOLI policies and had called for legislative action to outlaw them before any of the policies in this case were issued, it is nothing short of fanciful to suggest that Y. Neuman has established that it is likely that each of the documents will support his "materiality" defense. This is especially so given that "materiality" under the federal fraud statutes is defined pursuant to an objective standard. This request is the type of "blanket [request] routinely rejected [under Rule 17(c)]." Drakopoulis at *2, citing United States v. Hutchinson, 1998 U.S. Dist. Lexis 21462 at *2 (E.D.N.Y. 1998).

At a bare minimum general request two in the subpoenas the defendants seek, which requests all documents relating to the sale of life policies to third parties, including investors, is a pure fishing expedition. There is no doubt that there is a normal secondary market for the resale of policies which are not STOLI, namely, for the resale of policies that were originally purchased for traditional insurance purposes, but which, due to changed circumstances, are no longer need for those purposes. That normal secondary market is not opposed by insurers and the defendants cannot possibly show that each document responsive to that request is likely to contain information relevant to the offenses charged in the indictment. Thus, at the least, the motion should be denied with respect to general request two.

Thus, Y. Neuman's motion for 17(c) subpoenas should be denied. But should the Court decide that the defendants are entitled to any 17(c) subpoenas, then it should require that all documents responsive to those subpoenas be simultaneously provided to the government as well as the defendants.

## CONCLUSION

For the reasons stated above, the Court should deny each of the defendants' motions.

Dated: Brooklyn, New York
      February 24, 2012

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

Charles S. Kleinberg
Assistant U.S. Attorney