```
JDG:CSK
F. #2009R01998
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | S U P E R S E D I N G<br>I N D I C T M E N T |
| - against - | Cr. No. 11-134 (S-2)(SJ)<br>(T. 18, U.S.C., §§ |
| CHAIM MAYER LEBOVITS,<br>AVIGDOR GUTWEIN,<br>LEO FEKETE,<br>MOSES NEUMAN, also known as<br>    "Moishe," and<br>YUDAH NEUMAN, also known as<br>    "Yeheedle" and "Lenny," | 981(a)(1)(C), 982,<br>1341, 1343, 1349,<br>1956(a)(1),<br>1956(a)(1)(A)(i),<br>1956(a)(1)(B)(i),<br>1956(h), 1957(b),<br>1957(d)(1), 2 and 3551 |
| Defendants. | et seq.; T. 21, U.S.C.,<br>§ 853(p); T. 28,<br>U.S.C., § 2461(c)) |

- - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I. The Defendants and The Defendants' Related Companies

1. Liberty Planning, Inc. ("Liberty Planning") was an insurance agency located in Monsey, New York. The defendant CHAIM MAYER LEBOVITS was the Vice-President and Managing General Agent of Liberty Planning. In the role of Managing General Agent, he supervised licensed insurance agents affiliated with Liberty Planning, and possessed authority to disburse funds from Liberty Planning's bank accounts. LEBOVITS, together with

others, also possessed the authority to disburse funds from the bank accounts of several related entities, including CSL Properties, LLC, CSL Properties II, LLC, CSL Properties III, LLC and The Rocklyn Group, Ltd. (collectively, the "LEBOVITS Related Companies").

2. The defendant AVIGDOR GUTWEIN was a licensed insurance agent affiliated with Liberty Planning and other insurance agencies. GUTWEIN, together with others, possessed the authority to disburse funds from the bank accounts of several related entities, including BG Planning LLC, EG Planning LLC, EG Planning LLC #2 and Gutwein Associates, LLC (collectively, the "GUTWEIN Related Companies").

3. The defendant LEO FEKETE was married to a licensed New York State insurance agent affiliated with Liberty Planning.

4. The defendants MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, possessed the authority to disburse funds from the bank accounts of several related entities, including Adelphia Supplies Inc., Ador Mazal LLC, Brooklyn Life Group LLC, Choose US Inc., Fort Medical Supply Inc., N.S. BP Realty LLC, NS 43rd Street Realty LLC, One Touch Developers Inc., The Blue Rock Group LLC and The Bold Associates Inc. (collectively, the "NEUMAN Related Companies").

II. <u>Life Insurance Agents and Companies</u>

5. Generally, life insurance companies entered into agreements with licensed insurance agents to sell the companies' policies. Agents found potential insureds or other persons with an insurable interest in an insured's life ("owners") who wish to purchase policies on an insured's life. When an insurance company approved an insured's or an owner's application for a policy, the sponsoring insurance agent received a commission from the insurance company consisting of a percentage of the premiums that the insured or the owner paid to the insurance company. Insurance agencies with which insurance agents were affiliated also received a share of such commissions.

6. During the first year that a life insurance policy was in effect, the commissions on the policy typically exceeded 90 percent of the premiums paid. The higher the benefits that an insured or owner would receive upon an insured's death, the higher the cost of the premiums paid to the insurance company. A policy that paid millions of dollars upon an insured's death typically cost hundreds of thousands of dollars in annual premiums.

7. Under New York State law, only an insured or a <u>bona fide</u> owner such as a close relative could purchase an insurance

policy on an insured's life. At a later time, however, an insured or owner could sell the policy to anyone.

8. Generally, insurance companies did not knowingly sell a life insurance policy if the purchaser of the policy intended, from the outset, to later resell the policy. Nor did insurance companies knowingly sell a life insurance policy where a third-party investor, rather than an insured or an owner, would pay the premium.

9. Insurance companies also did not knowingly sell a life insurance policy where the benefits payable upon the death of the insured were in excess of the amount needed to serve the specified purpose of the policy. Where the specified purpose of the policy was to protect the owner of the policy from lost income in the event of the insured's early death, and the insured's net worth and income were such that the insured could not provide the owner with a great deal of money while the insured was alive, then the insurance company would not sell the owner a large policy on the insured's life.

10. Under New York State law, where a life insurance company was induced through fraud to issue a life insurance policy, the insurance company could sue to rescind the policy within two years of the date on which the policy was issued (the "contestability period"). Following the expiration of the

contestability period, an insurance company could not sue to rescind a life policy regardless of the circumstances.

III. Mail and Wire Fraud Scheme

11. In or about and between January 2007 and May 2010, the defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, engaged in a scheme designed to: (1) fraudulently induce insurance companies, their corporate subsidiaries and related companies (collectively, the "Insurance Companies"), to issue policies with high death benefits to elderly insureds; and (2) after the Insurance Companies issued such policies, create false records and make false statements which were intended to lower the life expectancies of the elderly insureds in order to fraudulently inflate the resale prices that purchasers would be willing to pay for these policies on the secondary market for life insurance. The defendants and their associates were the licensed agents who sold the policies to the elderly insureds. The insurance agency was Liberty Planning or another insurance agency with which one of the defendants or their associates was affiliated.

