**SPEARS & IMES** LLP

51 Madison Avenue
New York, NY 10010
tel 212-213-6996
fax 212-213-0849

David Spears
tel 212-213-6991
dspears@spearsimes.com

July 18, 2012

Honorable Steven M. Gold
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

United States v. Lebovits
CR 11-134 (SJ) (SMG)

Dear Chief Magistrate Judge Gold:

We are counsel for defendant Yudah Neuman in this proceeding. We respectfully submit this letter in response to (1) the government's letter to David Spears dated June 9, 2012, which the government made part of the record of this proceeding on the same date (Dkt. 97), and (2) the government's letter to Your Honor dated June 10, 2012 (Dkt. 98).

BACKGROUND

On October 14, 2011, we filed on behalf of Mr. Neuman a motion under Federal Rule of Criminal Procedure 17(c)(1) for an order to compel pretrial production of materials called for by trial subpoenas addressed to a number of life insurance companies at issue in this proceeding, with a memorandum of law and accompanying declaration. (Dkt. 63, 63-1, 63-2). In addition, in response to the government's opposition we filed a reply memorandum of law and accompanying declaration on May 18, 2012. (Dkt. 95, 95-1). In our reply papers we referred to two insured individuals at issue in this case – Chana Treitel and Louis Oberlander – as having been issued life insurance policies in the amounts of $5 million and $7 million, respectively, even though pre-issuance investigative reports commissioned by the company that issued the policies, ING, included a "HIGH RISK FRAUD ALERT" as to both individuals.

Following the filing of that reply, we wrote to the government noting some ambiguity in the documents relating to Ms. Treitel and Mr. Oberlander that were provided to the defense in discovery and asking the government to clarify the record as to whether the investigative reports had included a fraud alert. In the June 9, 2012 letter referred to above, the government responded to that request, denying that the investigative reports had included a fraud alert and stating that the numerous deficiencies identified by the investigative reports regarding the financial status of Ms. Treitel and Mr. Oberlander had been cured by detailed financial information provided subsequently by individuals associated with defendants in this case.

Honorable Steven M. Gold  Page 2
July 18, 2012

   While we appreciate the government's response, we believe that when it is considered together with other evidence in the case, it actually confirms the arguments made by Mr. Neuman in his motion and reply papers that the insurance companies – here, ING – were fully aware that they were receiving misstated financial information from applicants for the policies at issue in this case but issued the policies anyway because they did not care about the financial status of the applicants for those policies. That is, information relating to the financial status of the individual applicants at issue in this case was not material to the insurance companies in deciding whether to issue policies to those applicants. Accordingly, the information sought by Mr. Neuman in the Rule 17(c) subpoenas that are the subject of his motion is critical to his defense, and the Court should order the pretrial production of the information called for by the subpoenas.

ARGUMENT

  A.  The Insurance Companies Knew That Applicants Overstated
     Their Financial Status, But They Did Not Care About That Fact

   The government's June 9 letter, together with the discovery provided, shows the following about the issuance of the policies in question to Ms. Treitel and Mr. Oberlander: (1) through the most minimal inquiries, a pre-issuance investigation commissioned by the insurance company provided a report that cast doubt on the financial details included in the applications for Ms. Treitel and Mr. Oberlander; (2) the negative findings were reported to the insurance company in a written report; (3) the insurance company then sought further financial information from agents working with the applicants and was provided with summary and unsubstantiated representations about the financial status of the applicants that were consistent with the financial details in the applications but inconsistent with the negative findings in the investigative reports; and (4) the insurance company then issued the policies sought in the applications. From these facts, the government intends to argue at trial that the insurance company was misled into believing that (a) the investigative reports were wrong; and (b) the financial information provided on the applications and in the follow-up information provided by agents was accurate.

   However, other evidence provided by the government in discovery relating to the issuance by ING of a policy on an insured named Asher Blumenthal puts the lie to the government's theory that the insurance company was deceived. To the contrary, the evidence relating to Mr. Blumenthal – considered with the evidence relating to Ms. Treitel, Mr. Oberlander, and other insureds such as Arnold Cohen – shows that in fact the insurance company willingly, strategically, and consistently chose to ignore reliable information from a neutral third party demonstrating that the financial details set out in applications were false.

ING received an application on behalf of Mr. Blumenthal for a $10 million dollar policy, and that application stated that he had annual earned income of $650,000, annual unearned income of $1.8 million, and a net worth of $23 million. *See* Ex. A. On December 14, 2007, ING ordered an Amplified Life Inspection Report (the "Report") from an outside service called Exam One, *see* Ex. B at 1, and the Report was completed on December 21, 2007, *see id.* The Report informed ING of the following about Mr. Blumenthal's financial status: (1) his credit report showed "violations," *id.*; (2) he worked at a meat company called Bierig Brothers, where he supervised three employees in inspecting and labeling kosher meat for distribution to grocery stores, *see id.* at 2; (3) he also worked at, and was a part owner of, Vineland Kosher Poultry, where he performed the same work as at Bierig, *see id.*; (4) he earned $30,000 per year from Bierig and $11,700 per year from Vineland, for a total of $41,700, *see id.* at 8; and (5) he had a net worth of $23,000, *see id.*

