UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

UNITED STATES OF AMERICA                        :
                                                :
            -against-                           :        MEMORANDUM
                                                :        & ORDER
CHAIM MAYER LEBOVITS,                            :        AND
AVIGDOR GUTWEIN,                                 :        REPORT &
LEO FEKETE,                                      :        RECOMMENDATION
MOSES NEUMAN                                     :        11-CR-134 (SJ)
YUDAH NEUMAN,                                    :
EDWARD GRODSKY,                                  :
                                                :
                        Defendants.             :
-------------------------------------------------------------------- x

GOLD, STEVEN M., U.S.M.J.:

        On February 22, 2011, defendants were charged in a thirteen-count indictment with

participating in fraudulent scheme involving life insurance policies and conducting related

money laundering transactions.  Docket Entry 1 ("Original Ind.").  Count One of the indictment

charges the defendants with conspiracy to commit mail and wire fraud in violation of 18 U.S.C.

§§ 1341 and 1343.  Count Two charges defendants with conspiracy to commit money laundering

in violation of 18 U.S.C. § 1956.  Counts Three through Nine charge substantive mail and wire

frauds, and counts Ten through Thirteen charge substantive money laundering offenses.  On July

9, 2012, the government filed a superseding indictment charging defendants with the same

crimes, but adding factual allegations about the insurance fraud.  Docket Entry 106 ("Ind.").

Although named in the original indictment, Edward Grodsky is not charged in the superseding

indictment, as he pled guilty before the superseding indictment was returned.

        The remaining defendants have filed a variety of motions.  Defendant Gutwein has

moved to suppress wire communications intercepted over his cell phone and to dismiss the

indictment, or in the alternative to strike paragraph eight of the original indictment, which is re-

alleged as paragraph seven in the superseding indictment.  Docket Entry 62.  Defendants

Gutwein and Moses Neuman have moved to suppress wire communications intercepted over

their telephones, and defendants Moses and Yudah Neuman have moved to suppress emails

seized from their accounts pursuant to search warrants.  Docket Entries 62, 64, 66.  Yudah

Neuman also moves for leave to issue subpoenas, and defendant Lebovits moves to compel the

government to provide a bill of particulars.  Docket Entries 63, 65.  Each defendant joins in his

co-defendants' motions.

       Senior United States District Judge Sterling Johnson has referred defendants' motions to

me.  Docket Entry 67.  I heard oral argument on the motions, Docket Entry 115, and reserved

decision and permitted the parties to submit additional briefing.  Having considered the

arguments of the parties, I now issue Orders with respect to the defendants' discovery motions

and make recommendations with respect to defendants' motions to suppress and to dismiss the

indictment, as provided by 28 U.S.C. § 636(b)(1)(a).

BACKGROUND

*A.  Facts*[1]

       The scheme charged in the indictment was allegedly perpetrated in large part through

Liberty Planning, Inc., an insurance agency located in Monsey, New York.  Defendant Lebovits

was the Vice-President and Managing General Agent of Liberty, defendant Gutwein was a

licensed insurance agent affiliated with Liberty, and defendant Fekete was married to a licensed

insurance agent affiliated with Liberty.  Ind. ¶¶ 1-3.  Defendant Grodsky, an accountant,

"encouraged some of his elderly clients and elderly clients of [others] to apply for life insurance

policies through Liberty."  Original Ind. ¶ 5.  Defendants Moses and Yudah Neuman controlled

---

[1] The facts set forth in the text are drawn from the superseding indictment as well as affidavits of Maria Albright, a Postal Inspector, and Sheldon Tang, a Special Agent of the Internal Revenue Service.

the bank accounts of several related companies, referred to in the indictment as the "Neuman Related Companies," and used funds from these bank accounts to pay premiums on fraudulently obtained life insurance policies and to make payments to the insureds named on those policies as partial compensation for their role in the conspiracy.[2]  Ind. ¶¶ 4, 15.

The indictment alleges that defendants "engaged in a scheme designed to fraudulently induce insurance companies . . . to issue policies with high death benefits to elderly insureds" and to "create false records and make false statements which were intended to lower the life expectancies of the elderly insureds in order to fraudulently inflate the resale prices that purchasers would be willing to pay for these policies on the secondary market for life insurance." Ind. ¶ 11.  The charged fraud involved finding elderly individuals of modest means and falsely claiming that these individuals had substantial net worth and income, sought life insurance policies for estate planning purposes, did not intend to resell the policies on the secondary market, and would pay the policy premiums with their own funds.  Ind. ¶ 12.  According to the indictment, these false statements induced insurance companies to issue policies that they otherwise would not, and to charge lower premiums for those policies than they otherwise would.  *Id.*

In one example, certain defendants conspired to submit an application to ING, an insurance company, on behalf of an elderly individual referred to by the government as CI-2. This individual had an annual income of approximately $36,000, but the policy application claimed a net worth of $17,400,000 and an annual income of $475,000.  Albright 1/11/10 Aff.

---

[2] The "Neuman Related Companies" include Adelphia Supplies Inc., Ador Mazal LLC, Brooklyn Life Group LLC, Choose US Inc., Fort Medical Supply Inc., N.S. BP Realty LLC, NS 43rd Street Realty LLC, One Touch Developers Inc., The Blue Rock Group LLC, and The Bold Associates Inc.  Ind. ¶ 4.

¶ 15.[3]  The application further stated that the individual had no plans to resell the policy and would pay the premiums out of his own funds.  *Id.*   In fact, the policy was procured with the intent of reselling it, the premiums were to be paid by others, and the named insured, in return for his participation in the alleged fraud, was to be paid a monthly sum and participate in the profits realized when the policy was sold.  *Id.*  Based on the application, ING issued a $10 million insurance policy on the life of CI-2.  Albright 2/5/10 Aff. ¶ 8, Docket Entry 66-8.  Both Liberty and the individual agent identified on any life insurance policy earned commissions based on the premiums paid to maintain the policies, and these commissions totaled, as a general rule, more than 95% of the premiums paid during the first year that a policy was in effect.  Albright 2/18/10 Aff. ¶ 36, Docket Entry 66-6.

The money laundering charges in the indictment allege that the defendants engaged in financial transactions designed to give insurance companies the false impression that insureds were paying the premiums on their own policies. Ind. ¶ 15.  Bank records indicate that Blue Rock Group, a Neuman Related Company, deposited funds into a bank account that paid the insurance premiums on CI-2's policy and made payments of $500 per month to CI-2.  Albright 1/11/10 Aff. ¶ 15.  Financial records also indicate that, during 2008 and 2009, defendant Gutwein transferred approximately $5.8 million from his personal accounts to Bold Associates, one of the "Neuman Related Companies."  Albright 2/18/10 Aff. ¶ 11, Docket Entry 66-6.  Bold Associates then "fund[ed] other companies, including the Blue Rock Group, which in turn fund[ed] the life insurance bank accounts of some of Liberty Planning's clients."  *Id.* ¶ 31.  Defendant Yudah Neuman controlled one of the bank accounts of Blue Rock Group.  *Id.*

---

[3] "Albright 1/11/10 Aff." refers to the affidavit of Postal Inspector Maria Albright dated January 11, 2010, Docket Entry 66-3.  Subsequent affidavits of Inspector Albright are referenced in a similar manner.

The United States Postal Inspection Service began investigating Liberty in the summer of 2009 after receiving a report detailing the results of an internal fraud investigation conducted by ING.  That investigation uncovered fifteen allegedly fraudulent insurance applications submitted by Liberty.  Albright 1/11/10 Aff. ¶¶ 11, 14.  In December, 2009, ING filed a civil suit seeking to rescind four of the insurance policies that Liberty had submitted to ING.  *Id.* ¶ 21.

B. *Wiretap and Search Warrant Applications*

On January 11, 2010, United States District Judge Sandra L. Townes issued an order authorizing the government to intercept wire communications to and from a mobile telephone used by defendant Moses Neuman (the "Neuman phone").  Docket Entry 82-4.  On February 18, 2010, Judge Townes renewed the Neuman phone order and authorized the government to intercept calls to and from a second mobile telephone used by defendant Gutwein (the "Gutwein phone").  On February 5, 2010, I issued search warrants for historical text messages sent to and from the Neuman phone and historical emails in an account used by defendant Grodsky.  Docket Entries 82-1, 82-3.  On April 30, 2010, the government obtained search warrants for a number of email accounts used by defendants Moses and Yudah Neuman.  Docket Entry 66-9.

In support of its original wiretap application, the government submitted the affidavit of Postal Inspector Albright dated January 10, 2010.  After reciting much of the factual background described above, Albright revealed that two of the fifteen insureds who were the subject of ING's internal investigation were confidential informants ("CI's") working with the government.  Albright 1/11/10 Aff. ¶ 14.

CI-1 told Albright that Fekete, a distant relative, had asked him about purchasing life insurance in March of 2008.  *Id.* ¶ 18.  Fekete told CI-1 that investors would pay the premiums and that CI-1 would make money along the way.  *Id.*  Fekete also told CI-1 that his financial

information would be inflated on the application.  *Id.*  An application submitted to ING by Liberty states that CI-1's net worth and income are $5,300,000 and $325,000, respectively.  *Id.* CI-1 reported that those numbers are grossly inflated.  *Id.*  Bank records demonstrate that, after ING issued a policy on the life of CI-1, the premiums were paid from an account opened by Fekete and over which CI-1 had no control.  *Id.*  Albright suggests in her affidavit that CI-1 is a reliable source because 1) he has no criminal record, 2) he is likely to enter into an agreement with the government to testify at any trial, 3) he volunteered information to the New York State Department of Insurance prior to any investigation into Liberty, and 4) his information is at least partly corroborated by bank records and other documents, as well by the statements of CI-2.  *Id.* ¶ 18 n.7.

