

U.S. Department of Justice

United States Attorney
Eastern District of New York

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

By ECF                                               January 17, 2014

The Honorable Sterling Johnson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Moses Neuman
              Criminal Docket No. 11-134 (SJ)

Dear Judge Johnson:

      The defendant in the above-referenced case, Moses Neuman, is scheduled to be sentenced on January 28, 2014. On April 16, 2013, the defendant pleaded guilty to Count One of a thirteen-count superseding indictment charging him with conspiring to commit bank and wire fraud, in violation of 18 U.S.C. § 1349. While the Presentence Investigation Report ("PSR") indicates that the Guidelines range of imprisonment applicable to the defendant is 41 to 51 months, the government respectfully argues that, in accordance with the plea agreement entered into by the parties, the Court should find the applicable Guidelines range to be 18 to 24 months. Further, the government respectfully submits this letter in opposition to the defendant's letter dated December 30, 2013 ("Def. Ltr."), asking the Court to issue a non-custodial sentence. For the reasons stated below, the defendant should be sentenced within the Guidelines range of 18 to 24 months.

    **I.**    **Background**

        A.    Offense Conduct

      The defendant helped execute a scheme to deceive insurance companies into entering into contracts for life insurance policies. PSR ¶¶ 11-15. Specifically, the insurance companies would not have sold the life insurance policies at issue if they had known that the premiums for such policies were paid by investors, as opposed to the insured-customers themselves or their relatives, and that the policies would later be resold on the secondary market. Id. Generally, insurance companies do not knowingly sell a life insurance policy if the purchaser of the policy intended from the outset to later resell the policy, nor do they knowingly sell a life insurance policy where a third-party investor, rather than an insured or an owner, would pay the premium. The defendant was able to fool the insurance companies into issuing such policies by recruiting straw applicants and instructing them to make false statements on their insurance

applications and further coaching to them on how to answer questions by third-party verifiers hired by the insurance companies to check the accuracy of the applications. The defendant helped pay the straw buyers for their role in the scheme.

As a result, the defendant caused the submission of applications with materially false statements to insurance companies. These false statements not only induced those companies to issue the policies but also to charge lower premiums than would otherwise apply. The false statements that the defendant had the straw applicants submit were that: (1) the insureds had large net worths and annual incomes, above their true net worths and incomes; (2) neither the insureds nor the owners intended to resell the policies on the secondary market for life insurance; (3) the insureds and the owners intended to pay the premiums themselves with their own money; (4) the insureds had not been compensated or promised compensation for applying for the policies; (5) the insureds did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies were "estate planning," "estate liquidity," "estate conservation" or some equivalent description. Id. at ¶ 12. Each of these statements was false. To incentive straw buyers to go along with his scheme, the defendant paid cash and promised other financial incentives to them in exchange for the straw buyers submitting false applications. The defendant engaged in the scheme for three years and, during that time, he and his co-conspirators obtained hundreds of millions of dollars in life insurance through the submission of fraudulent applications.

Further, to falsely convince the insurance companies that the straw buyers were personally paying the premiums on the policies, the defendant paid some of the premiums from the bank accounts of several companies he or his wife controlled. These bank accounts were established in the names of irrevocable life insurance trusts for the straw buyers and were funded by the defendant and his co-conspirators and other third-party investors.

In addition, after the defendant fraudulently induced insurance companies to issue policies (normally with high death benefits to elderly insureds), the defendant would assist in the creation of false records and the submission of false statements which were intended to lower the life expectancies of the elderly insureds in order to fraudulently inflate the resale prices that purchasers would be willing to pay for these policies on the secondary market (since it would make it appear as if the insured would soon die, allowing the investor to quickly collect on the policy). In particular, the defendant instructed one straw buyer to go to the doctor and complain of the symptoms of Transient Ischemic Attacks, a very serious medical condition from which the straw buyer did not suffer. PSR at ¶21.

## II.  Guidelines Calculation

### A.  Loss Amount

Insurance companies issue and price policies based on a calculated lapse rate. A lapse rate is the rate at which insureds allow their policies to expire because the amount of premiums they have already paid has exceeded or soon will exceed the amount they can collect should the death of the insured occur. Here, because the premiums were actually being paid by third-parties investors (who recruited elderly straw buyers) and who counted on the pay-out of

the policy as a return on their investment, they had no intention of letting the policies lapse. As a result, the insurance companies' lapse rate was based on falsely-provided information which caused them to charge lower premiums than they otherwise would have with respect to the policies at issue.