12. In furtherance of the scheme, the defendants caused the submission of applications with materially false statements to the Insurance Companies. These false statements

induced the Insurance Companies to issue the policies and to charge lower premiums than would otherwise apply.  The false statements were that: (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) neither the insureds nor the owners intended to resell the policies on the secondary market for life insurance; (3) the insureds and the owners intended to pay the premiums themselves with their own money; (4) neither the insureds nor the owners had been compensated or were promised compensation for applying for the policies; (5) the insureds and the owners did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies were "estate planning," "estate liquidity," "estate conservation" or some equivalent description.

13.  During the periods of contestability of such fraudulently induced policies, and in furtherance of the scheme, the defendants made and caused to be made additional material false statements to the Insurance Companies, including statements that they were not aware that investors paid premiums on any of the said policies.  The defendants also engaged in additional fraudulent conduct by repeatedly transferring money used by investors to pay the premiums for the policies between various

bank accounts, to conceal the fact that investors were paying the premiums on said policies from the Insurance Companies.

  14. It was a part of the scheme that the defendants, together with others, recruited elderly people of modest means (the "Straw Buyers") to apply for life insurance policies with high death benefits from the Insurance Companies.  The defendants, together with others, paid cash and promised other financial incentives to the Straw Buyers in exchange for the Straw Buyers submitting applications for life insurance policies to the Insurance Companies.

  15. It was a part of the scheme that the defendants, together with others, engaged in financial transactions designed to falsely convince the Insurance Companies that the Straw Buyers were personally paying the premiums on the policies.  In fact, the defendants paid the premiums from the bank accounts of several companies.  These bank accounts were established in the names of irrevocable life insurance trusts for the Straw Buyers (the "Straw Buyers' Trust Accounts"), and were funded by the defendants and other third-party investors.  In order to conceal the source of the funds to the Straw Buyers' Trust Accounts, the defendants caused money to be exchanged among and between themselves, Liberty Planning, the GUTWEIN Related Companies, the LEBOVITS Related Companies and the NEUMAN Related Companies

(collectively, the "Defendants' Related Companies") and the Straw Buyers' Trust Accounts, prior to payment of the premiums. These payments were made through the mails, by private commercial interstate carriers, and through interstate wire communications.

16. It was a part of the scheme that after the Insurance Companies issued the policies to the Straw Buyers, the defendants, together with others, attempted to cause, and did cause, false records to be created and false statements to be made indicating that the Straw Buyers had poorer health than they in fact had. The defendants intended that these false records and false statements would cause the projected life expectancies of the Straw Buyers to be lowered, which would, as a result, fraudulently inflate the resale prices that prospective purchasers would be willing to pay for the Straw Buyers' life insurance policies on the secondary market for life insurance.

17. The defendants' goal was to profit from the scheme through: (1) the death benefits they would collect if the Straw Buyers died before the periods of contestability expired; (2) the commissions that Liberty Planning, other insurance agencies, the defendant AVIGDOR GUTWEIN and other insurance agents who participated in the scheme would receive from the premiums paid during the periods of contestability; and (3) the profits that

the defendants could make by reselling the policies on the secondary market once the periods of contestability expired.

IV. The Money Laundering Scheme

18. The defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, intended and expected to realize a profit on every insurance policy that was a part of the scheme as outlined above (the "scheme profits"). The defendants further intended to and did use a portion of the scheme profits to make subsequent investments in, and subsequent payments of, premiums on the same policies or different policies that were a part of the scheme, through deposits, withdrawals, transfers and exchanges of funds and monetary instruments by, through and to financial institutions (the "scheme profits transactions"). Indeed, for many of the premium payments made by the defendants, they used portions of the commissions that Liberty Planning, other insurance agencies and the insurance agents received from prior premium payments on other insurance policies that were a part of the scheme.

19. Each of the scheme profits transactions was designed in whole or in part to (a) conceal and disguise the nature, location, source, ownership and control of the scheme

profits, and (b) promote the continuation of the mail and wire fraud scheme outlined above. To this end, the defendants caused money to be transferred frequently among and between themselves, their associates, the Defendants' Related Companies, the Straw Buyers' Trust Accounts, the Straw Buyers, Liberty Planning, the other insurance agencies with which the defendants or their associates were affiliated and the Insurance Companies.

## COUNT ONE
(Conspiracy to Commit Mail Fraud and Wire Fraud)

20. The allegations contained in paragraphs 1 through 19 of this Indictment are realleged and incorporated as though fully set forth in this paragraph.

21. In or about and between January 2007 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Insurance Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to (a) cause mail matter to be delivered by the United

States Postal Service and commercial interstate carriers, to wit: Federal Express, UPS, Airborne Express and DHL, contrary to Title 18, United States Code, Section 1341, and (b) transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Conspiracy To Commit Money Laundering)

22. The allegations contained in paragraphs 1 through 19 of this Indictment are realleged and incorporated as though fully set forth in this paragraph.