Two months after receipt of the Report, Karen L. Grennan, Principal Life Underwriter at ING Life Underwriting, sent an email to John J. Ross and Peter Orenzoff regarding the application for a policy on Mr. Blumenthal. *See* Ex. C. Mr. Ross and Mr. Orenzoff are Sales Vice Presidents at ING Life Sales. *See* Ex. D. After reviewing certain unrelated internal business issues relating to the policy, Ms. Grennan turned to the subject of Mr. Blumenthal's financial status and stated:

> Also, so that you understand the need for solid 3rd party financials:
>
> His occupation listed on [the] app[lication] is Vice President. Income on [the] application = earned income of 650,000 and unearned income 1,800,000. NW on the application[] = 23,650,000[.]
>
> During inspection [by Exam One] he indicated that he supervises the kosher meat dept of a meat company. Income = 49,700 and NW is 23,000. Also is part owner of vineland kosher poultry and earns $225.00 weekly from that business. The credit report is more in-line with the finances provided during the inspection, and not those on the application[].
>
> 74 yr old with no prior insurance. Owner/bene is a trust.

Adjacent to Ms. Grennan's letter in the government's production relating to Mr. Blumenthal is a letter dated the next day, February 7, 2008, from an entity called "The Tax Experts," regarding Mr. Blumenthal's financial status. *See* Ex. E. It stated in full:

> Please be advised that the Blumenthal Family, has been my client for many years.

Honorable Steven M. Gold                                                                                      Page 4
July 18, 2012

> Mr. Blumenthal's financial information in a [sic] summary is as
> follows: His Net Real Estate Assets exceeds $23,000,000 (Twenty
> Three Million dollars)[.] This includes his interest in Beiring [sic]
> Brothers, Both Commercial and Residential real estate.
>
> Please feel free to contact me for any questions.

Several weeks later, ING issued the $10 million dollar policy that had been requested by Mr. Blumenthal.

Taken together, Ms. Grennan's email to the two Sales Vice Presidents, the next-day letter from The Tax Experts, and ING's decision to issue the policy on Mr. Blumenthal make an indisputable showing that ING fully understood Mr. Blumenthal's true financial status but was willing to rely on a grossly inadequate and unreliable form letter from an obscure source to provide a basis for a conclusion that Mr. Blumenthal had the enormous net worth set out in his application. Surely nothing could prove so convincingly that there was no fraud at all in connection with the issuance of the policies at issue in the case because accurate information about the applicants' net worth was not material – indeed, was completely irrelevant - to the insurance companies in deciding to issue the policies.

The Court should also know that in June 2012, the law firm Proskauer Rose filed a lawsuit on behalf of dozens of trusts, holding life insurance policies with a face amount of $466.9 million, against various Phoenix life insurance companies (Phoenix is another insurance company at issue in this case) alleging similar conduct by Phoenix in connection with the issuance of policies on the lives of elderly applicants. *See Wilmington Savings Fund Society, FSB v. PHL Variable Insurance Company*, CV 12-04926 (C.D. Cal.). Among other things, the complaint alleges that, "Defendants knowingly issued policies for 'resale' in the secondary market, and encouraged their sales force to seek out such business, to boost Defendants' short term profits, provide dividends for …shareholders, and enrich Defendants' management and sales force." Complaint ¶ 8. Evidence cited in the complaint indicates that Phoenix management encouraged employees to "crank out" this type of business and "bring it on," and stated "the more the merrier." *Id.* Phoenix managers "encouraged the solicitation of such business and taught employees how to find such business." *Id.* ¶ 9. This is further dramatic evidence that Mr. Neuman's defense regarding the lack of materiality of applicants' financial information is fact-based and deserving of the Court's intervention in the form of ordering the pretrial production of the information sought in the Rule 17(c) subpoenas presented to the Court.

  B. The Government Has Misstated the Applicable Law Regarding
    <u>The Legal Standard of Materiality Under the Wire Fraud Statute</u>

In its June 10, 2012 letter to the Court, the government egregiously misstates the law regarding the materiality standard under the wire fraud statute. Rather than taking this occasion to try to disentangle all of the strands of misconstruction proffered by the government, we simply

Honorable Steven M. Gold  Page 5
July 18, 2012

Honorable Steven M. Gold     Page 5
July 18, 2012

refer the Court to the cases we cited in our motion papers, such as *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) (a false statement can only be material if "it can or does result in some tangible harm"), and *United States v. Finazzo*, No. 10-CR-457 (RRM), 2011 WL 3794076, at *6 (E.D.N.Y. Aug. 24, 2011) ("A misrepresentation is material only if 'the information withheld either [has] some independent value of [] bear[s] on the ultimate value of the transaction").

## CONCLUSION

As demonstrated by Mr. Neuman in his motion dated October 14, 2011 and his reply papers dated May 18, 2012, the information sought by Mr. Neuman in Rule 17(c) subpoenas is critical to his defense. We urge the Court to order the pretrial production of the information called for by the subpoenas.

Respectfully,

*David Spears*/MS

David Spears