CI-2 described a series of events similar to those reported by CI-1.  As recounted in Albright's affidavit, CI-2 told government agents that he was contacted by his accountant, CI-3, in late 2007, and that his accountant told him about a man named Grodsky who was looking for healthy elderly persons willing to have life insurance policies taken out in their names.  CI-2 was told that investors would pay the premiums on any policy obtained on his life and that he would receive monthly payments of $500 until the policy was resold in two years, when he would receive $2,000,000.  *Id.* ¶ 15.  Grodsky told CI-2 that his net worth would be inflated.  *Id.* Indeed, as described above, although CI-2 had an annual income of approximately $36,000, the Liberty application states that his net worth and income are $17,400,000 and $475,000, respectively.  *Id.*  Bank records confirm that Blue Rock Group, one of the "Neuman Related Compaines," funded CI-2's life insurance trust bank account and paid CI-2 $500 per month for five months.  *Id.*

CI-2 also reported that "Moishe" and "Lenny," later identified as defendants Moses and Yudah Neuman, respectively, visited CI-2 and spoke to him by telephone in the summer of 2009. *Id.* ¶¶ 16, 17.  The Neumans told CI-2 that they were associates of Grodsky and that they wanted to resell his life insurance policy.  *Id.*  They explained to CI-2 that they could sell the policy for more money if CI-2 appeared unhealthy, and specifically suggested that CI-2 complain to his doctor that he suffered from symptoms related to transient ischemic attacks ("TIAs").  *Id.* ¶ 17. The Neumans went so far as to provide CI-2 with a list of TIA symptoms, and Yudah Neuman offered to prepare strong coffee for CI-2 to drink before his doctor's visit to create the impression of high blood pressure.  *Id.*  Albright suggests that CI-2 and CI-3 are reliable sources because 1) they do not have criminal records, 2) they are likely to enter into agreements with the government to testify at any trial, and 3) their information is at least partly corroborated by bank records and other documents, as well as by each other's statements.  *Id.* ¶ 15 n.5.  Although both initially made false statements about their involvement in the insurance fraud, each subsequently corrected his statements.  *Id.*

CI-2 called Moses Neuman on the Neuman phone in October, November, and December of 2009.  *Id.* ¶¶ 19, 21.  The calls were monitored by Inspector Albright with CI-2's consent.  *Id.* ¶ 19.  In their first telephone conversation, CI-2 and Moses Neuman discussed CI-2's recent doctor visit, and Neuman, in a "disappointed tone," stated that CI-2's medical records of the visit did not indicate that he currently suffered from TIAs and that "this result was not good enough." *Id.* ¶ 19.  Neuman agreed to pay CI-2's doctor bills and promised to send CI-2 a $500 payment soon.  *Id.*  Neuman and CI-2 also discussed the resale of the policy on CI-2's life.  Neuman indicated that there would probably be less profit than originally promised.  *Id.*  In a subsequent telephone call, Neuman and CI-2 again discussed the $500 monthly payments, Neuman

acknowledged that Grodsky had promised CI-2 that he would earn a profit of $2 million when the life insurance policy was sold, and Neuman explained that the reason for complaining of symptoms to a doctor was to increase the resale value of the policy.  *Id.* ¶ 20.  Moses Neuman and CI-2 had further conversations about the resale of the ING policy and the monthly payments of $500 in December of 2009.[4]  *Id.* ¶¶ 21, 22.

Albright further stated in her supporting affidavit that a review of pen register records for an approximately two-month period ending on December 30, 2009 revealed that the Neuman phone had approximately 465 contacts with telephone numbers believed to be used by persons associated with the insurance fraud scheme, including more than 150 contacts with Grodsky's phones and more than 50 contacts each with phones used by Gutwein and Lebovits.[5]  *Id.* ¶¶ 23-24, 27, 30.  Finally, Albright indicated in her affidavit that other investigative techniques, such as the use of confidential informants and pen registers, had been tried, and that other investigative tools such as surveillance were unlikely to yield evidence of the fraud.  *Id.* ¶¶ 33-48.

The government's application to continue intercepting calls made to and from the Neuman phone, and to intercept calls to and from the Gutwein phone, was supported by a second affidavit of Albright dated February 18, 2010.  In this affidavit, Albright reported that two additional insurance companies had terminated their relationship with Gutwein due to concerns that he was involved in the submission of fraudulent policies.  Albright 2/18/10 Aff. ¶ 12.  Albright further stated that the government had, since January 20, or over the course of less than a month, intercepted approximately 123 telephone calls over the Neuman phone related to the fraudulent life insurance scheme.  *Id.* ¶ 13.  In some of those calls, Neuman and others discussed

---

[4] Albright also reports that she listened to voicemail messages left for CI-2 and CI-3 by Moses Neuman and Grodsky in mid-December, 2009.  Albright 1/11/10 Aff. ¶ 21.
[5] Approximately 49 contacts were with a phone registered to Melissa Goldberger Neuman, Moses' wife.  Albright Aff. ¶ 25.

a blackmail threat made by the ex-wife of Arnold Cohen, one of the fifteen insureds, and considered whether to pay her $10,000 in return for her agreement not to report their fraud to "the authorities." *Id.* ¶ 14.

Albright explained in her affidavit that the resale of the insurance policies in the secondary market was an important aspect of the defendants' scheme, and reported that the government intercepted conversations about the resale of policies over the Neuman phone. *Id.* ¶¶ 15, 17. The government also intercepted communications between the defendants about the lawsuit instituted by ING when it uncovered the fraud; in February of 2010, Moses Neuman spoke with Grodsky about paying the attorney's fees for an insured who was being sued by ING to rescind a policy. *Id.* ¶ 18. In addition, the government offered evidence that Moses Neuman sent and received text messages on his telephone concerning the fraud. *Id.* ¶¶ 23, 26, 27.

In support of the government's application to intercept calls made to and from the Gutwein phone, Albright described an intercepted call made to the Neuman phone by Gutwein, during which the two defendants discussed splitting profits with Lebovits from the resale of two life insurance policies. *Id.* ¶¶ 35-36. In addition, Albright reported that toll records from January 11 through February 5, 2010 reflected approximately 105 calls over the Gutwein phone made to or received from persons connected to the fraud, including 26 with Moses Neuman. *Id.* ¶¶ 37, 38.[6]

Finally, on April 30, 2010, the government sought warrants to search five electronic mail accounts used by defendants Moses and Yudah Neuman. In support of its application, the government submitted an affidavit of Sheldon Tang ("Tang Aff."), a Special Agent of the Internal Revenue Service. Docket Entry 64-3. The Tang affidavit included many of the same

---

[6] On March 19, 2010, Judge Townes renewed the authorization for the wiretap of the Moses Neuman and Gutwein telephones. Docket Entry 82-6.

background facts recounted in the Albright affidavits.  In addition, the Tang affidavit described

evidence seized pursuant to an earlier search warrant for an electronic mail account used by

Edward Grodsky.[7]  Tang Aff. ¶ 17 *et seq.*  The Grodsky account included emails sent to and

received from the five Moses and Yudah Neuman accounts in which the defendants discussed

apparently fraudulent life insurance policy applications and premium payments made with

respect to those policies.  *Id.* ¶¶ 19-21.

DISCUSSION

A.  *Gutwein's Motion To Dismiss, or in the Alternative, To Strike Paragraph Eight*

Defendant Gutwein seeks dismissal of the indictment pursuant to Federal Rule of

Criminal Procedure 12(b) or, in the alternative, to strike paragraph eight of the original

indictment.  Paragraph eight states: "Under New York State law, only an insured or a <u>bona fide</u>

owner such as a close relative could purchase an insurance policy on an insured's life.  At a later

time, however, an insured or owner could sell the policy to anyone."  Ind. ¶ 8.[8]

Gutwein contends that the paragraph misstates the law because, upon certification of the

question by the Second Circuit, the New York Court of Appeals held that "New York law

permits a person to procure an insurance policy on his or her own life and immediately transfer it

to one without an insurable interest in that life, even where the policy was obtained for just such

a purpose."  *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 545 (2010).  *See* Gutwein Mem. at

---

[7] On February 5, 2010, I signed a warrant authorizing a search of an electronic mail account used by Grodsky. Docket Entry 82-2.  As noted above, Grodsky has entered a plea of guilty and has not moved to suppress the fruits of this warrant.

[8] As indicated above, a superseding indictment was returned after defendants filed the pending motions.  The text of paragraph eight of the original indictment is repeated in paragraph seven of the superseding indictment.

7; Gutwein Reply at 1.[9]  The government responds that the challenged paragraph of the indictment correctly states the law and is not inconsistent with *Kramer*.  Gov't Mem. at 51-52.[10]

The language of the indictment does not literally misstate *Kramer*'s holding.  *Kramer* held, and the indictment states, that a life insurance policy may be obtained only by either an insured or a person with an insurable interest in the insured's life.[11]  Moreover, *Kramer*'s holding that New York law permits a subsequent transfer of the policy is acknowledged by the indictment as well; as noted above, the indictment states that an insured may sell his or her life insurance policy to anyone after purchasing it.  Nevertheless, Gutwein is correct that the language of the indictment could be read to suggest that New York law would prohibits the following: arranging with an investor without an insurable interest to procure a life insurance policy with the intent of immediately transferring the policy to such investor.  *Kramer*, by contrast, held that such arrangements were *not* prohibited by New York Insurance Law § 3205(b).[12]

The relief that Gutwein seeks, though, is unwarranted.  The indictment should not be dismissed, and the challenged paragraph should not be stricken (at least not at this time), for at least two reasons.  First, as discussed above, the indictment's description of New York law is not literally incorrect.  Second, the gravamen of the fraud charged by the grand jury goes far beyond, and does not depend upon, the involvement of investors who are strangers to proposed insureds.  Rather, as discussed above and as described in the indictment, the gist of the charged fraud

---

[9] "Gutwein Mem." refers to the memorandum of defendant Gutwein in support of his pre-trial motions, Docket Entry 62-5.  "Gutwein Reply" here refers to his reply to the Government's opposition, Docket Entry 92.
[10] "Gov't Mem." refers to the Government's memorandum in opposition to the defendants' various motions, Docket Entry 82.
[11] An "insurable interest" is a term defined by statute and refers generally to a close relative or a person with a substantial economic interest in the continued life of the insured.  N.Y. Ins. Law § 3205(a)(1).
[12] In 2009, the New York State legislature enacted a statute prohibiting the acquisition of stranger owned life insurance policies.  *Kramer*, 15 N.Y.3d at 549 n.5.  The effective date of the prohibition was May 18, 2010, *id.*, after the time period relevant to the indictment.

involves false statements inflating the income and wealth of proposed insureds, representing that proposed insureds intended to pay their policy premiums themselves, and failing to disclose that proposed insureds intended to transfer their policies to investors and expected to be paid for allowing investors to obtain policies on their lives.  Ind. ¶ 12.  In other words, the indictment does not allege that the policies were fraudulently obtained because they were procured by investors; the indictment alleges that the policies were fraudulently obtained because the applications falsely asserted, among other facts, that there were no investors.  Accordingly, defendant Gutwein has not met his heavy burden of establishing that an incorrect statement of law "'substantially influenced the grand jury's decision to indict,' or [that] there is 'grave doubt' that the decision to indict was free from the substantial influence" of any incorrect statement of the law.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)); *see also United States v. Gall*, 1998 WL 387709, at *3 (D. Conn. Apr. 8, 1998) (holding that, even if defendant's claim that the indictment misstated underlying state law was correct, dismissal of the indictment was unwarranted because any misstatement of law did not concern "an essential element of the substantive crimes charged" in the indictment).  Finally, if it is ultimately determined that the challenged paragraph does misstate the law, the misstatement may be corrected when the jury is charged, and the inaccurate paragraph may be redacted from any copy of the indictment provided to the jury at that time.  *See United States v. Jacques Dessange, Inc.*, 2000 WL 280050, at *3 (S.D.N.Y. Mar. 14, 2000).

Gutwein seeks dismissal of the indictment on a second ground as well.  Gutwein argues that the indictment fails to allege a scheme subject to prosecution under the mail and wire fraud statutes because the fraud it alleges did not concern "an essential element of the bargain."  Gutwein Reply Mem. at 5, quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  As

the Court explained in *Shellef*, misrepresentations by defendants "that do no more than cause their victims to enter into transactions they would otherwise avoid" do not, without more, violate the mail or wire fraud statutes.  *Shellef*, 507 F.3d at 108.  Thus, if the government's proof at trial establishes only that insurance companies would prefer not to issue large, multi-million dollar life insurance policies to lower middle class individuals who plan to sell those policies immediately after obtaining them and have no intention of paying the premiums on the policies themselves, and that the reasons for this preference on the part of insurance companies *have nothing to do with* the risks and rewards, profits and losses, or other terms of the bargain made when an insurer issues a life insurance policy, defendants may well be in a position to make a compelling motion for a judgment of acquittal at the close of the prosecution's case.  At this stage of the case, however, the only question for the Court is whether the indictment, assuming all of its allegations to be true, properly states an offense.  *United States v. Goldberg*, 756 F.2d. 949, 950 (2d Cir. 1985); *United States v. Caronia*, 576 F. Supp. 2d 385, 390-91 (E.D.N.Y. 2008). The indictment in this case alleges that the false statements made by defendants "induced the Insurance Companies to issue the policies and to charge lower premiums than would otherwise apply."  Original Ind. ¶ 13; Superseding Ind. ¶ 12.  The amount of the premium charged in return for providing coverage is, of course, the essence of a bargain with an insurance company.  Thus, accepting the indictment's allegations as true, it properly and sufficiently charges the offenses of mail and wire fraud.

For all these reasons, I find no basis to strike paragraph eight or to dismiss the indictment and thus recommend that Gutwein's motion be denied.

B. *Motions To Suppress Communications Intercepted Over the Gutwein and Moses Neuman Phones*

Defendants Moses Neuman and Avigdor Gutwein move to suppress all evidence derived from the electronic surveillance conducted by the government. The grounds for suppression raised by these defendants include the following: a) wiretap interceptions are not authorized for investigations of insurance fraud, b) the government's application for a wiretap order was not supported by probable cause, c) the affidavits submitted by the government contained false or misleading statements and omissions, d) the government failed to establish that using wiretaps was necessary to its investigation, and e) the government failed to minimize its interceptions properly.

A court considering a motion to suppress intercepted wire communications must "grant considerable deference to the district court's decision whether to allow a wiretap, ensuring only that the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (internal quotation marks omitted). If the issuing judge's decision to authorize the wiretap had a "substantial basis," suppression should be denied. *United States v. Rajaratnam*, 2010 WL 4867402, at *7 (S.D.N.Y. Nov. 24, 2010). "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause." *Id.*

1. *Authorized Offenses*

Defendant Gutwein contends that the statute authorizing interception of communications may not be invoked in furtherance of an investigation of insurance fraud. Gutwein Mem. 8-11. Gutwein correctly points out that Title III limits the availability of wiretaps to investigations of certain specified offenses, and that insurance fraud is not one of them. *See* 18 U.S.C. § 2516. However, mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, and money laundering, 18 U.S.C.

§ 1956, are specifically enumerated in § 2516, and those are the offenses for which the government sought the wiretap authorization orders at issue here.  Accordingly, I recommend that this first basis for suppression be rejected.

### 2. *Probable Cause*

Defendants Moses Neuman and Gutwein contend that the facts asserted in the government's applications for wiretap authorization did not give rise to probable cause.  More specifically, these defendants contend that the facts alleged by the government failed to establish the materiality of any false statements defendants may have made, or that intercepting communications held over their phones would yield any evidence of fraud.

### a. *Materiality*

The first prong of defendants' probable cause argument rests upon the contention that any false statements allegedly made when applying for life insurance policies were not material. Gutwein Mem. 13-18.  Although the government need not prove justifiable reliance or damages to establish a case of mail or wire fraud, materiality is an element of both.  *Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Graham*, 2012 WL 1506027, at *4 (2d Cir. May 1, 2012) (quoting *Neder*, 527 U.S. at 24-25).  Generally, a fact is material if a "reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," or if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important to determining his course of action, although a reasonable man would not so regard it."  *Neder*, 527 U.S. at 22 n.5.

Evaluating whether probable cause has been established requires a court to make a "practical, common sense decision" about whether the totality of the circumstances described in a supporting affidavit establish a "fair probability" that evidence of crime will be obtained if the

application to intercept wire communications is granted.  *Rajaratnam*, 2010 WL 4867402, at *6.

When making this determination, a court should consider all of the allegations in the supporting

affidavit together, and not in isolation.  *Id.*

Viewed in this light, the facts set forth in the government's supporting affidavits,

recounted above, clearly established probable cause to believe the false statements attributed to

defendants were material.  Of particular relevance here, the affidavits state that the insurance

companies would not have issued policies to the insureds proposed by defendants if they had

known that the net worth of those proposed insureds had been inflated, that investors rather than

the proposed insureds would be paying the premiums, and that defendants intended to resell the

policies in the open market.  Albright Aff. 1/11/10 ¶¶ 12, 14 n.3, 18 n.9.  Although Gutwein

characterizes these statements as conclusory, Gutwein Mem. 14, I disagree; Albright appears to

be reporting information she learned from insurance companies, and indeed the government has

represented that to be the case, Gov't Mem. at 54.[13]

Moreover, Albright's assertion that the defendants' false statements were material to the

insurance companies is corroborated by several other facts set forth in her affidavits.  First,

Albright points out that ING, one of the insurance companies targeted by defendants, began an

internal investigation of "a large number of multi-million dollar life insurance policies that the

company believed Liberty Planning had fraudulently induced it to issue."  Albright Aff. 1/11/10

¶ 11.  Second, as a result of its investigation, ING terminated its relationship with five Liberty

Planning agents responsible for submitting some of the fraudulent applications.  *Id.* ¶ 14.  Third,

ING filed a civil lawsuit seeking to rescind some of the policies it issued in response to

applications submitted by Liberty Planning, *id.* ¶ 21, thus at least implicitly asserting that it was

---

[13] In support of its opposition to defendants' motions, the government has submitted an internal memorandum issued
by ING's president in 2005.  The memorandum is entitled "The ING Companies Will Not Issue Life Insurance
Policies Intended to be Resold in the Secondary Market."  *See* Docket Entry 82-14.

induced to issue policies by fraud and opening itself to the broad discovery available in civil litigation with respect to that assertion.  Fourth, defendants agreed to pay proposed insureds substantial amounts of money for their participation in the scheme.  *Id.* ¶¶ 14, 18.  If defendants believed the applications were legitimate and posed no risk, they would have had no reason to offer persons of modest means any compensation – much less millions of dollars – in return for agreeing to have an application made in their name.  Finally, the materiality of the false statements is corroborated by the very fact that defendants made them; defendants, experienced in the life insurance industry, would have had no reason to falsify facts if they could have accomplished the same results by being truthful.

Relying in part on a treatise excerpt, Gutwein argues that a false statement about the earnings of a proposed insured applying for life insurance is immaterial "where the indemnity provided by the policy [is] a fixed sum."  Gutwein Mem. at 14, quoting 3 Am. Jur. 3rd *Proof of Facts* 367.  There are several reasons why the quoted excerpt offers defendants no support.  First, as discussed above, the scheme described by the government involved making false statements not only about the income of the proposed insureds but also about their wealth, whether they would pay their own premiums, and whether they would retain their policies or transfer them to investors immediately upon issuance.  Second, when read in context, it is clear that the treatise excerpt quoted by Gutwein concerns the responsibility of an insurance company to pay the benefit on a policy it issued, whereas the question presented here is, more narrowly and distinctly, whether there was probable cause to believe that the false statements allegedly made by defendants were material to the insurance companies' decisions on whether to issue the policies in the first place or how high the premiums on such policies would be.

For all these reasons, the facts set forth in the Albright affidavits established probable cause to believe that the false statements made in furtherance of defendants' scheme were material.  Therefore, this ground for suppression should be rejected.

### b.  Staleness

Moses Neuman and Gutwein next argue that the evidence of criminality set forth in the Albright affidavits was too stale to support the government's wiretap applications.  The challenged orders authorized the government to intercept wire communications held over the Moses Neuman phone for thirty days beginning on January 11, 2010, and over the Neuman and Gutwein phones for an additional sixty days beginning on February 18, 2010.  Docket Entries 82-4, 82-5, 82-6.  Defendants Moses Neuman and Gutwein contend that the evidence in support of the government's wiretap applications was stale because defendants applied for the life insurance policies at issue in this case many months before the government applied for wiretap authorization.

Whether the government's probable cause showing was stale is properly measured not by when the life insurance policy applications were made, but by whether there was probable cause to believe evidence of criminality would be discovered during the time period over which the government sought to intercept communications.  *See, e.g.*, 18 U.S.C. § 2518(3) (providing that interceptions may be authorized when there is probable cause to believe that an individual "is committing, *has committed,* or is about to commit a particular offense," and that "communications concerning that offense will be obtained through such interception") (emphasis added); *see also United States v. Zoernack*, 2005 WL 1837962, at *2 (S.D.N.Y. Aug. 6, 2005) (stating that "the question is whether the information in the affidavit is sufficient to establish a 'fair probability' that evidence of criminal activity would be found at a particular place" and that

the "age of the information is relevant only in so far as it affects the likelihood that evidence will be found at the premises").  Moreover, where, as here, "a supporting affidavit presents 'a picture of continuing conduct as opposed to an isolated instance of wrongdoing[,] . . .  the passage of time between the last described act and the presentation of the application become[s] less significant.'"  *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir. 1999); *see also United States v. Singh*, 390 F.3d 168, 181-82 (2d Cir. 2004) (finding that a lapse of twenty months between the informant's last employment with defendant and the affidavit did not render the information stale where the information provided by the informant suggested that the health care fraud was ongoing and of a long-term nature); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) (finding that an eighteen-month delay from the informant's statement to the wiretap application was not stale in a narcotics conspiracy).

Evaluated by this standard, it is clear that the wiretap applications were not stale.  The showing made by the government in support of the its first application included the content of consensually monitored calls between Moses Neuman and confidential informants which took place only a short time before the application was made.  For example, the first Albright affidavit describes conversations between Moses Neuman and CI-2 in which they discussed the $500 per month promised to CI-2, as well as the results of a doctor's visit that was expected to result in a report indicating that CI-2 was suffering from TIAs.  Albright Aff. 1/11/10 ¶ 19.  These calls took place in late October and early November of 2009, or only a little more than two months before the first authorized interceptions.  Subsequently, Moses Neuman and CI-2 spoke again, at which time they discussed the monthly payments promised to the insureds, the expectation that the payments would be made by investors, and ongoing efforts to resell the insurance policy on CI-2's life.  *Id.* ¶¶ 21-22.  This call took place on December 22, 2009, *id.*, or only about four

weeks before the first interceptions were authorized.  These conversations not only indicated that the Moses Neuman telephone was being used to conduct relevant communications in the period shortly before the government applied for wiretap authority, but also, more generally, that defendants' scheme was ongoing.  *See, e.g.*, *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (noting that "[c]onspiracy is generally a continuing crime" that "is not complete until the purposes of the conspiracy have been accomplished or abandoned" (internal citations omitted)). Thus, the first Albright affidavit established more than sufficient probable cause to believe that discussions about the scheme under investigation were likely to be intercepted during the thirty days beginning on January 18, 2010.

The government's subsequent application was similarly well supported.  Not surprisingly, the Albright affidavit in support of this second application drew heavily on the results of the wiretap on the Neuman phone during January and February of 2010.  The calls intercepted pursuant to that wiretap included discussions about a blackmail threat made by an insured's former wife who demanded money in return for not reporting defendants to law enforcement, Albright 2/18/10 Aff. ¶ 14, as well as plans to "do" more policies, *id.* ¶ 16, commitments not to "cooperate against [defendant] Gutwein," *id.*, and attempts to obtain medical records that would support the anticipated resale of an existing policy, *id.* ¶ 17.  With respect to the Gutwein phone, the Albright affidavit described two calls, both made in late January of 2010, during which the division of profits from the resale of life insurance policies was discussed.  *Id.* ¶¶ 35-36.

In short, the government supplied ample evidence that the scheme under investigation was being discussed over the Moses Neuman and Gutwein phones during the weeks leading up to the government's wiretap applications, and further, that the scheme was ongoing. Accordingly, defendants' staleness arguments should be rejected.

### c. *Franks Hearing*

Defendants Gutwein and Moses Neuman challenge the veracity of the Albright affidavits and contend that they are entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (a "*Franks* hearing").  The Supreme Court held in *Franks* that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held.

438 U.S. at 155-56.  *Franks* applies to materially misleading omissions as well as affirmative misrepresentations.  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987).

"The *Franks* standard is a high one."  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).  A "presumption of validity typically attaches to a law enforcement affidavit." *United States v. Sessa*, 2011 WL 256330, at *34 (E.D.N.Y. Jan. 25, 2011) (citing *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008)).  Thus, a defendant seeking a hearing to challenge the veracity of a law enforcement officer's affidavit must make a "substantial preliminary showing that the government recklessly or knowingly made a misstatement or omission."  *United States v. Rajaratnam*, 2010 WL 3219333, at *1 (S.D.N.Y. Aug. 12, 2010).  The defendant's allegations of falsehood "must be more than conclusory and must be supported by more than a mere desire to cross-examine;" rather, a defendant's contentions "must be accompanied by an offer of proof," such as "[a]ffidavits or sworn or otherwise reliable statements of witnesses," unless "their absence [is] satisfactorily explained."  *Franks*, 438 U.S. at 171.

Moreover, even a defendant who establishes that a law enforcement officer's affidavit contains material misrepresentations or omissions is not necessarily entitled to relief.  "If, after setting aside the allegedly misleading statements or omissions, the affidavit nonetheless presents

sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing." *United States v. Hill*, 2012 WL 1014757, at \*6 (W.D.N.Y. Mar. 16, 2012); *see also Franks*, 438 U.S. at 156 (noting that "the search warrant must be voided and the fruits of the search excluded" only if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause").

Defendants Moses Neuman and Gutwein challenge the Albright affidavits for inaccurately suggesting that it was illegal for an insured to acquire a life insurance policy with the intention of immediately transferring it to a stranger. This contention is discussed in detail above in connection with defendant Gutweins' motion to dismiss the indictment. In short, the fraud described in the Albright affidavits went far beyond the purchase of policies with the intent to transfer them to strangers; instead, there was ample evidence of the materiality of the false statements defendants made to insurance companies.

Moses Neuman makes a series of additional arguments that may be addressed briefly. First, Neuman contends that the original Albright affidavit creates the false impression that he was a principal or agent of Liberty Planning. M. Neuman Mem. at 7. I discern nothing in the Albright affidavit that creates this impression. To the contrary, the Albright affidavit explicitly states that defendant Gutwein was the Liberty agent on several fraudulent insurance applications, while it describes Moses Neuman only in terms of his signatory authority over various bank accounts. Albright Aff. 1/11/10 ¶¶ 13, 15; *id.* at 13 n.6. Thus, the most logical inference to draw from the affidavit is that Neuman was *not* associated with Liberty. To the extent Moses Neuman argues that the affidavit misleadingly suggests that he participated in submitting fraudulent insurance policy applications, I again see no statements in the Albright affidavits that make that suggestion. In any event, whether or not Moses Neuman was involved in submitting fraudulent

insurance applications, or even whether or not he was involved in criminal conduct, was of only secondary relevance to the government's wiretap application; the primary question was whether evidence of criminal conduct would be derived by intercepting communications held over his phone. *See, e.g.*, *United States v. Ambrosio*, 898 F. Supp. 177, 184 (S.D.N.Y. 1995) (reasoning that "even if the government did not have probable cause to suspect [the defendant] of criminal activity," it could have intercepted his calls "as long as the communications were likely to contain evidence of the criminal activity that was being investigated").

Moses Neuman also asserts that the Albright affidavit misleadingly suggests that defendants were continuing to submit false insurance applications at the time the government applied for wiretap authorization. M. Neuman Mem. at 7. Again, I see nothing in the Albright affidavit that is in any way misleading in this regard. The Albright affidavit does not suggest that the life insurance applications at issue had been recently submitted; to the contrary, it describes 1) an internal investigation completed by ING no later than the summer of 2009 that concerns at least some of those applications, and 2) a lawsuit filed by ING based on the results of that investigation. Albright Aff. 1/11.10 ¶¶ 14, 21. The Albright Affidavit also states that CI-2 and CI-1 were approached about applying for life insurance policies in late 2007 and in or around March 2008, respectively. *Id.* ¶¶ 15, 18. These facts strongly suggest to the reader that the applications at issue were submitted some time ago.

Neuman's final contention in this regard is that the Albright affidavit falsely alleges that he encouraged CI-2 to "fake" TIA symptoms. Neuman claims this allegation was false because CI-2 told Neuman that he in fact *did* suffer from vertigo and TIA. Neuman Mem. at 12. Given that they did not know each other apart from Grodsky's introduction, the mere fact that Neuman was engaged in discussions with CI-2 about his health would be strong probable cause of

Neuman's involvement in the scheme to acquire policies by fraud and then resell them, even if the fraud did not include exaggerating the health problems of the insureds.  In any event, the transcript relied on by Neuman in connection with this argument reflects only a self-serving statement by Neuman suggesting that he believed CI-2 suffered from TIA and vertigo, and an acknowledgement by CI-2 that he told Neuman that he suffered from "a little vertigo about 2 years ago."  Declaration of Susan R. Necheles, Esq., Docket Entry 66, Ex B.  Nothing in the transcript indicates that CI-2 ever told Neuman that he had TIA symptoms.  In fact, in the same conversation relied upon by Neuman, CI-2 said to him, "you're asking me as though you think this TIA was real.  They were all made up.  I had nothing to do with the TIA.  You know that . . . ."  *Id.*  CI-2's allegation, moreover, was corroborated by a list of TIA symptoms that was given to him by Yudah Neuman in Moses Neuman's presence and that CI-2 later gave to Inspector Albright.  Thus, the statements in paragraph seventeen of the original Albright affidavit, recounting CI-2's allegation that Moses and Yudah Neuman instructed him to complain to his doctor about TIA-like symptoms, were not inconsistent with the statements made by CI-2 in the consensually monitored calls relied on by Neuman in support of his motion, nor were they otherwise misleading.

Finally, defendant Gutwein points to evidence, not disclosed in any of the Albright affidavits, indicating that ING was alerted to a high risk of fraud in connection with the financial information concerning one of the proposed insureds, but still issued a policy on his life in any event.  Gutwein Mem. at 15.  If Gutwein is correct, this was a significant omission.[14]  However, when the remaining facts recounted in the affidavit are taken into account, and even when they

---

[14] The government contends that the fraud alert had to do with the insured's social security number and not his finances and, in any event, never came to the attention of the underwriter who approved the issuance of the policy. Gov't Mem. at 77.

are considered in light of this omission, it is clear that they present "sufficient information to support a finding of probable cause."

For all these reasons, I conclude that defendants have failed to establish that a *Franks* hearing is warranted.

### 3. Necessity

Moses Neuman and Gutwein next argue that the government failed to establish that wiretaps, as opposed to ordinary investigative techniques, were necessary to its investigation.[15] Gutwein Mem. at 19-26. Defendants face a heavy burden in establishing that intercepted communications should be suppressed due to a lack of showing of necessity.

A court may authorize a wiretap if it finds that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). However, the government is not required to demonstrate that it would be completely impossible to continue its investigation without resort to wiretaps. Rather, as stated by the Second Circuit,

> the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance. [T]he statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision envisions is that the showing be tested in a practical and commonsense fashion.

*United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (alteration in original and internal citations and quotation marks omitted).

---

[15] Gutwein challenges many of the statements concerning alternative techniques in the Albright Affidavit in support of the January wiretap, which Gutwein lacks standing to challenge. I nevertheless review the showing of necessity in the original Albright affidavit both because Moses Neuman joins in Gutwein's motion, M. Neuman Mem. at 30, Docket Entry 66-1, and because many of the statements concerning alternative techniques in the January Albright Affidavit are repeated in the February Albright Affidavit.

Here, at the time it sought its first wiretap, the investigative methods that had already been employed by the government included pen registers, confidential informants, consensually recorded calls, and review of financial records.  Still, the government had not uncovered all of the details of the scheme.  The government's confidential informants, moreover, were two proposed insureds and an accountant for one of the proposed insureds.  These informants were at the periphery of the charged scheme, and were not in a position to identify policies other than their own that were obtained by fraud, or necessarily to identify the individuals who conceived of the scheme and managed its execution.  Thus, for example, while it appears that defendant Lebovits played a central role in the scheme, *see* Albright Aff. 2/18/10 ¶¶ 27, 35, there does not appear to have been any contact between Lebovits and any of the government's confidential informants.

For similar reasons, making use of undercover agents would likely have had only a marginal impact on the investigation; while it seems reasonable to think that CI-3 might have introduced the defendants to an undercover agent playing the role of a proposed insured, it is hard to envision a scenario in which an officer in an undercover role would be welcomed into the inner circle of the charged conspiracy.  It was, therefore, reasonable for Albright to conclude that "an undercover agent [would] not penetrate very far into the organization."  Albright 1/11/10 Aff. ¶ 36.

Finally, while examining financial records is typically useful in an investigation like the one conducted here, doing so generally will not reveal the full scope of the conspiracy, particularly where both legitimate and fraudulent transactions are conducted by the same entities. Moreover, according to the government, the defendants in this case conducted transactions through a number of entities and, as a result, created a confusing money trail.  Finally, even if

financial records might have revealed the identities of insureds receiving payments from defendants, it is far from clear that those insureds – if they could be found – would agree to cooperate and offer information about who solicited their participation in the scheme.

These circumstances are sufficient to make the showing of necessity required by the wiretap statute. *See United States v. Jimenez*, 2011 WL 308401, at *2 (S.D.N.Y. Jan. 28, 2011) (finding authorization of wiretapping proper where, although using informants and conducting surveillance had been productive, these techniques would not lead to discovery of all members of the conspiracy under investigation); *United States v. Im*, 2009 WL 2191231, at *7-8 (S.D.N.Y. July 17, 2009) (finding similar circumstances sufficient); *see also United States v. Barnes*, 411 Fed. Appx. 365, 368 (2d Cir. 2011) (noting that the government "does not have to conduct an exhaustive investigation in order to comply with the necessity requirement," and finding that "the government's two affidavits [that] indicate[d] the limited success of each other investigatory method and why the particular methods were inadequate" were sufficient).  This aspect of defendants' motion should therefore be denied as well.

### 4.  Minimization

Next, defendants Moses Neuman and Gutwein argue that suppression is required because the government failed to comply with the minimization requirement of 18 U.S.C. § 2518(5). Gutwein Mem. at 26.  "Every wiretap order must 'contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter.'"[16]  *United States v. Kazarian*, 2012 WL 1810214, at *13 (S.D.N.Y. May 18, 2012) (quoting 18 U.S.C. § 2518(5)).

---

[16] "[M]inimization is generally inapplicable to calls of less than two minutes in duration because they are too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation."  *United States v. Goffer*, 756 F. Supp. 2d 588, 592 (S.D.N.Y. 2011) (internal quotation marks omitted).

Whether the government has complied with the minimization requirement "is measured by the reasonableness of the surveilling agents' conduct." *Id.* Any determination of reasonableness "depend[s] on the facts and circumstances of each case," and the percentage of non-pertinent calls intercepted "is not a sure guide to the correct answer." *Scott v. United States*, 436 U.S. 128, 140 (1978) (finding that percentages may be useful "but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls[, 60%,] is relatively high and yet their interception was still reasonable" and noting that "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise"); *accord Kazarian*, 2012 WL 1810214, at *13.

Defendants' minimization argument arises from the fact that many of the calls intercepted over their phones were conducted in Yiddish. The government employed two Yiddish interpreters to minimize contemporaneously, one of whom was generally available while the other was available only on certain days. Gov't Mem. at 38. If a call conducted in Yiddish was intercepted when no interpreter was available to minimize contemporaneously, the call was recorded for after-the-fact minimization. *Id.* Defendants' primary argument is that, because the government knew before it applied for its first wiretap order that the targets of its investigation often spoke to each other in Yiddish, and because Yiddish is spoken by large numbers of people living in the New York metropolitan area, it was unreasonable for the government not to retain additional interpreters. M. Neuman Mem. at 27.

Whether it was reasonable for the government to retain only two interpreters is not properly evaluated in light of the number of Yiddish speakers in the community, but by considering the availability of Yiddish speakers willing and qualified to serve as interpreters

without compromising the investigation or the government's legitimate security concerns.  When considered in that context, it appears that the efforts made by the government to retain interpreters were reasonable.

The steps taken by the government are set forth in an affidavit submitted by United States Postal Inspector Richard Vignona, Docket Entry 123-1.  Inspector Vignona explains in his affidavit that the Postal Inspection Service does not have any "wire rooms," and that arrangements were therefore made to use a wire room maintained by Immigration and Customs Enforcement ("ICE").  Vignona Aff. ¶ 2.  ICE understandably limits access to its wire room to those who have cleared a security check.  *Id.* ¶ 3.  At the suggestion of an ICE agent, Vignona contacted a translation service that had a contract with ICE and learned that the service had three Yiddish interpreters on its staff, but that only two had the requisite security clearance.  *Id.*  The government hired both of the qualified interpreters to work in the wire room, and the third to assist with the "after-the-fact" minimization.  *Id.* ¶ 5.  Although additional efforts to locate Yiddish interpreters were made, the only responses were from people living in the same neighborhood as the targets of the investigation.  *Id.* ¶ 4.  The government reasonably declined to retain interpreters who might be acquainted with the targets.  In any event, the security clearance process would have taken longer than the time period over which the wiretapping was conducted.  *Id.*

The wiretap statute explicitly contemplates after-the-fact minimization like that performed by the government here; the statute provides that, "[i]n the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception  period, minimization may be accomplished as soon as practicable after such interception."  18 U.S.C. § 2518(5); *see also United States v.*

*Padilla-Pena*, 129 F.3d 457, 463 (8th Cir. 1997); *United States v. Simels*, 2009 WL 1924746, at

*4 (E.D.N.Y. July 2, 2009) (pointing out that after-the-fact review, while authorized by the

wiretap statute, does not minimize interceptions but instead "restricts the dissemination of

conversations the government has already intercepted").  Moreover, compliance with the

minimization statute requires only that the government make reasonably diligent efforts to have

interpreters available; as stated by the First Circuit,

> The government need not show, as a prerequisite to after-the-fact
> minimization, that contemporaneous minimization was an utter
> impossibility.  Here, the evidence indicated that, despite reasonable, good-
> faith efforts, . . . interpreters were not available at all times.  Thus, after-
> the-fact minimization, which is expressly authorized by Title III, became
> appropriate.  No more was exigible.

*United States v. David*, 940 F.2d 722, 730 (1st Cir. 1991).

The steps taken by the government to secure translation services, described in the

affidavit of Inspector Vignona as set forth above, constituted a reasonable, good-faith effort to

obtain a sufficient number of interpreters.  Moreover, those steps resulted in the

contemporaneous minimization of a large portion of the intercepted communications conducted

in Yiddish.  Gov't Mem. at 46 (pointing out that 291 non-pertinent calls of greater than two

minutes in duration were intercepted over the Neuman phone, and that 166 of them – 97 in

Yiddish and 69 in English – were contemporaneously minimized).  I therefore conclude that the

government made reasonable good-faith efforts to minimize, and that the government's resort to

"after-the-fact" minimization was consistent with the provisions of the wiretap statute.

Accordingly, this aspect of defendants' motion should be denied.

Defendants' minimization argument includes a second prong.  Defendants argue that,

when minimizing after the fact, the interpreters improperly listened to complete conversations

and should instead have stopped listening as soon as it became apparent to them that the

conversation they were reviewing was not relevant. It does appear that the interpreters reviewed entire recorded conversations when minimizing after the fact; however, only relevant portions of the conversations were disclosed to members of the prosecution team. Gov't Mem. at 40 n.15. In contrast, in *United States v. Gambino*, 734 F. Supp. 1084, 1106 (S.D.N.Y. 1990), a government agent involved in the investigation "translated the recorded conversations and effected minimization after interception." The Court nevertheless denied defendants' motion to suppress, reasoning that

> [t]he process of post-interception minimization undertaken by [the agent] provides essentially the same protection of privacy interests as does simultaneous minimization; in each case, only one government agent is privy to all conversations, and only the relevant conversations are translated into English and preserved as potential evidence.

*Id.* Accordingly, this prong of defendants' motion should be rejected as well.

Finally, even if the government had failed to make a reasonable, good-faith effort to minimize interceptions, suppression of relevant intercepted communications would not necessarily follow:

> The Second Circuit has not definitively resolved the question of whether the government's violation of Title Ill's minimization requirement warrants total suppression of the wiretap or mere suppression of the offending calls. As a general matter, however, district courts in this Circuit have favored the approach of suppressing only the improperly minimized calls.

*United States v. Goffer*, 756 F. Supp. 2d 588, 595-96 (S.D.N.Y. 2011) (citing cases). For this reason as well, I respectfully recommend that defendants' suppression motion, to the extent it rests on the argument that the government failed to minimize properly, be denied.

### 5. Disclosure of Irrelevant Private Communications

Moses Neuman raises a final argument in support of suppression: that the government improperly disclosed recordings of non-pertinent calls. M. Neuman Mem. at 29. Neuman

contends that the government, when producing recordings of intercepted calls in discovery on May 11, 2011, made two discs containing non-pertinent calls available to all defendants, but should have produced them only to defendant Moses Neuman.  *Id.*  After discovering its error, the government brought it to the attention of the defendants by letter dated June 28, 2011.  *Id.* Defendant Moses Neuman argues that this invasion of his privacy warrants suppression of all calls intercepted from his phone.

On August 2, 2012, defendant Moses Neuman submitted an application for leave to file a declaration of his counsel, with exhibits, *ex parte* and under seal.  Docket Entry 71.  That motion is hereby granted.  The declaration, which attaches examples of non-pertinent emails and text messages and describes the subject matter of certain intercepted calls, demonstrates that several of the non-pertinent communications intercepted by the government and distributed in discovery reveal highly personal information of a type that most people would find extremely embarrassing if disclosed.

The government, while conceding that it "failed to ensure that no defendant received the non-pertinent or privileged communications of other defendants," represents that no member of the prosecution team has ever listened to the recordings in dispute.  Gov't Mem. at 50, Ex. 11 at 6-7.  The government also points out that its original cover letter offering to produce discovery alerted defendants that the disks it was producing included non-pertinent communications, that defendant Moses Neuman was the only defendant to purchase a set of discs, and that it was Moses Neuman who then distributed the discs to the remaining defendants, despite having been made aware that they contained non-pertinent calls.  *Id.*, Ex. 11 at 7-8.

Neuman argues that the government's disclosure of non-pertinent communications warrants blanket suppression of all calls intercepted over his phone for two reasons.  (The

government concedes, of course, that it will not attempt to offer any non-pertinent intercepted communication in evidence at trial; Gov't Mem. at 48.  Thus, the only remedy at issue is blanket suppression of all intercepted communications.)  First, Neuman contends that suppression is warranted because the government's disclosure violated the wiretap statute.  Neuman rests his argument on 18 U.S.C. § 2517(2), which provides that a law enforcement officer may make use of intercepted communications only "to the extent such use is appropriate to the proper performance of his [or her] official duties."  Neuman suggests that, because this provision does not permit disclosure of minimized conversations to any person other than the one whose phone was tapped, the government's disclosure was not authorized by statute and warrants suppression.

Neuman does not cite any decision that ordered blanket suppression under circumstances comparable to those present here.  Moreover, the government's violation of the wiretapping statute – to the extent there even was one – is best understood as a violation of its minimization provisions.  As discussed above, however, whether a failure to minimize properly warrants suppression "is measured by the reasonableness of the surveilling agents' conduct."  *Kazarian*, 2012 WL 1810214, at *13.

Here, the government physically provided the offending discs only to counsel for Moses Neuman, and disclosed that the discs contained non-pertinent calls.  Moreover, no member of the prosecution team listened to the non-pertinent calls before they were disclosed or afterward. Finally, upon realizing that the procedures it followed had resulted in disclosure of Moses Neuman's non-pertinent calls to other defendants, the government alerted counsel and the Court and consented in part to a motion for a protective order sought by defendant Moses Neuman. Under these circumstances, I conclude that, if there was a statutory violation, it did not rise to the level warranting blanket suppression of all intercepted communications.

Neuman argues in the alternative that suppression is warranted because the government's conduct violated his constitutional right to privacy.  Again, Neuman fails to cite any precedent where conduct comparable to that of the government in this case resulted in blanket suppression of all intercepted communications.  Although the Second Circuit referred to blanket suppression in one case he cites, the Court held that it would be an "inappropriate" remedy.  *United States v. Amanuel*, 615 F.3d 117, 127 (2d Cir. 2010).  In *United States v. Simels*, 2009 WL 1924746, and *United States v. Renzi*, 722 F. Supp. 2d 1100 (D. Ariz. 2010), both also cited by Neuman, blanket suppression was ordered, but only after finding that the government had unreasonably intercepted and failed to minimize attorney-client communications.  722 F. Supp. 2d at 1110.  The government's conduct in this case was nowhere near as egregious as the conduct in those two cases.[17]  Accordingly, I recommend that defendant's motion for blanket suppression be denied.

### 6.  Deference

Even if I were to find that the wiretap application was deficient, whether because probable cause was lacking, because material misstatement were made, or because the statute's minimization and necessity requirements were not satisfied, I would still recommend that defendant's motion to suppress relevant intercepted communications be denied in light of the substantial deference due to the original finding that a wiretap was warranted.  As I have previously noted, a judicial order authorizing a wiretap is entitled to great deference so long as the facts set forth in the government's affidavit are even "minimally adequate" to support the issuing judge's determination.  *Concepcion*, 579 F.3d at 217; *see also Jimenez*, 2011 WL

---

[17] The particularly private and sensitive nature of the intercepted communications creates, at first blush, an impression of egregious government misconduct.  However, apart from the fact that the intercepted communications were not pertinent, their specific content is irrelevant to the reasonableness of the government's conduct because government agents did not listen to the communications and were thus unaware of how personal and sensitive they were.

308401, at *1 (noting that "the decision by the issuing district court to authorize wiretap surveillance may be overturned only for an abuse of discretion").

   C.   *Seizure of Yudah Neuman's Email Accounts*

   Yudah Neuman moves to suppress messages and other data seized from his email accounts pursuant to a search warrant.  Neuman argues in support of his motion that the affidavit submitted by the government in support of its search warrant application contained false statements and misleading omissions and failed to establish probable cause to search his accounts.  Neuman further contends that the warrant's scope was overbroad.

   The search warrants challenged by Yudah Neuman were issued on April 30, 2010, and authorized the government to search stored electronic mail and other content contained in five email accounts subscribed to by Yudah and Moses Neuman.[18]  In support of its application for these search warrants, the government submitted the affidavit of Sheldon Tang, a special agent of the Internal Revenue Service.  Docket Entry 64-3.  The background facts set forth in the Tang affidavit are similar to those recounted in the affidavits of Postal Inspector Albright that were submitted by the government in support of its wiretap applications.  Those affidavits, and the challenges to them raised by Moses Neuman, are discussed at length above.  Yudah Neuman's contention that the Tang affidavit is false and misleading merely relies upon the same arguments Moses Neuman directed at the Albright affidavits.  Y. Neuman Mem. at 3.[19]  Accordingly, this aspect of Yudah Neuman's motion should be rejected for the reasons already discussed in connection with the Albright affidavits.

---

[18] Moses Neuman joins in the motions made by his co-defendants to the extent they apply to him.  M. Neuman Mem. at 30.

[19] "Y. Neuman Mem." refers to Yudah Neuman's memorandum in support of his motion to suppress, Docket Entry 64-1.

Yudah Neuman next argues that the government failed to establish probable cause to believe that evidence of criminality would be found in his and Moses Neuman's email accounts. A magistrate judge's finding of probable cause is accorded "great deference" by reviewing courts.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  Here, the facts set forth in the Tang affidavit established ample probable cause to search the email accounts.

In his affidavit, Agent Tang described in some detail how bank accounts of entities controlled by Moses and Yudah Neuman received funds from entities associated with other members of the charged conspiracy, and how those funds were then used to pay premiums on fraudulently obtained life insurance policies and to make payments to the insureds named on those policies as compensation for their participation in the defendants' fraudulent scheme.  Tang Aff. ¶¶ 15-16.  The Tang affidavit also describes how Yudah and Moses Neuman encouraged CI-2 to appear unhealthy in order to enhance the value of his life insurance policy, and how they provided CI-2 with a list of TIA symptoms and offered to prepare strong coffee for CI-2 to elevate his blood pressure, all as discussed above in connection with the Albright affidavits.  *Id.* ¶ 13.  Tang described as well how Moses Neuman agreed with Grodsky to pay $10,000 to CI-2's former wife to keep her from reporting their activities to law enforcement authorities.  *Id.* ¶ 16(c) n.7.  Thus, the Tang affidavit established probable cause to believe that Moses and Yudah Neuman were conducting financial transactions and having communications that constituted evidence of the fraud the government was investigating, regardless of whether they themselves were knowing participants in the fraudulent scheme.

The Tang affidavit further described how Moses and Yudah Neuman used their email accounts to send and receive communications relevant to the fraudulent scheme under investigation.  For example, the Tang affidavit reported that Moses Schlesinger, the office

manager at Liberty Planning, forwarded at least two emails he received from a third party to Premises One,[20] the first asking for various items of information concerning a proposed insured, including "a statement from applicant's accountant verifying income and NW," and the second pointing out that "per the underwriter . . . we must have something signed by the accountant listing assets and their value to accept." *Id.* ¶¶ 14, 19(a) ("NW" presumably refers to the net worth of the proposed insured).  Moses Neuman then forwarded these emails to defendant Grodsky, together with a form captioned "Authorization to Disclose Heath Information." *Id.*[21] The proposed insured who is the subject of these emails, Beryl Bell, received multiple payments from accounts controlled by Moses and Yudah Neuman, indicating that her policy was involved in the charged fraudulent scheme. *Id.* ¶ 16(a), (b), (d).  Additional emails sent from Premises One concerned other substantial life insurance policies with premium payments made by entities controlled by defendants. *Id.* ¶ 19(b)-(d).

Premises Two was used by Yudah Neuman to receive and forward emails that appear to have been exchanged as part of an effort to obtain medical information about at least three proposed insureds. *Id.* ¶ 19(f)-(h).  In addition, Grodsky sent an email to Premises Two that apparently relates to an insured named Ellen Schneider. *Id.* ¶ 19(d).  A company controlled by Moses Neuman made payments both to Schneider herself and to bank accounts that subsequently paid the premiums on Schneider's life insurance policy. *Id.* ¶ 19(e).

The Tang affidavit also reports that Yudah Neuman exchanged multiple emails with Grodsky concerning the surrender of a life insurance policy through Premises Three. *Id.* ¶ 20(a)-(c).  In an intercepted telephone conversation held shortly before these emails were sent,

---

[20] For ease of reference, I adopt the Tang Affidavit's use of the terminology "Premises One through Five" to refer to the five email accounts for which the government sought and obtained search warrants.

[21] The government developed much of its evidence about how Moses and Yudah Neuman used their email accounts when, pursuant to a previously obtained search warrant, it reviewed the contents of an email account used by defendant Edward Grodsky.

Grodsky and Moses Neuman discussed that they preferred to surrender ING policies rather than suffer an adverse judgment in the lawsuit ING had by then commenced. *Id.* ¶ 20(d). The emails forwarding the surrender forms thus appear to have been exchanged in furtherance of the alleged scheme.

Premises Four and Five were also used to send or receive emails that appear to be related to the scheme. These include an email forwarded to Grodsky from Premises Four that includes a medical report concerning a woman who ultimately obtained an $8 million life insurance policy and received a series of payments from an entity with a bank account controlled by Yudah Neuman. *Id.* ¶¶ 16(a), 21(a). The medical report contains a section entitled "More Detail That Could Lower Life Expectancy." *Id.* Another email, this one received by Moses Neuman through Premises Four, was sent by a company involved in the resale of life insurance policies, and concerned another insured. The subject line of the email referred to "Life Settlements" and the body of the email made reference to "Medicals that could lower the LE." (Presumably, "LE" is a reference to life expectancy.) *Id.* ¶ 21(b). The premiums on the life insurance policy discussed in the email were paid by an account over which Moses Neuman exercised control. *Id.* Other emails of similar relevance to at least two other life insurance policies passed through Premises Four. *Id.* ¶ 21(c)-(j). Finally, Yudah Neuman sent at least two emails from Premises Five to Grodsky concerning the insured whose former wife, as discussed above, threatened to report defendants' activities to law enforcement authorities. *Id.* ¶ 21(k). Yudah Neuman also used this account to send Grodsky a shipping label with the return address of co-defendant Lebovits at Liberty Planning and, apparently, to instruct Grodsky to use the label when making a premium payment on a policy insuring the life of Beryl Bell, discussed above. *Id.* ¶ 21(n).

In sum, the facts set forth in Agent Tang's affidavit demonstrate that Moses and Yudah Neuman conducted financial transactions that provided funding to pay the premiums on life insurance policies obtained by making false statements and to pay insureds for allowing strangers to make false statements on their behalf and to take out policies on their lives.  The Neumans also had conversations with at least one insured about how he could create an appearance of ill health and thereby increase the resale value of the policy insuring his life, and with a co-defendant about paying an insured's former wife to keep her from reporting defendants to the authorities.  Tang's affidavit also demonstrated that each of the email accounts the government sought to search either received or sent emails pertinent to the fraudulent scheme under investigation.  I therefore conclude that the Tang affidavit established ample probable cause to search each of the five email accounts in issue.

Yudah Neuman's final challenge is that the search authorized by the warrants was overbroad.  The warrants at issue here were directed to the pertinent internet service providers, and directed them to produce, among other things, all emails and attachments sent or received by the five accounts during a limited, specified time period.  Docket Entry 64-4.  The warrants further provided that "taint agents, not connected with this investigation" would review the produced information and seize and turn over to investigating agents "only items that concern the participation" of defendants in various specifically enumerated offenses.  *Id.*  Neuman's overbreadth argument appears to be directed to the broad disclosure to the taint agents and not to the more narrowly defined material to be seized and produced to agents involved in the investigation.  Y. Neuman Mem. at 5-6; Y. Neuman Reply Mem. at 3.[22]

---

[22] "Y. Neuman Reply" refers to Yudah Neuman's memorandum submitted in reply to the Government's brief, Docket Entry 93.

A warrant does not run afoul of the Fourth Amendment if it is "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *United States v. Dupree*, 781 F. Supp. 2d 115, 150 (E.D.N.Y. 2011) (citing, *inter alia*, *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986)).  Accordingly, courts in this district reviewing challenges to searches of electronically stored information have declined to require any particular protocols such as the use of specific search terms or methodologies. *United States v. Bowen*, 689 F. Supp. 2d 675, 681 (S.D.N.Y. 2010).  Rather, "it is generally left to the discretion of the executing agents to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979).

It is difficult to imagine how, as a practical matter, the government could have searched the defendants' email accounts more narrowly.  Clearly, the service providers could not be expected to review and parse the emails on the government's behalf; the Court in *Bowen*, addressing the execution of a warrant to search email accounts, held that "the Fourth Amendment [does not] require the executing authorities to delegate a pre-screening function to the internet service provider or to ascertain which e-mails are relevant before copies are obtained from the internet service provider for subsequent searching."  689 F. Supp. 2d at 682.  In fact, I see no basis for concluding that the government was even required to use "taint" agents to prevent those involved in the investigation from seeing irrelevant material.  If the emails were not electronic data but instead physical documents maintained in a file cabinet, no question about overbreadth would arise from a warrant authorizing agents to search each of the files housed in the cabinet and to seize those documents that fell within the warrant's scope.  *See United States v. Graziano*, 558 F. Supp. 2d 304, 315 (E.D.N.Y. 2008) (noting that, "in most instances, there is

no way for law enforcement or the courts to know in advance how a criminal may label or code his computer files and/or documents which contain evidence of criminal activities"). In any event, the decision to use a taint team, even if not required, certainly minimized the impact of any overbreadth in the scope of the warrants.

The only case cited by Yudah Neuman in support of this prong of his motion, *United States v. Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009), is not on point. The warrant at issue in *Cioffi* listed various categories of records and other stored information with "no provision limiting the emails to be seized to those containing evidence of the crimes charged in the indictment or, indeed, of any crime at all." 668 F. Supp. 2d at 389. Here, in contrast, the warrants authorized the seizure only of "items that concern the participation of Moses Neuman, Yudah Neuman, Edward Grodsky and others in a scheme to commit conspiracy, mail fraud, wire fraud and money laundering" in violation of specifically enumerated statutes. Generally, a warrant that authorizes a search for documents or things that constitute evidence of a particular crime is not overbroad; rather, "generic terms may be used to describe the materials to be seized so long as the warrant identifies a specific illegal activity to which the item related." *United States v. Lake*, 233 F. Supp. 2d 465, 471 (E.D.N.Y. 2002) (citing *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)); *accord In re Application of Madison*, 687 F. Supp. 2d 103, 111-12 (E.D.N.Y. 2009); *United States v. Russo*, 483 F. Supp. 2d 301, 307-08 (S.D.N.Y. 2007); *see also United States v. Bazzi*, 2010 WL 4451454, at *23 (W.D.N.Y. Apr. 21, 2010) (denying a motion to suppress in part because "although the search warrant used the language 'included [sic] but not limited to' in describing the categories of items that could be seized, it instructed that any item seized 'must relate to violations of'" 18 U.S.C. Sections 1962 and 2320"). Although references to criminality "in truly vague terms" may not be sufficiently particular, *In re*

41

*Application of Madison*, 687 F. Supp. 2d at 112, any issue in that regard here is overcome by the reference in the warrants to crimes committed by specifically identified individuals.

Even if the warrants were overbroad or unsupported by probable cause, I would recommend that Yudah Neuman's suppression motion be denied.  Suppression is unwarranted where law enforcement officers "act in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *United States v. Leon*, 468 U.S. 897, 900, 922 (1984).  The same applies to warrants found upon review to be overbroad; "[u]nder *Leon*, evidence seized pursuant to an overly broad search warrant will be suppressed only if the warrant was so facially invalid that the executing agents could not reasonably have relied on it."  *United States v. Wapnick*, 1993 WL 86480, at *7 (E.D.N.Y. Mar. 16, 1993); *see also Bowen*, 689 F. Supp. 2d at 684-85.  No such facial invalidity exists here, and thus *Leon*'s "good faith" exception applies.

The good faith exception to suppression applies with particular force here, at least with respect to defendants' overbreadth argument, because the language used to describe the scope of the warrants was specifically crafted to address concerns raised by the Court.  When the government sought a warrant to search an email account used by Edward Grodsky, the Court directed that the items to be seized be described with greater particularity.  Gov't Mem. at 92-93; Gov't Ex. 3.  The government made the changes to the Grodsky email warrant required by the Court and used the same particularizing language in the warrants challenged by Yudah Neuman. The Supreme Court has "refuse[d] to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possess authorizes him to conduct the search he has requested."  *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984).

Particularly in light of the involvement of the Court in crafting the language used in the challenged warrants, no useful deterrent purpose would be served by suppression.

For all these reasons, Yudah Neuman's motion to suppress the results of the searches of his and Moses Neuman's email accounts should be denied.

### D. *Yudah Neuman's Motion for Issuance of a Subpoena*

Defendant Yudah Neuman moves pursuant to Federal Rule of Criminal Procedure 17(c) for leave to issue subpoenas directed to various insurance companies.  Y. Neuman Discovery Mem..[23]  The subpoenas Neuman seeks to serve call for the production of documents related to life insurance policies on any insured identified by the prosecution as part of the charged scheme, as well as more general documents such as those setting forth the life insurance underwriting guidelines used by each of the insurance companies, those relating to the sale of life insurance policies to investors or other third parties, and those relating to any policies owned by strangers to the insured or investors or initiated by speculators.  Docket Entry 63-3.

Rule 17(c) provides for the issuance of subpoenas that require a witness "to produce any books, papers, documents, data, or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence."  FED. R. CRIM. P. 17(c)(1).  The Supreme Court, favorably citing a formulation articulated by United States District Judge Weinfeld of the Southern District of New York, has held that a party seeking production under Rule 17 must show

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

---

[23] "Y. Neuman Discovery Mem." refers to the defendant's motion for certain pre-trial discovery, Docket Entry 63-1.

*United States v. Nixon*, 418 U.S. 683, 699-700 (1974).  In other words, the party must establish "(1) relevancy; (2) admissibility; [and] (3) specificity."  *Id.* at 700.

Life insurance applications and policies in the names of insureds who are alleged to have participated with defendants in the charged scheme are clearly relevant.  Moreover, this portion of the subpoena seeks specific documents which, assuming a proper evidentiary foundation, will likely be admissible at trial.  In addition, there appears to be no means for obtaining the documents other than by subpoena.  Finally, the government's response to the motion does not specifically oppose Neuman's demand for these documents.  Gov't Mem. at 97-99.  This aspect of Neuman's motion should, therefore, be granted, subject to the following limitation.  The subpoenas attached as exhibits to Yudah Neuman's motion call for each of several insurance companies to search for and produce applications or policies in the names of any insured alleged by the government to have participated in the charged scheme.  During the oral argument on the motions, however, Neuman agreed that, if the prosecution identified the policies about which it would seek to offer evidence at trial, the documents demanded by the subpoenas he seeks leave to issue would properly be limited to those policies and the applications submitted to obtain them.  Tr. of July 19, 2012, at 14, Docket Entry 115.  After the oral argument, the government did in fact serve a bill of particulars identifying

> for each life insurance application with respect to which the government is charging the defendants with a scheme to defraud, the following information:  (1) the insurance company to which the application was submitted; (2) the identity of the insured and an appropriate identifying number for the policy or application, if the latter is available; (3) the insurance policy effective date, of the application was granted, and the

44

> approximate date of the application, if the application was not granted; and
> (4) the insurance agent who is listed on the application or policy.

Gov't Letter dated August 2, 2012, Docket Entry 123; Gov't Letter dated August 16, 2012,

Docket Entry 124. Accordingly, the subpoenas should be limited to the policies and applications

identified in the government's bill of particulars.

The government does specifically oppose Neuman's request for underwriting documents.

The government contends that, because reliance is not an element of mail or wire fraud, the

underwriting practices of insurance companies are irrelevant. Yudah Neuman argues, however,

that defendants may be able to raise a reasonable doubt about the materiality of any facts they are

alleged to have misrepresented if they can demonstrate that the underwriting criteria of the

relevant insurance companies do not depend on the net worth or income of the insured, the

involvement of investors, or the source of premium payments. Y. Neuman Discovery Mem. at

9-10.

The parties' dispute over the relevance of the underwriting documents stems from their

conflicting positions with respect to the meaning of materiality. While the government stresses

that materiality "focuses on the violator and not the victim, and thus, whether the victim was

actually deceived by the defendants' misrepresentations is irrelevant," Gov't Letter dated July

17, 2012, Docket Entry 109, at 5, defendant Yudah Neuman argues that "materiality must be

assessed exclusively from the point of view of the person or entity to whom the false statement is

directed, without regard to the defendant's intent," Y. Neuman Discovery Mem. at 5.

I need not resolve this dispute over the definition of materiality because I conclude that

the documents Yudah Neuman seeks are relevant to materiality even as defined by the

prosecution. As discussed above when addressing whether the government's wiretap

applications were supported by probable cause, the materiality of the false statements charged in

this case is corroborated by the very fact that defendants made them; because at least some of the defendants were in the business of obtaining and selling life insurance policies, their decision to misrepresent facts on policy applications suggests that those facts would be material to an insurance company's underwriting decision.  The same logic suggests that, if insurance companies do not concern themselves with the net worth or income of an applicant, or whether the applicant intends to transfer his or her policy or personally pay the premiums on it, it is likely defendants would have known that, and that they would have had some reason for making false representations other than to deceive the insurance companies.  Therefore, the underwriting documents Yudah Neuman seeks are relevant to the defense even if, as the government contends, materiality focuses on the intent of the defendants and not on the effect upon the victims.

Nor is Neuman's demand for underwriting documents a mere "fishing expedition" undertaken without a good faith basis.  At least one insurance company received a report warning that the financial information about an applicant was grossly overstated and that the applicant had filed for bankruptcy and had judgments outstanding against him, but the company nevertheless issued a policy insuring his life.  Y. Neuman Discovery Mem. at 10-11.  These events provide a good faith basis for Neuman's demand for underwriting documents.

Neuman's final requests are for "all documents referring or relating to the sale of a life insurance policy to a third-party, including but not limited to the sale of a life insurance policy to an investor," and "all documents referring or relating to STOLI [stranger-owned life insurance] policies, IOLI [investor-owned life insurance] policies and/or SPIN-life [speculator-initiated life insurance] policies."  These requests are extremely broad and, as written, appear to seek

documents of limited or no relevance.[24] Accordingly, with respect to these demands, Neuman's Rule 17(c) motion should be denied.

### E. Defendant Lebovits' Motion for a Bill of Particulars

The final motion pending before the Court is brought by defendant Lebovits and seeks a bill of particulars. A court has broad discretion in deciding whether to require the government to provide a bill of particulars. *United States v. Shteyman*, 2011 WL 2006291, at *2 (E.D.N.Y. May 23, 2011). It is well settled that "[t]he purpose of a true bill of particulars is three-fold: to provide a defendant the necessary facts that would allow him '[1] to prepare for trial, [2] to prevent surprise, and [3] to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *Id.* Generally, a bill of particulars will be required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)). Moreover, a bill of particulars is not required "where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Walsh*, 194 F.3d at 47. Of particular relevance here, however, "[i]n cases involving fraud, . . . a bill of particulars may be appropriate where the indictment does not identify the specific documents and transactions the Government contends are fraudulent." *Shteyman*, 2011 WL 2006291, at *3 (citing *United States v. Bortnovsky*, 820 F.2d 572, 574-75 (2d Cir. 1987)).

Lebovits' motion seeks particulars with respect to the insurance policy applications the government contends were made as part of the charged fraudulent scheme. More specifically, Lebovits seeks disclosure of the identity of the insurance companies that received such

---

[24] To the extent insurance company documents indicate that the involvement of an investor, speculator or other third party is relevant to the decision whether to issue a policy, those documents would presumably be responsive to Yudah Neuman's demand for documents reflecting underwriting guidelines.

applications, the persons who submitted them, the dates of the applications, the names of the

insureds, and the basis for concluding that the false statements attributed to the defendants

caused the insurance companies to issue the policies.  Lebovits Mem., Docket Entry 65-4, at 3.

Lebovits also seeks specification of the "additional material false statements" referred to in

paragraph fourteen of the original indictment and paragraph thirteen of the superseding

indictment.  *Id.*  As indicated above, since the oral argument on defendants' motions was held,

the government has served a bill of particulars that identifies (1) the insurance company to which

the application was submitted; (2) the identity of the insured and an appropriate identifying

number for the policy or application, if the latter is available; (3) the insurance policy effective

date, if the application was granted, and the approximate date of the application, if the

application was not granted; and (4) the insurance agent who is listed on the application or

policy.  This disclosure is in large part responsive to Lebovits' motion and "identif[ies] the

specific documents and transactions the Government contends are fraudulent."  *Shteyman*, 2011

WL 2006291, at *3.

  The remaining aspect of Lebovits' motion seeks particularization of the false statements

attributed to defendants by the government, disclosure of the evidentiary basis for the conclusion

that the false statements induced insurance companies to issue policies and to charge lower

premiums than they otherwise would, and identification of the financial transactions the

government relies upon in support of the indictment's money laundering charges.  In light of the

extensive discovery already provided, including the detailed description of the defendants'

fraudulent scheme in the Albright and Tang affidavits, these particulars are not required to

enable Lebovits to prepare for trial or plead double jeopardy in the event of a subsequent

prosecution.  Rather, this aspect of Lebovits' motion seeks "evidentiary details" that are not

appropriately demanded in a motion for a bill of particulars. *See Torres*, 901 F.2d at 234. Accordingly, this aspect of Lebovits' motion should be denied.

CONCLUSION

For all the reasons discussed above, it is hereby ORDERED

(1) that the motion of defendant Yudah Neuman for leave to issue subpoenas be GRANTED with respect to each policy the government has identified on its bill of particulars, and otherwise, including with respect to the demands in the subpoenas for "all documents referring or relating to the sale of a life insurance policy to a third-party, including but not limited to the sale of a life insurance policy to an investor," and "all documents referring or relating to STOLI [stranger-owned life insurance] policies, IOLI [investor-owned life insurance] policies and/or SPIN-life [speculator-initiated life insurance] policies," that the motion be DENIED; and

(2) that the motion of defendant Lebovits for a bill of particulars, to the extent it seeks particulars the government has now provided, be TERMINATED AS MOOT, and that, to the extent it seeks additional particulars, be DENIED.

In addition, for the reasons discussed above, I respectfully recommend

(1) that the suppression motions made by defendants Moses Neuman, Yudah Neuman, and Avigdor Gutwein be DENIED;  and

(2) that the motion made by defendant Avigdor Gutwein to dismiss the indictment or strike a portion of it be DENIED.

Any appeal from this Order, or objection to the recommendations made in this report, must be made within fourteen days after service of this Order and Report, and, in any event, no later than December 17, 2012. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a)-(b).  Failure

to file timely objections may waive the right to appeal from this Order or any Order of the

District Court adopting the recommendations made in this report.  *See Small v. Sec'y of*

*Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former

ten-day limit).

**SO ORDERED.**

_____/s/_____
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
November 30, 2012

*U:\eoc 2012\lebovits final*.docx