However, attempting to determine what the correct premiums should have been and over what period of time the proper premiums would have been paid to the insurance companies are difficult endeavors. As a result, based on the evidence available to the parties at the time, and in accordance with U.S.S.G. § 2B1.1, App. Note (3)(c), the parties agreed that a reasonable estimate of the loss suffered by the insurance companies was more than $120,000 but less than $200,000. While the PSR noted that the defendant agreed to an amount of forfeiture of $300,00, that figure should not affect the loss amount. During a conversation with the Probation Officer who authored the PSR, the government incorrectly told the Officer that the $300,000 represented commissions that the defendant improperly received as a result of his fraud, and the PSR accordingly added this amount to the loss figure, resulting in $420,000 of loss attributed to the defendant. PSR ¶ 26. In reality, the forfeiture amount ($300,000) represents proceeds from the resale of policies on the secondary market. While such sales were improper, they did not cause financial harm to the insurance companies.

As a result, the government respectfully requests that the Court adopt the loss amount of $120,000.

### B. Sophisticated Means

The PSR includes a "sophisticated means" enhancement. PSR ¶ 43. While the scheme the defendant helped execute may not have been simple, and while it certainly was very serious, it is the government's position that the scheme was not "especially complex or especially intricate." See U.S.S.G. § 2B1.1, Application Note (3)(c). The defendant's insurance fraud was similar to many insurance fraud schemes where the applications for the policies at issue misstate material facts about the applicant's qualifications. Further, the government's plea agreement contains no such enhancement and the government, in accordance with that agreement, continues to assert that the Court should compute the Guidelines calculation without this enhancement.

### C. Global Plea

The government's plea agreement provides for an additional one-point reduction in the calculation of the Guidelines range for the defendant's acceptance of a global plea, pursuant to U.S.S.G. § 5K2.0. Because the majority of the defendant's co-conspirators also pleaded guilty alongside him, he is entitled to that reduction, even though it is not reflected in the PSR. See United States v. Figueroa, 2013 WL 4679948 at *5 (E.D.N.Y. Aug. 30, 2013) (Irizarry, J.) (noting that the district court the "subtracted two points for the global plea arrangement, even though that had not been recommended by the Probation Department.").

As a result, the government urges the Court to adopt the following Guidelines calculation:

3

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. § 2B1.1(a)(1)) | +7 |
| Loss exceeded $120,000:<br>(U.S.S.G. § 2B1.1(b)(1)(F)) | + 10 |
| More than 10 victims<br>(U.S.S.G. § 2B1.1(b)(2)(A)(i)) | + 2 |
| Global plea<br>(U.S.S.G. § 5K2.0) | - 1 |
| Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1(a)) | - 3 |
| Adjusted Offense Level: | <u>15</u> |

Because the defendant falls within Criminal History Category I, the resulting Guidelines range should be 18 to 24 months.

**III.   Argument**

For the following reasons, the defendant is deserving of a sentence within the Guidelines range of 18 to 24 months.

   A.   The Offense is Serious

It is has been repeatedly held that insurance fraud is a serious offense. See e.g., United States v. Hawkins, 380 F.Supp2d. 143, 164 (E.D.N.Y. 2005) (Weinstein, J.) (characterizing insurance fraud offense as a "serious crime."); United States v, Hunter, 2008 WL 4291324 at *2 (11th Cir. Sept. 22, 2008) (same). Here, during the course of three years, the defendant stole from more than 10 separate companies and profited in an amount in excess of one-hundred thousand dollars. Had the government not learned of the scheme, in light of the sheer number of applications submitted to the victim-companies, the defendant might well have stolen over $1 million.

The evidence also demonstrated that despite his protestations otherwise, the defendant was aware of the serious nature of his actions yet he continued to execute the criminal scheme anyway. Def. let. at 3-10. For example, he and his co-conspirators were aware of the steps that insurance companies might take to detect fraud, such as having third-party telephonic verification of the applications. As a result, he equipped straw buyers with a script to read from should they receive such calls. In addition, he also submitted phony verifications from purported accountants that claimed to certify the straw buyers' financial statements. He also shifted a great deal of money through bank accounts he controlled to hide from insurance companies that

4

investors were paying the premiums. It cannot be believed that the defendant did know that what he was doing was wrong in light of the actions he took to conceal his offense.

Further, his claim that the insurance companies were aware of what he was doing but turned a "blind-eye" is not worthy of belief. The insurance companies moved to rescind the policies en masse when they learned of the fraudulent scheme, and by so doing, they were required to return, and did return, every single premium payment they had received on the rescinded policies, and also incurred legal fees, which is a very expensive way to turn a "blind eye." But the most important point is that whether or not the insurance companies were actually deceived by the defendant's lies or, as the defendant argues, turned a blind eye to his lies, is legally irrelevant. If a defendant intended that his lies would deprive his victims of their money or property then the defendant has committed mail and wire fraud even if the victims were not deceived in the least and did not rely upon the defendant's false statements. Neder v. United States, 527 U.S. 1, 24 (1999).

### B. A Non-Custodial Sentence is Not Warranted Based on the Defendant's Family Circumstances

The defendant's request for a non-custodial sentence based on the fact that he has a wife and sister-in-a-law who suffer from mental illnesses should be rejected. The pertinent Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant" when fashioning a defendant's sentence. U.S.S.G. § 5H1.6. Accordingly, recent cases interpreting the Guidelines explain that family ties and relationships should be taken into account only when they are truly "extraordinary." See e.g., United States v. Cutler, 520 F.3d 136, 164-65 (2d Cir. 2008) (analyzing the relevance of family ties and responsibilities in determining whether a sentence should be outside the applicable Guidelines range). Absent extraordinary circumstances, courts are "discouraged" from basing sentences on the defendant's familial circumstances. United States v. Sprei, 145 F.3d 528, 534 (2d Cir. 1998); see also United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").

Courts have been reluctant to find such extraordinary circumstances. In the few cases in which the Second Circuit has found that a defendant's extraordinary familial circumstances warrant a shorter term of incarceration, it has done so where the defendant is the only source of care or financial support for minor or disabled family members. See e.g., Johnson at 129 (departing from the Guidelines range for a defendant who was solely responsible for raising four young children); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (departure granted to defendant who worked two jobs to support his wife, two children, his grandmother, and his disabled father who depended on the defendant's physical strength "to help him get in and out of his wheelchair"). But see Primo v. United States, 2008 WL 428449 at *3 (E.D.N.Y. Feb. 14, 2008) (refusing to find extraordinary circumstances where the defendant was not "the sole financial provider or caretaker for his family").

Here, the defendant's wife and sister-in-law are not "uniquely dependent" on him to care for their welfare, despite his claims otherwise. See Sprei at 535. First, the PSR and its Addendum note that the defendant's wife is under the "intermittent" care of a mental health

5

professional, undercutting the defendant's arguments concerning the severity of his wife's illness. PSR ¶ 63. It is important to recognize that the Court is not dealing with someone who is mentally crippled, requires round-the-clock care or cannot take care of her own needs. While the defendant's presence may contribute to his wife's mental stability, increasing and regulating her appointments with her psychiatrist and psychologist can also result in such stability. Further, far from not being able to care for her own health, the defendant's wife maintains a job and has raised four children that are generally reported "to be in good health." Id. at ¶¶ 64, 76. Indeed, the defendant's letter notes that he and his wife have a regular housekeeper and that they enjoy the support of an extended community that has supported them financially. Id. ¶ 85. Moreover, the PSR is unclear, and the defendant's letter remains silent, as to whether the defendant's wife's siblings or any of the defendant's eight siblings remain available to assist his family in his absence. It is highly doubtful that none of them are available or so inclined. Thus, the evidence shows both that the defendant's wife is not in dire need of help and that there is a wide network of support to provide the help she does need.

Similarly, the defendant's letter is conspicuously silent as to whether the defendant's sister-in-law's husband still lives with her, as it would naturally fall to him, not the defendant, to care for her. While it may be argued that the defendant's wife or sister-in-law would be better off with the defendant present, that is not the applicable standard. Rather, the standard is whether or not they are uniquely dependent on the defendant's care. See United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003) (holding non-Guidelines sentence unwarranted, even though the defendant was a single mother, where her three oldest children were available to care for their three younger siblings, one of whom was under 18 and another of whom suffered from a psychiatric disorder); United States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005) (finding that extraordinary circumstances do not exist "where other relatives could meet the family's needs"). Here the defense has not proffered sufficient evidence to establish the requisite standard.

Most important, the defendant has shown little respect for his wife's situation by immersing her in his crimes and having used her to further his fraudulent scheme. The defendant used his wife to control the bank account of the Brooklyn Life Group, one of the principal companies that he controlled and through which he funneled investor money to advance his criminal purposes. She paid straw buyers their monthly payments as their compensation for participating in the scheme from that account. She was also the trustee on at least one of the life insurance trusts for the straw buyers, the Martin Lieberman Irrevocable Life Insurance Trust, which, unbeknownst to the insurance companies, listed the defendant as an investor. Indeed, the defendant discussed over the telephone how his wife moved money amongst the different accounts that were part of the scheme. See. e.g., Exs. 1-3 and calls 874 and 1576 over the Neuman cell phone. Further, both the defendant's wife and sister-in-law have had long-standing issues with respect to their mental health and yet the defendant brazenly executed the fraud scheme at issue despite his awareness of this fact. Such behavior demonstrates that he did not take seriously the risks to which he exposed his family, and he should not now be allowed to hide behind the family whose well-being he so blatantly disregarded. As such, "[w]hatever damage to [the defendant's] family [that] will result from his incarceration is a consequence of his actions, not of the court's failure to consider his family

6

circumstances." Naugle at 267. Accordingly, a non-custodial sentence based on family circumstances is inappropriate in this case.

The defendant's family will also not suffer extraordinary financial hardships as a result of his incarceration. The addendum to the PSR reveals that the defendant's wife's salary is three times his own and that they receive over $2,000 in monthly rental income. See Addendum at 5. While the defendant may be a valued employee of his company, he is not running a sole proprietorship as the business employs eight other individuals, and the business can use the money they would have paid him to hire a professional of equivalent skill should the defendant be incarcerated. In addition, the defendant's wife, who owns the business at issue, told the Probation Officer that "she is learning the business so that she can assume greater responsibility in the event that the defendant is sentenced to a term of incarceration." Id. ¶ 76. See United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003) (refusing to find extraordinary circumstances where the defendant's wife was capable of working to support the family, although she would have to drop out of college to do so).

Ironically, one of the "employees" that wrote to the Court about the defendant's importance to his business, def. let. at 29, had a company of his own, YLE & B Enterprises (Ex. 4), and used that company to pay a portion of a premium payment for one of the straw buyers (Ex. 5). That same individual also owned the mailboxes at which two of the defendant's companies that were central to his scheme, the Brooklyn Life Group and the Blue Rock Group, received their mail, see Exs. 6 and 7, and he discussed the movement of money that was part of the scheme with the defendant over the telephone. See, e.g., calls 874 and 1576. As an unindicted co-conspirator of the scheme in question, he is hardly in a position to advise the Court as to the defendant's sentence.

Lastly, even in cases where defendants have more dire family circumstances than this defendant, courts in this district have repeatedly denied requests for non-Guideline sentences, including cases in which the defendants have committed non-violent offenses. See e.g., United States v. Jacobowitz, 04-CR-558, ECF Docket Entry No. 158 (E.D.N.Y July 31, 2007)(Gleeson, J.) (imposing Guidelines sentence for insurance fraud notwithstanding the fact that defendant and his wife had eight children, several of whom had medical problems, and where the wife suffered from hyperthyroidism); United States v. Johnny Alberto Sosa De Los Santos, 07-CR-111 (ENV), ECF Docket Entry No. 23 (E.D.N.Y. Nov. 11, 2008) (imposing Guidelines sentence for defendant who had seven children and was convicted of importing heroin); see also Sprei at 536 (finding extraordinary circumstances absent where defendant convicted of insurance fraud supported five of his six children, a wife with a medical condition, and an elderly father, even when such factors demonstrated the family had a "heavy dependence" on the defendant).

III.     Conclusion

For the reasons discussed above, the government respectfully requests that the Court sentence the defendant to a term of incarceration within the applicable Guidelines sentencing range of 18 to 24 months' imprisonment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:     /s/
         Todd Kaminsky
         Assistant U.S. Attorney
         (718) 254-6367

cc:     Clerk of Court (SJ)
         Susan Necheles, Esq.  (by email)