23. In or about and between January 2007 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, did knowingly and intentionally conspire to: (1) conduct financial transactions affecting interstate and foreign commerce, to wit: the scheme profits transactions, which transactions in fact involved the proceeds of specified unlawful activity, to wit: mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and

1343, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, (a) with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i), and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and (2) engage in monetary transactions, in and affecting interstate and foreign commerce, to wit: the scheme profits transactions, in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit: mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, contrary to Title 18, United States Code, Section 1957.

(Title 18, United States Code, Sections 1956(h), 1956(a)(1), 1957(b), 1957(d)(1) and 3551 <u>et</u> <u>seq</u>.)

## COUNTS THREE THROUGH FIVE
(Mail Fraud)

24.  The allegations contained in paragraphs 1 through 19 of this Indictment are realleged and incorporated as though fully set forth in this paragraph.

12

25. In or about and between January 2007 and May 2010, both dates being approximate and inclusive, within the Southern District of New York with respect to Count Three and within the Eastern District of New York and elsewhere with respect to Counts Four and Five, the defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Insurance Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, did place, deposit and cause to be placed and deposited in a post office and authorized depository for mail matter, the following matter to be sent and delivered by the United States Postal Service and UPS, a commercial interstate carrier, as set forth below:

| COUNT | APPROXIMATE DATE | NATURE OF MAILING | ADDRESSEE |
|---|---|---|---|
| THREE | September 26, 2007 | Letter from CHAIM MAYER LEBOVITS to Company A, whose identity is known to the Grand Jury, enclosing a premium check for $400,000 and insurance documents | Company A Northwest Minot, North Dakota |

13

| COUNT | APPROXIMATE DATE | NATURE OF MAILING | ADDRESSEE |
|---|---|---|---|
| FOUR | February 25, 2008 | Commission check for $417,265.36 from Company B, whose identity is known to the Grand Jury | AVIGDOR GUTWEIN Brooklyn, New York |
| FIVE | January 27, 2010 | Check from MOSES NEUMAN to Straw Buyer A, whose identity is known to the Grand Jury | Straw Buyer A Huntington Valley, Pennsylvania |

(Title 18, United States Code, Sections 1341, 2 and 3551 et seq.)

                    COUNTS SIX THROUGH NINE
                         (Wire Fraud)

26. The allegations contained in paragraphs 1 through 19 of this Indictment are realleged and incorporated as though fully set forth in this paragraph.

27. In or about and between January 2007 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Insurance Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did

14

transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE |
|---|---|---|
| SIX | January 24, 2009 | Wire transfer from Company C, whose identity is known to the Grand Jury, to AVIGDOR GUTWEIN in the amount of $125,231 |
| SEVEN | June 26, 2009 | Wire transfer from Company D, whose identity is known to the Grand Jury, to The Bold Associates Inc. in the amount of $60,000 |
| EIGHT | August 5, 2009 | Email from MOSES NEUMAN to EDWARD GRODSKY concerning Straw Buyer B, whose identity is known to the Grand Jury |
| NINE | November 12, 2009 | Email from MOSES NEUMAN to YUDAH NEUMAN enclosing copies of premium payments and receipts concerning an insurance policy |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNTS TEN THROUGH THIRTEEN
(Money Laundering)

28. The allegations contained in paragraphs 1 through 19 of this Indictment are realleged and incorporated as though fully set forth in this paragraph.

29. On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants CHAIM MAYER LEBOVITS, AVIGDOR GUTWEIN, LEO FEKETE, MOSES NEUMAN, also

known as "Moishe," and YUDAH NEUMAN, also known as "Yeheedle" and "Lenny," together with others, did knowingly and intentionally conduct and attempt to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the scheme profits transactions identified below, which transactions in fact involved the proceeds of specified unlawful activity, to wit: mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, (1) with the intent to promote the carrying on of the specified unlawful activity, and (2) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity:

| COUNT | APPROXIMATE DATE | APPROXIMATE AMOUNT |
|---|---|---|
| TEN | May 30, 2008 | $181,035.00 |
| ELEVEN | January 27, 2009 | $131,726.38 |
| TWELVE | February 3, 2009 | $123,500.00 |
| THIRTEEN | April 8, 2009 | $55,000.00 |

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
(Counts One and Three through Nine)

30. The United States hereby gives notice to the defendants charged in Counts One and Three through Nine that, upon conviction of any such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including but not limited to the following, a sum of money equal to five hundred and fifty million dollars in United States currency ($550,000,000) for which the defendants are jointly and severally liable.

31. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
(Counts Two and Ten through Thirteen)

32. The United States hereby gives notice to the defendants charged in Counts Two and Ten through Thirteen that, upon conviction of any such offense, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 982, of all property involved in each offense of conviction in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offense, and all property traceable to such property as a result of the defendants' conviction of such offenses, including but not limited to, the following: a sum of money equal to five hundred and fifty million dollars in United States currency ($550,000,000) for which the defendants are jointly and severally liable.

33. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982, to seek forfeiture of any other

19

property of such defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982)

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK